NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

MARMEN INC., *et al.*,

Plaintiffs,

and

WIND TOWER TRADE COALITION,

Consolidated Plaintiff,

v.

UNITED STATES,

Defendant,

and

WIND TOWER TRADE COALITION, *et al.*,

Defendant-Intervenors

Before:  Hon. Jennifer Choe-Groves, Judge

Consol. Court No. 20-00169

NON-CONFIDENTIAL VERSION

Business Proprietary Information Removed from Pages 6, 7, 16, 18-23, 27, and 30

## WIND TOWER TRADE COALITION'S RESPONSE BRIEF

Alan H. Price, Esq.
Daniel B. Pickard, Esq.
Robert E. DeFrancesco, III, Esq.
Maureen E. Thorson, Esq.
Laura El-Sabaawi, Esq.

WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the Wind Tower Trade Coalition*

Dated: April 30, 2021

Consol. Ct. No. 20-00169                          NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

<div align="right">Page</div>

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS .................................................................................. 1

    A.      Smoothing of Marmen's Costs .............................................................. 1

    B.      New Factual Information ........................................................................ 5

    C.      Differential Pricing ................................................................................ 8

III.    SUMMARY OF ARGUMENT .......................................................................... 9

IV.     ARGUMENT ..................................................................................................... 11

    A.      Commerce's Decision to Average Marmen's Input Costs for Steel
           Plate Should be Affirmed ..................................................................... 11

          1.      Commerce Did Not "Arbitrarily Disregard" Past Practice ...... 12

          2.      Substantial Record Evidence Supported Commerce's Cost-
                Smoothing .................................................................................. 17

          3.      Conclusion ................................................................................ 24

    B.      Commerce Did Not Err In Rejecting Marmen's Untimely-Filed New
           Information ............................................................................................ 24

    C.      Commerce Did Not Err In Applying its Average-to-Transaction
           Methodology ......................................................................................... 29

V.      CONCLUSION .................................................................................................. 32

Consol. Ct. No. 20-00169                                    NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apex Frozen Foods Priv. Ltd. v. United States*,
    862 F.3d 1322 (Fed. Cir. 2017)...................................................................30

*Apex Frozen Foods Priv. Ltd. v. United States*,
    862 F.3d 1337 (Fed. Cir. 2017)...................................................................30

*Aristocraft of Am., LLC v. United States*,
    269 F. Supp. 3d 1316 (Ct. Int'l Trade 2017) ..................................14, 15

*Boomerang Tube LLC v. United States*,
    856 F.3d 908 (Fed. Cir. 2017)..............................................................13, 14

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938).................................................................................17, 21

*Downhole Pipe & Equip., L.P. v. United States*,
    776 F.3d 1369 (Fed. Cir. 2015).....................................................................21

*FCC v. Fox TV Stations, Inc.*,
    556 U.S. 502 (2009)........................................................................................14

*Goodluck India Ltd. v. United States*,
    393 F. Supp. 3d 1352 (Ct. Int'l Trade 2019) .........................................29

*Mid Continent Steel & Wire, Inc. v. United States*,
    940 F.3d 662 (Fed. Cir. 2019).......................................................................18

*Nexteel Co. v. United States*,
    355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) .........................................15

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006).....................................................................18

*Pastificio Lucio Garofalo, S.p.A. v. United States*,
    35 CIT 630, 783 F. Supp. 2d 1230 (2011) ..............................................17

*Siderca S.A.I.C. v. United States*,
    29 CIT 1030, 391 F. Supp. 2d 1353 (2005) ...........................................17

*Stanley Works (Langfang) Fastening Sys., Ltd. v. United States*,
    279 F. Supp. 3d 1172 (Ct. Int'l Trade 2017) ..................................30, 31

Consol. Ct. No. 20-00169                              NON-CONFIDENTIAL VERSION

*Thai Plastic Bags Indus. Co. v. United States*,
  746 F.3d 1358 (Fed. Cir. 2014) ..............................................................15

*Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*,
  975 F.2d 807 (Fed. Cir. 1992) ................................................................22

*Tri Union Frozen Prods., Inc. v. United States*,
  163 F. Supp. 3d 1255 (Ct. Int'l Trade 2016) ..........................................30

*Xi'an Metals & Minerals Imp. & Exp. Co. v. United States*,
  256 F. Supp. 3d 1346 (Ct. Int'l Trade 2017) ..........................................30

**Statutes**

19 U.S.C. § 1677b(a)(4) ..............................................................1, 5, 11

19 U.S.C. § 1677b(a)(6)(C)(ii) ....................................................1, 5, 11

19 U.S.C. § 1677b(e) ..................................................................1, 5, 11

19 U.S.C. § 1677b(f)(1) ..........................................................1, 2, 11, 12

19 U.S.C. § 1677f-1(d) ........................................................................1

**Regulations**

19 C.F.R. § 351.411 ......................................................................1, 5

**Administrative Materials**

*Certain Carbon and Alloy Steel Cut-to-Length Plate from Italy*, 85 Fed. Reg. 3,026
  (Dep't Commerce Jan. 17, 2020) ............................................................14

*Certain Cut-to-length Carbon-Quality Steel Plate Products from the Republic of
  Korea*, 81 Fed. Reg. 62,712 (Dep't Commerce Sept. 12, 2016).................2

*Stainless Steel Bar from the United Kingdom*, 72 Fed. Reg. 43,598
  (Dep't Commerce Aug. 6, 2007) ........................................................2, 11

*Welded Line Pipe from the Republic of Korea*, 80 Fed. Reg. 61,366
  (Dep't Commerce Oct. 13, 2015) ...................................................2, 14, 15

## I.    INTRODUCTION

On behalf of the Wind Tower Trade Coalition ("WTTC"), we respectfully submit the following response to the January 29, 2021 opening brief filed by Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co. (collectively, "Marmen"). *See* Mem. of P. & A. in Supp. of Pls.' Rule 56.2 Mot. for J. Upon the Agency R. (Jan. 29, 2021), ECF No. 23 ("Marmen's Brief").

## II.    STATEMENT OF FACTS

Below, WTTC lays out pertinent legal and factual background regarding the issues raised in Marmen's appeal.

### A.    Smoothing of Marmen's Costs

The U.S. Department of Commerce ("Commerce") determines antidumping duty margins by comparing the prices at which companies sell subject goods in their home market against the prices that they charge in the United States, so long as the home market prices are above the goods' cost of production. *See, e.g.*, 19 U.S.C. § 1677f-1(d); *see also id.* §§ 1677a, 1677b(a), 1677b(b). Commerce normally relies on the costs recorded in a company's normal books and records to determine the cost of production for goods sold in the home market. *Id.* § 1677b(f)(1). Commerce also normally relies on such costs in adjusting its calculations to account for physical differences in the merchandise sold in the home and U.S. markets (known as a "DIFMER adjustment") and, where necessary, to calculate constructed value.[1] *See, e.g., id.* §§ 1677b(a)(4), 1677b(a)(6)(C)(ii), 1677b(e); 19 C.F.R. § 351.411. However, Commerce will deviate from the costs recorded in a

---

[1]    Where there are no sales of subject goods in the home market, or the sales in the home market are all below-cost or otherwise unsuitable for comparison with U.S. prices, Commerce will construct a value for comparison with U.S. prices, based on the costs to produce subject goods and other factors. 19 U.S.C. §§ 1677b(a)(4) & 1677b(e).

NON-CONFIDENTIAL VERSION

company's normal books and records if they do not reasonably reflect the cost to produce the merchandise at issue. *See, e.g.*, 19 U.S.C. § 1677b(f)(1).

One situation in which Commerce will deviate from a company's books and records is where the respondent reports significantly differing production costs for similar goods, and the reported costs vary in a way not explained by the goods' physical characteristics. *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Cut-to-length Carbon-Quality Steel Plate Products from the Republic of Korea*, 81 Fed. Reg. 62,712 (Dep't Commerce Sept. 12, 2016) (final results of antidumping duty admin. review and new shipper review; 2014-2015) at 4-6. For example, a company might produce goods using multiple production processes, or using inputs purchased at different times. In such cases, the costs to produce the goods could vary due to cost differences in the processes used or changing input prices, rather than from differences in the physical characteristics of the goods produced. *See, e.g.*, *id.* at 5; *see also* Issues and Decision Memorandum accompanying *Welded Line Pipe from the Republic of Korea*, 80 Fed. Reg. 61,366 (Dep't Commerce Oct. 13, 2015) (final deter. of sales at less than fair value) at 38-40 ("*Korean Pipe* IDM") (goods produced using differing processes); Issues and Decision Memorandum accompanying *Stainless Steel Bar from the United Kingdom*, 72 Fed. Reg. 43,598 (Dep't Commerce Aug. 6, 2007) (final results of antidumping duty admin. review) at 3-7 ("*UK Bar* IDM") (goods produced using inputs that had undergone price swings).

On July 29, 2019, Commerce initiated an antidumping duty investigation into wind towers from Canada. *See, e.g.*, Preliminary Decision Memorandum accompanying *Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 8,562 (Dep't Commerce Feb. 14, 2020) (preliminary affirm. deter. of sales at less than fair value, prelim. negative deter. of critical circumstances, and postponement of final deter. and extension of provisional measures), P.R. 146 at 1 ("Preliminary

NON-CONFIDENTIAL VERSION

IDM"). Commerce selected Marmen as its mandatory respondent. *Id.* at 1-2. Marmen submitted information on its costs of production, including information on the per-ton cost of the steel plate included in the wind towers that Marmen produced for the home and U.S. markets. *Id.* at 2, 16-17. Commerce relied, in general, on Marmen's reported cost information in making its preliminary calculations. *Id.* at 16-17. However, Commerce weight-averaged Marmen's reported per-ton costs for steel plate across all product models, or "CONNUMs." *Id.*[2] Commerce explained that it averaged these costs because "Marmen reported steel plate cost differences between CONNUMs that appear to be unrelated to the physical characteristics of the products", and because Commerce had found the differences significant. Memorandum from Gina K. Lee, Senior Accountant, to Neal M. Halper, Director, Off. of Accounting, re: *Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination—Marmen Inc. and Marmen Energie Inc.* (Feb. 4, 2020), C.R. 170, P.R. 147 at 1 and Attachment 1 ("Preliminary Cost Memo").

In its case brief, Marmen argued that Commerce had erred in preliminarily weight-averaging its input plate costs across all product models. Letter from White & Case LLP to Sec'y Commerce, re: *Utility Scale Wind Towers from Canada: Case Brief* (Apr. 24, 2020), C.R. 219, P.R. 178 at 4-12 ("Marmen's Case Brief"). Marmen argued that it did not incur significantly different plate costs for similar CONNUMs. *Id.* at 6-8. Marmen argued that the per-ton plate costs

---

[2]       CONNUMs, or "control numbers", refer to codes that identify products by specific physical characteristics. After determining which physical characteristics bear on the cost and commercial nature of relevant goods, Commerce requires respondents in its investigations to code the goods sold to the home and U.S. market in accordance with these characteristics, and to report sales and cost data on a CONNUM-specific basis. For example, the CONNUM coding system in this investigation identified products based on whether they consisted of towers or sections, and then by product weight, product height, number of sections, type of paint coating, metallization, inclusion of bus bars, type of power cables, etc. *See, e.g.*, Letter from White & Case LLP to Sec'y Commerce, re: *Utility Scale Wind Towers from Canada: Sections B, C, and D Response* (Oct. 11, 2019), C.R. 40-95, P.R. 89-97 at B-12 – B-20 ("BDQR").

for its most similar U.S. and home market products were not significantly different, and that, in finding that there were similar products for which plate costs varied significantly, Commerce had misidentified certain U.S. products as home-market products. *Id.* Marmen further argued that, where there were significant differences in per-ton plate costs across product types, these differences were related to the physical characteristics of the goods, and particularly to the thickness of plate used to produce the bottom-most sections of the towers that Marmen sold to its Canadian customer, Vestas. *Id.* at 8-11.

In its final determination, Commerce excluded from its smoothing calculations the CONNUM relating to Marmen's bottom-most tower sections. Issues and Decision Memorandum accompanying *Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 40,239 (Dep't Commerce July 6, 2020) (final deter. of sales at less than fair value and final negative deter. of critical circumstances), P.R. 192 at 5-6 ("Final IDM"). Commerce also corrected its preliminary misidentification of certain U.S. products as home-market products. Memorandum from Gina K. Lee, Senior Accountant, to Neal M. Halper, Director, Off. of Accounting, re: *Cost of Production and Constructed Value Calculation Adjustments for the Final Determination—Marmen Inc. and Marmen Energie Inc.* (June 29, 2020), C.R. 223-224, P.R. 194 at 1-2 and Attachment 1 ("Final Cost Memo"). However, Commerce continued to find that there were significant differences in per-ton plate costs between CONNUMs that were not attributable to the physical characteristics of the goods, and it weight-averaged Marmen's reported per-ton costs for steel plate across product models other than the bottom-most tower section. *Id.* at 2.

Commerce noted that Marmen's steel suppliers generally did not charge different per-ton prices for steel plate of different grades, thickness, widths, or lengths. Final IDM at 5; *see also* Final Cost Memo at 2. The only exception related to plates of the greatest thickness, *i.e.*, plates

with a thickness of 50.8mm or above. Final IDM at 5-6; Final Cost Memo at 2. Marmen used steel plate of this thickness for only one CONNUM, which Commerce duly excluded from its smoothing calculations. Final IDM at 5-6; *see also* Final Cost Memo at 2. With respect to the steel plate used to produce other CONNUMs, the record indicated that Marmen's reported per-unit cost differences were related to the timing of tower production. Final IDM at 6; *see also* Final Cost Memo at 2. Commerce also noted that, contrary to one of Marmen's claims, differences in plate costs across CONNUMs did not appear to be attributable to the weight of the internal components included in certain CONNUMs, given the extremely small weight of such internal components. Final IDM at 6; *see also* Final Cost Memo at 2.

### B.    New Factual Information

As part of its antidumping duty investigations, Commerce collects data from respondent companies regarding their sales to the home and U.S. markets, as well as the costs to produce the merchandise under consideration. *See, e.g.*, BDQR at B-1, C-1, and D-1. Commerce requires respondent companies to reconcile their reported sales and cost data to their financial statements and other standard accounting records, such as cost accounting systems. *Id.* at B-8 – B-9, C-6 – C-7, D-14 – D-16, D-24 – D-25, and D-34 – D-37. This enables Commerce to analyze the accuracy of the reported figures, and to determine the degree to which the reported figures depart from a respondent company's books and records, which are the normal basis from which the agency calculates costs for use in the dumping calculations. *See* 19 U.S.C. §§ 1677b(a)(4), 1677b(a)(6)(C)(ii), 1677b(e); 1677b(f)(1); 19 C.F.R. § 351.411.

In accordance with Commerce's instructions, Marmen submitted cost reconciliation data as part of its response to Section D of the agency's initial questionnaire. BDQR at D-34 – D-37 and Exhibit D-14. After learning of recent revisions to Marmen's financial statements, Commerce

requested that Marmen reconcile its reporting to the revised statements. *See* Letter from White & Case LLP to Sec'y Commerce, re: *Utility Scale Wind Towers from Canada: Second Supplemental Section D Response* (Feb. 7, 2020), C.R. 184-195, P.R. 151-154 at 14-15 and Exhibits 2nd Supp. D-9 and D-10 ("Original 2D Supp. QR"). However, rather than simply reconciling its previously reported data to its amended financial statements, as requested, Marmen submitted an entirely new reconciling line and other data that, as Marmen put it, reflected "changes unrelated to the financial statement amendments." *Id.* Specifically, this new data related to currency conversions for certain purchases ostensibly made in U.S. dollars. *See id.* at Exhibit 2nd Supp. D-9; *see also* Letter from Erin Kearney, Program Manager, AD/CVD Operations, Off. VI to White & Case LLP, re: *Investigation of Utility Scale Wind Towers from Canada—Rejection of New Factual Information* (Feb. 25, 2020), C.R. 203, P.R. 160 ("Rejection Letter"). Commerce subsequently rejected this submission of new factual information as untimely, and required Marmen to resubmit its second supplemental questionnaire response with this new information removed. *See* Rejection Letter; *see also* Letter from White & Case LLP to Sec'y Commerce, re: *Utility Scale Wind Towers from Canada: Resubmission of Second Supplemental Section D Response* (Feb. 28, 2020), CR. 206-217, P.R. 162-165 at 14-15 and Exhibit D-9 ("Refiled 2D Supp. QR").

In its case brief, Marmen argued that Commerce should have accepted the new information. Marmen's Case Brief at 21-28. Marmen stated that in the course of preparing its second supplemental Section D response, it realized that it had not previously converted certain U.S. dollar values recorded in its general ledger at a [     ] exchange rate with Canadian dollars pursuant to the separate exchange rate that it had used to covert U.S. dollar purchases to Canadian dollars in its cost database. *Id.* at 22-23, 26-27. Marmen argued that the currency conversions and underlying data presented in its supplemental questionnaire response should not be considered new factual

information, but rather a correction to prior-submitted data. *Id.* at 24-25. Marmen further argued that accepting the information would not have negatively affected the investigation, would not have placed any additional burden on Commerce, and would have advanced the goal of an accurate margin calculation. *Id.* at 25. In this regard, Marmen argued that because Commerce required Marmen to update its reconciliations based on its amended financial statements, but without allowing restatement of values based on its new conversions, the reconciliation inappropriately indicated that Marmen's costs were under-reported by [        ]. *Id.* at 24-28.

Commerce continued to reject the new information in its final determination. Final IDM at 8-9. Commerce noted that Marmen originally reported its manufacturing costs based on its audited financial statements. *Id.* at 8. However, Marmen's auditors subsequently amended those statements, including with respect to conversions and foreign exchange gains and losses. *Id.* In asking Marmen to submit a revised cost reconciliation, Commerce specified that the revision should show only changes relating to the auditor's restatements. *Id.*; *see also* Refiled 2D Supp. QR at 14-15. Marmen, however, submitted additional conversion data that would have offset the auditor's changes. Final IDM at 8.

Commerce explained that Marmen did not establish that its revised, audited financial statements did not already take into account the conversion data by which it sought to offset the financial statement revisions. *Id.* at 8-9. Indeed, Marmen's new information appeared to call into question the accuracy of even its revised, audited financial statements, and to suggest that they required further restating. *Id.* Given that Marmen did not seek to place the new information on the record until after the preliminary results, and provided only the barest explanation of the new information even then, Commerce did not have adequate time to probe the reliability of the new information, and thus declined to rely on it in the final determination. *Id.* at 9.

### C.      Differential Pricing

In calculating antidumping duty margins, Commerce typically compares weight-averaged normal values (home market prices that are above cost) with weight-averaged export prices (U.S. prices for the same or similar goods). *See, e.g.*, Preliminary IDM at 10. However, Commerce will compare weight-averaged normal values with the prices of individual U.S. sales where it finds that there is a pattern of U.S. prices that differ significantly among purchasers, regions, or time periods. *Id.* To determine whether such a pattern exists, Commerce utilizes a two-part methodology rooted in statistical analysis. *Id.* at 10-11.

In this case, Commerce preliminarily found that its statistical analysis confirmed the existence of a pattern of prices in the U.S. market that differed significantly among time periods. *Id.* at 12. Specifically, Commerce found that more than two-thirds of Marmen's U.S. sales, by value, passed the Cohen's *d* test, a statistical tool for measuring the significance of the difference between the mean prices of a test group of transactions and a comparison group. *Id.* at 11. Commerce also found that there was at least a 25% relative change between the weighted-average dumping margins calculated using its standard methodology and its alternative, average-to-transaction methodology. *Id.* It thus concluded that its standard methodology was insufficient to address the pattern of differential pricing, and calculated Marmen's preliminary margin using the average-to-transaction approach. *Id.*[3]

---

[3]      Under the agency's practice, where more than two-third of transaction pass the Cohen's *d* test (and assuming the existence of the 25% relative change in margins), the average-to-transaction methodology is used to calculate the margin for all sales. Where between one-third and two-thirds of sales pass the Cohen's *d* test, the average-to-transaction methodology is applied to determine dumping margins for those sales, while the remaining sales are subject to the average-to-average methodology, (again, assuming the existence of the 25% relative change in margins). Preliminary IDM at 11.

In its case brief, Marmen argued against use of the average-to-transaction methodology. Marmen's Case Brief at 29-32. Marmen argued that the methodology is inconsistent with the United States' obligations under the World Trade Organization's Anti-Dumping Agreement. *Id.* at 29. Marmen also argued that, for five of the seven CONNUMs for which Commerce found a pattern of timing-based price differences, the differences between the highest and lowest quarterly prices were less than one percent. *Id.* at 30-31. Marmen also argued that for four of these CONNUMs, quarterly pricing differences were attributable entirely to duty drawback adjustments and imputed credit costs. *Id.* at 31-32. Marmen argued that it would be unreasonable for the agency to rely on its average-to-transaction methodology given these facts. *Id.* at 32.

In the Final IDM, Commerce explained that it would continue to use the average-to-transaction methodology in the final determination. Final IDM at 10-11. Commerce explained that more than two-thirds of Marmen's U.S. transactions passed the Cohen's *d* test for determining whether a significant pattern of differential pricing exists. *Id.* at 11. Further, the antidumping duty margins calculated using both methodologies varied by more than 25%. *Id.* Finally, Commerce explained that Marmen's WTO-based arguments were misplaced, because WTO dispute settlement reports do not trump agency discretion under the Tariff Act of 1930, unless the reports are adopted by the United States pursuant to a specific statutory scheme. *Id.* No such adoption had taken place here; as such, the agency was not obliged to follow the WTO report cited by Marmen. *Id.*

## III.   <u>SUMMARY OF ARGUMENT</u>

The Court should affirm Commerce's determinations regarding the issues subject to Marmen's appeal.

First, the Court should affirm Commerce's smoothing of Marmen's reported costs for the steel plate used in its wind tower production. Substantial record evidence supported Commerce's determination that the cost differences reported for such plate were not fully attributable to the plate's physical characteristics, or the physical characteristics of the output wind towers. Accordingly, Marmen cannot establish that Commerce's decision is inconsistent with the standard of review. Rather, Marmen invites this Court to reweigh the evidence and to supplant Commerce's reasonable exercise of its authority as the fact-finder. The Court should decline this invitation.

Second, the Court should affirm Commerce's rejection of the new factual information included in Marmen's second supplemental Section D questionnaire. Rather than hew to Commerce's instructions that it provide an updated cost reconciliation reflecting only changes relating to its auditor's amendment of Marmen's financial statements, Marmen included a new cost reconciling line item and new data that it described as "unrelated to the financial statement amendments." Notably, this new line item and data would have had the effect of offsetting the auditor's changes to Marmen's financial statements. Given this fact, as well as Marmen's failure to properly explain the new line item and data at the time of submission, Commerce acted reasonably and appropriately in rejecting the line item and data as untimely filed new factual information.

Finally, the Court should affirm Commerce's application of the average-to-transaction methodology to determine Marmen's dumping margin. Marmen's sales to the United States exhibited meaningful price differences by time period, as established by the agency's differential pricing analysis. More than two-thirds of the U.S. sales, by value, passed the Cohen's $d$ test, which measures differences between the mean value of a comparison group and a test group. Further,

there was a greater than 25% difference between the margins calculated using the average-to-average and average-to-transaction methodologies.

## IV.    ARGUMENT

For the reasons discussed below, this Court should affirm the final results of Commerce's antidumping duty investigation into Canadian wind towers as to (1) smoothing of Marmen's costs, (2) rejection of Marmen's new factual information, and (3) use of the agency's average-to-transaction methodology.

### A.    Commerce's Decision to Average Marmen's Input Costs for Steel Plate Should be Affirmed

As discussed above, Commerce normally relies on the costs recorded in a respondent company's normal books and records to determine whether the respondent has sold goods in its home market at less than the cost of production, to make DIFMER adjustments and, if necessary, to determine constructed value. 19 U.S.C. §§ 1677b(a)(4), 1677b(a)(6)(C)(ii), 1677b(e), 1677b(f)(1); *see also* discussion *supra* at 1-2. However, Commerce will deviate from the respondent's normal books and records where the costs recorded therein do not reasonably reflect the cost to produce the merchandise at issue. *See, e.g.*, 19 U.S.C. § 1677b(f)(1). For example, Commerce will deviate from the respondent's financial records where the recorded costs to produce similar product models vary significantly due to factors unrelated to the physical nature of the goods. *See, e.g.*, *UK Bar* IDM at 3-7.

Here, Commerce found that Marmen's reported, per-unit input costs for the steel plate used to produce its wind towers varied significantly, in ways not explained by the physical characteristics of the plate or wind towers. Final IDM at 5-6. Rather, the reported cost differences appeared to be related to the timing of wind tower production. *Id.* As such, Commerce averaged

the company's per-unit plate costs across all of its wind tower product models – with the exception of one model that used especially thick plate for which suppliers levied an upcharge. *Id.*

Marmen challenges Commerce's determination to smooth the company's per-unit plate costs on two main grounds. Marmen's Brief at 15-26. First, Marmen argues that, in deciding to average the per-ton plate costs, Commerce "arbitrarily disregarded" its past practice. *Id.* at 18-22. Second, Marmen argues that substantial record evidence does not support Commerce's determination to smooth the per-ton plate costs. *Id.* at 22-26. As discussed below, however, Marmen's arguments are without merit.

### 1.    Commerce Did Not "Arbitrarily Disregard" Past Practice

Marmen concedes that Commerce has a past practice of averaging input costs across CONNUMs where the respondent reports CONNUM-specific costs that significantly differ for reasons other than physical product characteristics. *Id.* at 18-19. However, Marmen argues that Commerce's practice requires it to examine only whether costs differ among "nearly identical or very similar CONNUMs." *Id.* at 19. Marmen argues that Commerce did not limit its analysis of cost differences here to only "nearly identical" and "very similar" product models, but broadly considered the degree to which the company's per-unit plate costs varied for reasons unrelated to the physical characteristics of the plate or output wind towers. Marmen thus argues that Commerce has "arbitrarily disregarded" its past practice. *Id.* at 18.

Marmen's claim is unpersuasive, for three reasons. First, Marmen failed to exhaust any argument that Commerce deviated improperly from past practice by analyzing cost differences across Marmen's CONNUMs as a whole. Second, Marmen's arguments elide the reasons why (1) cost differences that are unrelated to physical characteristics are relevant to the antidumping calculations and (2) courts are concerned with agency deviations from past practice. Third, and crucially, the

record showed widely differing costs, unrelated to physical differences, for CONNUMs that even Marmen would appear to concede are "very similar."

First, Marmen failed to exhaust any argument that Commerce deviated improperly from past practice by analyzing cost differences unrelated to physical characteristics across Marmen's CONNUMs as a whole. Commerce analyzed per-ton plate costs for all CONNUMs in reaching not only its final determination, but its preliminary determination. *Compare* Preliminary Cost Memo at 1 and Attachment 1, *with* Final Cost Memo at 1-2 and Attachment 1. Thus, Marmen had ample opportunity to argue in its case brief that it was inconsistent with past practice for the agency to analyze, for cost differences unrelated to physical characteristics, CONNUMs other than those which were "nearly identical" or "very similar" (however that might be defined). But Marmen did not make such an argument in its case brief. Marmen's Case Brief at 4-12. Instead, it conceded that all CONNUMs were potentially relevant to the agency's cost analysis, by arguing both that (1) plate costs were similar for similar CONNUMs and that (2) that plate costs differed as to *dissimilar* CONNUMs due to differences in the physical characteristics of those CONNUMs. *Id.* Having failed to exhaust its opportunities for administrative remedy, and having taken a position below that implicitly conceded the appropriateness of a review of all CONNUMs' plate costs, Marmen cannot now raise a claim that analysis of all CONNUMs was improper. *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912-13 (Fed. Cir. 2017).

Second, Marmen's assumption that Commerce should have assessed only a subset of CONNUMs for cost differences unrelated to physical characteristics is a gross simplification of the agency's practice and methodology – one that elides the reason why the agency is concerned with

such cost differences in the first place.[4] As Commerce has explained, it seeks not only to make price-to-price comparisons between the "most similar" products in the home and U.S. markets, but to make sure that the product-specific costs used in the agency's sales-below-cost tests, DIFMER adjustments, and constructed value calculations "accurately reflect the precise physical characteristics of the products whose sales prices are used in the {} dumping calculations." *Korean Pipe* IDM at 39. To ensure that the reported CONNUM-specific costs reflect the physical nature of the products at issue, Commerce assesses the degree to which costs vary with physical product characteristics, and are thus "attributable to {} different physical characteristics." *Id.* If it finds cost differences that do not appear traceable to physical product characteristics, Commerce then assesses the "magnitude of {any} cost differences and the number of CONNUMs affected." *See* Issues and Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-to-Length Plate from Italy*, 85 Fed. Reg. 3,026 (Dep't Commerce Jan. 17, 2020) (final results of antidumping duty admin. review; 2016-2018) at 25 (quoting *Korean Pipe* IDM at 40). Nothing about the concerns animating the agency's consideration of the degree to which costs may not reflect physical characteristics requires Commerce to analyze only "nearly identical" or "very similar" CONNUMs (however defined).

Importantly, with respect to deviations from past practice, the courts' concern is to prevent an agency from ignoring, willy-nilly, facts or circumstances that it found crucial to its decision-making in the past. *Aristocraft of Am., LLC v. United States*, 269 F. Supp. 3d 1316, 1334 (Ct. Int'l Trade 2017), discussing *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515-516 (2009). Widely varying costs for what Marmen terms "nearly identical" or "very similar" products certainly indicate that

---

[4]     Notably, Marmen does not identify the specific CONNUMs to which it believes Commerce's analysis should have been limited, or identify the factors that, in Marmen's view, rendered certain CONNUMs included in Commerce's analysis unsuitable for such inclusion. Marmen's Brief at 16-26.

factors beyond physical characteristics may be influencing production costs. But Marmen points to no cases – and WTTC has found none – that indicate that Commerce has previously found it crucial to *only* assess address cost differences that affect putatively identical/similar CONNUMs, or, alternatively, that it has found it important to willfully ignore potential cost differences affecting putatively dissimilar CONNUMs. Indeed, such a requirement or practice would be inconsistent with the reasons Commerce itself has articulated for being concerned to ensure a tight correlation between physical characteristics and product costs – *i.e.*, to broadly ensure conformity with the statutory requirement that the costs used in the antidumping duty calculations "reflect meaningful cost differences attributable to {} different physical characteristics." *See, e.g.*, *Korean Pipe* IDM at 39.

Notably, if cost differences attributable to non-physical characteristics were of concern only and uniquely as to "nearly identical" or "very similar" CONNUMs, Commerce would presumably never apply cost-smoothing to CONNUMs other than those it found physically similar. But Commerce has applied cost-smoothing more widely than that in past cases. *See Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1366-69 (Fed. Cir. 2014) (noting that Commerce had averaged costs across all CONNUMs, although it had analyzed cost differences across pairs of "similar" CONNUMs); *Nexteel Co. v. United States*, 355 F. Supp. 3d 1336, 1361-62 (Ct. Int'l Trade 2019) (affirming Commerce's adjustment of input costs for all CONNUMs in a proceeding where reported costs varied due to raw material price declines). And even if Commerce could be said to have a past practice of the type alleged by Marmen, agencies are broadly permitted to deviate from past practice if they have a reasonable basis for doing so. *Aristocraft*, 269 F. Supp. 3d at 1334. Here, such a reasonable basis existed, given that Marmen's reported costs exhibited significant price differences unrelated to physical product characteristics for nearly all CONNUMs. Final IDM at 5-6; Final Cost Memo at 2 and Attachments 1-2.

Third, and crucially, while Commerce included all CONNUMs in its analysis, it remains that there were significant differences between CONNUMs that are "very similar," where similarity is assessed using the type/weight/height rubric that Marmen relied on its case brief. Marmen's Case Brief at 6-7. For example, the per-ton plate costs for CONNUMs [                    ] and [                    ] differed by [     ]%, although the CONNUMs are of the [                    ] heights. *See* Final Cost Memo at Attachment 1; *see also* BDQR at B-12 – B-20 (describing CONNUM characteristics). CONNUMs [                    ] also exhibited a [     ]% difference in the per-ton cost of input plate, although the CONNUMs were [                    ]. *See* Final Cost Memo at Attachment 1. The plate costs for CONNUM [                    ] were [     ] below those of CONNUM [                    ], and [     ] below those of CONNUM [                    ], although all three CONNUMs are of the [                    ]. *Id.* CONNUMs [                    ] also displayed a [     ] difference in the per-ton cost of input plate, although the products were of the [                    ]. *Id.* These [     ] product models represent [                    ] of all CONNUMs. *Id.*

As Commerce explained, the differences in per-unit plate costs for these and other CONNUMs were not fully attributable to the physical characteristics of the plate or finished product. Final IDM at 5-6. With the exception of the plate used in the CONNUM excluded from the smoothing calculations, Marmen's suppliers did not charge different per-ton prices for steel plate of different grades, thicknesses, lengths, etc. *Id.* Instead, the per-unit costs that Marmen reported for its steel plate were correlated with the timing of production. *Id.*; *see also* Final Cost Memo at 2 and Attachment 2.

Because Commerce's dumping calculations would be distorted by costs that reflect non-physical characteristics of this type, Commerce's averaging of the reported plate costs did not constitute a deviation from its past practice. Rather, they represented a logical and reasonable application of that practice given the facts of record. In sum, Commerce did not inappropriately deviate from past practice in determining to smooth Marmen's per-ton plate costs.

### 2.    Substantial Record Evidence Supported Commerce's Cost-Smoothing

Marmen next argues that substantial record evidence does not support Commerce's determination to smooth the company's per-ton plate costs. Marmen's Brief at 22-26. Marmen claims that Commerce lacked substantial record evidence to show that, with the exception of an upcharge levied on particularly thick steel plate, Marmen's suppliers did not charge different prices for plate of different grades, widths, lengths, or thicknesses. *Id.* at 22-23. Marmen likewise argues that the record does not support Commerce's conclusion that differences in Marmen's reported plate costs reflected the timing of Marmen's production and sales, rather than the physical characteristics of the underlying plate or resulting wind towers. *Id.* at 23-25. Marmen's arguments, however, are unpersuasive.

To comply with the substantial evidence standard, Commerce's decisions must rest on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). To show inconsistency with this standard, it is not enough for Marmen to present an alternative reading of the record, even one that a reasonable mind would accept. "Reasonable minds may differ, but a determination does not fail for lack of substantial evidence on that account." *See, e.g., Past.ficio Lucio Garcfalo, S.p.A. v. United States*, 35 CIT 630, 632, 783 F. Supp. 2d 1230, 1233 (2011) (quoting *Siderca S.A.I.C. v. United States*, 29 CIT 1030, 1048, 391 F. Supp. 2d 1353, 1369 (2005)). Rather, Marmen must

show that the record could *only* support a conclusion other than that reached by the agency. *See Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 669 (Fed. Cir. 2019); *see also Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351-52 (Fed. Cir. 2006) (discussing substantial evidence standard). This it cannot do.

Here, Commerce was called upon to examine whether Marmen's steel plate costs reflected only the physical characteristics of the plate (and the resulting wind towers) or were influenced by other factors in a meaningful degree. The record evidence included:

- Marmen's reported per-CONNUM costs for steel plate, as well as the dates of sale for these CONNUMs;[5]

- A chart provided by Marmen purporting to show weights and dimensions of plates purchased for producing wind towers for the U.S. market (Refiled 2D Supp. QR at Exhibit 2nd Supp. D-1);

- A chart provided by Marmen purporting to show dimensions, weights, and prices of plates purchased for producing wind towers for the Canadian market (*Id.*);

- An [

---

[5]     The CONNUM-specific plate costs were included in the revised cost database that Marmen submitted with its first supplemental Section D questionnaire response. Letter from White & Case LLP to Sec'y Commerce, re: *Utility Scale Wind Towers from Canada: Supplemental Section D Response* (Dec. 6, 2019), C.R. 99-141, P.R. 114-119 at Exhibit Supp. D-3 ("1st Supp. DQR"). The dates of sale were included in the revised sales databases submitted with Letter from White & Case LLP to Sec'y Commerce, re: *Utility Scale Wind Towers from Canada: Supplemental Sections A, B, and C Response* (Dec. 11, 2019), C.R. 142-157, P.R. 120-121 at Exhibits FSQ-15 and FSQ-23 ("1st Supp. ABCQR").

] and that an upcharge [

] (*Id.* at Exhibit 2nd Supp. D-2);

- Communications from [

] (*Id.*);

- Agreements between Marmen and its steel supplier [        ], indicating that [      ] would

  supply [

  ], but that the [            ] plate price [

  ] (1st Supp. ABCQR at FSQ-15 and Exhibit FSQ-8).

- [                                                    ]   indicating   that

  [

  ] for a

  [                                    ] (Refiled 2D Supp. QR at Exhibit 2nd Supp. D-2);[6]

- Communications between Marmen personnel, Vestas, and/or [            ], a steel plate

  provider, in which [            ] price quotes for steel plate for the [            ]

  project are referred to in terms [        ] price per-ton (or per hundredweight). 1st

  Supp. ABCQR at Exhibit FSQ-12 ([

  ], [

  ], [

  ], [

---

[6]      Although the [          ] documentation is somewhat unclear on the point, Marmen
represented to Commerce in its case brief that [            ], like [            ], levied an
upcharge for plates over a specific thickness. Marmen's Case Brief at 9 n.17. Commerce adopted
this representation in its final determination. *See* Final Cost Memo at 2.

]); *see also* Letter from White & Case LLP to Sec'y

Commerce, re: *Utility Scale Wind Towers from Canada: Second Supplemental Sections A,*

*B, and C Response* (Feb. 6, 2020), C.R. 181-183, P.R. 150 at Exhibit SSQ-14 ([


]).

- An invoice from Marmen's plate supplier [                    ] indicating that

  the supplier provided plates of varying dimensions for [

  ]. Refiled 2D Supp. QR at Exhibit 2nd Supp. D-7 ([                    ]);

- Data confirming that Marmen used what it conceded were "roughly equivalent" grades of

  steel plate to produce for both the home and U.S. market (*Id.* at 2);

- Data confirming that the weight of internal components, including steel plate, provided

  free of charge by Marmen's customers was [                    ], whereas the overall

  weight of the CONNUMs for which Commerce smoothed costs was approximately [

  ] this amount (1st Supp. DQR at 8-9 and Exhibit Supp. D-4; *see also* Final Cost Memo

  at Attachment 1).[7]

As indicated in Commerce's Final IDM and Final Cost Memo, Marmen's reported

CONNUM-specific, per-ton plate costs [                    ], from [        ] per net ton to

[          ] per net ton (not including [                    ], the CONNUM excluded

from the smoothing calculations). Final Cost Memo at Attachments 1-2; *see also id.* at 2 and Final

---

[7]     Marmen reported receiving [                    ] of steel plate free of charge for use in
producing [                    ] and a total of [                    ] of other
internal components for use in providing [                    ]. 1st Supp. DQR at 8-9 and
Exhibit Supp. D-4.

IDM at 5-6.[8] However, Marmen's communications with its suppliers indicated that, with the exception of plates more than 2 inches thick, the suppliers "do not charge different prices for plates of different grade, thickness, width, or length." Final IDM at 5; Final Cost Memo at 2. Commerce also found that the weight of the internal components that Marmen received from customers free-of-charge for use in producing wind towers was "extremely small," such that they could not explain the CONNUM-specific plate cost differences at issue. Final IDM at 6; Final Cost Memo at 2.

Given the record data described above, Commerce's conclusion that Marmen's CONNUM-specific plate cost data reflected factors other than physical characteristics is grounded in evidence that "a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison*, 305 U.S. at 229. In arguing otherwise, Marmen points to a "plate list for the wind tower{s} sold in the home market," which Marmen claims shows that the per-ton prices it paid for plate varied by as much as Canadian [      ] based on dimension. Marmen's Brief at 22-23. But while the plate list shows different prices for certain plates that happen to have different dimensions, it does not establish that the prices differed *because* of the different dimensions. As Commerce pointed out, Marmen's communications with its steel suppliers indicate that suppliers' per-ton steel plate prices were not, as general matter, changeable with plate dimension. Final IDM at 5-6; Final Cost Memo at 2. And to the extent that the "plate list" and the supplier communications might potentially be considered inconsistent with one another, Commerce reasonably weighed more heavily the supplier communications that directly state the basis on which the suppliers' prices were set. In any event, the Court may not "reweigh the evidence or . . . reconsider questions of fact anew." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir.

---

[8]    Throughout the agency's record, there are values given variably in short tons and net tons. These units of measure are equivalent, *i.e.*, one short ton is the same as one net ton.

2015) (quoting *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d

807, 815 (Fed. Cir. 1992)).

Marmen goes on to argue that substantial record evidence does not support Commerce's

conclusion that the differences in CONNUM-specific plate costs were correlated with the timing

of tower production. Marmen's Brief at 24-26. Marmen argues that Commerce's conclusion is a

mere assumption. *Id.* at 24-25. Marmen also states that the assumption is inconsistent with

Commerce's identification of the specific physical product characteristics that it found "are the

most significant in differentiating the costs between products." *Id.* at 25-26. Again, Marmen's

claims are unconvincing.

As an initial matter, having reasonably concluded, with the support of substantial record

evidence, that factors beyond physical characteristics were influencing Marmen's reported plate

costs, it was not incumbent upon Commerce to determine with exactitude what those factors were.

Thus, even if Marmen were correct in its assertion that no reasonable mind could accept that the

cost differences here were related to "timing of production," Final IDM at 6, this would have no

practical bearing on its appeal, given the agency's reasonable, well-supported conclusion that non-

physical factors were at work.

Moreover, a reasonable mind could easily accept Commerce's conclusion that the cost

differences here were related to "timing of production." Commerce reviewed Marmen's reported

sales dates for individual wind towers/sections corresponding to each CONNUM. Final Cost

Memo at 2. The agency found that the majority of individual towers/sections corresponding to the

CONNUMs with the highest per-unit plate costs were produced mainly during [                    ]

of the investigation period, while the majority of individual towers/sections corresponding to

CONNUMs with the lowest prices were produced mainly during [                              ].

*Id.* at 2 and Attachment 2.[9] As such, there is a clear correlation between the time of production and the per-unit plate cost differences. Moreover, Marmen purchased plate from [          ] suppliers that [                                              ]. Refiled 2D Supp. QR at Exhibit 2nd Supp. D-2. Marmen also had an agreement with its U.S. customer, [

                          ]. *See, e.g.*, 1st Supp. ABCQR at FSQ-15 – FSQ-16. This further supports Commerce's conclusion that the cost differences seen in Marmen's data relate to timing of tower production.

Accordingly, while Marmen faults Commerce for not concluding that the wide variations in Marmen's reported CONNUM-specific per-ton plate costs were attributable to the physical characteristics of the plate/output wind towers, substantial record evidence supports Commerce's determination. Specifically, a reasonable mind could accept Commerce's conclusion that the cost differences were attributable, in a meaningful degree, to factors beyond the dimensions of the plate, given that Marmen's plate suppliers did not vary their prices based on plate dimensions, except as to the thickest plate, which was used in only one CONNUM that was excluded from the smoothing calculations. Final IDM at 5-6; Final Cost Memo at 2. And while Commerce's conclusion that the cost differences were attributable to timing is secondary, a reasonable mind could likewise accept this conclusion, given the record evidence regarding how costs changed over time.

---

[9]    The PDF version of Attachment 2 that was included at the end of the Final Cost Memo differs slightly from the Excel version of the Attachment (which is also on the record, as C.R. 224, ACCESS Document No. 3994095-02). The principal difference is that certain columns included in the Excel attachment are cut off in the PDF attachment. We will ensure that a copy of the full Excel attachment is included in the joint appendix.

### 3.    Conclusion

The Court should affirm Commerce's determination to smooth Marmen's reported costs of input plate. Commerce did not impermissibly depart from past practice in analyzing the degree to which Marmen's reported plate costs were attributable to factors beyond the physical characteristics of the plate or output wind towers. Rather, it appropriately applied its practice in light of its concern to ensure that the costs used in the dumping margin calculations reflect the physical nature of the goods under consideration. Further, Commerce's cost-smoothing determination was supported by substantial record evidence. Accordingly, Commerce's treatment of Marmen's input plate costs should be affirmed.

### B.    Commerce Did Not Err In Rejecting Marmen's Untimely-Filed New Information

As discussed above, as part of its antidumping duty investigations, Commerce requires respondent companies to reconcile their reported sales and cost data to their financial statements and other standard accounting records. *See* discussion *supra* at 5. In this case, after Marmen submitted its initial cost reconciliation data, Commerce learned that the company's financial statements had been amended to reflect certain currency conversions, as well as certain foreign exchange gains and losses. Letter from White & Case LLP to Sec'y Commerce, re: *Utility Scale Wind Towers from Canada: Response to Questions 24 and 29 of the Supplemental Sections A, B, and C Questionnaire* (Dec. 13, 2019), C.R. 161-162, P.R. 126-129 at 2-3 ("24 & 29 QR"); Letter from White & Case LLP to Sec'y Commerce, re: *Utility Scale Wind Towers from Canada: Response to Question 14.g of the Supplemental Section Questionnaire* (Dec. 13, 2019), C.R. 158-160, P.R. 123-125 at 2-3. The auditors' amendments included the conversion of certain U.S. dollar values that had been recorded in the company's books and records as if they were Canadian dollar values, without any exchange rate applied. 24 & 29 QR at 5-6. While the original audited financial

statements had reflected such conversions in part, they failed to fully convert all affected accounts. *See* 1st Supp. DQR at 17-18 and Refiled 2D Supp. QR at 11. Applying conversions to all relevant accounts was one of the principal factors driving the auditors' decision to amend the financial statements. Refiled 2D Supp. QR at 11.

Commerce requested that Marmen update its prior cost reconciliation to reconcile its reporting to the amended financial statements. *See* Refiled 2D Supp. QR at 14-15. However, rather than simply reconciling its previously reported cost data to the amended statements, Marmen submitted data reflecting what Marmen called "changes unrelated to the financial statement amendments." *Id.*; *see also* Original 2D Supp. QR at Exhibit 2nd Supp. D-9. Specifically, Marmen submitted a new reconciling line item and calculations that would have offset the auditors' changes to Marmen's cost of manufacturing. Original 2D Supp. QR at Exhibit 2nd Supp. D-9; *see also* Final IDM at 8.

Commerce rejected this new reconciling line and the related data as untimely filed and unsolicited new factual information, and required Marmen to resubmit its second supplemental questionnaire response with this new information removed. *See* Rejection Letter. Commerce continued to reject the data after Marmen argued in its case brief that it should have been accepted. Commerce noted that in asking Marmen to submit a revised cost reconciliation, Commerce specified that the revision should show only changes relating to the auditor's restatements. *Id.*; *see also* Original 2D Supp. QR at 14. Marmen, however, not only submitted additional data, but submitted additional data that would have offset the auditor's restatements to Marmen's cost of manufacturing. Final IDM at 8.

Commerce noted that Marmen had not established that its auditors' amendments to the financial statements did not capture the data by which Marmen sought to offset its auditor's

restatements. *Id.* And to the extent that the amended statements did not capture the information, Marmen appeared to be claiming that its amended statements were inaccurate. *Id.* at 8-9. Commerce stated that, because Marmen had submitted the new data after the preliminary results and with little explanation, Commerce did not have adequate time to probe the reliability of the new information, and thus declined to rely on it in the final determination. *Id.* at 9.

Marmen now argues that Commerce lacked substantial evidence to support its rejection of the new information, and abused its discretion in doing so. Marmen's Brief at 26-32. First, Marmen argues that Commerce assumed, without evidence, that Marmen was submitting data to account for flaws in its amended financial statements. *Id.* at 26-30. Second, Marmen argues that it was an abuse of discretion for Commerce to reject what Marmen considers a "minor correction" to already submitted data. *Id.* at 27, 30-32. Neither of Marmen's arguments are persuasive.

Marmen first argues that, in rejecting the new information, Commerce unreasonably assumed that Marmen was attempting to correct "exchange gains/losses that *were incorrectly booked*." Marmen's Brief at 28 (quoting Final IDM at 8). Marmen claims that it clearly explained, in the supplemental questionnaire response in which it attempted to submit its new information, that there was no incorrectly booked data in its normal books and records, and that its new information was "unrelated to the financial statement amendments." *Id.* at 30 (quoting Refiled 2D Supp. QR at 14-15). Rather than stemming from an error in its financial statements or the underlying records, Marmen argues that the new information related to an error in its original cost reconciliation. *Id.* at 28-29.

What is clear, however, is that Marmen provided an entirely new and unanticipated line in its updated cost reconciliation, which would have offset its auditor's restatements to the company's costs of manufacturing. Final IDM at 8; *compare* Original 2D Supp. QR at Exhibit 2nd Supp. D-9 (Marmen's updated cost reconciliation), *with* 1st Supp. DQR 18-19 and Exhibit Supp. D-8

(Marmen's pre-update cost reconciliation).[10] And contrary to its arguments, Marmen did not provide Commerce with an explanation sufficient to justify acceptance of its new information. Final IDM at 8-9.

In the same questionnaire in which Commerce requested that Marmen provide an updated cost reconciliation, the agency requested an explanation of certain previously-submitted revisions to the company's financial expense ratio. Original 2D Supp. QR at 10-14. Marmen explained that it recorded U.S.-dollar purchases during its 2018 fiscal year at a [    ] rate with Canadian dollars. *Id.* at 11. In other words, [                                        ]. In preparing its financial statements, its auditor meant to convert these values, but Marmen discovered after the financial statements were issued that the auditor had not done so fully. *Id.* Upon being apprised of the issue, the auditor amended the statements to reflect the complete conversions and to recategorize certain foreign exchange gains/losses. *Id.* Marmen further stated that, in compiling its cost database for Commerce, it had "applied an exchange rate variance factor to the consumption value of all materials purchased in USD," such that its cost reporting already reflected the conversions. *Id.* at 14.

Then, in response to Commerce's request for an updated cost reconciliation, Marmen stated that it had made changes to the reconciliation "unrelated to the financial statement amendments," claiming that it had discovered that it had made certain U.S. dollar purchases but "did not convert

---

[10]     In the text of its first supplemental section D questionnaire, Marmen refers to Exhibit Supp. D-8 as a "revised cost reconciliation." 1st Supp. DQR at 15-19. The reconciliation provided in this questionnaire response reflects certain revisions specifically requested by Commerce regarding the initial reconciliation that accompanied Marmen's original Section D questionnaire response, or otherwise explained by Marmen at the time that the first supplemental section D questionnaire response was submitted. *Id.* However, the revisions reflected in the cost reconciliation included with Marmen's second supplemental questionnaire response reflected still further revisions that were not requested by Commerce, and that Marmen conceded were "unrelated to the financial statement amendments." Refiled 2D Supp. QR at 14-15; *see also* Original 2D Supp. QR at Exhibit 2nd Supp. D-9.

those purchases to CAD for the original reconciliation." *Id.* at 14-15 and Exhibit 2nd Supp. D-9; *see also* Refiled 2D Supp. QR at 14-15 and Exhibit 2nd Supp. D-9. Commerce reasonably read this not only as indicating that Marmen was not, in fact, hewing to the agency's instruction that the updated cost reconciliation should only reflect the financial statement amendments, but that Marmen was attempting to use the reconciliation to claim the benefit of currency conversions beyond those that had already resulted in its financial statement amendments and which were reflected in its cost reporting.

Marmen argues to this court that it was instead attempting to make a "minor correction" to its original reconciliation calculations, rather than to provide new information relating to an omission affecting its books and records or its amended financial statements. Marmen's Brief at 27, 30-32. But, even assuming that this is the case, Marmen provided "insufficient explanation" of its proposed additions to its reconciliation worksheet and related documents. Final IDM at 8; *see also* Original 2D Supp. QR at Exhibit 2nd Supp. D-9. In fact, as described above, it provided information that reasonably indicated to Commerce that Marmen was attempting to use the reconciliation to alter its reporting in a way inconsistent with its amended financial statements. *See* Refiled 2D Supp. QR at 10-15; *see also* Original 2D Supp. QR at Exhibit 2nd Supp. D-9.

Notably, after Commerce rejected Marmen's original response to the second supplemental questionnaire, the company did not press the issue by asking for reconsideration of the rejection. Marmen neither objected to the rejection of its new information nor attempted to explain its submission of the rejected information until two months later, when it filed its case brief. There, it argued that it had been attempting to correct flaws in its original cost reconciliation, Marmen's Brief at 30-32, and that its new information should have been accepted as "corrective." *Id.* at 30. But again, as Commerce noted:

> The Marmen Group's statement that it discovered that the company did not convert certain purchases to Canadian dollars does not explain how such discovery relates to the auditor's reclassifications and how it is reflected in the audited financial statements, which is the starting point of the cost reconciliation.

Final IDM at 9. Further, while Marmen argues in its briefing here that Commerce errs wherever it does not accept corrective information, Marmen's Brief at 30-32, it remains that Marmen did not establish below that the information was a correction, rather than new information that would offset the cost of manufacturing increase reflected in the company's amended, audited financial statements. Final IDM at 8. In other words, Marmen did not "adequately prove{} the need for the requested corrections," or even establish that a "correction" was what it was trying to make. *Goodluck India Ltd. v. United States*, 393 F. Supp. 3d 1352, 1357 (Ct. Int'l Trade 2019). Commerce's determination to reject the new information, which would have offset Marmen's auditor's restatement of the company's manufacturing costs, should therefore be affirmed.

### C.    Commerce Did Not Err in Applying its Average-to-Transaction Methodology

As discussed above, Commerce calculates dumping margins by comparing weight-averaged normal values with the prices of individual U.S. sales where it finds that there is a pattern of U.S. prices that differ significantly among purchasers, regions, or time periods. Preliminary IDM at 10; *see also* discussion *supra* at 8. Here, Commerce applied this average-to-transaction methodology to all of Marmen's sales because more than two-thirds of Marmen's U.S. transactions passed the Cohen's *d* test for determining whether a significant pattern of differential pricing exists. Final IDM at 11. Further, the antidumping duty margin *calculated* using its average-to-average methodology was 3.01%, whereas the margin calculated using the average-to-transaction method was 4.94%—a difference of more than 25%. *Id.*; *see also* Memorandum from Michael J. Heaney, to the File, re: *Analysis for the Final Determination of Utility Scale Wind Towers: Final Margin for Calculation for the Marmen Group* (June 29, 2020), C.R. 225-231, P.R. 195 at 3-4

("Final Calculation Memo"). Accordingly, Commerce found that its average-to-average methodology was insufficient to address the differential pricing, requiring resort to the average-to-transaction methodology. *See* Final IDM at 11.

Marmen here argues that Commerce's application of the average-to-transaction methodology was unreasonable and unsupported by substantial record evidence. Marmen's Brief at 32-36. Marmen states that, while more than two-thirds of transactions may have passed the Cohen's *d* test, there was little pricing difference across quarters for five of the seven CONNUMs that passed the test, and most of this difference resulted from Commerce's imputation of exempted duties and credit expenses into Marmen's sales values. *Id.*[11]

But as Commerce explained, the agency here applied its standard differential pricing analysis to determine whether a pattern of price differences existed. Final IDM at 11. This methodology has been upheld repeatedly. *See, e.g.*, *Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337 (Fed. Cir. 2017); *Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1322 (Fed. Cir. 2017); *Stanley Works (Langfang) Fastening Sys., Ltd. v. United States*, 279 F. Supp. 3d 1172 (Ct. Int'l Trade 2017); *Xi'an Metals & Minerals Imp. & Exp. Co. v. United States*, 256 F. Supp. 3d 1346 (Ct. Int'l Trade 2017); *Tri Union Frozen Prods., Inc. v. United States*, 163 F. Supp. 3d 1255 (Ct. Int'l Trade 2016).

Marmen would have this Court endorse cherry-picking of the U.S. CONNUMs to be included in the differential pricing analysis. But the differential pricing test, by its nature, is meant

---

[11]   WTTC notes that, if these five CONNUMs were found not to have passed the Cohen's *d* test, the remaining two CONNUMs, [



].  Final Calculation Memo at 3-4 and Attachment 2 (Margin Program Output at 275-276, 312-314, and 419).

to include the full universe of a respondent's U.S. sales. Removing sales from the analysis stands to introduce distortions and complications, such as requiring additional inquiries into the statistical significance of patterns among the remaining sales. *Stanley Works*, 279 F. Supp. 3d at 1187 (discussing why there is no need to measure statistical significance under a test, like the differential pricing analysis, that reviews the entire population of a respondent's sales).

As Commerce found, an analysis of all of Marmen's U.S. sales revealed that more than two-thirds of sales passed the Cohen's *d* test. *See, e.g.*, Preliminary IDM at 12. In other words, when divided into test and comparison groups by time period, the average prices for Marmen's U.S. sales met or exceeded a Cohen's *d* coefficient of 0.8. *Id.* at 11. This indicated a "large" and therefore significant difference between the average prices of the test and comparison groups. *Id.* Further, there was at least a 25% difference between the dumping margin calculated using the average-to-average methodology and the margin calculated using the alternative, average-to-transaction methodology. *See, e.g.*, *id.* at 12. Thus, Commerce's application of the average-to-transaction methodology to determine Marmen's margin was reasonable, supported by the record, and otherwise in accordance with law.

Consol. Ct. No. 20-00169                                    NON-CONFIDENTIAL VERSION

## V.    <u>CONCLUSION</u>

For the reasons detailed above, WTTC respectfully submits that this Court should affirm the

final results of Commerce's antidumping duty investigation into Canadian wind towers as to

(1) smoothing of Marmen's costs, (2) rejection of Marmen's new factual information, and (3) use of

the agency's average-to-transaction methodology.

<div style="margin-left:50%">

Respectfully submitted,

<u>/s/ Alan H. Price</u>
Alan H. Price, Esq.
Daniel B. Pickard, Esq.
Robert E. DeFrancesco, III, Esq.
Maureen E. Thorson, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the Wind Tower Trade Coalition*

</div>

Dated: April 30, 2021

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Wind Tower Trade Coalition's Response Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 9,695 words.

<u>*/s/ Alan. H. Price*</u>
(Signature of Attorney)

<u>Alan H. Price</u>
(Name of Attorney)

<u>Wind Tower Trade Coalition</u>
(Representative Of)

<u>April 30, 2021</u>
(Date)