IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

_____
                                          )
MARMEN INC., *et al.*,                    )
                                          )
              Plaintiffs,                 )
                                          )
     and                                  )          Consol. Court No. 20-00169
                                          )
WIND TOWER TRADE COALITION,               )          **PUBLIC VERSION**
                                          )
              Consolidated Plaintiff,     )          Business Proprietary Information
                                          )          (BPI) Denoted by Brackets [ ] on
     v.                                   )          Pages 17, 18, 38, and 41.
                                          )
UNITED STATES,                            )
                                          )
              Defendant,                  )
                                          )
     and                                  )
                                          )
WIND TOWER TRADE COALITION., *et al.*,    )
                                          )
              Defendant-Intervenors.      )
_____)

---

**DEFENDANT'S RESPONSE TO PLAINTIFFS' RULE 56.2
MOTIONS FOR JUDGMENT UPON THE AGENCY RECORDRECORD**

---

                              BRIAN M. BOYNTON
                              Acting Assistant Attorney General


                              JEANNE E. DAVIDSON
                              Director


                              REGINALD T. BLADES, JR.
                              Assistant Director

OF COUNSEL:
KIRRIN A. HOUGH
NATALIE M. ZINK
Attorneys
Office of the Chief Counsel
for Trade Enforcement & Compliance
U.S. Department of Commerce
Washington, D.C. 20230

JOSHUA E. KURLAND
Trial Attorney
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-0477
Fax: (202) 307-0972
E-mail:  Joshua.E.Kurland@usdoj.gov

April 30, 2021

*Attorneys for Defendant United States*

## <u>TABLE OF CONTENTS</u>

STATEMENT PURSUANT TO RULE 56.2 ........................................................................2

    I.    The Administrative Determination Under Review ................................................2

    II.    Issues Presented for Review ...............................................................................2

STATEMENT OF FACTS ...............................................................................................3

    I.    Commerce's Investigation ..................................................................................3

    II.    Commerce's Determination .................................................................................4

SUMMARY OF THE ARGUMENT .................................................................................6

ARGUMENT ...................................................................................................................7

    I.    Standard Of Review ...........................................................................................7

    II.    Commerce's Decision To Weight-Average Marmen's Reported
          Steel Plate Costs Across CONNUMs Is Supported By Substantial
          Evidence And Otherwise Lawful ........................................................................9

          A.    Legal Framework ...................................................................................9

          B.    Commerce Reasonably Weight-Averaged Marmen's Reported
               Steel Plate Costs Across CONNUMs .......................................................11

          C.    Substantial Evidence Supports Commerce's Finding That
               Marmen's Steel Suppliers Do Not Charge Different Prices
               Corresponding To Plate Thickness ...........................................................15

          D.    Commerce Reasonably Determined That Marmen's Reported
               Steel Plate Cost Differences Stem From The Timing Of
               Marmen's Sales .......................................................................................18

    III.    Commerce's Rejection Of Marmen's Cost Reconciliation Worksheet Is
           Supported By Substantial Evidence And Otherwise Lawful ...............................20

          A.    Factual Background ...............................................................................20

          B.    Commerce's Rejection Of Marmen's Unsolicited New Factual
               Information Was Within Commerce's Discretion And Otherwise
               Lawful ...................................................................................................22

IV.   Commerce Properly Applied The Average-To-Transaction (A-T)
Comparison Method To Marmen's United States Sales Based On
Differential Pricing Analysis ...........................................................................26

     A.   Overview Of Differential Pricing Analysis ...............................................26

     B.   Commerce's Application Of The A-T Method In This Case Is
Supported By Substantial Evidence And Otherwise Lawful.....................28

V.   Commerce's Date Of Sale Determination For Marmen's Home Market
And United States Sales Is Supported By Substantial Evidence And
Otherwise Lawful............................................................................................30

     A.   Legal Framework ....................................................................................30

     B.   Commerce Reasonably Determined To Use Invoice Date As The
Date Of Sale For Marmen's Home Market And United States Sales........32

     C.   Commerce's Determination Not To Use The Purchase Order Date
As The Date Of Sale Under The "Custom-Made Goods" Exception
Is Supported By Substantial Evidence And Otherwise Lawful ................38

VI.   Commerce Reasonably Treated Marmen's Home Market Sales As Sales
of Wind Tower Sections ..................................................................................40

     A.   Commerce's Decision To Rely On Marmen's Reporting Of Its
Sales Of Wind Tower Sections In Canada Is Reasonable And Lawful.....40

VII.   Commerce Lawfully Determined Not To Apply Adverse Facts Available
To Marmen.......................................................................................................43

CONCLUSION......................................................................................................46

## **TABLE OF AUTHORITES**

**Cases**                                                                    **Page(s)**

*Allied Tube & Conduit Corp. v. United States*,
    127 F. Supp. 2d 207 (Ct. Int'l Trade 2000) ....................................................... 33, 34

*Apex Frozen Foods Priv. Ltd. v. United States*,
    862 F.3d 1337 (Fed. Cir. 2017) ........................................................................... 29

*Atl. Sugar, Ltd., v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984) ............................................................................. 8

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) .............................................................................................. 8

*Cleo Inc. v. United States*,
    501 F.3d 1291 (Fed. Cir. 2007) ............................................................................. 8

*Consol. Edison Co. of N.Y. v. NLRB*,
    305 U.S. 197 (1938) .............................................................................................. 7

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) .............................................................................................. 7

*Deacero S.A.P.I. de C.V. v. United States*,
    353 F. Supp. 3d 1303 (Ct. Int'l Trade 2018) ............................................. 23, 25, 26

*Fischer S.A. Comerico v. United States*,
    700 F. Supp 2d 1364 (Ct. Int'l Trade 2010) ...................................................... 25

*Fujitsu Gen. Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996) ........................................................................... 7, 9

*Goldlink Indus. Co. v. United States*,
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ........................................................ 8

*Goodluck India Ltd. v. United States*,
    393 F. Supp. 3d 1352 (Ct. Int'l Trade 2019) ............................................. 24, 25, 26

*Haixing Jingmei Chem. Prod. Sales Co. v. United States*,
    335 F. Supp. 3d 1330 (Ct. Int'l Trade 2018) .............................................. *passim*

*INS v. Elias-Zacarias*,
    502 U.S. 478 (1992) .............................................................................................. 7

*JBF RAK LLC v. United States,*
    790 F.3d 1358 (Fed. Cir. 2015) ................................................................. 9

*Mittal Steel Point Lisas Ltd. v. United States,*
    548 F.3d 1375  (Fed. Cir. 2008) ............................................................... 31

*Nakornthai Strip Mill Pub. Co. Ltd. v. United States,*
    614 F. Supp. 2d 1323 (Ct. Int'l Trade 2009) ............................................ 31

*NEXTEEL Co. v. United States,*
    355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) ............................... 11, 13, 15

*NEXTEEL Co. v. United States,*
    392 F. Supp. 3d 1276 (Ct. Int'l Trade 2019) ............................................ 27

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006) ...................................................... 8, 29, 42

*NMB Sing. Ltd v. United States,*
    557 F.3d 1316 (Fed. Cir. 2009) ................................................................ 36

*PSC VSMPO-Avisma Corp. v. United States,*
    688 F.3d 751 (Fed. Cir. 2012) .................................................................. 24

*Sahaviriya Steel Indus. Public Co. v. United States,*
    714 F. Supp. 2d 1263 (Ct. Int'l Trade 2010), *aff'd,* 649 F.3d 1371 (Fed. Cir. 2011) ........ *passim*

*Shandong Rongxin Imp. & Exp. Co. v. United States,*
    203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) ............................................. 7

*Thai Plastic Bags Indus. Co. v. United States,*
    746 F.3d 1358 (Fed. Cir. 2014) ...................................................... 11, 15

*Timken Co. v. United States,*
    354 F.3d 1334 (Fed. Cir. 2004) .................................................................. 8

*Timken U.S. Corp. v. United States,*
    434 F.3d 1345 (Fed. Cir. 2006) ...................................................... 24, 25, 26

*Torrington Co. v. United States,*
    68 F.3d 1347 (Fed. Cir. 1995) ................................................................... 9

*United States v. Eurodif S.A.,*
    555 U.S. 305 (2009) ................................................................................. 11

*Universal Camera v. NLRB,*
  340 U.S. 474 (1951) ............................................................................................ 16

*Viraj Group, Ltd. v. United States,*
  343 F.3d 1371 (Fed. Cir. 2003) ......................................................................... 32

**Statutes**

19 U.S.C. § 1675 .......................................................................................................... 9

19 U.S.C. § 1677(15) ................................................................................................ 10

19 U.S.C. § 1677b ........................................................................................... *passim*

19 U.S.C. § 1677e ...................................................................................................... 44

19 U.S.C. § 1677f-1 ............................................................................................ 27, 28

19 U.S.C. § 1677m ............................................................................................. 44, 45

**Regulations**

19 C.F.R. § 351.102 ............................................................................................ 22, 23

19 C.F.R. § 351.301 ........................................................................................ *passim*

19 C.F.R. § 351.302 .................................................................................................. 21

19 C.F.R. § 351.401 ............................................................................................ 30, 32

19 C.F.R. § 351.414 .................................................................................................. 26

**Administrative Determinations**

*Antidumping Duties; Countervailing Duties: Final Rule,*
  62 Fed. Reg. 27,296 (Dep't of Commerce May 19, 1997) ................................ 30, 31

*Certain Pasta from Italy,*
  83 Fed. Reg. 63,627 (Dep't of Commerce Dec. 11, 2018) ................................ 13, 14

*Large Power Transformers from the Republic of Korea,*
  82 Fed. Reg. 13,432 ( Dep't of Commerce Mar. 13, 2017) ............................... 35, 37

*Utility Scale Wind Towers from the Socialist Republic of Vietnam,*
  76 Fed. Reg. 75,984 (Dep't of Commerce Dec. 26, 2012) ...................................... 37

*Utility Scale Wind Towers from Canada, Indonesia, the Republic of Korea, and the Socialist Republic of Vietnam*,
   84 Fed. Reg. 37,992 (Dep't of Commerce Aug. 5, 2019) ........................................................... 3

*Utility Scale Wind Towers from Canada*,
   85 Fed. Reg. 8,562 (Dep't of Commerce Feb. 14, 2020) ........................................................... 4

*Utility Scale Wind Towers From Canada*,
   85 Fed. Reg. 40,239 (Dep't of Commerce July 6, 2020) ....................................................... 2, 5

*Wooden Bedroom Furniture from the People's Republic of China*,
   69 Fed. Reg. 67, 313 (Dep't of Commerce Nov. 17, 2004) ........................................... 40, 41, 42

*Welded Carbon Steel Standard Pipe and Tube Products from Turkey*,
   82 Fed. Reg. 49,179 (Dep't of Commerce Oct. 24, 2017) .................................................. 13, 14

**Legislative Materials**

Statement of Administrative Action accompanying the Uruguay Round Agreements Act,
   H.R. Doc. 103-316(1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 .......................................... 30

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

_____
                                           )
MARMEN INC., *et al.*,                      )
                                           )
              Plaintiffs,                   )
                                           )
       and                                  )          Consol. Court No. 20-00169
                                           )
WIND TOWER TRADE COALITION,                 )          **PUBLIC VERSION**
                                           )
              Consolidated Plaintiff,       )          Business Proprietary Information
                                           )          (BPI) Denoted by Brackets [ ] on
       v.                                   )          Pages 17, 18, 38, and 41.
                                           )
UNITED STATES,                              )
                                           )
              Defendant,                    )
                                           )
       and                                  )
                                           )
WIND TOWER TRADE COALITION., *et al.*,      )
                                           )
              Defendant-Intervenors.        )
_____)

**DEFENDANT'S RESPONSE TO PLAINTIFFS' RULE 56.2
MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully responds to the motions for judgment upon the administrative record filed by plaintiffs, Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co. (Marmen), and the Wind Tower Trade Coalition (WTTC).  Plaintiffs challenge aspects of the Department of Commerce's (Commerce's) final results in its antidumping duty investigation concerning utility scale wind towers from Canada.  We demonstrate below that Commerce's determination should be sustained because it is supported by substantial evidence and otherwise lawful.

## <u>STATEMENT PURSUANT TO RULE 56.2</u>

### I.   <u>The Administrative Determination Under Review</u>

The administrative determination under review is *Utility Scale Wind Towers From Canada*, 85 Fed. Reg. 40,239 (Dep't of Commerce July 6, 2020) (final determ.) (Final Results), and the accompanying Issues and Decision Memorandum (IDM) (P.R. 192).[1]  The period of investigation is July 1, 2018, to June 30, 2019.

### II.   <u>Issues Presented for Review</u>

1.      Whether Commerce's weight-averaging of Marmen's reported plate costs across CONNUMs[2] (also known as "cost smoothing") is supported by substantial evidence and lawful.

2.      Whether Commerce's rejection of Marmen's cost reconciliation worksheet is supported by substantial evidence and lawful.

3.      Whether Commerce's adherence to its standard differential pricing analysis—and consequent use of the average-to-transaction comparison method—is supported by substantial evidence and lawful.

4.      Whether Commerce's decision to use invoice date as the date of sale for Marmen's United States and home market sales is supported by substantial evidence and lawful.

5.      Whether Commerce's decision to treat Marmen's home market sales as sales of tower sections, rather than complete towers, is supported by substantial evidence and lawful.

6.      Whether Commerce's decision not to apply facts available with an adverse inference to Marmen's sales reporting is supported by substantial evidence and lawful.

---

[1] "P.R." refers to the public administrative record; "C.R." refers to the non-public record.

[2] A CONNUM is a "control number" assigned to a group of materially identical products to distinguish them from similar but non-identical products.

## STATEMENT OF FACTS

### I.     Commerce's Investigation

In July 2019, Commerce received an antidumping duty petition from WTTC concerning

wind towers imports from Canada, and in August 2019 Commerce initiated this investigation.

*Utility Scale Wind Towers from Canada, Indonesia, the Republic of Korea, and the Socialist*

*Republic of Vietnam,* 84 Fed. Reg. 37,992 (Dep't of Commerce Aug. 5, 2019).  Commerce

subsequently selected Marmen as the mandatory respondent.  Respondent Selection Memo

(Aug. 19, 2019) (P.R. 53; C.R. 28).

From September through October 2019, Marmen submitted timely responses to sections

A through D of Commerce's initial antidumping questionnaire, relating to general information,

home market sales, United States sales, and cost of production (COP)/Constructed Value (CV),

respectively.  Preliminary Decision Memorandum at 2 (Feb. 4, 2020) (P.R. 146) (PDM); *see*

*generally* Marmen Section A Questionnaire Response (Sept. 13, 2019) (P.R. 76; C.R. 35-38)

(Marmen AQR); Marmen Sections B, C, and D Questionnaire Response (Oct. 11, 2019) (P.R.

89-97; C.R. 40-95) (Marmen BCDQR).  From October through December 2019, Marmen

responded to Commerce's supplemental questionnaires and provided additional information

about its sales and cost of production.  PDM at 2; *see generally* Marmen Supplemental Section D

Questionnaire Response (Dec. 6, 2019) (P.R. 114-19; C.R. 99-141) (Marmen SDQR); Marmen

Supplemental Sections A, B, and C Questionnaire Response (Dec. 11, 2019) (P.R. 120-21; C.R.

142-57) (Marmen SABCQR); Marmen Response to Question 14.g of Supplemental Section D

Questionnaire (Dec. 13, 2019) (P.R. 123-25; C.R. 158-60) (Marmen Question 14.g SDQR);

Marmen Response to Questions 24 and 29 of the Supplemental Sections A, B, and C

Questionnaire (Dec. 13, 2019) (P.R. 126-29; C.R. 161-62).

## II.   **Commerce's Determination**

Commerce published its preliminary determination in February 2020.  *Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 8,562 (Dep't of Commerce Feb. 14, 2020) (preliminary determ.) (P.R. 145).  Commerce preliminarily determined that wind towers from Canada were being, or were likely to be, sold in the United States at less-than-fair-value.  *Id.*  As part of the preliminary determination, Commerce weight-averaged or "smoothed" Marmen's reported steel plate costs across its reported CONNUMs.  PDM at 17.  Further, Commerce applied its differential pricing analysis to examine whether there was a pattern of export prices that differed significantly among purchasers, regions, or time periods for comparable merchandise.  *Id.* at 10.  Based on this analysis, Commerce preliminarily found such a pattern and that using an "average-to-average" (A-A) sales comparison method could not account for the differences, leading it to apply the "average-to-transaction" (A-T) comparison method in calculating Marmen's weighted-average dumping margin.  *Id.* at 12.

Also in the preliminary determination, Commerce determined to adhere to its normal practice by using Marmen's invoice date as the date of sale for both Marmen's home market and United States sales, based on Marmen's explanation that using the invoice date was appropriate because the quantity, price, delivery times, or other material terms of the sale may be adjusted until the invoice is finalized.  *Id.* at 12-13.  Similarly, based on Marmen's reporting of its invoicing practices, Commerce accounted for Marmen's home market sales as sales of wind tower sections rather than whole towers.  *Id.* at 13; *see also* Prelim. Analysis Memo at 1 (Feb. 4, 2020) (P.R. 148; C.R. 171) (stating that Commerce relied on Marmen's reported data).

In addition, prior to the preliminary determination, Commerce had requested that Marmen submit a revised cost reconciliation stemming from a restatement of Marmen's audited

financial statements.  Commerce Second Supplemental Section D Questionnaire to Marmen at 3-4. Questions 2-3 (Jan. 31, 2020) (P.R. 144; C.R. 169) (Commerce SSDQ to Marmen).  Marmen, however, submitted a second supplemental section D questionnaire response on February 7, 2020 that included unsolicited new factual information revising the cost reconciliation beyond the update that Commerce requested.  Commerce Rejection of New Factual Information (Feb. 25, 2020) (P.R. 160; C.R. 203) (Commerce Rejection Ltr.).  Commerce thus rejected the portions of the submission containing the unsolicited new factual information.  *Id.*; *see also* Commerce Memo re: Request to Reject Certain Documents in ACCESS (Feb. 28, 2020) (P.R. 166).

In June 2020, Commerce published its final determination.  Consistent with its preliminary determination, Commerce continued to find that wind towers from Canada were being dumped in the United States.  Final Results, 85 Fed. Reg. at 40,239.  Commerce's final determination also continued to weight-average or "smooth" Marmen's reported steel plate costs across its reported CONNUMs, with the exception of excluding one CONNUM relating to a product for which Marmen used high-thickness plate in production.  IDM at 4-6.  Commerce based its determination on record evidence demonstrating that—with the exception of that one excluded CONNUM—the reported plate cost differences were due to factors unrelated to the differences in the physical characteristics of the products.  *Id.*

Commerce in the final determination also maintained its rejection of portions of Marmen's February 7, 2020 second supplemental section D response as unsolicited new factual information.  *Id.* at 7-9.  Marmen had argued that the information was corrective in nature and thus permitted under 19 C.F.R. § 351.301(c).  *Id.* at 7.

Furthermore, Commerce considered Marmen's argument that the differential pricing analysis falsely identified a pattern of significant price differences, but ultimately continued to

use the A-T comparison method.  *Id.* at 10-11.  Commerce determined that, on an overall basis, 68.29 percent of Marmen's United States sales passed the Cohen's *d* test, and that the A-A method could not account for the differences because there was a greater than 25 percent change between the margins calculated using the A-A method and the A-T method.  *Id.* at 11.

Commerce also maintained its use of Marmen's invoice date as the date of sale for both Marmen's home market and United States sales because Marmen accurately and appropriately reported the invoice date as its date of sale, notwithstanding WTTC's allegations that Commerce lacked information necessary to analyze Marmen's sales activity and that Marmen misreported its date of sale.  IDM at 15-16.  Likewise, notwithstanding WTTC's objections, Commerce maintained its determination that Marmen sold wind towers in sections in its home market, based on Marmen's section-based invoices to its home market customer.  IDM at 17-18.

Finally, contrary to WTTC's request that Commerce apply facts available with an adverse inference because Marmen provided incorrect and misleading questionnaire responses, Commerce found that Marmen provided the information about its sales that Commerce requested and did not apply adverse facts available.  IDM at 19-20.

## SUMMARY OF THE ARGUMENT

Commerce's determination is supported by substantial evidence and should be sustained. Regarding Marmen's claims, Commerce's determination is both reasonable and lawful because (1) Commerce appropriately smoothed Marmen's steel plate costs based on substantial record evidence showing substantial differences in plate costs across CONNUMs that did not stem from differences in physical characteristics; (2) Commerce lawfully rejected the unsolicited new factual information contained in Marmen's revised cost reconciliation because the information contravened Commerce's instructions, was submitted late, was inadequately described, and was

not sufficiently reliable for Commerce's determination; and (3) Commerce reasonably relied on the results of its differential pricing analysis and corresponding evidence in determining to use the A-T comparison method.  Regarding WTTC's claims, Commerce's determination should be sustained because (1) Commerce reasonably weighed the evidence of changes to Marmen's material sales terms in identifying the invoice date as the appropriate date of sale; (2) Commerce reasonably treated Marmen's home market sales as sales of wind tower sections, when that was how Marmen actually documented the sales based on customer instructions; and (3) Commerce appropriately declined to apply adverse facts available to Marmen upon finding that Marmen had not withheld requested information and complied with Commerce's reporting instructions.

## ARGUMENT

### I.    Standard Of Review

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence on the record, or otherwise unlawful.  *See Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Indeed, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion.  *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327,

1338 (Ct. Int'l Trade 2017) (noting tremendous deference to Commerce's factual findings). It is thus improper to overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007), and the Court will not substitute its judgment for Commerce in choosing between two fairly conflicting views, even if it could justifiably have made a different choice had the matter been before it *de novo*. *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006). Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court sustains Commerce's factual determinations if they are reasonable and supported by the record as a whole, even if evidence detracts from them. *See Atl. Sugar, Ltd., v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

When the Court examines Commerce's interpretations of the statute it administers, the Court employs the two-pronged test established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). First, the Court examines "whether Congress has directly spoken to the precise question at issue," and if it has, the agency and Court must comply with Congress's clear intent. *Id*. at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. If so, "{a}ny reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation and quotation marks omitted), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (citation

omitted).  Indeed, "the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *Id.* (citation omitted); *see Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995) (recognizing Commerce as "master" of antidumping laws).

Finally, the Court affords Commerce especially great deference "{w}hen a statute fails to make clear any Congressionally mandated procedure or methodology for assessment of the statutory tests." *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (citation and quotation marks omitted).  In that circumstance, "Commerce may perform its duties in the way it believes most suitable." *Id.*  Consequently, Commerce receives "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and to apply methodologies to implement the trade statute.  *Fujitsu*, 88 F.3d at 1039.

## II.     Commerce's Decision To Weight-Average Marmen's Reported Steel Plate Costs Across CONNUMs Is Supported By Substantial Evidence And Otherwise Lawful

### A.     Legal Framework

The statute directs Commerce in antidumping proceedings to determine whether subject merchandise is being, or likely to be, sold at less than fair value by comparing the export price (or constructed export price) and the merchandise's normal value.  19 U.S.C. § 1675(a)(2)(A). The statute further directs that "a fair comparison shall be made between the export price or constructed export price and normal value."  19 U.S.C. § 1677b(a); *see Torrington*, 68 F.3d at 1352 (statutory framework seeks "to produce a fair . . . comparison between foreign market value and United States price").  To this end, as Marmen states, Commerce identifies the subject merchandise's commercially significant physical characteristics and uses them to establish control numbers or CONNUMs for sales comparison purposes.  *See* Marmen Br. 16.

Next, in calculating normal value for its antidumping comparisons, Commerce will consider only those sales in the comparison market that are made in the "ordinary course of trade."  19 U.S.C. § 1677b(a).  The statute at 19 U.S.C. § 1677(15) provides that sales are in the "ordinary course of trade" if they are made under conditions and practices that, for a reasonable period of time prior to the date of sale, have been normal for sales of the foreign like product.  Further, the statute at section 1677b(b) authorizes Commerce to disregard sales if they have been made at less than the "cost of production" of the product (such sales are not in the "ordinary course of trade").  *See* 19 U.S.C. §§ 1677b(b), 1677(15)(A).

The statute defines the cost of production as the amount equal to the sum of "the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business{.}"  19 U.S.C. § 1677b(b)(3)(A).  Commerce relies on a company's normal books and records for purposes of calculating cost of production (and constructed value) if they meet two conditions: (1) the books and records are kept in accordance with the company's home country's generally accepted accounting principles, and (2) the books and records reasonably reflect the cost to produce and sell the merchandise in question.  *See* 19 U.S.C. § 1677b(f)(1)(A).

When the costs reported in a company's books are not reasonable—for example, if cost differences among products do not represent differences in their physical characteristics—Commerce may revise the costs.  IDM at 5.  It is thus normal for Commerce to adjust costs to address distortions when it encounters cost differences that are attributable to factors beyond differences in the products' physical characteristics.  *See*, *e.g.*, *Thai Plastic Bags Indus. Co. v.*

*United States*, 746 F.3d 1358, 1366-67 (Fed. Cir. 2014); *NEXTEEL Co. v. United States*, 355 F. Supp. 3d 1336, 1361-62 (Ct. Int'l Trade 2019).

### B. Commerce Reasonably Weight-Averaged Marmen's Reported Steel Plate Costs Across CONNUMs

The issue in this case concerns the appropriate way to treat significant cost differences among CONNUMs in the steel plate costs Marmen reported for the investigation, when Commerce determined that they *did not* stem from physical differences in the plate itself.

In accordance with 19 U.S.C. § 1677b(b)(2)(A)(ii), Commerce requested cost of production information from Marmen at the outset of the investigation and applied its standard methodology of using annual costs to calculate the weighted-average cost of production. In the final determination, Commerce weight-averaged or smoothed Marmen's reported plate costs for all reported CONNUMs (with the exception of one CONNUM that used high-thickness plate), because the record demonstrated that the significant steel plate cost differences among the CONNUMs resulted from factors unrelated to differences in the physical characteristics defining the CONNUMs. *See* IDM at 4-6. Contrary to Marmen's claims that Commerce disregarded its practice, *see* Marmen Br. 18-19, Commerce's determination to weight-average Marmen's reported plate costs is based on substantial record evidence and lawful.

Commerce determined based on the record that, although Marmen's books and records met the first criterion under 19 U.S.C. § 1677b(f)(1)(A) for using Marmen's information without adjustment, they did not "reasonably reflect" the cost to produce subject merchandise based on the physical characteristics that Commerce identified in defining different CONNUMs. *See* IDM at 5-6. Specifically, Commerce explained that a respondent's reported production costs should reflect meaningful cost differences attributable to different physical characteristics, but in this case Marmen's reported costs did not. *See id.* at 5. Indeed, cost fluctuations among CONNUMs

PUBLIC VERSION

could not be explained by their physical characteristics, and Marmen's suppliers did not charge prices that correlated to different grade, thickness, width, or length. *See id.* at 5-6; Marmen Resubmitted Second Supplemental Section D Questionnaire Response at 1-2, Ex. D-1–D-2 (Feb. 28, 2020) (P.R. 162-65; C.R. 206-09) (Marmen SSDQR)).[3]  Rather, record evidence showed that the cost differences were linked to "a pattern where most of the CONNUMs with the higher plate costs were sold early in the {period of investigation}, whereas CONNUMs with lower plate costs were sold later in the {period of investigation}." *Id.* at 6; *see also* Marmen Final Cost Calculation Memorandum at 2, Att. 2 (June 29, 2020) (P.R. 194; C.R. 223).

When faced with such situations, as explained above, Commerce's practice is to adjust costs to address distortions. *See* IDM at 6.  Thus, upon determining that Marmen's reported costs did not reflect meaningful differences attributable to the physical characteristics defining the CONNUMs for product comparison purposes, Commerce followed its practice and corrected that distortion. *See id.*  Specifically, Commerce weight-averaged or smoothed Marmen's reported plate costs across the reported CONNUMs (save for the CONNUM corresponding to the product for which the high-thickness plate was used). *See id.*

Marmen argues that, "Commerce arbitrarily disregarded its standard practice without explanation, failing to examine whether Marmen's reported plate costs differed significantly among nearly identical or very similar products." Marmen Br. 1-2.  According to Marmen, Commerce's practice is to apply cost smoothing *only* when the finished products are identical or very similar. *See id.* at 17-18, 20-21.  Marmen's argument, however, reflects a fundamental misunderstanding of Commerce's weight-averaging or smoothing practice.

---

[3] The only exception was certain high-thickness plates for which the supplier charged a surcharge. *See id.*

Contrary to Marmen's argument, Commerce's cost smoothing is not limited solely to instances in which finished products are "identical" or "very similar."  Although the particular issue addressed by smoothing is easier to identify among products that are very similar, the key factor is whether a respondent's reported cost differences properly reflect production differences associated with physical characteristics, as opposed to other unrelated factors.  *See* 19 U.S.C. § 1677b(f)(1)(A) (stating that Commerce will use records if they "reasonably reflect" production costs); *Welded Carbon Steel Standard Pipe and Tube Products from Turkey*, 82 Fed. Reg. 49,179 (Dep't of Commerce Oct. 24, 2017) (final admin. review), at IDM Cmt. 2 (*Pipe & Tube from Turkey*) (explaining that under section 1677b(f)(1)(A) Commerce may revise costs "if cost differences among products do not represent differences in physical characteristics").

Commerce thus applies its practice of adjusting unreasonable cost reporting both to finished products *and* to individual inputs for such products.  *See, e.g.*, *Pipe & Tube from Turkey*, 82 Fed. Reg. 49,179, at IDM Cmt. 2 (re-allocating costs for zinc input); *Certain Pasta from Italy*, 83 Fed. Reg. 63,627 (Dep't of Commerce Dec. 11, 2018) (final admin. review), at IDM at 3-11 (*Pasta from Italy*) (smoothing costs for semolina, an input for pasta).  When there is an absence of meaningful physical differences in the input—*e.g.*, the semolina used in finished products comprising different pasta types—Commerce will smooth costs for that input.  *See Pasta from Italy* at IDM at 3-11.  Similarly, even if there are physical differences between finished products, Commerce would still smooth costs among product groups when "differences in costs between CONNUMs cannot be explained solely by the differences in the physical characteristics of the CONNUMs."  *Id.* at 8; *see NEXTEEL*, 355 F. Supp. 3d at 1361-62 (sustaining determination focusing on cost differences unrelated to physical characteristics, rather than similarity of end-products).  The finished products do not need to be "identical" or "very similar."

13

For example, in *Pasta from Italy*, Commerce found that respondents reported significantly different costs for the semolina input, resulting in variation in direct material costs between CONNUMs.  *See* 83 Fed. Reg. 63,627, at IDM at 8-9.  Although Commerce explained that the CONNUMs had similarities in the end products, the crux of the issue was that there were disparities in the reported semolina costs for the different products, despite the fact that they used essentially the same semolina.  *See id.*  The similarities in the end products merely demonstrated that the disparate semolina costs between nearly identical CONNUMS were not related to the products' physical characteristics.  *See id.*  As Commerce described, "{a}ssigning the significantly different semolina costs only to specific products produced by each company results in cost variation by CONNUM that are not related to the physical differences of the products, leading to costs . . . that do not reasonably reflect the cost of the subject merchandise."  *Id.* at 9.  Accordingly, Commerce adjusted (by weight-averaging) the respondents' submitted input costs to "smooth" the cost differences unrelated to physical characteristics of pasta.  *See id.* at 9-11.

Likewise, in *Pipe & Tube from Turkey*, Commerce highlighted *differences* in the end products that were obscured by the way in which the respondent recorded the costs for its zinc input in its accounting system.  *See* 82 Fed. Reg. 49,179, at IDM Cmt. 2.  Hence, Commerce found that the respondent's zinc cost allocation was unreasonable because it did not accurately reflect the characteristics that affect the zinc costs incurred in producing a given CONNUM, and it made an adjustment to the costs for the individual zinc input to avoid distortion.  *See id.*

In a similar vein, the record evidence in this case supports Commerce's finding that there should be minimal, if any, cost differences for the steel plate input.  Specifically, Commerce found that, on a per-unit weight basis, there should be little difference in steel plate costs for the different dimensions and grades used to produce the wind towers under investigation.  IDM at 6;

14

PUBLIC VERSION

Marmen Final Cost Calculation Memorandum at 2, Att. 1 - Column E, Att.2 - Column D (P.R. 194; C.R. 223) (showing that per-ton plate costs nonetheless varied considerably). Accordingly, Commerce reasonably concluded that the reported differences in costs were based on factors other than differences in the physical characteristics of the products—*i.e.,* timing of production. *See id.* In keeping with its practice of adjusting distortions when cost differences in products are attributable to factors other than differences in physical characteristics, Commerce applied cost smoothing to the steel plate input. *Cf. NEXTEEL*, 355 F. Supp. 3d at 1361 (explaining that steel input costs in that case also varied by time).

Thus, Marmen's argument that Commerce applies cost smoothing only when finished products are "identical" or "very similar" lacks merit and invites distortion in Commerce's calculations. Contrary to Marmen's claims, it is *Marmen's* position that would cause Commerce to "fail{ } to meet its statutory obligation to calculate Marmen's dumping margin as accurately as possible." Marmen Br. 15; *see Thai Plastic Bags*, 746 F.3d at 1366 ("A methodology that shifts costs unreasonably from U.S. sales to home-market sales can heavily influence the Department's entire antidumping calculation." (citation and quotation marks omitted)).

### C.   Substantial Evidence Supports Commerce's Finding That Marmen's Steel Suppliers Do Not Charge Different Prices Corresponding To Plate Thickness

Marmen's substantial evidence challenges to Commerce's smoothing determination equally lack merit. In response to Commerce's Second Supplemental Section D Questionnaire, Marmen submitted information regarding its plate lists (showing the grade and dimensions of each type of plate its customer required), plate thicknesses, and plate costs. *See* Marmen SSDQR at 1-2, Exs. D-1–D-2 (P.R. 162; C.R. 206). After reviewing the information, Commerce in the final determination found that Marmen's suppliers did not charge prices that correlated to plates

of different grade, thickness, width, or length, with the exception of certain high-thickness plates greater than 50.8 mm for which the supplier included a surcharge.  *See* IDM at 5-6.

Despite substantial evidence supporting Commerce's finding, Marmen argues that the steel suppliers' plate prices varied by dimension, particularly thickness.  *See* Marmen Br. 22.  According to Marmen, the plate list it submitted for the wind towers it sold in its home market "showed significant price differences among plates with other thickness ranges (as well as differences in length and width)."  Marmen Br. 23.  Marmen likewise claimed before Commerce that "{t}hickness, in particular, affects steel plate costs."  Marmen SSDQR at 1 (P.R. 162; C.R. 206).  Marmen further asserted that "{t}hicker plate is more expensive than thinner plate.  Thicker plates are more difficult for steel mills to roll, require a longer cooling process, and tie up more of a mill's available capacity.  Moreover, delivery costs are higher for thicker (and heavier) plate, as railcars and trucks have weight limitations. The large difference in thickness is one reason why the HM CONNUM has higher unit costs reported in field DIRMAT_PLATE than the US CONNUM."  *Id.* at 6.  Correspondingly, Marmen submitted plate lists for the wind towers it sold in its home market as well as purchase agreements showing what other steel plate suppliers charged for plates exceeding certain thicknesses.  *See id.* at 1-2, Exs. D-1–D-2.

As Marmen observes, substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion{.}"  Marmen Br. 23 (quoting *Universal Camera v. NLRB,* 340 U.S. 474, 477 (1951)).  In this case, a reasonable mind would expect the record evidence that Marmen relies upon to support its argument that the price of the steel plates increases in correlation with increases in plate thickness.  To the contrary, however, the record demonstrates that supplier cost differences do not track observable differences in the physical

characteristics of the respective home market and United States CONNUMs in question, thus rendering the cost differences unreliable for calculating accurate cost differences between plates.

For example, according to Exhibit D-1 in Marmen's resubmitted Second Supplemental Section D Questionnaire Response, four plates ([                              ]), ranging from [                      ] in thickness, were all priced at $[          ], while four plates ([                ]), ranging from [                    ] in thickness, were all priced at $[          ].  *See* Marmen SSDQR at Ex. D-1 (P.R. 162; C.R. 206).  Although the [                  ] plates are thicker than the [                    ] plates, the [                      ] plates cost $[    ] less per ton.  *See id.* Furthermore, [              ] had a price of $[            ] with a thickness of [        ] mm, while [                ] through [                ] had a price of $[          ] with a thicknesses of [                  ] mm, again reflecting that plates of greater thickness actually cost less than those that were thinner. *See id.*  Finally, [          ] plates, ranging from [                    ] mm in thicknesses, were all priced at $[        ].  *See id.*  Under Marmen's theory, one would expect the thicker plates in this range of fifteen plates to cost more per ton, and those that are thinner to cost less per ton.  The fact that the plate costs do not correlate to increases in thickness contrasts with Marmen's assertions that there is a significant price difference for plates of greater thickness.

Additionally, as we explained above, Commerce calculated Marmen's steel plate costs on a per-unit weight basis, and despite the fact that there should be little difference in the costs on that basis if it were just a matter of larger plates costing more, Commerce nonetheless identified significant variance.  *See* IDM at 6; Marmen Final Cost Calculation Memorandum at 2, Att. 1 - Column E, Att.2 - Column D (P.R. 194; C.R. 223) (showing varied per-ton costs).

The record evidence thus supports Commerce's determination that the cost variance it observed is not explained by suppliers charging greater prices based on thicknesses and stems

from other reasons.  *See* IDM at 5-6.  Marmen's disagreement with Commerce's weighing of the

record evidence is not a valid basis to overturn the decision.  *See Haixing Jingmei Chem. Prod.*

*Sales Co. v. United States*, 335 F. Supp. 3d 1330, 1346 (Ct. Int'l Trade 2018) ("mere

disagreement with Commerce's weighing of the evidence" insufficient basis for legal challenge).

### D.      Commerce Reasonably Determined That Marmen's Reported Steel Plate Cost Differences Stem From The Timing Of Marmen's Sales

Marmen further argues that Commerce unreasonably assumed that timing, rather than

differences in physical characteristics, explained the observed differences in Marmen's steel

plate costs.  *See* Marmen Br. 24-26.  According to Marmen, Commerce's finding is unreasonable

and inconsistent with the physical characteristics Commerce identified as the most significant in

differentiating the costs between products.  *See id.*  These claims lack merit.

As we explained above, in defining the CONNUMs, Commerce identified the physical

characteristics that are most significant in differentiating the cost between products.  *See* IDM at

5.  The level of detail within each of the physical characteristics (*e.g.,* thickness, width, height,*et*

*cetera*) reflects the importance Commerce places on comparing the most similar products in

price-to-price comparisons.  *See id.*  Contrary to Marmen's claims, Commerce explicitly used the

physical characteristics as a "guidepost" to compare Marmen's reported CONNUM-specific

plate costs with other CONNUMs.  *Id.*at 6.  However, when Commerce computed the plate costs

on a per-unit weight basis, for which there should have been little difference among products of

different dimensions, it nonetheless found differences from the average plate costs ranging from

[        ] percent to [        ] percent (a significant amount for similar inputs).  *See* Marmen Final

Cost Calculation Memorandum at 2, Att. 1, Columns E-I (P.R. 194; C.R. 223). Commerce thus

found that the differences in costs across CONNUMs were based on factors other than physical

differences.  In further analyzing the record data, Commerce found a pattern where most of the

CONNUMs with higher plate costs were sold early in the investigation period, while those with lower plate costs were sold later.  *See id*. at 2, Att. 2.

Marmen's arguments amount to "mere disagreement" with Commerce's weighing of the record evidence.  *See Haixing*, 335 F. Supp. 3d at 1346 ("mere disagreement with Commerce's weighing of the evidence" insufficient).  Notwithstanding Commerce's clear reliance on record evidence in its analysis, Marmen claims inaccurately that Commerce simply assumed that timing explained the differences in Marmen's plate costs without applying its own identification of the most significant physical characteristics differentiating costs between products.  *See* Marmen Br. 25.  According to Marmen, Commerce "failed to consider the obvious: that differences in these same physical characteristics explained the observed differences in CONNUM-specific cost." *Id.*  Contrary to these claims, as we explained above, Commerce considered the effect of physical characteristics in explaining the cost variance across CONNUMs, and rooted its analysis in record evidence indicating that physical characteristics did not explain the variance.  *See* IDM at 6; Marmen Final Cost Calculation Memorandum at 2, Att. 1 (P.R. 194; C.R. 223).

Further, Marmen provides no compelling evidence demonstrating that differences in physical characteristics account for the differing production costs between products.  Before Commerce, Marmen attributed the differences in plate costs to the weight of internal components (*e.g.*, platforms, lifts, etc.) that were included in some CONNUMs and not others.  *See* IDM at 6. But Marmen has abandoned that rejected argument before this Court.  *See id*.

Finally, regarding Marmen's disagreement with Commerce's analysis of the record evidence as to timing, Commerce's examination of Marmen's per-ton unit costs by date at Attachment 2 of the calculation memorandum supports Commerce's determination that the reported differences in costs are based on timing rather than physical characteristics.  *See*

Marmen Final Cost Calculation Memorandum at 2, Att. 2 (P.R. 194; C.R. 223). Commerce explained that, although there should have been little difference in plate costs on a per-unit weight basis, most of the CONNUMs with higher plate costs were sold early in the investigation period, while those with lower plate costs tended to be sold later. *See id.* at 2; IDM at 6. Thus, record evidence rather than "mere assumption" supports Commerce's conclusion that the significant differences across CONNUMs in Marmen's steel plate costs can be attributed to timing rather than physical differences, necessitating an adjustment.

## III. Commerce's Rejection Of Marmen's Cost Reconciliation Worksheet Is Supported By Substantial Evidence And Otherwise Lawful

### A. Factual Background

Marmen originally reported its cost of manufacturing for the investigation based on its audited financial statements. *See* IDM at 8. However, Marmen's auditor subsequently restated its 2018 audited statements regarding net foreign exchange gains and losses, with the effect of increasing Marmen's cost of goods sold. *See id.*; Marmen Question 14.g SDQR at 2, Ex. D-17 (P.R. 123-25; C.R. 158). Thus, although it was late in the investigation, Commerce sought to address the issue through its January 31, 2020 Second Supplemental Section D Questionnaire. *See* Commerce SSDQ to Marmen at 3-4. Questions 2-3 (P.R. 144; C.R. 169).

In particular, in the supplemental section D questionnaire, Commerce asked Marmen to submit a revised cost reconciliation that started with the cost of goods sold as reported in the amended audited financial statements and ended with the extended cost file. *Id.* at Question 3. In doing so, Commerce specifically instructed Marmen that "{a}ll responses to this combined section D supplemental questionnaire should be limited to the questions contained herein," and should only reflect changes to Marmen's previously submitted cost reconciliation relating to the auditor's restatements. *Id.* at Item 4.

Marmen submitted a revised cost reconciliation showing that the auditor's restatement would cause its cost of manufacturing to increase. *See* IDM at 8 (referencing Marmen Rejected Response to Second Supplemental Section D Questionnaire (Feb. 7, 2020) (P.R. 151-54; C.R. 184-95) (Marmen Rejected SSDQR)).[4] However, despite Commerce's contrary instructions, Marmen also offset the increase to its cost of manufacturing with an additional change to its cost reconciliation regarding foreign exchange gains/losses that was separate from the restatement of its financial statements and done without auditor backing. *See id.* Marmen did not explain how, if at all, the change was reflected in its restated financial statements (on which Commerce relies for its calculations), or whether it was brought to the auditors' attention given their revision to the same cost category. *See id.* In addition, Marmen provided minimal narrative explanation of the change, simply stating that it had "identified certain additional changes unrelated to the financial statement amendments" and including a brief note in the reconciliation itself. Marmen Rejected SSDQR at 14-15, Ex. D-9 (P.R. 151-54; C.R. 184-95).

Commerce found that Marmen's proposed additional change was submitted late in the proceeding, was not adequately described, and was not supported by factual information on the record. IDM at 9. Thus, in accordance with 19 C.F.R. § 351.301 and 19 C.F.R. § 351.302(d), Commerce rejected Marmen's unsolicited cost reconciliation changes, while adjusting Marmen's reported cost of manufacturing by the unreconciled difference relating to the auditor's revision to the financial statements. *See* IDM at 8-9; Commerce Rejection Ltr. (P.R. 160; C.R. 203).

Marmen argues that Commerce unreasonably rejected its response to the second supplemental section D Questionnaire as untimely filed new factual information. Specifically,

---

[4] Commerce retained this document on the record pursuant to 19 C.F.R.. § 351.104(a)(2)(ii)(A) solely for the purposes of establishing and documenting the basis for rejecting it. *See* Commerce Memo re: Request to Reject Certain Documents in ACCESS (P.R. 166).

Marmen contends that its submission did not contain new factual information, but rather it contained "corrective information" that is permitted under 19 C.F.R. § 351.301(c).  *See* Marmen Br. 30.  We demonstrate below that Commerce lawfully rejected the unsolicited information.

**B.    Commerce's Rejection Of Marmen's Unsolicited New Factual Information Was Within Commerce's Discretion And Otherwise Lawful**

Commerce's regulations at 19 C.F.R. § 351.301 set forth the time limits for submission of new factual information, as defined by 19 C.F.R. § 351.102(b)(21).  Section 351.301(b) further requires that every submission of factual information be accompanied by a written explanation identifying the subsection of 19 C.F.R. § 351.102(b)(21) under which the information is being submitted.  This written explanation allows Commerce to efficiently and quickly identify the factual information and analyze it in accordance with the purpose for which it is being submitted.

Regarding the explanation requirement, Marmen contends that its proposed change to the cost reconciliation did include an explanation that the error was not in the company's accounting, but in Marmen Inc.'s cost reconciliation worksheet.  *See* Marmen Br. 26-27.  Further, Marmen argues that the record did not indicate that Marmen Inc.'s amended 2018 audited financial statement would need to be restated again.  *See id.*  Despite Marmen's arguments to the contrary, Commerce reasonably concluded that Marmen's proposed correction was not adequately described and was not supported by factual information on the record.

Commerce found that Marmen provided only a short explanatory statement and a single line in the cost reconciliation.  *See* IDM at 9; Marmen Rejected SSDQR at 14-15, Ex. D-9 (P.R. 151-54; C.R. 184-95).  As Commerce explained, Marmen's vague statement and note in its cost reconciliation were inadequate because "it is not as simple as claiming an error occurred in its accounting records and presenting it as a single adjustment line on a single page of a reconciliation document."  IDM at 9.  Indeed, as Commerce elaborated, Marmen's statement that

it discovered that the company did not convert certain purchases to Canadian dollars did not explain how its alleged discovery comports with the auditor reclassification and reflected in its financial statements. *See id.* Nor did Marmen's cursory statement identify the subsection of 19 C.F.R. § 351.102(b)(21) under which Marmen was submitting this new factual information. *See* Commerce Rejection Ltr. at 2 (P.R. 160; C.R. 203). Ultimately, notwithstanding its current explanations for the unsolicited change to its cost reconciliation, Marmen did not provide an appropriate or adequate explanation for the unsolicited change it was making.

Moreover, the record evidence that Marmen purchased wind tower sections from an affiliate in United States dollars does not by itself establish that an adjustment is warranted. *See* IDM at 9; Marmen Br. 27-29. Contrary to Marmen's arguments, as Commerce stated, simply citing various parts of responses that show that Marmen made purchases in United States dollars, and that its cost system—which is different than its financial accounting system—recorded a 1:1 exchange rate to Canadian dollars, does not establish that Marmen's audited financial statements, which were already restated by the auditors, were again wrong in relation to foreign exchange gains/losses and cost of goods sold errors. IDM at 9. Further, Commerce explained that its ability to investigate and to substantiate the significant claimed change was hampered by the untimely nature of the change following the preliminary determination, especially in an investigation. *Id.* Thus, Commerce lawfully found that Marmen's proposed change could not be relied on for the final determination, and properly rejected it from the record. *See id.*; *cf. Deacero S.A.P.I. de C.V. v. United States*, 353 F. Supp. 3d 1303, 1308 (Ct. Int'l Trade 2018) (sustaining Commerce decision to disregard revised cost database when respondent "did not fully explain why the revisions were necessary" or "what record evidence substantiated the changes it made"), *aff'd by sealed decision*, No. 2020-1918, ECF 62-63 (Fed. Cir. Apr. 13, 2021).

Additionally, Commerce acted within its discretion in rejecting the unsolicited portions of Marmen's response as untimely new factual information under 19 C.F.R. § 351.301(c). Sections 351.301(c)(1) to (4) establish deadlines for submission of specific types of factual information, and section 351.301(c)(5) establishes that new factual information must be submitted 30 days prior to the scheduled date of the preliminary determination, which in this investigation was January 6, 2020. The regulation goes on to state that "{Commerce} will reject any untimely filed rebuttal, clarification, or correction submission{.}" 19 C.F.R. § 351.301(c)(1)(v). In this case, Marmen first alerted Commerce to its need to submit a revised cost reconciliation for the foreign exchange gain/loss issues on February 7, 2020—*after* Commerce issued its preliminary determination in the investigation. *See* IDM at 9. As we explained above, Commerce found that "{n}otification after the *Preliminary Determination* is made too late for {Commerce} to probe, question, and obtain support for a claimed change that is significant in amount and substance, especially in an investigation." *Id.*; *see also PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760 (Fed. Cir. 2012) (holding that "absent constitutional constraints or extremely compelling circumstances," Court "will defer to the judgment of an agency regarding the development of the agency record" (internal bracketing, citations, and quotation marks omitted)).

Marmen argues that the change to its cost reconciliation is not untimely new factual information because it was "corrective" in nature. *See* Marmen Br. 30-31. However, Marmen's proposed change does not constitute the type of correction permitted by this Court. The Court of Appeals for the Federal Circuit and this Court have held that Commerce abuses its discretion by rejecting submissions correcting information already in the record. *See Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006); *Goodluck India Ltd. v. United States*, 393 F. Supp. 3d 1352, 1357 (Ct. Int'l Trade 2019) (citing *Fischer S.A. Comercio v. United States*,

700 F. Supp. 2d 1364, 1376-77 (Ct. Int'l Trade 2010)).  Thus, "Commerce is free to correct any type of importer error—clerical, methodology, substantive, or one in judgment—in the context of making an antidumping duty determination, provided that the importer seeks correction before Commerce issues its final results *and adequately proves the need for the requested corrections*." *Goodluck*, 393 F. Supp. 3d at 1357 (quoting *Timken*, 434 F.3d at 1353) (emphasis added).  At the same time, "Commerce is afforded discretion in deciding whether to accept a respondent's corrective information{.}"  *Id.* at 1358 (quoting *Deacero*, 353 F. Supp. 3d at 1309).

In this investigation, Commerce acted within its discretion in rejecting the new cost reconciliation information Marmen submitted as untimely new factual information, because the information was unsolicited and did not seek to correct information that was already on the record.  Marmen had previously submitted its cost reconciliation for the investigation *without* this information.  *See* IDM at 8 (citing Marmen BCDQR (P.R. 89-97; C.R. 40-95)).  In its second supplemental section D questionnaire, Commerce explicitly instructed Marmen to make changes to only the previously submitted cost reconciliation relating to the auditor's restatement.  *See* Commerce SSDQ to Marmen at 4 (P.R. 144; C.R. 169).  The instruction specifically stated that "{a}ll responses to {the} combined section D supplemental questionnaire should be limited to the questions contained herein."  *Id.*  Nonetheless, Marmen instead provided new information not in the previous reconciliation and not stemming from the auditor's restatement by adding a new adjustment for foreign exchange gains/losses with minimal explanation.  *See* IDM at 8.

Equally important, as Commerce explained, the change Marmen proposed was not simply a matter of "correcting" a line in its cost reconciliation, when relevant information was lacking and it was not clear how the new line item was reflected in Marmen's audited financial statements, which are the starting point for the cost reconciliation.  *See id.* at 9; *see also id.* at 8

(explaining "it appears that these exchange gains/losses were not included in either the original audited financial statements or the restated audited financial statements").  Further, even if the unsolicited factual information that Marmen submitted *could* be considered corrective (which it should not), Marmen's cursory explanation for its substantive change failed to "adequately prove{} the need for the requested corrections."  *Goodluck*, 393 F. Supp. 3d at 1357 (quoting *Timken*, 434 F.3d at 1353); *cf. Deacero*, 353 F. Supp. 3d at 1308 (sustaining Commerce decision to disregard revised cost database when respondent failed to explain substantiate changes).

Thus, Commerce properly rejected Marmen's newly submitted information because it was unsolicited and unrelated to information already on the record.

## IV. Commerce Properly Applied The Average-To-Transaction (A-T) Comparison Method To Marmen's United States Sales Based On Differential Pricing Analysis

In the preliminary and final determinations, Commerce adhered to its standard differential pricing analysis for determining whether application of the A-T method was appropriate.  *See* PDM at 10-12; IDM at 10-11.  Nonetheless, according to Marmen, Commerce acted without substantial evidence in finding that prices "differ significantly" among time periods, and thus unreasonably used the A-T method for five of the seven CONNUMs to which Commerce applied it.  *See* Marmen Br. 32-36.  Marmen's disagreement with Commerce's finding is not a valid basis to overturn Commerce's application the A-T comparison method.

### A. Overview Of Differential Pricing Analysis

Pursuant to 19 C.F.R. § 351.414(c)(1), Commerce calculates weighted-average dumping margins by comparing normal value and export price using the A-A method, unless it determines that another method is appropriate in a particular case.  The statute authorizes Commerce to use the A-T method as an alternative if "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or

periods of time{.}"  19 U.S.C. § 1677f-1(d)(1)(B).  Neither the statute nor the regulation dictate

how Commerce must make such a determination.  Hence, Commerce lawfully relies on

differential pricing analysis to examine which method to apply.  IDM at 10-11; *see also*, *e.g.*,

*NEXTEEL Co. v. United States*, 392 F. Supp. 3d 1276, 1294-97 (Ct. Int'l Trade 2019), *appeal

pending*, No. 21-1334 (Fed. Cir. Nov. 25, 2020).

The first stage of Commerce's differential pricing analysis includes two steps.  *See* PDM

at 10-11.  The first step is to apply the "Cohen's *d*" test to evaluate the extent to which the prices

to a particular purchaser, region, or time period differ significantly from the prices of all other

sales of comparable merchandise.  *See id*. at 11.  A group of sales with a Cohen's *d* coefficient

equal to or greater than 0.8—providing the strongest indication that there is a significant

difference between the test and comparison group prices—"passes" the test and signifies that a

significant pattern of price differences exists within that group.  *See id.*

Commerce then applies the "ratio test" to measure the extent of the significant price

differences by aggregating the value of all the sales that passed the Cohen's *d* test and comparing

that total to the total value of the respondent's United States sales.  *See id.*  If, as in this case, the

value of sales passing the Cohen's *d* test accounts for 66 percent or more of the value of total

United States sales, Commerce will consider whether to apply the A-T method to all sales.  *Id.*

At the second stage of the differential pricing analysis, Commerce applies a "meaningful

difference" test to evaluate whether calculating the weighted-average dumping margins using the

A-A method is meaningfully different from using the A-T method.  *See id.*  If so, this shows that

the A-A method cannot account for the observed differences in sale prices, and Commerce may

apply the appropriate alternative comparison method.  *See id.*

**B.**   **Commerce's Application Of The A-T Method In This Case Is Supported By Substantial Evidence And Otherwise Lawful**

Marmen does not dispute the record evidence showing that 68.29 percent of its United States sales passed the Cohen's *d* test, and that the A-A method does not account for these differences because there is a greater than 25 percent change in Marmen's dumping margin when using the A-A versus the A-T method.  *See* IDM at 11. Nonetheless, Marmen contends—as a matter of substantial evidence—that the absolute value of the differences the Cohen's *d* analysis unmasked means that they cannot be considered significant.  Marmen Br. 34 ("Despite the results of the Cohen's *d* test, a less-than-one percent difference in price cannot reasonably be considered 'significant.'")  Marmen's disagreement with Commerce's conclusion from its Cohen's *d* analysis does not demonstrate that Commerce's actions in this case are unlawful.

Contrary to Marmen's arguments, Commerce reasonably found the price differences in this case to be significant.  In accordance with 19 U.S.C. § 1677f-1(d)(1), Commerce used the Cohen's *d* test precisely because the Cohen's *d* coefficient is a measure of "the extent to which the prices to the particular purchaser, region, or time period differ significantly from the prices of all other sales of comparable merchandise." PDM at 11.  Moreover, in evaluating whether the prices differed significantly, Commerce quantified the extent of the differences using the most stringent of the Cohen's *d* test's three thresholds:  small, medium, and large (0.2, 0.5, and 0.8, respectively).  *Id.*  It did so because "the large threshold provides the strongest indication that there is a significant difference between the mean of the test and comparison groups{.}."  *Id.* And, ultimately, not only did Marmen's sales pass the large Cohen's *d* threshold—68.29 percent of Marmen's sales by value did so, thus confirming the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  *See* IDM at 11; Marmen Final Margin Calculation Memorandum at 3-4 (P.R. 195; C.R. 225).

The fact that the price differences that Commerce unmasked for individual CONNUMs may not be large in absolute terms does not prohibit Commerce from finding that those prices "differ significantly" based on the results of the Cohen's *d* analysis. Indeed, charging slightly less for certain time periods and not others matches the type of masked dumping that differential pricing analysis is designed to reveal. *See Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337, 1341-42 (Fed. Cir. 2017) (discussing "driving rationale" behind use of A-T method to address targeted or masked dumping). As Commerce explained, that is borne out in this case because, notwithstanding the experience associated with certain of Marmen's CONNUMs, on an overall basis a large portion of Marmen's United States sales (68.29 percent) exhibited a pattern of price differences, and when the more exacting A-T method was applied it revealed a greater than 25 percent change in Marmen's dumping margin. *See* IDM at 11.

Given the substantial record evidence and statistical analysis underlying Commerce's conclusion, as well as that Commerce considered Marmen's arguments (IDM at 10), Marmen's allegation that the Cohen's *d* test falsely identified a pattern of significant differences for certain CONNUMs, again, constitutes "mere disagreement" with Commerce's determination. *Haixing*, 335 F. Supp. 3d at 1346. Marmen does not demonstrate that Commerce's statistical analysis is false beyond asserting its belief that that a less-than-one-percent difference in price cannot be "significant." *See* Marmen Br. 34-35. Similarly, Marmen's belief that the differences for four of the five CONNUMs it challenges arose from adjustments for exempted import duties and imputed credit expenses does not negate Commerce's Cohen's *d* analysis or the underlying substantial record evidence. *See* Marmen Br. 35-36. In any event, that some evidence allegedly detracts from Commerce's conclusion does not render the determination unsupported by substantial evidence. *See Nippon Steel*, 458 F.3d at 1352. As Commerce explained in response

to Marmen's arguments, a large percentage of Marmen's sales still passed the Cohen's *d* test and actually led to a significant change in dumping margin.

## V. Commerce's Date Of Sale Determination For Marmen's Home Market And United States Sales Is Supported By Substantial Evidence And Otherwise Lawful

The Court should sustain Commerce's determination that Marmen's invoice date is the appropriate date of sale for Marmen's home market and United States sales because Commerce's determination is supported by substantial evidence and WTTC has not met its burden to overcome presumptive use of the invoice date under 19 C.F.R. § 351.401(i).

### A. Legal Framework

Commerce's antidumping comparisons of United States sales with concurrent home market or third country sales require the agency to establish dates of sale for the sales being compared. Neither the statute nor the Statement of Administrative Action (SAA) accompanying the Uruguay Round Agreements Act provide a methodology for determining date of sale; however, the SAA instructs that the "date of sale" for purposes of currency conversion should be understood as the "date when the material terms of sale are established." H.R. Doc. No. 103-316, at 810 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4153.

Consistent with the SAA, to determine on which date a sale occurs, and hence which sales to compare on a temporal basis, Commerce's regulations establish a presumption that the date of sale is the invoice date. *See* 19 C.F.R. § 351.401(i). Section 351.401(i) provides that Commerce normally "will use the date of invoice, as recorded in the exporter or producer's records" to identify the date of sale. *Id.* Commerce explained in the preamble to this regulation that "price and quantity are often subject to continued negotiation between the buyer and the seller until a sale is invoiced," and that the date of an enforceable sale "is not necessarily the date on which the terms of sale actually are established." *Antidumping Duties; Countervailing*

*Duties: Final Rule*, 62 Fed. Reg. 27,296, 27,348-49 (Dep't of Commerce May 19, 1997)

(*Preamble*).  Further, Commerce's longstanding practice is to use a uniform date of sale for each

respondent rather than a different date of sale for each sale.  *See id.* at 27,349.

Notwithstanding the regulatory presumption for the invoice date, Commerce's date of

sale methodology is "flexible," *Allied Tube & Conduit Corp. v. United States*, 127 F. Supp. 2d

207, 219 (Ct. Int'l Trade 2000), and if Commerce "is presented with satisfactory evidence that

the material terms of sale are finally established on a date other than date of invoice, {it} will use

the alternative date as the date of sale." *Preamble*, 62 Fed. Reg. at 27,349.  In these situations,

however, "the terms of sale must be firmly established and not merely proposed." *Id.*  Therefore,

"{a} preliminary agreement on terms, even if reduced to writing, in an industry where

renegotiation is common does not provide any reliable indication that the terms are truly

'established' in the minds of the buyer and seller." *Id.*

Parties advocating a different date of sale, such as WTTC, bear the burden of presenting

evidence to overcome the regulatory presumption by demonstrating that the material terms of

sale are established at a time other than the invoice date.  *See Sahaviriya Steel Indus. Public Co.*

*v. United States*, 714 F. Supp. 2d 1263, 1279-80 (Ct. Int'l Trade 2010), *aff'd*, 649 F.3d 1371

(Fed. Cir. 2011).  Commerce considers "material terms of sale" to include terms such as price,

quantity, delivery, and payment.  *See id.* at 1280 (citations omitted).

This Court has sustained Commerce's date of sale regulation and practice.  *See*, *e.g.*,

*Sahaviriya Steel*, 714 F. Supp. 2d at 1279-82; *Nakornthai Strip Mill Pub. Co. Ltd. v. United*

*States*, 614 F. Supp. 2d 1323, 1333-34 (Ct. Int'l Trade 2009); *see also Mittal Steel Point Lisas*

*Ltd. v. United States,* 548 F.3d 1375 1379-80 (Fed. Cir. 2008) (recognizing Commerce's date of

sale practice).  Specifically, this Court has held that "unless the party seeking to establish a date

of sale other than the invoice date produces sufficient evidence to overcome this presumption, Commerce will use invoice date as the date of sale." *Sahaviriya Steel*, 714 F. Supp. 2d at 1279-80.  In other words, the plaintiff bears the burden of producing sufficient evidence demonstrating that another date "better reflects the date on which the exporter or producer establishes the material terms of sale." *Viraj Group, Ltd. v. United States*, 343 F.3d 1371, 1377, n.1 (Fed. Cir. 2003) (citing 19 C.F.R. § 351.401(i) (2003)).  Moreover, even after a plaintiff produces evidence to overcome the presumption, if "the record indicates that Commerce's decision to use the invoice date as the date of sale was reasonable and was supported by substantial evidence, Plaintiff's arguments must fail." *Allied Tube*, 127 F. Supp. 2d at 220.

### B.    Commerce Reasonably Determined To Use Invoice Date As The Date Of Sale For Marmen's Home Market And United States Sales

In this case, Commerce reasonably analyzed Marmen's questionnaire responses and sample sale documents and identified the invoice date as the date of sale for both Marmen's home market and United States sales.  WTTC argues that Commerce's decision was flawed in various ways.  *See* WTTC Br. 18-33.  To the contrary, Commerce's analysis is consistent with 19 C.F.R. § 351.401(i) and supported by substantial evidence.  *See* IDM at 13-16.

As an initial matter, WTTC improperly attempts to shift the burden to Commerce merely to follow the established regulatory presumption.  Commerce in this case pursued its normal practice and started with the presumption that the invoice date would be the most reasonable way to determine Marmen's date of sale.  WTTC, however, seeks to shift the burden by asserting that "Commerce failed to adequately explain or support its selection of invoice date as the date of sale in the Canadian and United States markets."  WTTC Br. 18.  This misstates Commerce's practice—it is *WTTC* that bears the burden of demonstrating that Commerce should treat a date *other* than invoice date as the date on which parties firmly establish the material sales terms.  *See*

*Sahaviriya Steel*, 714 F. Supp. 2d at 1279-80 (holding that party, not Commerce, has burden of establishing that date on which material terms of sale were set is different from invoice date). Commerce explained in establishing its lawful regulatory presumption that businesses frequently shift their terms of sale between the purchase order and invoice, so that in most situations the material terms of sale are established by the invoice. *See Preamble*, 62 Fed. Reg. at 27,348-49 (explaining that "price and quantity are often subject to continued negotiation between the buyer and the seller until the sale is invoiced"). Hence, "the date on which the buyer and seller appear to agree on the terms of a sale is not necessarily the date on which the terms of sale actually are established" and "{a} preliminary agreement on terms, even if reduced to writing, in an industry where renegotiation is common does not provide any reliable indication that the terms are truly 'established' in the minds of the buyer and seller." *Id.* at 27,349.

Similarly, WTTC improperly seeks to separate the analysis for Marmen's home market and United States sales, even though it is Commerce's longstanding practice to use a uniform date of sale for each respondent. *See Preamble*, 62 Fed. Reg. at 27,349. Marmen provided an example of pre-invoice changes for both kinds of sales, and it is not appropriate for WTTC to attempt to conceptually separate the analysis of the record evidence.

More fundamentally, Commerce requested and received substantial evidence supporting its determination that the invoice date is the date of sale. Commerce asked Marmen to provide the invoice date for the sales in question and Marmen explained that the invoice date should be the date of sale because adjustments to quantity, price, delivery times, and other terms of sale may occur until the invoice is finalized. *See* PDM at 12-13; Marmen AQR at 20, 25 (P.R. 76; C.R. 35-38); Marmen SABCQR at 14 (P.R. 120-21; C.R. 142-57).

Commerce also sought additional information from Marmen to determine whether material changes were made between the purchase order and invoice date, and to confirm that material sales terms were indeed firmly established by the invoice date.  Specifically, Commerce asked Marmen to provide an example in which the terms of sale changed between the purchase order and the invoice date for both Canadian and United States sales.  *See* IDM at 16; Commerce Supplemental Sections ABC Questionnaire for Marmen at 5-6 (Nov. 20, 2019) (P.R. 103: C.R. 97).  With respect to its United States sales, Marmen explained that its customer GE amended the original purchase order five times over a period of nearly six months with respect to quantity, price, and payment terms, demonstrating that the material terms of sales were not final until issuance of the invoice.  *See* Marmen SABCQR at 13-14 & Ex. FSQ-7 (P.R. 120-21; C.R. 142-57).  This large number of changes to material terms between the purchase order and invoice signified to Commerce that the final material terms of sale had yet to be finalized and that the parties were still negotiating material terms in the purchase orders or other preliminary agreements.  *See* IDM at 16.  With respect to home market sales in Canada, Marmen provided an example where its customer Vestas requested a change in transportation mode from truck to railcar, which affected whether Marmen loaded the sections onto trucks or railcars and needed to charge for this service.  *See* Marmen AQR at 25 (P.R. 76; C.R. 35-38); Marmen SABCQR at 12-13 & Ex. FSQ-6.  This transportation adjustment affected all wind tower sections ordered for Vestas's production of wind turbines, and therefore was material.  *See* Marmen Rebuttal Case Br. 16 (May 6, 2020) (P.R. 184: C.R. 222).

Although Commerce in some instances has not considered delivery terms controlling in determining date of sale, Commerce has clarified that its "interpretation of the material terms of sale has evolved over time, and can include (but is not limited to) price, quantity, *delivery terms*,

and payment terms." *Large Power Transformers from the Republic of Korea*, 82 Fed. Reg. 13,432 (Dep't of Commerce Mar.13, 2017) (final admin. review), at IDM Cmt. 17 (*Transformers from Korea*) (emphasis added; citation omitted).  Thus, Commerce properly examined Marmen's wind tower sales and the record evidence to determine when the material terms were established, and reasonably determined to use invoice date as the uniform date of sale for Marmen's sales.

WTTC's arguments do not negate Commerce's reasonable determination.  First, WTTC emphasizes the extent of Marmen's negotiations with its home market customer Vestas prior to Vestas's issuance of a purchase order.  WTTC Br. 19-20.  The key inquiry, however, is whether the material terms of sale for Marmen's home market sales are established at a time other than the invoice date.  *See Sahaviriya Steel*, 714 F. Supp. 2d at 1279-80.  In that regard, Marmen explained in its certified questionnaire responses that adjustments to the material terms of sale may occur until the invoice is finalized.  *See* PDM at 12-13; Marmen AQR at 25 (P.R. 76; C.R. 35-38); Marmen SABCQR at 14 (P.R. 120-21; C.R. 142-57).  Further, Marmen complied with Commerce's requests for examples of such changes.  *See* Marmen SABCQR at 12-14 & Exs. FSQ–6–7.  The extent of negotiations does not change these facts.

WTTC also suggests that Commerce unlawfully relied on its questionnaire instructions to control its date of sale determination.  WTTC Br. 21-22.  But Commerce merely pointed out, in the context of WTTC arguing that Marmen had improperly withheld date of sale information, that Marmen had compiled with Commerce's instructions in its reporting.  *See* IDM at 15. Indeed, while WTTC quibbles that the initial questionnaire did not specifically state that invoice date would be used as the date of sale, it nonetheless acknowledges that the initial questionnaire "directed Marmen to include in its reporting all sales for which invoices had been issued by the date of the filing of the response{.}"  WTTC Br. 22.

Likewise, WTTC argues that Commerce's regulatory presumption to use the invoice date as the date of sale is insufficient to support Commerce's determination.  WTTC Br. 22-23. However, Commerce in this case did not merely rely on a presumption—it looked to the record evidence indicating that Marmen's material terms of sale were subject to adjustment prior to the invoice date.  *See* PDM at 12-13; IDM at 15-16.  Moreover, as we demonstrated above, it remains *WTTC's* burden to overcome the regulatory presumption by showing that the material terms of sales were firmly established on a different date.  Commerce assessed the evidence and arguments in this case and found that WTTC had not done so.  *See* IDM at 13-16.

Next, notwithstanding that Commerce clearly considered WTTC's date of sale arguments and disagreed with its conclusion about the evidence that Marmen provided, WTTC claims that Commerce failed to consider important aspects of the problem.  *See* IDM at 13-16; WTTC Br. 23-27.  That is not accurate.  For example, contrary to WTTC's claims, Commerce explicitly considered WTTC's arguments that the example of the change in delivery terms that Marmen provided for its home market sales was insufficient to qualify as a change to the material terms of sale.  *See* IDM at 13-14.  Commerce, in disagreeing with WTTC's position, summed-up WTTC's arguments (which involve a significant amount of bracketed confidential information) by quoting WTTC's contentions that the examples Marmen provided of changes between the order agreement and invoice date were "minor and isolated" changes to delivery terms that occurred subsequent to the true agreement.  IDM at 14, 16 (quoting WTTC Case Br. 34 (Apr. 24, 2020) (P.R. 179; C.R. 220)).  Commerce further confirmed its finding, notwithstanding WTTC's contentions, that "{a}s previously indicated, the Marmen Group has provided evidence that changes to the material terms of sale occurred between the purchase order and the invoice date in both the home and U.S. markets."  *Id.* at 16; *cf. NMB Sing. Ltd v. United States*, 557 F.3d 1316,

1319 (Fed. Cir. 2009) (Commerce's explanation need not be perfect, so long as "the path of Commerce's decision" is "reasonably discernable to a reviewing court" (citation omitted)).

Relatedly, to the extent that WTTC argues that Commerce does not consider changes in delivery terms to be material changes to the terms of sale, *see* WTTC Br. 26, we demonstrated above that Commerce has evolved and clarified its practice in this regard.  *See Transformers from Korea*, 82 Fed. Reg. 13,432, at IDM Cmt. 17.  Nor is Commerce's determination "speculative" (WTTC Br. 27) merely because it required Marmen to provide only one example each for its home market and United States sales.  The example Marmen provided for its United States sales actually involved multiple changes over a period of months to quantity, price, and payment terms, demonstrating that the material terms of sales were not final until issuance of the invoice.  *See* Marmen SABCQR at 13-14 & Ex. FSQ-7 (P.R. 120-21; C.R. 142-57).  Moreover, beyond the specific examples, the record contains evidence consisting of Marmen's certified representations that adjustments to various materials terms of sale may occur until the invoice is finalized.  *See* PDM at 12-13; Marmen AQR at 25 (P.R. 76; C.R. 35-38); Marmen SABCQR at 14 (P.R. 120-21; C.R. 142-57).  Commerce is entitled to rely on this record evidence.

WTTC also criticizes Commerce's observation that its decision in this case in consistent with its previous reliance on the invoice date in its *Wind Towers from Vietnam* investigation.  *See* WTTC Br. 30-31; IDM at 16 (citing *Utility Scale Wind Towers from the Socialist Republic of Vietnam*, 76 Fed. Reg. 75,984 (Dep't of Commerce Dec. 26, 2012), at IDM Cmt. 12.  However, WTTC's criticism merely reflects its disagreement that the changes Marmen highlighted are material terms of sale.  See WTTC Br. 30-31.  Contrary to this position, Commerce explained that in both *Wind Towers from Vietnam* and this case, the respondents similarly demonstrated

that "changes to the material terms of sale occurred between the purchase order and the invoice date in both the home and U.S. markets." IDM at 16.

In a similar vein, WTTC's criticism of the example Marmen provided of a United States sale for which there were multiple changes to the material terms of sale prior to issuance of the invoice rely on very similar arguments to those WTTC levies against Marmen's home market example. *See* WTTC Br. 31-33. If anything, WTTC's position in even weaker regarding the United States sales. Notwithstanding WTTC's contentions that the numerous changes Marmen discussed and documented for the sale in question were [

], the record evidence still shows that material terms like the sale's quantity, price, and payment terms all changed in multiple revisions preceding the invoice date. *See* Marmen SABCQR at 13-14 & Ex. FSQ-7 (P.R. 120-21; C.R. 142-57); *see also Preamble*, 62 Fed. Reg. at 27,348-49 (explaining that "price and quantity are often subject to continued negotiation between the buyer and the seller until a sale is invoiced" and that "{a} preliminary agreement on terms, even if reduced to writing, in an industry where renegotiation is common does not provide any reliable indication that the terms are truly 'established' in the minds of the buyer and seller"). This weakness significantly undermines WTTC's claim because of Commerce's longstanding practice to use a uniform date of sale for each respondent. *See Preamble*, 62 Fed. Reg. at 27,349.

### C. Commerce's Determination Not To Use The Purchase Order Date As The Date Of Sale Under The "Custom-Made Goods" Exception Is Supported By Substantial Evidence And Otherwise Lawful

WTTC's various arguments that Commerce should have used the purchase order date as the date of sale under the "Custom-Made Goods" exception also lack merit. *See* WTTC Br. 19, 26-27, 27-30, 33. As WTTC states—*in some, but not all, cases*—the presumption in favor of using the invoice date may be overcome for custom-made merchandise sold under long term

contracts.  *See* WTTC Br. 19 (citing *Preamble*, 62 Fed. Reg. at 27,349).  In this case, however, substantial evidence supports Commerce's determination to use invoice date as the date of sale.

As we explained above, the *Preamble* provides Commerce with flexibility to determine whether the invoice date is appropriate.  It says only that purchase order dates are "usually" appropriate in cases involving custom-made merchandise requiring substantial investment to produce.  *See* 62 Fed. Reg. at 27,349 ("If the Department is presented with satisfactory evidence that the material terms of sale are finally established on a date other than the date of invoice, the Department will use that alternative date as the date of sale.  For example, in situations involving large custom-made merchandise in which the parties engage in formal negotiation and contracting procedures, the Department *usually* will use a date other than the date of invoice.") (emphasis added).  Therefore, even in the case of custom-made goods, the *Preamble* does not require Commerce to depart from using invoice date as the date of sale.  Further, the *Preamble* clarifies that, even in a situation involving custom-made goods, "the terms of sale must be firmly established and not merely proposed" and that "{a} preliminary agreement on terms, even if reduced to writing, in an industry where renegotiation is common does not provide any reliable indication that the terms are truly 'established' in the minds of the buyer and seller . . . . even if, for a particular sale, the terms were not renegotiated."  62 Fed. Reg. at 27,349.

As Commerce observed, Marmen's sales fail to satisfy this exception to the general presumption in favor of invoice date for custom goods.  Record evidence shows that Marmen's purchase orders for its sales were revised multiple times, which indicates that the material terms of sale were not established at the time the purchase order was issued.  *See* PDM at 12-13; IDM at 15-16.  Further, as Commerce explained, Marmen reported that it did not engage sales support services, such as design and engineering, installation, or post-maintenance repair, that would

signify a level of investment indicative of a different date of sale.  *See* IDM at 16.  Hence,

notwithstanding Commerce's application of the custom-made goods exception on other

occasions, it is not appropriate in this case.

## VI.  Commerce Reasonably Treated Marmen's Home Market Sales As Sales of Wind Tower Sections

Commerce's treatment of Marmen's Canadian wind tower sales as sales of wind tower

sections is supported by substantial evidence.  The decision is reasonable because it rests on

concrete record evidence that Marmen provided in accordance with the instructions in

Commerce's Antidumping and Model Match Questionnaires.  *See* IDM at 17.  Commerce also

did not find evidence suggesting that Marmen withheld information about its sales and invoicing

practices.  *See id.*  Indeed, Commerce (and Marmen) followed Commerce's practice of requiring

parties to report sales on an invoice-line-item basis.  *See id.* at 18; *Wooden Bedroom Furniture*

*from the People's Republic of China*, 69 Fed. Reg. 67,313 (Dep't of Commerce Nov. 17, 2004)

(final determ.) (*Wooden Bedroom Furniture*), at IDM Cmt. 53.

### A.  Commerce's Decision To Rely On Marmen's Reporting Of Its Sales Of Wind Tower Sections In Canada Is Reasonable And Lawful

Commerce reasonably treated Marmen's Canadian sales as sales of wind tower sections

because that is how Marmen actually invoiced the sales, while also being consistent with the way

Commerce instructed Marmen to report the information.  *See* IDM at 17-18.  In its Section A

response, Marmen indicated that it produced and "sold wind-towers to Vestas, a turbine OEM, in

the home market" and "issued one invoice *per section*, in accordance with Vestas's instruction."

*Id.* at 17 (quoting Marmen AQR at 21-22 (P.R. 76; C.R. 35-38); Marmen Rebuttal Case Br. 21

(P.R. 184; C.R. 222) (emphasis added)).  Further, Marmen demonstrated that this was because

Vestas instructed Marmen to issue invoices by section.  *See* Marmen Second Supplemental

Sections A, B, and C Questionnaire Response at 7, Ex. SSQ-15 (Feb. 6, 2020) (P.R. 150; C.R. 181-83) (Marmen SSABCQR).[5]  Marmen also provided Commerce with the documentation showing Marmen's section-based price quotes and Vestas's purchase orders with a line item and price for each wind tower section.  *See* Marmen SABCQR at Exs. FSQ-12 (price quotes), FSQ-1 (purchase orders), FSQ-11 (invoices) (P.R. 120-21; C.R. 142-57).

At the same time, Commerce in its questionnaires instructed Marmen to report sales on an invoice-line-item basis, per Commerce's standard practice.  *See* IDM at 17-18; Antidumping Questionnaire at B-2, B-7, C-2, C-6 (Aug. 19, 2019) (P.R. 54); *Wooden Bedroom Furniture*, 69 Fed. Reg. 67,313, at IDM Cmt. 53.  Marmen followed these instructions in its sales reporting.  *See* IDM at 17.  Thus, the home market sales listing that Marmen provided was consistent with the information in its section A response and what Commerce requested in the questionnaires.  *See id.* at 17-18 (citing Marmen AQR at 21-22 (P.R. 76; C.R. 35-38); Marmen BCDQR at B-16 (P.R. 89-97; C.R. 40-95)).  Likewise, as Commerce observed, Marmen's reporting of the invoice issued with each tower section that Marmen sold to its home market customer constituted a unique sales record that corresponded to the merchandise that Marmen *actually* invoiced to the customer.  *Id.* at 18 (citing Marmen AQR at 22; Marmen BCDQR at B-2).

Moreover, Commerce reasonably disagreed with WTTC's contention that Marmen had misreported its Canadian sales so that evidence on the record would lead Commerce to treat the wind tower sales as sections rather than completed wind towers.  *See* IDM at 17.  Marmen did not mislead Commerce in its questionnaire responses because Marmen adhered to Commerce's instructions.  *See id.*  Indeed, upon reviewing Marmen's Section A Response, Marmen's Sections

---

[5] WTTC highlights that Vestas's instructions to Marmen stemmed from requirements arising from Vestas's [                    ].  *See* WTTC Br. 34-35.  But that does not change the fact that Marmen's reporting was both consistent with its records and based on customer instructions.

B, C, and D Response, and Marmen's Supplemental A, B, and C Response, Commerce found no evidence that Marmen withheld information about its sales and invoicing in Canada. *Id.*

The foregoing refutes WTTC's arguments contending that Commerce's acceptance of Marmen's reporting and consequent treatment of Marmen's Canadian sales as sales of wind tower sections is unreasonable. For example, WTTC contends that "Commerce's questionnaire instructions, issued before any record evidence is collected or analyzed, cannot reasonably be treated as determinative of whether Commerce should treat Marmen's sales, for product-matching purposes, as sales of complete towers or sales of individual tower sections." WTTC Br. 35; *see generally id.* at 35-37. This misses the point. Commerce did not accept Marmen's invoice-line-item reporting *merely* because that is how Commerce instructed Marmen to proceed, but because that is *actually* how Marmen and its customer handled the sales *and* the way Commerce instructed Marmen to report them. WTTC cannot overcome the "high barrier to reversal" for its substantial evidence challenge when Commerce's determination follows the manner in which the sales were actually documented in real time. *See Nippon Steel*, 458 F.3d at 1352. Nor is it accurate for WTTC to claim that Commerce "sidestepped" the issue (WTTC Br. 36), when Commerce explained in the IDM that it accepted Marmen's reporting because it was consistent with what Marmen had explained in its section A response, Commerce's instructions, and how Marmen actually invoiced its customer. *See* IDM at 17-18.

Likewise, WTTC does not deny that, as in *Wooden Bedroom Furniture* (when a party improperly reported some merchandise as complete beds rather than component pieces), Commerce's general practice and clear instructions in this investigation were that Marmen should report its sales information as it appears on Marmen's actual invoices. *See* IDM at 18; *Wooden Bedroom Furniture*, 69 Fed. Reg. 67,313, at IDM Cmt. 53. Commerce was thus correct

in explaining that Marmen's reporting of the invoice Marmen issued for each tower section sold to its Canadian customer constituted a unique sales record corresponding to the merchandise that Marmen invoiced.  *See id.*  Therefore, Commerce acted consistently with its normal practice of using the invoice-line-item basis in making its determination that Marmen sold wind towers in sections and not complete units in its home market but did not solely rely on that practice.

Next, WTTC argues that Commerce inadequately considered WTTC's arguments and supporting evidence that, despite the way the sales were actually invoiced, Commerce should nonetheless treat them as sales of full wind towers.  *See* WTTC Br. 37.  Commerce, however, explained in response to WTTC's arguments before the agency that it disagreed with WTTC's assertion that the information WTTC cited undermines the credibility of Marmen's reporting in its initial and supplemental questionnaire responses.  *See* IDM at 18 (discussing arguments raised at WTTC Case Br. 41 (P.R. 179; C.R. 220)).  Commerce further elaborated that, by reporting its home market sales by tower section, Marmen provided information that (1) was consistent with the description of sales process provided in both Marmen's Section A and Sections B through D Questionnaire Responses, and (2) comprised a unique sales record of each line item on the invoice.  *See* IDM at 18 (citations omitted).  WTTC merely disagrees with Commerce's weighing of the record evidence in making its determination, and the Court should thus deny WTTC's claim.  *See Haixing*, 335 F. Supp. 3d at 1346 ("mere disagreement" insufficient).

## VII.  Commerce Lawfully Determined Not To Apply Adverse Facts Available To Marmen

Commerce's decision not to apply facts available or an adverse inference to Marmen is lawful because, contrary to WTTC's arguments, Commerce received the necessary information it requested from Marmen.  *See* IDM at 18-20; WTTC Br. 37-44.

Under 19 U.S.C. § 1677e, Commerce uses "facts otherwise available" to reach its determination if "necessary information is not available on the record," or if a party withholds information that Commerce has requested, fails to provide information by the deadline or in the form or manner requested, significantly impedes a proceeding, or provides information that cannot be verified.  19 U.S.C. § 1677e(a).  Commerce may apply an adverse inference in selecting among the facts otherwise available if it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information{.}"  *Id.* § 1677e(b)(1).

Application of facts otherwise available is also subject to the requirements of 19 U.S.C. § 1677m(d).  If Commerce determines that a response does not comply with its request for information in an antidumping duty review, it shall "promptly inform the person submitting the response of the nature of the deficiency{.}"  19 U.S.C. § 1677m(d).  If that party submits further information that continues to be unsatisfactory, or the information is not submitted within the applicable time limits, Commerce may, subject to 19 U.S.C. § 1677m(e), disregard all or part of that party's original and subsequent responses.

In this case, WTTC's claims that the Court should require Commerce to apply adverse facts available to Marmen are tied closely to its disagreement with Commerce's acceptance of Marmen's sales reporting, discussed above.  *See*, *e.g.*, WTTC Br. 38, 39-40.  On top of arguing the Marmen withheld or provided inaccurate information by reporting its invoice dates as the date of sale and its home market sales as sales of tower sections, WTTC asserts that different reporting would have resulted in Commerce needing constructed value information that Marmen did not provide—even though Commerce, having accepted Marmen's sales reporting, did not request that information.  *See id.* at 40.

Contrary to these arguments, Commerce explained repeatedly in its determination that Marmen complied with Commerce's instructions and that, upon reviewing Marmen's various questionnaire responses, Commerce found "no evidence" suggesting that Marmen withheld information concerning the date of sale or its invoicing of tower sections.  IDM at 15, 17; *see also id.* at 19-20 (finding that "Marmen Group was responsive to the information requested by Commerce, and submitted its responses in a timely manner").  Moreover, WTTC's disagreement notwithstanding, Commerce accepted Marmen's reporting as appropriate after Marmen first explained and then illustrated with documentary evidence that (1) its material terms of sale were subject to change prior to the invoice date and (2) it actually invoiced its home market customer based on tower sections.  In other words, Marmen's sales reporting is consistent with both the narrative record evidence from Marmen's initial reporting and with what Commerce agreed was appropriate and consistent with its instructions.  *See* IDM at 20 ("while the petitioner has argued for an alternative date of sale and for a different reporting methodology . . . the sales data that the Marmen Group provided was consistent with that which Commerce requested"); *see also* Marmen Rebuttal Case Br. 30-38 (P.R. 184; C.R. 222) (addressing WTTC's arguments).

Apart from whether the Court sustains Commerce's determinations, these are not circumstances in which it would be appropriate for Commerce to apply facts otherwise available, let alone an adverse inference.  As Commerce explained in rejecting WTTC's contentions, "we find there is no missing information from the record that is a condition necessary for applying facts available, whether based upon the use of an adverse inference or not{.}"  IDM at 20.  Moreover, WTTC's allegations about the record lacking constructed value information conflict with the requirements of 19 U.S.C. § 1677m(d), because Commerce neither identified a deficiency nor notified Marmen and requested further information that Marmen failed to provide.

*See* IDM at 20 ("We further note that in this investigation, we have made no requests in which we asked the Marmen Group to either: 1) revise its home market sales so as to report sales by purchase order; or 2) to replace the Marmen Group's home market reporting of wind tower sections with a reporting methodology that is based on completed wind towers.").

Therefore, Commerce acted reasonably when it declined to resort to facts available with an adverse inference and its determination should be sustained.

## **CONCLUSION**

For these reasons, we respectfully request that this Court sustain Commerce's final determination in its entirety and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                           /s/ Joshua E. Kurland
KIRRIN A. HOUGH                    JOSHUA E. KURLAND
NATALIE M. ZINK                     Trial Attorney
Attorneys                                 U.S. Department of Justice
Office of the Chief Counsel        Commercial Litigation Branch
for Trade Enforcement & Compliance    P.O. Box 480
U.S. Department of Commerce    Ben Franklin Station
Washington, D.C. 20230            Washington, D.C. 20044
                                              Tel: (202) 616-0477
                                              Fax: (202) 307-0972
                                              E-mail:  Joshua.E.Kurland@usdoj.gov

April 30, 2021                           *Attorneys for Defendant United States*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limitation of Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains approximately 13,942 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.


/s/ Joshua E. Kurland