NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| MARMEN INC., *et al.*, |
| Plaintiffs, |
| and |
| WIND TOWER TRADE COALITION, |
| Consolidated Plaintiff, |
| v. |
| UNITED STATES, |
| Defendant, |
| and |
| WIND TOWER TRADE COALITION, *et al.*, |
| Defendant-Intervenors. |

Before:  Hon. Jennifer Choe-Groves,
Judge

Consol. Court No. 20-00169

## NON-CONFIDENTIAL VERSION

Business Proprietary Information
Removed from Pages: 3, 4, 6, 9, 10,
12-17, and 19-22

## WIND TOWER TRADE COALITION'S REPLY BRIEF

Alan H. Price, Esq.
Daniel B. Pickard, Esq.
Robert E. DeFrancesco, III, Esq.
Maureen E. Thorson, Esq.
Laura El-Sabaawi, Esq.

WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the Wind Tower Trade Coalition*

Dated: May 28, 2021

Consol. Ct. No. 20-00169                                   NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

                                                                              **Page**

I.     INTRODUCTION ........................................................................................1

II.    ARGUMENT ...............................................................................................1

       A.     Commerce Erred in Selecting Dates of Sale ........................................1

              1.     Commerce Erred in Selecting Marmen's Home-Market Date
                     of Sale ........................................................................................3

              2.     Commerce Erred in Selecting Marmen's U.S. Date of Sale......................14

       B.     Commerce Erred in Treating Marmen's Home-Market Sales as Sales
              of Sections ..........................................................................................16

       C.     Commerce Erred in in Declining to Resort to the Facts Available,
              with Adverse Inferences ......................................................................19

III.   CONCLUSION ...........................................................................................23

Consol. Ct. No. 20-00169                                    NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Tube and Conduit Corp. v. United States,*
    24 CIT 1357, 127 F. Supp. 2d 207 (2000)................................................................5

*Baroque Timber Indus. (Zhongshan) Co. v. United States,*
    971 F. Supp. 2d 1333 (Ct. Int'l Trade 2014) ..........................................................2

*Burlington Truck Lines, Inc. v. United States,*
    371 U.S. 156 (1962)..................................................................................................2

*CC Metals & Alloys, LLC v. United States,*
    145 F. Supp. 3d 1299 (Ct. Int'l Trade 2016) ........................................................18

*Çelik Fabrikalari T.A.Ş. v. United States,*
    308 F. Supp. 3d 1297 (Ct. Int'l Trade 2018) ..........................................................7

*Dong-A Steel Co. v. United States,*
    475 F. Supp. 3d 1317 (Ct. Int'l Trade 2020) ........................................................18

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)....................................................................................................2

*Nakornthai Strip Mill Pub. Co. v. United States,*
    33 CIT 326, 614 F. Supp. 2d 1323 (2009)..............................................................10

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006)................................................................................2

*Rebar Trade Action Coal. v. United States,*
    No. 14-00268, slip op. 15-130 (Ct. Int'l Trade Nov. 23, 2015)..............................7

*Sahaviriya Steel Indus. Pub. Co. v. United States,*
    34 CIT 709, 714 F. Supp. 2d 1263 (2010)..................................................5, 10, 11

*SeAH Steel Corp. v. United States,*
    25 CIT 133 (2001) ..................................................................................................10

*SKF USA Inc. v. United States,*
    263 F.3d 1369 (Fed. Cir. 2001)................................................................................2

*Yangzhou Bestpak Gifts & Crafts Co. v. United States,*
    716 F.3d 1370 (Fed. Cir. 2013)................................................................................2

**NON-CONFIDENTIAL VERSION**

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) .................................................................2

19 U.S.C. § 1677b(a) .........................................................................20

19 U.S.C. § 1677b(a)(1) .....................................................................20

19 U.S.C. § 1677b(a)(1)(A) ..................................................................1

19 U.S.C. § 1677b(a)(4) .....................................................................20

19 U.S.C. § 1677b(e) .........................................................................20

**Regulations**

19 C.F.R. § 351.401(i) ........................................................................2

**Administrative Materials**

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296
   (Dep't Commerce May 19, 1997) ............................................... *passim*

*Carbon and Alloy Steel Wire Rod from Spain*, 83 Fed. Reg. 13,233
   (Dep't Commerce Mar. 28, 2018) ......................................................8

*Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 78 Fed. Reg. 21,105
   (Dep't Commerce Apr. 9, 2013) ........................................................7

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules,
   from the People's Republic of China*, 77 Fed. Reg. 63,791 (Dep't Commerce
   Oct. 17, 2012) ........................................................................8

*Ferrovanadium from the Republic of Korea*, 82 Fed. Reg. 14,874 (Dep't Commerce
   Mar. 23, 2017) ........................................................................8

*Large Power Transformers from the Republic of Korea*, 77 Fed. Reg. 40,857
   (Dep't Commerce July 11, 2012) .......................................................8

*Large Power Transformers from the Republic of Korea*, 82 Fed. Reg. 13,432
   (Dep't Commerce Mar. 13, 2017) ......................................................10

*Steel Concrete Reinforcing Bar from Turkey*, 79 Fed. Reg. 22,804
   (Dep't Commerce Apr. 24, 2014) .......................................................7

*Utility Scale Wind Towers from the Socialist Republic of Vietnam*, 77 Fed. Reg.
   75,984 (Dep't Commerce Dec. 26, 2012) ..............................................12

## I.      **INTRODUCTION**

On behalf of the Wind Tower Trade Coalition ("WTTC"), we respectfully submit the following reply to the response briefs filed by Defendant the United States ("the Government") and Defendant-Intervenors Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co. (collectively, "Marmen"). *See* Def.'s Resp. to Pls.' Rule 56.2 Mots. for J. Upon Agency R. (Apr. 30, 2021), ECF No. 37 ("Government's Brief"); Def.-Ints.' Resp. in Opp'n to Consol. Pl.'s Rule 56.2 Mot. for J. Upon Agency R. (Apr. 30, 2021), ECF No. 34 ("Marmen's Brief").

## II.     **ARGUMENT**

This appeal arises from an antidumping duty investigation into utility scale wind towers from Canada. *See Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 40,239 (Dep't Commerce July 6, 2020) (final deter. of sales at less than fair value and final negative deter. of critical circumstances), P.R. 196 and accompanying Issues and Decision Memorandum, P.R. 192 ("Final IDM"). WTTC has appealed (1) the selection of invoice date as Marmen's date of sale in the home and U.S. markets, (2) treatment of Marmen's home market sales as sales of tower sections, and (3) the determination not to employ adverse inferences in determining Marmen's final antidumping duty margin.

### A.      **Commerce Erred in Selecting Dates of Sale**

In calculating antidumping duty margins, the U.S. Department of Commerce ("Commerce") seeks to compare the prices of contemporaneous U.S. and home market sales. *See, e.g.*, 19 U.S.C. § 1677b(a)(1)(A). For each market, Commerce selects a "date of sale" on which material selling terms are deemed to have become finally established in the minds of buyer and seller. "Normally," invoice date will be treated as the date of sale, but where Commerce "is presented with satisfactory evidence that the material terms of sale are finally established on a date

other than the date of invoice, {Commerce} will use that alternative date as the date of sale."
19 C.F.R. § 351.401(i); *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,349
(Dep't Commerce May 19, 1997) ("*Preamble*"). Sales of "large custom-made merchandise in
which the parties engage in formal negotiation and contracting procedures" are particularly likely
to involve the establishment of material sales terms on a date other than invoice date. *Preamble*,
62 Fed. Reg. at 27,349.

The standard of review applicable to this action requires Commerce to support its
determinations with substantial record evidence and for those determinations to be otherwise in
accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). This standard requires Commerce to address
all "important aspect{s} of the problem" before it. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v.
State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Commerce must also "provide a 'rational
connection between the facts found and the choice made'" and "'articulate a satisfactory
explanation for its action.'" *Baroque Timber Indus. (Zhongshan) Co. v. United States*, 971 F. Supp.
2d 1333, 1339-40 (Ct. Int'l Trade 2014) (quoting *Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156, 168 (1962) and *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d
1370, 1378 (Fed. Cir. 2013)); *see also SKF USA Inc. v. United States*, 263 F.3d 1369, 1378, 1382-
83 (Fed. Cir. 2001). Overall, Commerce's determinations must be reasonable and may not reflect
arbitrary decision-making. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir.
2006); *SKF USA*, 263 F.3d at 1378, 1382-83.

In its opening brief, WTTC explained that Commerce's selection of invoice date as
Marmen's home and U.S. market date of sale was inconsistent with the standard of review. Wind
Tower Trade Coalition's Mem. in Supp. of its Rule 56.2 Mot. for J. Upon the on Agency R. (Jan.
29, 2021), ECF No. 25 at 18-33 ("WTTC's Brief"). While the Government and Marmen argue that

Commerce's date of sale determinations were justified, their arguments are unpersuasive, as explained below.

    1.    **Commerce Erred in Selecting Marmen's Home-Market Date of Sale**

Marmen reported invoice date as its home market date of sale, but conceded that its sales were made pursuant to purchase orders. Letter from White & Case LLP to Sec'y Commerce, re: *Utility Scale Wind Towers from Canada: Supplemental Sections A, B, and C Response* (Dec. 11, 2019) at FSQ-4 and Exhibit FSQ-2, C.R. 142-157, P.R. 120-121 ("1SABCQR"); Letter from White & Case LLP to Sec'y Commerce, re: *Utility Scale Wind Towers from Canada: Sections B, C, and D Response* (Oct. 11, 2019) at B-24, C.R. 40-95, P.R. 89-97 ("BDQR"). These purchase orders, as well as other documents resulting from the nearly [      ] of negotiations that preceded the purchase orders, reflected terms under which Marmen's customer, Vestas, was solely responsible for transporting wind towers from Marmen's facilities. 1SABCQR at FSQ-16, Exhibit FSQ-1 ([          ] at [       ] and Purchase Orders [           ]); *see also id.* at Exhibit FSQ-12, ([             ]) ([               ]); *see* Letter from White & Case LLP to Sec'y Commerce, re: *Utility Scale Wind Towers from Canada: Section A Response* (Sept. 13, 2019) at A-21 – A-22, C.R. 35-38, P.R. 76 ("AQR") (describing Marmen/Vestas's responsibilities and activities regarding freight).

As of [        ], the date on which Vestas issued its purchase orders for Marmen's wind towers, the parties understood that Vestas would send trucks to pick up the goods. 1SABCQR at FSQ-12, Exhibit FSQ-1 ([               ], Purchase Orders [             ]) and Exhibit FSQ-12 ([           ]) ([         ], stating that [

]). However, Vestas later requested that Marmen load the goods onto rail cars. *Id.* at FSQ-12; *see also id.* at Exhibit FSQ-6 (Marmen's [                    ] quote for [                              ]). Vestas then issued Marmen [                                    ] to cover Marmen's loading of the wind towers on rail cars, and Marmen issued [                                              ]. *Id.* at FSQ-12, Exhibit FSQ-6 ([                              ]) and Exhibit FSQ-15 ([                                              ]).

In response to Marmen's claim that material sales terms were set only upon invoicing, Commerce requested that Marmen demonstrate that changes to material sales terms occurred, in at least one instance, between purchase order and invoice date. *Id.* at FSQ-12. Marmen identified no changes to price, quantity, delivery date, or payment terms. *Id.* at FSQ-12 – FSQ-13. Rather, it noted that, after initially contemplating that Vestas would transport its wind towers by truck, Vestas [                              ] Marmen to load the towers onto rail cars. *Id.* at FSQ-12 – FSQ-13 and Exhibit FSQ-6.

WTTC argued that this did not constitute a material change to the terms of sale for the towers. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Utility Scale Wind Towers from Canada: Case Brief* (Apr. 24, 2020) at 13-35, C.R. 220, P.R. 179 ("WTTC's Case Brief"). Commerce rejected these arguments in its Final IDM. *See* Final IDM at 15-16. But as explained in WTTC's opening brief, Commerce's stated bases for selecting invoice date as the home-market sale date did not comport with the standard of review. WTTC's Brief at 19-31.

The Government and Marmen nonetheless defend Commerce's selection of invoice date as Marmen's home-market date of sale. Government's Brief at 30-40; Marmen's Brief at 4-14.

The Government argues that the regulatory presumption in favor of invoice date placed the burden on the WTTC to demonstrate that invoice date was not an appropriate date of sale. Government's Brief at 32-33, 36. The Government and Marmen also claim that the date of sale must be the same in both the home and U.S. markets. *Id.* at 33; Marmen's Brief at 5-6. Next, the defense argues that Commerce's home-market date of sale selection was supported by a material change to delivery terms. Government's Brief at 33-36; Marmen's Brief at 7-10. The defense then argues that Commerce adequately addressed WTTC's case brief arguments, Government's Brief at 36-37, before arguing in support of Commerce's reliance on a prior case involving Vietnamese wind towers. *Id.* at 37-38; Marmen's Brief at 13. Finally, the defense argues that Commerce's decision not to utilize its "Custom-Made Goods" exception to the use of invoice date was consistent with the standard of review. Government's Brief at 38-40; Marmen's Brief at 10-12, 14. The defense's arguments, however, do not withstand scrutiny.

The Government first argues that, given Commerce's regulatory preference for invoice date, WTTC bore the burden of showing that invoice date was not an appropriate date of sale. Government's Brief at 32-33, 36. But while the agency's regulations indicate that invoice date will "normally" be the date of sale, the *Preamble* states that situations involving large scale, custom-made goods "usually" call for use of another date. *Preamble*, 62 Fed. Reg. at 27,349. Further, Congress has expressed its intent that "the date of sale be flexible so as to accurately reflect the true date on which the material elements of sale {are} established." *Allied Tube and Conduit Corp. v. United States*, 24 CIT 1357, 1370, 127 F. Supp. 2d 207, 219 (2000). As such, "the invoice date presumption is merely a 'starting point' in the determination of which date better reflects the date on which the material terms of sale were established." *Sahaviriya Steel Indus. Pub. Co. v. United States*, 34 CIT 709, 727, 714 F. Supp. 2d 1263, 1280 (2010). Because invoice date is only a

"starting point," Commerce is not entitled to treat it as an endpoint regardless of the record evidence. For the same reasons, the Government's attempt to defend Commerce's selection of invoice date as consistent with questionnaire instructions rings hollow. *See* Government's Brief at 40; *see also* WTTC's Brief at 21-22.

Moreover, WTTC met its burden. It would be arbitrary and unreasonable – and thus inconsistent with the standard of review – for Commerce to hold WTTC to an evidentiary standard that it has not imposed upon Marmen. Commerce tested Marmen's claim that the material terms of its tower sales to Vestas were set only upon invoicing by asking Marmen to demonstrate at least one material change in selling terms between purchase order and invoice date. 1SABCQR at FSQ-12 – FSQ-13. WTTC was thus required only to show, as it did, that the record indicated that the purported change identified by Marmen was not a change at all, much less a significant change to material terms of sale. *See, e.g.*, WTTC's Brief at 19-21, 23-27. At best, Marmen demonstrated that Vestas [                                        ], pursuant to [

] for the towers. 1SABCQR at FSQ-12 and Exhibit FSQ-6; *see also id.* at Exhibit FSQ-1 (purchase orders for towers).

To the extent that the Government argues that WTTC should have come forward with affirmative evidence of lack of changes in material terms, this would represent an unfair – and nearly impossible – standard. Government's Brief at 32-33, 36. Petitioners are not in possession of any of respondents' sales documents, which are what Commerce requires for examination of the proper date of sale. Again, having pointed out that the record compiled by Marmen to demonstrate changes in material terms of sale did not bear out the company's claims, WTTC met its burden.

The Government and Marmen next argue that Commerce's longstanding practice requires that the same date of sale be used in both the home and U.S. markets. Government's Brief at 33; Marmen's Brief at 5-6. For this proposition, the Government cites the *Preamble*, while Marmen points to the *Preamble* and various administrative precedents. Government's Brief at 33; Marmen's Brief at 5. These sources, however, do not bear out the defense's claims.

While the *Preamble* refers to a "uniform" date of sale, Commerce's practice and judicial precedent indicates that this means a uniform date for a respondent's sales in each market, not a uniform date for a respondent's sales across both markets. *Preamble*, 62 Fed. Reg. at 27,348-49. Specifically, Commerce has found, and the courts have approved, different home and U.S. dates of sale where the record shows that buyers/sellers in each market set material terms on different dates. *See, e.g., Ereğli Demir ve Çelik Fabrikalari T.A.Ş. v. United States*, 308 F. Supp. 3d 1297, 1307-14 (Ct. Int'l Trade 2018) (rejecting invoice date as home market date of sale while affirming it as U.S. date of sale); *Rebar Trade Action Coal. v. United States*, No. 14-00268, slip op. 15-130 at 17 (Ct. Int'l Trade Nov. 23, 2015) (noting the Commerce "matches U.S. and home market sales to one another on the basis . . . of the respondent's 'date of sale' *in each market*.") (emphasis added); Preliminary Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from Turkey*, 79 Fed. Reg. 22,804 (Dep't Commerce Apr. 24, 2014) (prelim. affirm. deter. of sales at less than fair value, prelim. affirm. deter. of critical circumstances, and postponement of final deter.) at 16-17 (selecting contract date as Habas's U.S. sales date and invoice date as Habas's home-market sales date) (unchanged in final); Preliminary Decision Memorandum accompanying *Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 78 Fed. Reg. 21,105 (Dep't Commerce Apr. 9, 2013) (prelim. results antidumping duty admin. review; 2011-2012) at 6-7

(selecting contract date as the home-market sales date and invoice date as the U.S. sales date) (unchanged in final).

The precedents that Marmen cites are not to the contrary. For example, in Commerce's investigation into Spanish wire rod, Commerce stated that its practice is to use a "uniform" date of sale in response to a party's argument that the agency should assign different dates of sale to different *U.S.* sales. Issues and Decision Memorandum accompanying *Carbon and Alloy Steel Wire Rod from Spain*, 83 Fed. Reg. 13,233 (Dep't Commerce Mar. 28, 2018) (final deter. of sales at less than fair value, and final deter. of critical circumstances, in part) at 11-15 (emphasis added). Because Commerce was being asked only whether there should be multiple dates of sale within a single market, it statement indicates nothing about uniformity across markets. *Id.* Likewise, in the other precedents cited by Marmen, Commerce addressed the question of whether it should apply unique dates of sale for each sale made by a respondent, including those made within a single market. *See* Issues and Decision Memorandum accompanying *Ferrovanadium from the Republic of Korea*, 82 Fed. Reg. 14,874 (Dep't Commerce Mar. 23, 2017) (final deter. of sales at less than fair value) at 6-8; Issues and Decision Memorandum accompanying *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 77 Fed. Reg. 63,791 (Dep't Commerce Oct. 17, 2012) (final deter. of sales at less than fair value, and affirm. final deter. of critical circumstances, in part) at 17-18; Issues and Decision Memorandum accompanying *Large Power Transformers from the Republic of Korea*, 77 Fed. Reg. 40,857 (Dep't Commerce July 11, 2012) (final deter. of sales at less than fair value) at 21. These precedents are accordingly not germane to the question at hand. And in any event, Commerce's selection of the home-market date of sale (and, separately, the U.S. sale) must be adequately explained and supported by the record. The defense cannot rehabilitate inadequate

decision-making with respect to one market's date of sale by pointing to the other market's date of sale.[1]

The Government and Marmen next argue that Commerce's home-market date of sale selection was supported by a material change in delivery terms. Government's Brief at 33-36; Marmen's Brief at 7-8. The defense claims that Vestas's post-purchase order request for "a change in transportation mode" affected all ordered wind tower sections, and was thus material to the wind tower sale. Government's Brief at 34; Marmen's Brief at 8-9. The defense also argues that Commerce has clarified that material terms of sale "can" include delivery terms. Government's Brief at 34-35; Marmen's Brief at 10. These rejoinders do not establish that Commerce adequately or appropriately considered the questions of whether the "change in transportation mode" was a significant change to a material term of the tower sale.

Again, the record shows that Vestas assumed transportation costs from the outset, and contracted with Marmen for rail-loading services [                    ] its tower purchase. 1SABCQR at FSQ-12, FSQ-16, and Exhibit FSQ-6; *see also id.* at Exhibit FSQ-1 (purchase orders for towers). Given these facts, the argument that the rail-loading services "affected all wind tower sections" is insufficient to explain and support Commerce's date of sale selection, given that Vestas had assumed all transportation costs, and [          ] contracted for rail-loading services. Government's Brief at 34; *see also* Marmen's Brief at 8. As such, the Government's conclusory statements that Commerce complied with the standard of review are unpersuasive. Government's Brief at 34-35.

---

[1]     For just this reason, Marmen's claim that Commerce appropriately rejected WTTC's case brief arguments in support of multiple U.S. dates of sale is irrelevant to Commerce's selection of the home-market date of sale. *See* Marmen's Brief at 5-6.

Similarly, even if material terms of sale "can" include delivery terms, *id.*; Marmen's Brief at 10, it is not clear why Commerce found that delivery terms constituted a material term here, much less why it treated Vestas's decision to [                    ] for rail-loading services as part of the tower sale. Final IDM at 15-16; *see also* WTTC's Brief at 23-27. For that matter, WTTC has not argued that delivery terms can never be a material term; rather, it has argued that Commerce has previously found that changes in delivery terms are not necessarily controlling. WTTC's Brief at 26. The lone case cited by the Government, which does not appear to have involved a change in delivery terms, fails to establish why Commerce found transportation mode controlling in this case. Government's Brief at 34-35 (citing Issues and Decision Memorandum accompanying *Large Power Transformers from the Republic of Korea*, 82 Fed. Reg. 13,432 (Dep't Commerce Mar. 13, 2017) (final results of antidumping duty admin. review; 2014-2015) at 55-56). Nor does the prior judicial precedent that Marmen cites establish why Commerce found transportation mode controlling in this case. At best, it indicates – as WTTC does not dispute – that delivery terms are among the terms that Commerce analyzes in determining whether a significant change in a material sales term has taken place. Marmen's Brief at 10 (citing *Sahaviriya Steel*, 34 CIT at 727, 714 F. Supp. 2d at 1280, *Nakornthai Strip Mill Pub. Co. v. United States*, 33 CIT 326, 337, 614 F. Supp. 2d 1323, 1334 (2009)).[2] The fact that a term is subject to analysis, however, does not mean that

---

[2]     Marmen also cites to *SeAH Steel Corp. v. United States*, 25 CIT 133, 134 (2001). Marmen's Brief at 10. This case, however, does not mention delivery terms as a potentially material term of sale. While it mentions "delivery dates," it also states that Commerce has found that these do not constitute material selling terms. *SeAH Steel*, 25 CIT at 136 n.3.

the term is material in every contract, or that every change to such a term (if, indeed, there is such a change) is significant. *Sahaviriya Steel*, 34 CIT at 727-28, 714 F. Supp. 2d at 1280.[3]

The Government next claims that Commerce considered all important aspects of the problem before it. Government's Brief at 36-37. The Government notes that the Final IDM summarized WTTC's arguments, and that Commerce quoted WTTC's case brief in explaining its home-market date of sale selection. *Id.* at 36. The Government also explains that Marmen provided evidence of a change in the material terms of a home market sale and that Commerce was entitled to rely on Marmen's certified representation that changes to material sales terms "may occur until the invoice is finalized." *Id.* at 36-37.

These arguments fare no better than those previously addressed. Commerce's summarization of WTTC's case brief does not substitute for adequate explanation of its reasons for rejecting WTTC's arguments. Nor does such summarization, or the inclusion of a quotation from WTTC's case brief in the Final IDM, establish that the agency adequately and appropriately considered all aspects of the problem before it. Likewise, Commerce's conclusion that Marmen provided evidence of a change to a home market sales term does not, by itself, explain that conclusion, particularly in light of WTTC's arguments, Commerce's *Preamble*, and Commerce's prior precedent. And while the Government argues that Commerce was entitled to rely on Marmen's representations, Commerce did not cite these representations in explaining its date of sale determination. Final IDM at 15-16. It instead relied on Marmen's documentation purporting to show a change in material sales terms between purchase order and invoice date. *Id.* But even if Commerce had cited Marmen's representations, Commerce still would have been required to

---

[3]     Marmen argues that Commerce's antidumping manual cannot be cited to establish Commerce's practice. Marmen's Brief at 10. Even if this is so, however, the agency precedents discussed in that manual are evidence of the agency's practice.

explain why those representations outweighed the documentary evidence that Marmen provided in response to the agency's specific request for documentation of a change in material sales terms.

The defense next argues in support of Commerce's reliance on a prior investigation into Vietnamese wind towers. Government's Brief at 37-38; Marmen's Brief at 13. The defense argues that, in both that case and this one, the record showed material changes in selling terms between purchase order and invoice date. Government's Brief at 37; Marmen's Brief at 13. Marmen additionally assumes that Commerce determined in the Vietnamese case that wind towers are not "large-scale capital goods." *See* Marmen's Brief at 13-14. Neither defense is persuasive.

First, while there were [                                        ] in the Vietnamese investigation, here [                                        ]. WTTC's Case Brief at 13-14; *see also* 1SABCQR at FSQ-12 – FSQ-13. Moreover, Commerce did not adequately explain or support its apparent finding that Vestas's decision to [                    ] for rail-loading services constituted a significant change in a material term of the wind tower purchase transaction. Nor did Commerce find in the Vietnamese case that wind towers are not "large-scale capital goods," or ground its date-of-sale analysis in such a finding. Issues and Decision Memorandum accompanying *Utility Scale Wind Towers from the Socialist Republic of Vietnam*, 77 Fed. Reg. 75,984 (Dep't Commerce Dec. 26, 2012) (final deter. of sales at less than fair value) at 51-52. Thus, the Vietnamese case offers no support for Commerce's home-market date-of-sale selection here.

Finally, the defense argues that Commerce adequately explained why it found its "Custom-Made" goods exception inapplicable in this case. Government's Brief at 38-40; Marmen's Brief at 10-12, 14. The defense states that the *Preamble* does not universally require Commerce to use a date other than invoice date for custom-made goods. Government's Brief at 38-39; Marmen's Brief at 14. The Government also argues that Commerce adequately explained that the case at bar did

not merit application of the exception because (1) purchase orders were revised multiple times before invoicing, and (2) Marmen did not provide Vestas with post-sale services. Government's Brief at 39-40. Marmen argues that, in its rebuttal brief below, it explained that various precedents involving large, custom-made goods were not apposite to the facts here, because (1) Marmen did not provide Vestas with post-sale services, and (2) Commerce reasonably viewed wind towers as not constituting "large-scale capital equipment." Marmen's Brief at 11-12. These arguments are unavailing.

As an initial matter, WTTC has not argued that Commerce is obliged to use a date other than invoice date in every case involving large and/or custom-made goods. What WTTC has argued is that, given the *Preamble's* statement that it will "usually" be appropriate to use a non-invoice date as the date of sale for large, custom-made goods, and the agency's practice, Commerce was required to adequately explain and support its treatment of Marmen's home-market date of sale here.

While the Government argues that the purchase orders that Marmen received were subject to multiple revisions, Commerce cited no evidence of multiple revisions to home-market purchase orders. Final IDM at 15-16. Indeed, the record does not reflect any revision to the purchase orders in the home market – just a [                                      ]. With respect to post-sale services, the cases on which Commerce appears to rely did not involve any finding that post-sale services are relevant to the date of sale determination. *Compare* Final IDM at 16 & n.91 (citing Letter from White & Case LLP to Sec'y Commerce, re: *Utility Scale Wind Towers from Canada: Rebuttal Brief* (May 6, 2020) at 8, C.R. 222, P.R. 184), *with* WTTC's Brief at 27-30.

While Marmen argues that Commerce reasonably declined to treat wind towers as "large-scale capital equipment," Marmen's Brief at 11-12, the only basis that Commerce provided for

finding prior cases involving large, custom-made goods to be inapposite was the lack of post-sale services. Final IDM at 16. Commerce did not find that wind towers are not "large," or "custom-made," or subject to "formal negotiation and contracting procedures," – which is how the *Preamble* characterizes the types of products that will "usually" have dates of sale other than invoice date. *Preamble*, 62 Fed. Reg. at 27,349. Indeed, as WTTC noted in its opening brief, such findings would appear difficult to square with the record, given that the wind towers at issue were in excess of [                                        ], were made to unique, purchaser-specific specifications, were repeatedly described by Marmen as "custom-made," and were the subject of negotiations that went on [                    ], inclusive of a [

]. WTTC's Brief at 28; AQR at A-25, A-28; 1SABCQR at Exhibit FSQ-1 and Exhibit FSQ-12.

For the reasons noted above and in WTTC's opening brief, WTTC respectfully submits that Commerce's home-market date of sale selection should be remanded for further consideration.

### 2.   Commerce Erred in Selecting Marmen's U.S. Date of Sale

Marmen's customers in the U.S. market were Vestas and General Electric ("GE"). AQR at A-22. In response to Commerce's request that Marmen support its claim that material selling terms in the U.S. market were set only upon invoicing, Marmen identified a purchase order for which GE issued revisions to the price, quantity, and payment terms. 1SABCQR at FSQ-13 – FSQ-14 and Exhibit FSQ-7. Marmen conceded, however, that [                                        ] with the [                        ] provided in a [                    ] Letter of Intent. *Id.* at FSQ-13 – FSQ-16 and Exhibit FSQ-7; AQR at Exhibit A-6; WTTC's Case Brief at 35-36. Similarly, the quantity ordered [                        ] the terms of the Letter of Intent. *Compare* 1SABCQR

at Exhibit FSQ-7, *with* AQR at Exhibit A-6; WTTC's Case Brief at 37. The remaining change

[                                                      ]. 1SABCQR at Exhibit FSQ-7.

In its final determination, and over WTTC's objections, Commerce treated invoice date as

Marmen's U.S. date of sale, providing largely the same rationales that it cited for treating invoice

date as the home-market sales date. Final IDM at 15-16. But as explained in WTTC's opening

brief and above, these rationales are insufficient. *See* discussion *supra* at Section II.A and *infra* at

Section II.B; *see also* WTTC's Brief at 32-33. Moreover, Commerce did not address the degree to

which the pricing/quantity "changes" that Marmen reported were [

], and thus did not represent changes. *Compare* Final IDM at 15-16, *with*

WTTC's Case Brief at 35-36, 39-40. Nor did it address WTTC's argument that the alteration in

[                ] was not material on its face or in terms of the sale as a whole. *Compare* Final

IDM at 15-16, *with* WTTC's Case Brief at 37. Commerce's Final IDM does not establish that the

agency considered all aspects of the problem before it.

The defense's arguments in support of Commerce's U.S. date-of-sale selection are largely

identical with their arguments in support of the agency's home-market date-of-sale selection,

which are addressed in Section II.A.1, above. Government's Brief at 30-40; Marmen's Brief at 4-

14. The defense also argues that Marmen's U.S. customer, GE, amended one of its purchase orders

five times over the course of six months, indicating that the purchase order did not represent a final

meeting of the minds as to material terms of sale. Government's Brief at 34, 37-38; Marmen's

Brief at 9-10, 13. Marmen additionally argues that payment terms can constitute a material term

of sale. Marmen's Brief at 10. These defenses are not compelling.

As explained in WTTC's opening brief, Commerce failed to address WTTC's argument

that the pricing/quantity "changes" to the GE purchase order in question were [

]. WTTC's Brief at 33. In failing to consider important aspects of the problem before it – or at least, in failing to memorialize its consideration – Commerce left the Court with inadequate articulation of its reasoning and otherwise failed to comply with the standard of review. Likewise, while Marmen argues that Commerce and the courts have previously found that payment terms can be material to a sale, Marmen's Brief at 10, Commerce did not address WTTC's argument that the alteration here, which [

], was immaterial on its face and in terms of the sale as a whole. *Compare* Final IDM at 15-16, *with* WTTC's Case Brief at 37. Thus, just as Commerce's selection of Marmen's home market date of sale should be remanded for further consideration, so should the agency's selection of Marmen's U.S. date of sale be remanded as well.

### B.    Commerce Erred in Treating Marmen's Home-Market Sales as Sales of Sections

Marmen reported selling complete wind towers in Canada. AQR at A-31; *see also* 1SABCQR at FSQ-7 ("Marmen Canada produced complete towers for Vestas."). The record contained no indication that Vestas [

], or that Vestas and Marmen negotiated [

]. 1SABCQR at Exhibit FSQ-12; *see also* WTTC's Brief at 8-11, 34-37. However, Marmen invoiced the towers it sold in Canada on a section-specific basis, because Vestas's [

]. WTTC's Brief at 34-35; AQR at A-31; 1SABCQR at FSQ-7 – FSQ-8; Letter from White & Case LLP to Sec'y Commerce, re: *Utility Scale Wind Towers from Canada: Second Supplemental Sections A, B, and C Response* (Feb. 6, 2020) at 7 and Exhibit SSQ-15, C.R. 181-183, P.R. 150. In its final determination, Commerce treated Marmen's Canadian sales as being of sections, rather than complete towers. Final IDM at 17-18. But as WTTC explained in its opening brief and above, the agency failed to adequately

explain its determination, or adduce substantial record evidence to support it. WTTC's Brief at 34- 37.

The Government and Marmen defend Commerce's treatment of tower sales as section sales. Government's Brief at 40-43; Marmen's Brief at 14-18. The defense argues that Commerce's treatment was consistent with Marmen's invoicing practice and Commerce's own instructions. Government's Brief at 40-42; Marmen's Brief at 14-18. The Government also argues that Commerce reasonably disagreed that Marmen had misreported its Canadian sales as being of tower sections. Government's Brief at 41, 43. Marmen argues that Commerce's citation of WTTC's brief in its Final IDM necessarily means that the agency fully and adequately considered WTTC's arguments, and otherwise considered all important aspects of the problem before it. Marmen's Brief at 18. The Government concludes that WTTC has merely invited the Court to reweigh the evidence. Government's Brief at 43.

These defenses are unpersuasive. As WTTC explained in its opening brief, the salient question before Commerce was not that of how the agency's questionnaire instructions were worded, or how Marmen's customer preferred invoices [

]. WTTC's Brief at 34-37. Rather, it was that of what Marmen actually sold. Marmen answered this question clearly: "Marmen Canada produced complete towers for Vestas." 1SABCQR at FSQ-7. Indeed, in its response brief here, Marmen again confirms that it "*sold towers* to Vestas." Marmen's Brief at 15. Far from attempting to "sow confusion," as Marmen puts it, *id.* at 16, WTTC has pointed out that Commerce's treatment of Marmen's tower sales is inconsistent with the record, and with Marmen's continued insistence that it sold complete towers in its home market, not individual sections.

Further, all wind towers consist of one or more assembled sections. BDQR at C-14. Nonetheless, Commerce found that the first, and thus most important, question for product-matching purposes was that of whether the good subject to sale was a complete tower (*i.e.*, one or more sections meant to work together as a complete tower) or merely a portion of a tower (*i.e.*, a single section that did not constitute a complete tower). *See, e.g.*, *id.* at C-10. In treating sales of what Marmen itself concedes were "complete towers" as sales of individual sections, 1SABCQR at FSQ-7, Commerce failed to grapple with the consequences of its own CONNUM coding system. And while Marmen argues that courts have upheld Commerce's reliance on invoice-line-specific CONNUM reporting, the cases that it cites either do not squarely address this issue, or are specific to factual scenarios that are not present here. Marmen's Brief at 16-17 (citing *Dong-A Steel Co. v. United States*, 475 F. Supp. 3d 1317, 1341 n.17 (Ct. Int'l Trade 2020) (addressing Commerce's reliance on nominal dimensions/theoretical weights)); *CC Metals & Alloys, LLC v. United States*, 145 F. Supp. 3d 1299, 1307 (Ct. Int'l Trade 2016) (addressing whether Commerce can rely on invoice-specific information for immaterial physical characteristics that are identical with the actual characteristics of the delivered goods). Nor can these cases answer the question of whether Commerce complied with the standard of review in determining to treat Marmen's sales of complete wind towers as sales of sections.

Again, in rendering its determination, Commerce failed to confront an important aspect of the problem before it – namely, that of whether the customer had contracted to obtain complete towers. Again, Marmen was uniquely clear on that point, stating that it sold complete wind towers to Vestas. 1SABCQR at FSQ-7. Further, the record bore out Marmen's statement. *See, e.g.*, WTTC's Brief at 34-35, 39 (reviewing record evidence). Had Marmen been purchasing individual sections, rather than complete wind towers, one would expect them to purchase some combination

of sections, based on their needs, that would not make for a set of complete wind towers, *e.g.*, ten top section, 15 bottom sections, 30 middle sections, etc. But instead, having a project that called for [     ] complete wind towers, Marmen bought [     ] complete wind towers, which were made of [                    ]. *Id.* at 36; *see also* 1SABCQR at Exhibit FSQ-12.

And contrary to Marmen's claim, Marmen's Brief at 18, the mere fact that Commerce cited WTTC's case brief does not automatically compel a finding that the agency appropriately considered either WTTC's arguments or the record as a whole – or that that agency adequately explained its consideration. *See* discussion *supra* at 10-11. Rather than inviting the Court to re-weigh the evidence, WTTC is requesting that the Court ensure that Commerce complies with the standard of review. Because that standard requires that Commerce render a reasonable determination backed by adequate explanation and substantial record evidence, and Commerce has yet to make such a determination, this Court should remand Commerce's treatment of Marmen's Canadian sales as being of tower sections for further consideration.

**C.**   **Commerce Erred in in Declining to Resort to the Facts Available, with Adverse Inferences**

Commerce's selection of invoice date as Marmen's home and U.S. date of sale and treatment of Marmen's Canadian tower sales as sales of sections are inadequately explained and are unsupported by the record. Rather, the record supports treatment of dates other than invoice date as the date of sale in both markets, as well as treatment of Marmen's Canadian sales as sales of wind towers, not sections. Marmen therefore neither had home-market sales during the period of review, nor sales of goods in either market that were [

                    ]. WTTC's Case Brief at 10, 46; WTTC's Brief at 40-41. Marmen's antidumping duty margin should accordingly have been based on constructed value. WTTC's Case

Brief at 10-12, 46; WTTC's Brief at 40-41; *see also* 19 U.S.C. §§ 1677b(a), 1677b(a)(1), 1677b(a)(4), and 1677b(e).

The record, however, lacked the information necessary to determine constructed value. As WTTC explained in both its case brief and its opening brief in this appeal, the record lacked such information because Marmen's reporting was dilatory and misleading. For example, Marmen reported invoice date as its date of sale, based on a supposed "change" in delivery terms that was no change at all, but the subject of a [                                    ]. AQR at A-21 – A-22 (noting Vestas's responsibility for transportation of the wind towers); 1SABCQR at FSQ-12 and Exhibit FSQ-6. Similarly, Marmen [

                                                                         ]. WTTC's Brief at 34-35 (reviewing record evidence). Because the record lacked the information necessary for accurate margin calculations, and lacked this information due to Marmen's failure to timely provide complete and accurate questionnaire responses, resorting to adverse inferences was appropriate in this investigation. Commerce, however, failed to adequately explain or support its determination not to employ such inferences. *Id.* at 37-44.

The Government and Marmen defend Commerce's choice on two main grounds. The defense argues that Commerce explained that Marmen's reporting complied with the agency's instructions, and that Marmen did not withhold any information. Government's Brief at 45; Marmen's Brief at 20-21. The defense also argues that it would have been inappropriate for Commerce to apply adverse inferences, given that no information is missing from the record and that Commerce informed Marmen of no deficiency in its reporting. Government's Brief at 45-46; Marmen's Brief at 19-21.

But as WTTC described in its opening brief, Commerce did not adequately explain or support decision not to employ adverse inferences. First, Commerce did not adequately explain or support its finding that Marmen complied with the agency's questionnaire instructions. Commerce did not instruct Marmen to report its sales based on treatment of invoice date as the date of sale. *Antidumping Duty Investigation Request for Information for Marmen, Inc., Utility Scale Wind Towers from Canada*, Section A, B, and C (Aug. 19, 2019) at B-2 and C-1 – C-2, P.R. 54 ("Initial Questionnaire"); Letter from Erin Kearney, Program Manager, AD/CVD Operations, Off. VI to White & Case LLP, re: *Product Characteristics for the Antidumping Duty Investigation of Utility Scale Wind Towers from Canada* (Sept. 17, 2019), P.R. 77. And while Commerce instructed Marmen to code its home-market database and report product characteristics on an invoice-line basis, Initial Questionnaire at B-2, it remains that Marmen sold towers to Vestas, not sections. 1SABCQR at FSQ-7.

Nor did Commerce adequately explain or support its determination that Marmen was fully responsive to the agency's questionnaires, and did not withhold information. The information that Marmen originally submitted regarding dates of sale and the nature of the product it sold was so incomplete as to require two supplemental questionnaires. The information was also misleading in important respects. For example, while Marmen reported that its Canadian sales process began with the issuance of purchase orders by the customer, AQR at A-21 – A-22, [

] of negotiations. 1SABCQR at Exhibits FSQ-1 and FSQ-12. Moreover, pursuant to a [                              ] concluded between Marmen and Vestas, the sales process did not begin with issuance of a purchase order; rather, issuance of a purchase order meant that a sale had definitively occurred. *Id.* at Exhibit FSQ-1, Section 2.2; *see also* WTTC's Brief at 42-43 (reviewing record evidence).

While Marmen argues that the [                              ] did not govern [

            ] of its sales to Vestas, Marmen's Brief at 21, the [                 ] belies this argument. The

[                                    ] details the [

            ]. 1SABCQR at Exhibit FSQ-1, Section 2.2. It also provides [

                                                                    ] *Id.* at Exhibit

FSQ-1, Sections 6 and 7. The [                 ] also reflects [

            ]. *See id.* at Exhibit FSQ-1, Sections 2.2, 5-8, and 10.

Commerce's conclusion that no information is missing from the record is also inadequately

explained and supported. As WTTC noted in its opening brief, this conclusion appears to rest in

substantial part on Commerce's findings that invoice date was the appropriate date of sale in both

the home and U.S. markets, and that Marmen's home-market sales were appropriately treated as

sales of sections. *See* WTTC's Brief at 41. But neither conclusion is adequately explained or

supported by the record. *See* discussion *supra* at Sections II.A. & II.B; *see also* WTTC's Brief at

19-31, 33-37. As such, the defense cannot shield Commerce's determination regarding adverse

inferences from scrutiny by pointing to the agency's failure to inform Marmen of any deficiency

in its reporting. Rather, just as Commerce's determinations regarding date of sale and treatment of

Marmen's Canadian sales for product-matching purposes must be remanded for further

consideration, so must its determination not to rely on the facts available, with adverse inferences.

## III.   <u>CONCLUSION</u>

For the reasons detailed above and in its opening brief, WTTC respectfully submits that this

Court should remand the final results of Commerce's antidumping duty investigation into Canadian

wind towers for further consideration regarding the issued raised in WTTC's appeal.

Respectfully submitted,

*/s/ Alan H. Price*
Alan H. Price, Esq.
Daniel B. Pickard, Esq.
Robert E. DeFrancesco, III, Esq.
Maureen E. Thorson, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the Wind Tower Trade Coalition*

Dated: May 28, 2021

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Wind Tower Trade Coalition's Reply Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 6,978 words.

<u>/s/ Alan. H. Price</u>
(Signature of Attorney)

<u>Alan H. Price</u>
(Name of Attorney)

<u>Wind Tower Trade Coalition</u>
(Representative Of)

<u>May 28, 2021</u>
(Date)