**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| MARMEN INC., MARMEN ÉNERGIE INC., MARMEN ENERGY CO., <br><br>    Plaintiffs, <br><br> WIND TOWER TRADE COALITION, <br><br>    Consolidated Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br>    Defendant, <br><br> WIND TOWER TRADE COALITION, <br><br>    Defendant-Intervenor, <br><br> and <br><br> MARMEN INC., MARMEN ÉNERGIE INC., MARMEN ENERGY CO., <br><br>    Defendant-Intervenors. | Consolidated Court No. 20-00169 <br><br> **NON-CONFIDENTIAL** <br><br> **Business Proprietary Information has been deleted from Pages 9, 11-13, 21.** |

**REPLY IN SUPPORT OF PLAINTIFFS' RULE 56.2 MOTION**
**FOR JUDGMENT UPON THE AGENCY RECORD**

Jay C. Campbell
Ting-Ting Kao
Ron Kendler
Allison J.G. Kepkay

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

May 28, 2021

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    ARGUMENT .................................................................................................. 2

    A.    Defendant and Petitioner Fail to Demonstrate that Commerce's Modification of Marmen's Product-Specific Plate Costs Was Supported by Substantial Evidence or Otherwise in Accordance with Law ................................. 2

        1.    Contrary to Defendant's and Petitioner's assertions, Commerce arbitrarily disregarded its consistent practice ................................................. 2

        2.    Petitioner's argument that that there were significantly different per-unit plate costs between "very similar" CONNUMs is an unsupported *post hoc* rationalization ...................................................... 9

        3.    Contrary to Defendant's and Petitioner's assertions, Commerce's factual findings are unsupported by substantial evidence ........................... 9

            a.    The record evidence disproves Commerce's finding that prices only differed for high-thickness plates ................................ 10

            b.    Commerce's assumption that timing explained differences in plate costs does not constitute substantial evidence ................. 12

    B.    Defendant and Petitioner Fail to Demonstrate that Commerce's Rejection of Marmen's Minor Correction to its Cost Reconciliation Was Supported by Substantial Evidence or a Proper Exercise of Discretion ............................... 13

        1.    Nothing in the record supports Commerce's unreasonable assumption that Marmen had made an accounting error that would require an amendment to the company's year-2018 financial statements ............................................................................. 14

        2.    Commerce abused its discretion by rejecting Marmen's minor correction as untimely filed, unsolicited factual information ................... 16

    C.    Defendant and Petitioner Fail to Demonstrate that Commerce's Application of the Average-to-Transaction Method to Marmen's U.S. Sales of Five CONNUMs Is Supported by Substantial Evidence ........................ 19

III.    CONCLUSION ............................................................................................ 23

AMERICAS 107832469

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allegheny Ludlum Corp. v. United States,*
   112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000) ........................................................................12

*Apex Frozen Foods Priv. Ltd. v. United States,*
   144 F. Supp. 3d 1308 (Ct. Int'l Trade 2016) ........................................................................21

*Baroque Timber Indus. (Zhongshan) Co. v. United States,*
   971 F. Supp. 2d 1333 (Ct. Int'l Trade 2014) ........................................................................20

*Bosun Tools Co. v. United States,*
   Slip Op. 19-125, 2019 WL 4599805 (Ct. Int'l Trade Sept. 23, 2019)....................................18

*Burlington Truck Lines, Inc. v. United States,*
   371 U.S. 156 (1962).........................................................................................................6, 9, 10

*China Mfrs. All., LLC v. United States,*
   357 F. Supp. 3d 1364 (Ct. Int'l Trade 2019) ........................................................................21

*Consolidated Bearings Co. v. United States,*
   348 F.3d 997 (Fed. Cir. 2003).................................................................................................18

*Deacero S.A.P.I. v. United States,*
   353 F. Supp. 3d 1303 (Ct. Int'l Trade 2018) ...................................................................17, 18

*Dong-A Steel Co. v. United States,*
   337 F. Supp. 3d 1356 (Ct. Int'l Trade 2018) ..........................................................................7

*FCC v. Fox Television Stations, Inc.,*
   129 S. Ct. 1800 (2009).............................................................................................................8

*Fischer S.A. v. United States,*
   700 F. Supp. 2d 1364 (Ct. Int'l Trade 2010) ........................................................................19

*Goodluck India Ltd. v. United States,*
   393 F. Supp. 3d 1352 (Ct. Int'l Trade 2019) .............................................................16, 17, 18

*Nexteel Co. v. United States,*
   355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) .....................................................................5, 7

*NTN Bearing Corp. v. United States,*
   74 F.3d 1204 (Fed. Cir. 1995).................................................................................................19

i

*Papierfabrik August Koehler SE v. United States*,
      843 F.3d 1373 (Fed. Cir. 2016)..........................................................................18

*Pro-Team Coil Nail Enter. v. United States*,
      419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) .......................................................18

*RHP Bearings v. United States*,
      288 F.3d 1334 (Fed. Cir. 2002)..........................................................................18

*SeAH Steel Corp. v. United States*,
      CIT Consol. No. 19-00086, Slip Op. 21-43 (Apr. 14, 2021).................................20

*Seah Steel Vina Corp. v. United States*,
      182 F. Supp. 3d 1316 (Ct. Int'l Trade 2016) .........................................................8

*Stanley Works Langfang Fastening Sys. Co. v. United States*,
      333 F. Supp. 3d 1329 (Ct. Int'l Trade 2018) .......................................................22

*Thai Plastic Bags Indus. Co. v. United States*,
      746 F.3d 1358, 1363 (Fed. Circ. 2014).................................................................7

*Timken U.S. Corp. v. United States*,
      434 F.3d 1345 (2006).........................................................................................16

*United States Steel Corp. v. United States*,
      179 F. Supp. 3d 1114 (Ct. Int'l Trade 2016) .......................................................20

*Viraj Forgings, LTD. v. United States*,
      350 F. Supp. 2d 1316 (Ct. Int'l Trade 2004) .......................................................21

*Xi'An Metals & Minerals Imp. & Exp. Co. v. United States*,
      256 F. Supp. 3d 1346 (Ct. Int'l Trade 2017) .......................................................21

## STATUTES AND REGULATIONS

19 U.S.C. § 1677b(f)(1)(A)........................................................................................3

19 U.S.C. § 1677f-1(d)(1)(B)(i).................................................................................21

19 C.F.R. § 351.102(b)(21)........................................................................................19

19 C.F.R. § 351.102(b)(21)(i)....................................................................................19

19 C.F.R. § 351.301(c)..............................................................................................16

AMERICAS 107832469

## ADMINISTRATIVE DETERMINATIONS

*Certain Carbon and Alloy Steel Cut-to-Length Plate from Italy*,
    85 Fed. Reg. 3026 (Dep't Commerce Jan. 17, 2020) (final results 2016-2018
    review),
    and accompanying Issues & Decision Memorandum...........................................................7, 9

*Certain Cut-to-Length Carbon-Quality Steel Plate Products from the Republic of
Korea*,
    82 Fed. Reg. 42075 (Dep't Commerce Sept. 6, 2017), (final results 2015-2016
    review),
    and accompanying Issues & Decision Memorandum................................................................3

*Certain Oil Country Tubular Goods from the Republic of Korea*, ,
    82 Fed. Reg. 18105 (Dep't Commerce Apr. 17, 2017) (final results 2014-2015
    review),
    and accompanying Issues & Decision Memorandum................................................................5

*Certain Pasta from Italy*,
    83 Fed. Reg. 63627 (Dep't Commerce Dec. 11, 2018) (final results 2016-2017
    review),
    and accompanying Issues & Decision Memorandum...................................................4, 5, 6, 7

*Heavy Walled Rectangular Pipes and Tubes from Korea*,
    84 Fed. Reg. 24471 (Dep't Commerce May 28, 2019) (final results 2016-2017
    review),
    and accompanying Issues & Decision Memorandum...........................................................3, 7

*Polyethylene Retail Carrier Bags from Thailand*,
    76 Fed. Reg. 12700 (Mar. 8, 2011),
    and accompanying Issues & Decision Memorandum................................................................7

*Utility Scale Wind Towers from Canada*,
    85 Fed. Reg. 40239 (Dep't Commerce July 6, 2020) (final AD determ.),
    and accompanying Issues & Decision Memorandum...................................................... passim

*Welded Carbon Steel Standard Pipe and Tube from Turkey*,
    82 Fed. Reg. 49179 (Dep't Commerce Oct. 24, 2017) (final results 2015-2016
    review),
    and accompanying Issues & Decision Memorandum................................................................6

*Welded Line Pipe from the Republic of Korea*,
    80 Fed. Reg. 61366 (Dep't Commerce Oct. 13, 2015) (final LTFV determ.),
    and accompanying Issues & Decision Memorandum................................................................3

AMERICAS 107832469

**MISCELLANEOUS**

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY
    1159 (11th ed. 2003)................................................................................................................21

AMERICAS 107832469

**NON-CONFIDENTIAL VERSION**

## I.    INTRODUCTION

Plaintiffs Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co. (collectively, "Marmen") reply to Defendant United States' Response Brief (ECF 36, 37) ("Def.'s Resp.") and Defendant-Intervenor the Wind Tower Trade Coalition's ("Petitioner") Response Brief (ECF 30, 31) ("Petr.'s Resp.").  We refer to underlying documents from the record using the abbreviated names set forth in Marmen's Memorandum of Points and Authorities in Support of Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record (ECF 23, 24) ("Pls.' Br.") and its Response in Opposition to Consolidated Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record (ECF 34, 35).

Defendant and Petitioner fail to defend as supported by substantial evidence and in accordance with law:

- The Department of Commerce's ("Commerce") arbitrary decision to modify Marmen's reported product-specific plate costs contrary to its normal practice and based on findings belied by the record evidence, as well as its own identification of the "physical characteristics that are the most significant in differentiating the costs between products";

- Commerce's abuse of discretion by rejecting a minor correction to one line of a cost reconciliation worksheet – contrary to established case law – despite having five months left to issue a final AD determination and based on a refuted assumption that Marmen's accounting records and financial statements were somehow erroneous; and

- Commerce's decision to apply the average-to-transaction methodology to U.S. sales of five control numbers ("CONNUMs") based on a patently unreasonable

conclusion that fictitious net price differentials of less than one percent were "significant."

Instead, Defendant and Petitioner misinterpret agency and court precedent; reiterate Commerce's flawed reasoning; offer unsupported *post hoc* rationalizations; and fail to demonstrate that Commerce's factual findings were reasonable. Simply characterizing Commerce's conclusions as "reasonable" do not make them so. By ignoring its own practice, relying on assumptions instead of record evidence, and exploiting procedural technicalities to reject corrective information (among other deficiencies), Commerce failed to meet its statutory duty to calculate Marmen's dumping margin as accurately as possible.

## II.   ARGUMENT

### A.   Defendant and Petitioner Fail to Demonstrate that Commerce's Modification of Marmen's Product-Specific Plate Costs Was Supported by Substantial Evidence or Otherwise in Accordance with Law

Marmen demonstrated that, in determining to modify Marmen's product-specific plate costs recorded in the normal course of business, Commerce arbitrarily disregarded its consistent practice without explanation and made findings belied by the record evidence. *See* Pls.' Br. at 15-26. In response, (1) Defendant and Petitioner misinterpret agency and court precedent to justify Commerce's arbitrary disregard of its standard practice; (2) Petitioner relies on a *post hoc* – and unsupported – argument to demonstrate that Marmen's plate costs differed significantly among "very similar" CONNUMs; and (3) Defendant and Petitioner offer *post hoc* rationalizations that otherwise fail to support Commerce's key factual findings.

#### 1.   Contrary to Defendant's and Petitioner's assertions, Commerce arbitrarily disregarded its consistent practice

Commerce's consistent practice has been to consider averaging a respondent's reported product-specific costs across multiple products (as defined by "CONNUMs") *only if* the reported

costs are significantly different for "nearly identical" or "very similar" CONNUMs.  *See* Pls.' Br. at 16-18.  Defendant denies that Commerce's "cost smoothing" practice is limited in this manner, claiming the agency has averaged costs even when the products under investigation have physical differences.  Petitioner, in contrast, concedes that Commerce averages costs that vary significantly for "similar" goods, but argues Commerce's "cost smoothing" practice is not limited to situations where the reported costs differ significantly for "nearly identical" or "very similar" CONNUMs.  As demonstrated below, however, Defendant and Petitioner rely on cases that fail to support their arguments.

Invoking the exception to 19 U.S.C. § 1677b(f)(1)(A), Commerce has averaged or "smoothed" certain of the respondent's reported CONNUM-specific costs across multiple CONNUMs, ***but only where*** (1) the reported costs are significantly different for "***nearly identical***" or "***very similar***" CONNUMs, and (2) the difference in cost was unrelated to the product's physical characteristics (as defined by the CONNUM structure).  In *Welded Line Pipe from Korea*, for example, Commerce articulated its practice as follows:  "In past cases, the Department has revised reported CONNUM-specific costs which were based on normal books and records, in order to smooth out ***large*** cost differences among products that have ***minor differences*** in physical characteristics."  *Welded Line Pipe from the Republic of Korea*, 80 Fed. Reg. 61366 (Dep't Commerce Oct. 13, 2015) (final LTFV determ.), accompanying Issues & Decision Memo ("IDM") at 39-40 ("*Korean Pipe*"); *see also*, *e.g.*, *Heavy Walled Rectangular Pipes and Tubes from Korea*, 84 Fed. Reg. 24471 (Dep't Commerce May 28, 2019) (final results 2016-2017 review), accompanying IDM at 42; *Certain Cut-to-Length Carbon-Quality Steel Plate Products from the Republic of Korea*, 82 Fed. Reg. 42075 (Dep't Commerce Sept. 6, 2017) (final results 2015-2016 review), accompanying IDM at 20.

AMERICAS 107832469

Defendant contends, "{c}ontrary to Marmen's argument, Commerce's cost smoothing is not limited solely to instances in which finished products are 'identical' or 'very similar.'" Def.'s Resp. at 13. According to Defendant, "even if there are physical differences between finished products, Commerce would still smooth costs among product groups when '***differences in costs between CONNUMs cannot be explained solely by the differences in the physical characteristics of the CONNUMs***.'" *Id.* at 13 (emphasis added) (citing *Certain Pasta from Italy*, 83 Fed. Reg. 63627 (Dep't Commerce Dec. 11, 2018) (final results 2016-2017 review), accompanying IDM at 8 ("*Pasta from Italy*"). Defendant, however, quotes *Pasta from Italy* out of context. The full quote states:

> Commerce found in the *Preliminary Results* that the ***differences in costs between CONNUMs cannot be explained solely by the differences in the physical characteristics of the CONNUMs***. For the preliminary calculations, we found that {the respondent's} reported material costs varied significantly ***among CONNUMs with the same shape, wheat species, and milling form***, and that these differences are caused by reasons not related to the product characteristics, such as the source of the supply of the semolina . . . used to produce the pasta, which is not a physical characteristics defined by Commerce in this proceeding. Therefore, . . . we reallocated material costs ***among products with common physical characteristics*** to mitigate cost differences that are unrelated to differences in the physical characteristics of the products.
>
> For these final results, . . . we continue to find that {respondent} incurred significantly different semolina costs, resulting in large material cost differences ***between pasta CONNUMs that are identical except for vitamin enrichment and additives***, and that the differences in the semolina costs ***between the nearly identical CONNUMs*** were due to reasons unrelated to the products' physical characteristics.

*Pasta from Italy* at 8-9. Commerce also referred to the approach described above as its "normal practice." *Id.* at 9. Thus, contrary to Defendant's interpretation, *Pasta from Italy* further demonstrates Commerce's practice to smooth costs only when costs differ significantly among identical or very similar CONNUMs.

4

**NON-CONFIDENTIAL VERSION**

Similarly, Defendant cites *Nexteel Co. v. United States* for the proposition that Commerce's cost-smoothing analysis "focus{es} on cost differences unrelated to physical characteristics, rather than similarity of end-products." Def.'s Resp. at 13 (citing 355 F. Supp. 3d 1336, 1361-62 (Ct. Int'l Trade 2019)). In the underlying case reviewed in *Nexteel*, however, Commerce observed that the respondent's reported hot-rolled coil costs varied significantly for CONNUMs of **identical** grades (with grade being a physical characteristic included in the CONNUM). *See Certain Oil Country Tubular Goods from the Republic of Korea*, 82 Fed. Reg. 18105 (Dep't Commerce Apr. 17, 2017) (final results 2014-2015 review), accompanying IDM at 104 ("*OCTG from Korea*"). Consequently, Commerce "weight averaged {the respondent's} reported material costs **by reported OCTG grade** for the final results{,}" as upheld by this Court. *Id.* (emphasis added); *Nexteel*, 355 F. Supp. 3d at 1361-62. Contrary to Defendant's interpretation, the Court in *Nexteel* upheld Commerce's determination to analyze significant differences in reported material costs by reference to similar end products.

Defendant further argues that Commerce's practice is to consider physical differences not only in finished products (defined by CONNUMs), but also in the inputs used to produce the CONNUMs. *See* Def.'s Resp. at 13. Once again, however, Defendant relies on cases – namely, *Pasta from Italy* and *Pipe & Tube from Turkey* – that fail to support its position. *See id.* at 13-14.

Regarding *Pasta from Italy*, Defendant contends that "similarities in the **end products** merely demonstrated that the disparate semolina {(the input)} costs between nearly identical CONNUMs were not related to the products' physical characteristics{,}" but that "the crux of the issue was that there were disparities in the reported semolina costs for the different products . . . ." Def.'s Resp. at 13 (emphasis added) (citing *Pasta from Italy* at 3-11). Contrary to Defendant's reading, Commerce's focus was on the physical differences in the finished products.

AMERICAS 107832469

*See Pasta from Italy* at 8 ("{W}e reallocated material costs among products with common physical characteristics to mitigate cost differences that are unrelated to differences in the physical characteristics of the products {(*i.e.*, the pasta products)}.").

Defendant's other case – *Pipe & Tube from Turkey* – is inapposite. In *Pipe & Tube*, the respondent allocated the input (zinc) costs evenly across all galvanized CONNUMs (consistent with its accounting system), and Commerce ***reallocated*** the reported zinc costs to account for physical differences ***in the CONNUMs***. *See Welded Carbon Steel Standard Pipe and Tube from Turkey*, 82 Fed. Reg. 49179 (Dep't Commerce Oct. 24, 2017) (final results 2015-2016 review), accompanying IDM at 4. Here in contrast, Commerce "smoothed" Marmen's reported ***CONNUM-specific*** plate costs across all CONNUMs without regard to physical differences in the CONNUMs. Moreover, consistent with its practice, Commerce's focus in *Pipe & Tube from Turkey* was on the physical differences of the subject merchandise (as defined by the CONNUMs) – ***not*** the input: "{W}e find that {the respondent's} allocation of zinc costs is unreasonable because it does not accurately reflect the CONNUM characteristics that affect zinc costs incurred in producing that CONNUM." *Id.* at 5.

Unlike Defendant, Petitioner recognizes that "Commerce will deviate from a company's books and records . . . where the respondent reports significantly differing production costs for ***similar goods***, and the reported costs vary in a way not explained by ***the goods' physical characteristics***{,}" but claims Commerce's analysis is not limited to "nearly identical" or "very similar" CONNUMs. Petr.'s Resp. at 2, 11, 14. Petitioner, however, also relies on cases that do not support its argument. Petitioner cites *Thai Plastic Bags Indus. Co. v. United States*, Petr.'s Resp. at 15, but in that case the court affirmed Commerce's decision to reject a respondent's cost allocation methodology that "result{ed} in products with ***few or minor physical differences***

6

having significantly different {costs of manufacturing} assigned to them." 746 F.3d 1358, 1363 (Fed. Cir. 2014) (emphasis added); *see also Dong-A Steel Co. v. United States*, 337 F. Supp. 3d 1356, 1369-71 (Ct. Int'l Trade 2018) (affirming Commerce's decision to smooth the respondent's "reported raw material costs for product control numbers that were ***identical in all physical characteristics except painting***"); *Polyethylene Retail Carrier Bags from Thailand*, 76 Fed. Reg. 12700 (Mar. 8, 2011) (final results 2008-2009 review), accompanying IDM at 7-15. (emphasis added).  Petitioner cites *Nexteel*, Petr.'s Resp. at 15, but in that case the Court affirmed Commerce's decision to smooth steel input costs that varied significantly for ***CONNUMs of identical grades***.  *See OCTG from Korea* at 104; *Nexteel*, 355 F. Supp. 3d at 1361-61 (affirming).  Petitioner cites *CTL Plate from Italy*, Petr.'s Resp. at 14, but in that case Commerce ***accepted*** the respondent's reported material costs where the cost differences between "***CONNUMs sharing the same quality and chemical element characteristics***" were "minor." *Certain Carbon and Alloy Steel Cut-to-Length Plate from Italy*, 85 Fed. Reg. 3026 (Dep't Commerce Jan. 17, 2020) (final results 2016-2018 review), accompanying IDM at 25 (emphasis added) ("*CTL Plate from Italy*").  Finally, Petitioner cites *Korean Pipe*, Petr.'s Resp. at 15, but in that case Commerce found that "the fluctuation in costs between CONNUMs {could not} be wholly explained by the differences in the physical characteristics of those ***demonstrably similar CONNUMs***."  *Korean Pipe* at 39 (emphasis added).

Here, contrary to its consistent practice, Commerce averaged Marmen's reported per-unit plate costs across all CONNUMs without examining whether such costs differed significantly among nearly identical, very similar, or even similar CONNUMs.  Instead, without explanation, Commerce compared the reported per-ton plate costs for ***all*** CONNUMs (save one) – regardless of Type (complete tower or section of a tower), Weight of Tower/Section, or Height of

7

Tower/Section, even though Commerce itself had determined that these "physical characteristics . . . are the most significant in differentiating the costs between products." *See Final Decision Memo* at 5-6; *see also Final Cost Memo* at Attachment 1. Commerce acted arbitrarily and contrary to law by failing to acknowledge or explain its departure from past practice. *See FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1811 (2009); *Seah Steel Vina Corp. v. United States*, 182 F. Supp. 3d 1316, 1326 (Ct. Int'l Trade 2016).[1]

Commerce's failure to follow its consistent practice is puzzling, given its claim to have used "the physical characteristics as {its} guidepost" for comparing CONNUM-specific plate costs. *Final Decision Memo* at 6. In commenting on the physical characteristics to define CONNUMs in the AD investigation, Petitioner cited "the overwhelming role played by steel plate{,}" and argued that "section weight" and "section height" are "the most significant factors associated with wind tower sections . . . ." Petitioner's Prod. Char. Comments at 7-8. In turn, Commerce selected Type (*i.e.*, complete wind tower or section of a wind tower), Weight of the Tower/Section, and Height of the Tower/Section as the three "physical characteristics that are the most significant in differentiating the costs between products." *Final Decision Memo* at 5; *Commerce Prod. Char. Letter* at Attachment 1. Nevertheless, Commerce neglected to test whether Marmen's reported plate costs differed significantly among CONNUMs that were identical or similar with respect to these three characteristics – contrary to its established practice.

---

[1] Petitioner mistakenly claims that Marmen failed to argue before Commerce that its practice is to analyze cost differences only with respect to "nearly identical" or "very similar" products. *See* Petr.'s Resp. at 13. To the contrary, in its case brief Marmen asserted: "To ensure CONNUM-specific costs reasonably reflect physical characteristics, the Department has, in certain cases, averaged or 'smoothed' the reported costs across CONNUMs, ***but only where*** (1) the respondent reported significantly different costs for '***nearly identical***' or '***very similar***' CONNUMs and (2) the difference in cost was unrelated to the product's physical characteristics." Marmen Case Br. at 5.

AMERICAS 107832469

2. **Petitioner's argument that that there were significantly different per-unit plate costs between "very similar" CONNUMs is an unsupported *post hoc* rationalization**

Commerce failed to apply its normal practice for determining whether to "smooth" Marmen's CONNUM-specific plate costs even though Marmen had demonstrated in its case brief that the company did ***not*** incur significantly different plate costs for the most similar CONNUMs (defined by Type, Weight, and Height). *See Final Decision Memo* at 5-6; Marmen Case Br. at 6-8. Petitioner counters that "there were significant differences between CONNUMs that are 'very similar,'" Petr.'s Resp. at 16, but this is a *post hoc* rationalization. *See Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168-69 (1962) (holding that agency action must be "upheld, if at all, on the same basis articulated in the order by the agency itself").

Moreover, Petitioner's analysis is limited to four comparisons that fail to demonstrate "significant" differences in per-unit plate costs. *See* Petr.'s Resp. at 16. Two of Petitioner's comparisons are unreasonable because they include outlier CONNUMs with production quantities of only one tower section. *See id.*; *Final Cost Memo* at Attachment 2 (see field "PRODQTY" for CONNUMs [                    ] and [                    ]). *See also CTL Plate from Italy* at 25 (declining to smooth material costs, in part, because the similar CONNUMs used in the cost comparisons had "low production volumes"). Petitioner's other two CONNUM comparisons reflect plate-cost differences of only [  ]% and [  ]% (with per-ton plate costs of USD [    ] compared to USD [    ], and USD [    ] compared to USD [    ]). *See* Petr.'s Resp. at 16; *Final Cost Memo* at Attachment 2.

3. **Contrary to Defendant's and Petitioner's assertions, Commerce's factual findings are unsupported by substantial evidence**

In its initial brief, Marmen demonstrated that Commerce's two key factual findings related to "cost smoothing" are unsupported by substantial evidence: (1) Commerce's claim that

9

per-unit costs differed only for high-thickness plates; and (2) Commerce's assumption that timing explained observed differences in Marmen's reported CONNUM-specific plate costs. *See* Pls.' Br. at 22-26.  In response, Defendant and Petitioner offer *post hoc* rationalizations that otherwise fail to support Commerce's findings.

   a. **The record evidence disproves Commerce's finding that prices only differed for high-thickness plates**

  In the *Final AD Determination*, Commerce wrongly concluded that "Marmen Group's steel suppliers do not charge different prices for plates of different grade, thickness, width, or length{,}" except for "high thickness range plates" (*i.e.*, greater than 50.8mm).  *Final Decision Memo* at 5-6; *Final Cost Memo* at 2.  Commerce overlooked that Marmen had submitted the plate list for the tower model sold in Canada, which showed that per-unit prices varied for plates of different dimensions (thickness, length, and width).  *See* Marmen 2nd Supp. D Response (Original) at Exhibit 2nd Supp. D-1 (Henvey Project tower plate list).  In response, Defendant and Petitioner resort to two *post hoc* arguments, neither of which supports Commerce's conclusion. *See Burlington Truck,* 371 U.S. at 168-69.

  First, Defendant claims the plate list for the home-market tower does not show "that the price of the steel plates increases in correlation with increases in plate thickness."  Def.'s Resp. at 16.  This misses the point.  Regardless of whether price increases with plate thickness, the plate list undeniably shows that the per-ton plate prices varied by dimensions – even for plates with thicknesses less than 51mm – as summarized in the table below:[2]

---

[2] Petitioner argues, "while the plate list shows different prices for certain plates that happen to have different dimensions, it does not establish that the prices differed *because* of the different dimensions." Petr.'s Resp. at 21.  To the contrary, because thickness, length, and width are the only physical characteristics included in the plate list, the only reasonable interpretation is that prices differed based on the varying dimensions.

AMERICAS 107832469

**NON-CONFIDENTIAL VERSION**

| Thickness | Length | Width | Canadian Dollar ("CAD") per short ton |
|---|---|---|---|
| [    ]mm – [    ]mm | [     ]mm – [     ]mm | [     ]mm – [     ]mm | $[     ] - $[     ] |
| [    ]mm –[    ]mm | [     ]mm – [     ]mm | [     ]mm – [     ]mm | $[     ] |
| **[    ]mm – [    ]mm** | **[     ]mm – [     ]mm** | **[     ]mm – [     ]mm** | **$[     ]** |
| [    ]mm – [    ]mm | [     ]mm – [     ]mm | [     ]mm – [     ]mm | $[     ] |
| [    ]mm – [    ]mm | [     ]mm – [     ]mm | [     ]mm – [     ]mm | $[     ] |
| Marmen 2nd Supp. D Response (Original) at Exhibit 2nd Supp. D-1 (Henvey Project tower plate list) | | | |

The plate list also indicates that plate prices tend to increase with larger thicknesses, with one exception for plates with thicknesses ranging from [     ]mm to [     ]mm (as well as different length and width ranges). More importantly, the plate list disproves Commerce's finding that "{t}he only {price} exception demonstrated on the record is for high thickness range plates (*e.g.*, greater than 50.8 mm in thickness for one supplier) for which the supplier charges a surcharge." *Final Decision Memo* at 5-6; *see also* Final Cost Memo at 2. Consequently, Commerce's finding is unsupported by substantial evidence.

Petitioner points to additional documents on the record in attempting to prove that plate prices do not vary by dimension – many of which were not relied upon or cited by Commerce in the *Final AD Determination*. *See* Petr.'s Resp. at 18-20. For example, Petitioner points to Marmen's purchase agreements and communications with [                              ], which show that these steel plate suppliers charged USD [     ] – [     ] more per ton for thicknesses exceeding 50.8mm or 52mm. *See id.* at 18-19 (citing Marmen 2nd Supp. D Response (Original) at Exhibit 2nd Supp. D-2). Petitioner also cites various communications between Marmen and its home-market customer Vestas, a wind turbine manufacturer, and [               ]. *See id.* at 19-20 (citing Marmen 1st Supp. ABC Response at Exhibit FSQ-12; Marmen 2nd Supp. ABC Response at Exhibit SSQ-14). These materials, however, reflect Marmen's **negotiations** with its customer and a steel supplier related to a home-market wind farm project; the plate list (with the final plate prices) supersedes all such negotiation documents.

11

Contrary to Defendant's assertion, *see* Def.'s Resp. at 17-18, Marmen is not asking the Court to reweigh the evidence. "{I}t is . . . well-established that Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department's determination unsupported by substantial evidence." *Allegheny Ludlum Corp. v. United States,* 112 F. Supp. 2d 1141**,** 1165 (Ct. Int'l Trade 2000). The plate list for the wind tower sold in Canada showed significant price differences among steel plates with thicknesses less than 50.8mm (as well as among plates with differences in length and width). Yet Commerce ignored this information even though Marmen highlighted it in the company's case brief. *See* Marmen Case Br. at 9 ("For example, Vestas's plate list for the Henvey Project tower sections shows Canadian dollar ('CAD') per ton prices varying by as much as CAD [    ] per ton based on dimension (thickness, length, width)."). A reasonable mind considering all the relevant evidence would not have found, as did Commerce, that per-unit plate prices differ only for high thickness plates.

> **b.**     **Commerce's assumption that timing explained differences in plate costs does not constitute substantial evidence**

Commerce *assumed* without substantial evidence that timing explained the observed differences in Marmen's CONNUM-specific plate costs based on a purported "pattern where most of the CONNUMs with higher plate costs were sold early in the POI, whereas CONNUMs with lower plate costs were sold later in the POI." *Final Decision Memo* at 6; *see also Final Cost Memo* at 2, Attachment 2. In fact, the record evidence *disproves* the notion that timing caused differences in Marmen's CONNUM-specific plate costs. Of the CONNUMs "with higher plate cost," *six* (with per-ton plate costs ranging from CAD [    ] to CAD [    ]) were sold in the first half of the POI, and *five* (with per-ton plate costs ranging from CAD [    ] to

**NON-CONFIDENTIAL VERSION**

CAD [       ]) were sold in the second half of the POI.[3]  *See Final Cost Memo* at Attachment 2.

Moreover, two of the CONNUMs "with lower plate costs" (at CAD [     ] and CAD [      ]) were

sold during the first half of the POI.  *See id.*  Contrary to Commerce's conclusion, ***there was no***

***time-based pattern at all:***   CONNUMs with high ***and*** low per-unit plate costs were sold

throughout the POI.  Moreover, this is not – as Defendant contends – "'mere disagreement' with

Commerce's weighing of the record evidence."  Def's. Resp. at 19.  A reasonable decision maker

would not have found on this record that timing explained differences in Marmen's CONNUM-

specific plate costs, and used this to justify invoking rejecting Marmen's product-specific plate

costs recorded in its GAAP-compliant accounting system.

> **B.**    **Defendant and Petitioner Fail to Demonstrate that Commerce's Rejection of Marmen's Minor Correction to its Cost Reconciliation Was Supported by Substantial Evidence or a Proper Exercise of Discretion**

In its initial brief, Marmen demonstrated that Commerce's decision to reject a minor

correction to the company's cost reconciliation was (1) unsupported by substantial evidence,

because Commerce wrongly assumed that Marmen had made an unaudited accounting error, and

(2) an abuse of discretion, because the minor correction was submitted nearly five months before

the deadline for the final AD determination, did not require any modifications to Marmen's

reported cost or sales data, and was necessary to ensure an accurate dumping margin calculation.

*See* Pls.' Br. at 26-32.   In response, Defendant and Petitioner simply reiterate Commerce's

deficient reasoning – without addressing Marmen's arguments – and misapply binding case law.

---

[3] This comparison omits the one CONNUM Commerce excluded from its "plate smoothing" calculation, CONNUM [                            ].

AMERICAS 107832469

NON-CONFIDENTIAL VERSION

**1.      Nothing in the record supports Commerce's unreasonable assumption that Marmen had made an accounting error that would require an amendment to the company's year-2018 financial statements**

In defending Commerce's unreasonable decision to reject a minor correction to one line of a cost reconciliation, neither Defendant nor Petitioner address the arguments and evidence discussed in Marmen's initial brief.  Instead, Defendant and Petitioner (1) reiterate Commerce's flawed assumption that Marmen had made an accounting error; (2) reiterate Commerce's unsupported speculation that the error required an amendment to Marmen Inc.'s audited financial statements; and (3) mischaracterize the nature of the error.

Defendant repeats Commerce's faulty assumption that the correction to Marmen Inc.'s cost reconciliation worksheet stemmed from an accounting error.  *See* Def.'s Resp. at 22 (citing *Final Decision Memo* at 9).  Commerce, however, unreasonably ***assumed*** there was an error in Marmen's accounting records without evidentiary support.  Marmen did not say or suggest that Marmen Inc. had made an accounting error.  *See* Pls.' Br. at 28-29.  Rather, Marmen explained that the error – inadvertently omitting to convert USD purchases to CAD – was made in one line of Marmen Inc.'s cost reconciliation.  *See* Marmen 2nd Supp. D Response (Original) at Exhibit 2nd Supp. D-9 ("Purchases of sections from Energie were in USD.  Marmen discovered it did not convert those purchases to CAD ***for the original reconciliation***.") (emphasis added).  Moreover, Marmen had explained several times that the company's accounting practice in 2018 was not to convert USD purchases to CAD in its accounting records, but rather to leave that conversion for the auditor at the fiscal year's end.  *See* Marmen Section D Response at D-15; Marmen 1st Supp. D Response at 20; Marmen 2nd Supp. D Response (Original) at 11.  Like Commerce below, neither Defendant nor Petitioner addresses the evidence disproving Commerce's assumption that Marmen had made an accounting error.

14

Defendant and Petitioner also reiterate Commerce's unfounded assumption that the USD-CAD conversion error in Marmen Inc.'s reconciliation worksheet also required a correction to the company's year-2018 audited financial statements.  *See* Def.'s Resp. at 23 (citing *Final Decision Memo* at 9); Petr.'s Resp. at 25-26.  Marmen explained and supported the reasons for the auditor's amendment to Marmen Inc.'s year-2018 financial statements, and explicitly stated that the correction to Marmen Inc.'s cost reconciliation was "***unrelated to the financial statement amendments***."  Marmen 2nd Supp. D Response (Original) at 14-15 (emphasis added); *see also id.* at 11-12, Exhibit 2nd Supp. D-7 (explaining and documenting the auditor's revisions to Marmen Inc.'s year-2018 financial statements).  Again, neither Defendant nor Petitioner – much like Commerce before them – addresses the evidence that the conversion error in Marmen Inc.'s cost reconciliation was not repeated in the company's audited financial statements.  Moreover, while Petitioner complains that the correction to Marmen's cost reconciliation "would have had the effect of offsetting the auditor's changes to Marmen's financial statements{,}" Petr.'s Resp. at 10, 25, the correction, in fact, demonstrated that Marmen Inc.'s reported costs reconciled to the company's financial statements and corroborated Marmen's explanation that the USD-CAD conversion error was not repeated in the company's financial statements.

Lastly, Petitioner wrongly contends that the minor correction "reasonably indicated to Commerce that Marmen was attempting to use the reconciliation ***to alter its reporting*** in a way inconsistent with its amended financial statements."  Petr.'s Resp. at 28 (emphasis added).  To the contrary, the correction was an adjustment to one line of Marmen Inc.'s cost reconciliation – ***not*** a change to Marmen's reported cost or sales data.  *See* Marmen 2nd Supp. D Response (Original) at Exhibit 2nd Supp. D-9.

AMERICAS 107832469

**2.    Commerce abused its discretion by rejecting Marmen's minor correction as untimely filed, unsolicited factual information**

In its initial brief, Marmen established that Commerce abused its discretion by rejecting the minor correction to one line of Marmen Inc.'s cost reconciliation as untimely filed and unsolicited factual information. *See* Pls.' Br. at 30-32. In response, Defendant misinterprets the case law to conclude that Marmen's correction was not the type of "corrective information" permitted by the courts, and overstates Commerce's discretion to reject a respondent's correction. Moreover, neither Defendant nor Petitioner addresses the factors Commerce was required to consider in deciding whether to accept Marmen's correction.

Regardless of the deadlines for submission of information imposed by 19 C.F.R. § 351.301(c), "Commerce is free to correct any type of importer error – clerical, methodology, substantive, or one in judgment – in the context of making an antidumping duty determination, provided that the importer seeks correction before Commerce issues its final results and adequately proves the need for the requested corrections." *Goodluck India Ltd. v. United States*, 393 F. Supp. 3d 1352, 1357 (Ct. Int'l Trade 2019) (citing *Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353 (2006)). While acknowledging the case law, Defendant argues that Marmen's correction "does not constitute the type of correction permitted by this Court{,} . . . because the information was unsolicited and did not seek to correct information that was already on the record." Def.'s Resp. at 24-25. Neither Defendant's claim – nor Commerce's action below – squares with the case law.

In *Goodluck*, the court held that Commerce improperly rejected the respondent's information as untimely, where the respondent reported CONNUM coding corrections to its sales and cost data at verification. *See Goodluck*, 393 F. Supp. 3d at 1361-62, 1368. The court held "that Goodluck's submission was correctible importer error and not untimely new factual

AMERICAS 107832469

information." *Id.* at 1368. "Goodluck sought to rectify reporting mistakes contained in its previous submission to the record, and not to supply additional underlying data to fill gaps caused by an omission or withholding of requested information from Commerce." *Id.*

Marmen's facts are ***even stronger*** than those presented in *Goodluck*. Marmen presented the minor correction to Marmen Inc.'s cost reconciliation on February 7, 2020 – nearly four weeks before the first day of the scheduled cost verification (March 2, 2020) – as opposed to during the verification itself. *See* Marmen 2nd Supp. D Response (Original); Cost Verification Agenda (A-122-867) (Feb. 24, 2020) (PR 159; CR 202). Moreover, unlike in Goodluck, Marmen's correction was an adjustment to one line of a cost reconciliation worksheet – ***not*** a change to the reported cost or sales data. *See* Marmen 2nd Supp. D Response (Original) at Exhibit 2nd Supp. D-9. Lastly, as in *Goodluck*, Marmen merely sought to correct an error in one exhibit of a previous submission (*i.e.*, omitted USD-CAD conversion in one line of the cost reconciliation) – "***not*** to supply additional underlying data to fill gaps caused by an omission or withholding of requested information from Commerce." *Goodluck*, 393 F. Supp. 3d at 1368 (emphasis added).

Defendant also overstates Commerce's discretion to reject a correction. Quoting *Goodluck*, Defendant asserts, "{a}t the same time, '***Commerce is afforded discretion in deciding whether to accept a respondent's corrective information***{.}'" Def.'s Resp. at 25 (emphasis added) (quoting *Goodluck*, 393 F. Supp. 3d at 1358 (citing *Deacero S.A.P.I. v. United States*, 353 F. Supp. 3d 1303, 1309 (Ct. Int'l Trade 2018))). Defendant, however, quotes *Goodluck* out of context. The full quote states:

> ***While*** Commerce is afforded discretion in deciding whether to accept a respondent's corrective information, *Deacero*, 353 F. Supp. 3d at 1309, ***if 'Commerce acted differently in this case than it has consistently acted in similar circumstances without reasonable explanation, then Commerce's actions will***

AMERICAS 107832469

> *have been arbitrary*,' *Consolidated Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003) (citing *RHP Bearings v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002)).   *Moreover, 'Commerce abuse{s} its discretion {when it} refuses to accept updated data when there {i}s plenty of time for Commerce to verify or consider it*.'"   *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1384 (Fed. Cir. 2016) . . . .

*Goodluck*, 393 F. Supp. 3d at 1358 (emphases added).

Moreover, Defendant's reliance on *Deacero* is curious because that decision **supports** Marmen's case.  *See* Def.'s Resp. at 23, 25 (citing *Deacero*, 353 F. Supp. 3d at 1308-09).  In *Deacero*, the respondent submitted a revised cost database – as opposed to one line in a cost reconciliation worksheet.  *See Deacero*, 353 F. Supp. 3d at 1308.  Nevertheless, Commerce **accepted** the respondent's submission and even issued a supplemental questionnaire to give the respondent an opportunity to provide "further support for and explanation of the revisions."  *Id.* at 1309.  Here, in stark contrast, Commerce rejected Marmen's submission outright – striking the correction from the record – without any inquiry at all.  If anything, *Deacero* highlights Commerce's abuse of discretion in Marmen's case.

Lastly, like Commerce below, neither Defendant nor Petitioner addresses the factors Commerce was required to consider in deciding whether to accept Marmen's correction.  In its briefs to Commerce and the Court, Marmen cited the factors courts have instructed Commerce to consider when reviewing respondents' corrections.

> In deciding whether to accept a correction, Commerce may consider its "'interest in ensuring finality, the burden of incorporating the information, and consideration of whether the information will increase the accuracy of the calculated dumping margins.'"  *Pro-Team Coil Nail Enter. v. United States*, 419 F. Supp. 3d 1319, 1332-33 (Ct. Int'l Trade 2019) (quoting *Bosun Tools Co. v. United States*, Slip Op. 19-125, 2019 WL 4599805, at *4 (Ct. Int'l Trade Sept. 23, 2019)).

AMERICAS 107832469

Pls.' Br. at 31; Marmen Case Br. at 25. Marmen also demonstrated how each factor supported

acceptance of Marmen's correction. *See id.* Defendant's and Petitioner's silence here is telling.[4]

At bottom, Commerce's failure to consider Marmen's correction was an abuse of

discretion. *See Fischer S.A. v. United States*, 700 F. Supp. 2d 1364, 1376 (Ct. Int'l Trade 2010)

(following the Federal Circuit's holding that "Commerce abused its discretion when it 'refused

to consider correction of . . . errors because of the 'untimely' submission of the corrective

information,' emphasizing that '{i}t is the duty of {Commerce} to determine dumping margins

as accurately as possible' and that 'the antidumping laws are remedial, not punitive.'") (quoting

*NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1207-08 (Fed. Cir. 1995)).

### C. Defendant and Petitioner Fail to Demonstrate that Commerce's Application of the Average-to-Transaction Method to Marmen's U.S. Sales of Five CONNUMs Is Supported by Substantial Evidence

Defendant and Petitioner fail to respond to Marmen's argument that Commerce's

application of the average-to-transaction ("A-T") method to U.S. sales of five CONNUMs was

unreasonable. *See* Pls.' Br. at 32-36. Their briefs repeat Commerce's conclusory determination

and do not substantively address Marmen's claims. Defendant and Petitioner (1) claim that net

price differences of ***less than one percent*** are "significant"; (2) attempt to justify Commerce's

finding of "significant" price differences with backwards reasoning; and (3) disregard the

relevance of Marmen's exempted duties and imputed credit expenses in creating purported net

price differences where none existed.

---

[4] Defendant also alleges that Marmen failed to "identify the subsection of 19 C.F.R. §
351.102(b)(21) under which Marmen was submitting this new factual information." Def.'s Resp.
at 23. To the contrary, because Marmen was responding to a supplemental questionnaire,
Marmen stated, "This submission contains factual information provided by Marmen under 19
C.F.R. § 351.102(b)(21)(i) (statements of fact, documents, and data submitted in response to
initial and supplemental questionnaires)." Marmen 2nd Supp. D Response (Original) (cover letter
at 2).

AMERICAS 107832469

First, Defendant and Petitioner assert that, because 68.29% of Marmen's sales passed the Cohen's *d* test, there exists "a pattern of prices that differ significantly among purchasers, regions, or time periods" that justified applying the A-T methodology to all of Marmen's sales. *See* Def.'s Resp. at 28 (citations omitted); Petr.'s Resp. at 29.  This misses the point.  As Marmen explained, the only reason that 68.29% of Marmen's sales passed the Cohen's *d* test "is because Commerce unreasonably considered price differences of less-than-one percent to be 'significant.'"  Pls.' Br. at 35.

In response, Defendant contends that, because Commerce "quantified the extent of the price differences using the most stringent of the Cohen's *d* test's three thresholds" (*i.e.*, a coefficient of 0.8 or greater), Marmen's argument amounts to "mere disagreement" because it fails to "demonstrate that Commerce's statistical analysis is ***false*** beyond asserting its belief that a less-than-one percent difference in price cannot be 'significant.'"  Def.'s Resp. at 29 (emphasis added).  Here, too, Defendant mischaracterizes Marmen's argument.  The point is not that the analysis must be "false"; Marmen does not challenge the Cohen's *d* test itself, and the Court recently stated that "Commerce's approach regarding use of the Cohen's *d* test and application of the 0.8 threshold is in accordance with the law."  *SeAH Steel Corp. v. United States*, CIT Consol. No. 19-00086, Slip Op. 21-43 at 21-22 (Apr. 14, 2021) (citation omitted).

Rather, as Marmen explained in its initial brief, the point is that the ***application*** of "Commerce's statistical analysis" must be reasonable.  Pls.' Br. at 33-34 (citing *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1326 n.6 (Fed. Cir. 2020); *United States Steel Corp. v. United States*, 179 F. Supp. 3d 1114, 1125 (Ct. Int'l Trade 2016); *Baroque Timber Indus. (Zhongshan) Co. v. United States*, 971 F. Supp. 2d 1333, 1341 (Ct. Int'l Trade 2014)).  To invoke the exception and use an A-T comparison method (with zeroing), the statute requires

**NON-CONFIDENTIAL VERSION**

Commerce to find a pattern of U.S. prices that differ "significantly" among purchasers, regions, or periods of time.   19 U.S.C. § 1677f-1(d)(1)(B)(i).   If application of the Cohen's *d* test indicates a price differential that is not "significant" on its face, Commerce cannot reasonably rely on the results of the test.

"Neither the statute nor the SAA define the term 'significantly'. . . ."  *Xi'An Metals & Minerals Imp. & Exp. Co. v. United States*, 256 F. Supp. 3d 1346, 1365 (Ct. Int'l Trade 2017). Although the court has upheld the Cohen's *d* test as satisfying the statutory language, it also has stated that "Congress did not use the word 'statistical' or any variation thereof" with respect to the term "significant . . . when it drafted the statute."   *Id.* at 1365-66.   Moreover, the term "significant" must be read in accordance with its "plain meaning to avoid absurd results."   *See Viraj Forgings, LTD. v. United States*, 350 F. Supp. 2d 1316, 1324 (Ct. Int'l Trade 2004) (citations omitted).   An interpretation that conflicts with the plain meaning of a statute is both unreasonable and "fails as a matter of law."   *China Mfrs. All., LLC v. United States*, 357 F. Supp. 3d 1364, 1375 (Ct. Int'l Trade 2019).   "Significant" means "of a noticeably or measurably **large** amount."   Merriam-Webster's Collegiate Dictionary 1159 (11th ed. 2003) (emphasis added).   Defendant's insistence that less-than-one-percent differences in price – three of which were **less than [        ] of a percentage point each**[5] – are "significant" thus conflicts with the plain meaning of the statute, generating an "absurd" result.[6]

---

[5] *See* Pls.' Br. at 34, n.5 (listing the five differences in question and showing that two were [    ]% and one was [       ]%; the other two were [    ]% and [       ]%) (citations omitted).

[6] In *Apex Frozen Foods*, the court stated that price differences that are "small in absolute terms" may nevertheless be "significant" in relative terms "depending on what is considered significant for a particular industry or product."   144 F. Supp. 3d 1308, 1331 (Ct. Int'l Trade 2016).   Neither Commerce nor Defendant has explained why differences of less than one percent are "significant" in the context of the wind tower industry.   *See Final Decision Memo* at 10-11.

AMERICAS 107832469

Second, Defendant and Petitioner attempt to justify Commerce's finding of "significant" price differentials by noting that the difference between the dumping margin using the A-T method versus the average-to-average ("A-A") was greater than 25%.  *See* Def.'s Resp. at 29; Petr.'s Resp. at 31.  This point is irrelevant.  The 25% threshold relates to "the **second stage** of the differential pricing analysis," in which Commerce evaluates whether a dumping margin using the A-T method is "meaningfully different" from one using the A-A method.  Def.'s Resp. at 27 (emphasis added).  Commerce applies the "meaningful difference" test only **after** having found a pattern of prices that differ "significantly" by purchaser, region, or time period.  *See id.* Consequently, the "meaningful difference" test cannot be used to justify a finding of a pattern of "significant" price differences.[7]  To conclude otherwise is backwards reasoning.

Finally, Defendant alleges, "Marmen's **belief** that the differences for four of the five CONNUMs it challenges arose from adjustments for exempted import duties and imputed credit expenses does not negate Commerce's Cohen's *d* analysis or the underlying substantial record evidence."  Def.'s Br. at 29 (emphasis added).  This is not simply a matter of "Marmen's belief." Commerce's margin programs **show** that the net price differences for four out of five CONNUMs arose from exempted import duties and imputed credit expenses.  *See* Pls.' Br. at 35 (citing Marmen Case Br. at 32; Marmen's US sales database ("marmenUS02"); Margin Program at 2-H: CONVERT FOREIGN-CURRENCY VARIABLES INTO U.S. DOLLARS & 4-C: CALCULATE NET U.S. PRICE).  Moreover, these facts invalidate Commerce's reliance on the

---

[7] The Court should likewise reject Petitioner's claim that "Marmen would have this Court endorse cherry-picking of the U.S. CONNUMs to be included in the differential pricing analysis." Petr.'s Resp. at 30.  Marmen's argument is that Commerce unreasonably applied the A-T method to U.S. sales of the five CONNUMs at issue.  *See* Pls.' Br. at 32.  Contrary to Petitioner's suggestion, the differential pricing analysis envisions that the A-T method may be applied to some, but not all U.S. sales.  *See, e.g.*, *Stanley Works Langfang Fastening Sys. Co. v. United States*, 333 F. Supp. 3d 1329, 1339 (Ct. Int'l Trade 2018).

AMERICAS 107832469

**NON-CONFIDENTIAL VERSION**

Cohen's *d* analysis for these four CONNUMs.  The adjustment for exempted import duties (duty drawback adjustment) and imputed credit expenses are not even adjustments or expenses that companies' book in their accounting.  *See* Pls.' Br. at 35-36.  It was unreasonable for Commerce to treat net price differences arising from these circumstances as "significant," particularly when, as here, the differences are less than one percent.

Ultimately, Defendant's and Petitioner's responses to Marmen's argument fail to justify Commerce's application of the A-T methodology to the five CONNUMs at issue, largely repeating Commerce's scant and conclusory explanations from the *Final Decision Memo*.  To that end, and, because those original explanations did not address Marmen's argument in the underlying proceeding, *see id.*, Commerce's application of the A-T method to Marmen's U.S. sales of the five CONNUMs is unsupported by substantial evidence.

## III.    CONCLUSION

For the reasons discussed above, Plaintiffs respectfully request that the Court enter judgment in favor of Marmen.

Respectfully submitted,

WHITE AND CASE LLP

  /s/ Jay C. Campbell
Jay C. Campbell
Ting-Ting Kao
Ron Kendler
Allison J.G. Kepkay
White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiffs Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co.

Date: May 28, 2021

23

CERTIFICATE OF COMPLIANCE

I, Jay C. Campbell, certify that the attached brief complies with the word limitation requirement, as stated in the Standard Chambers Procedures.  The word count for Marmen's Response Brief, as computed by the White & Case word processing system (Microsoft Word 2016) and manual tally, is 6,965 (exclusive of the table of contents, table of authorities, and counsel's signature block).

_____/s/ Jay C. Campbell_____
Jay C. Campbell