**Slip Op. 21-148**

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| MARMEN INC., MARMEN ÉNERGIE INC., and MARMEN ENERGY CO., | |
|     **Plaintiffs,** | |
| **and** | |
| **WIND TOWER TRADE COALITION,** | |
|     **Consolidated Plaintiff,** | **Before: Jennifer Choe-Groves, Judge** |
| **v.** | **Consol. Court No. 20-00169** |
| **UNITED STATES,** | |
|     **Defendant,** | |
| **and** | |
| **WIND TOWER TRADE COALITION, MARMEN INC., MARMEN ÉNERGIE INC., and MARMEN ENERGY CO.,** | |
|     **Defendant-Intervenors.** | |

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part the U.S. Department of Commerce's final affirmative determination in the 2018–2019 antidumping duty investigation on utility scale wind towers from Canada.]

Consol. Court No. 20-00169                                    Page 2


Dated:  October 22, 2021

Jay C. Campbell, Allison J.G. Kepkay, Ron Kendler, and Ting-Ting Kao, White & Case, LLP, of Washington, D.C., for Plaintiffs and Defendant-Intervenors Marmen Inc., Marmen Energy Co., and Marmen Energie Inc.

Alan H. Price, Daniel B. Pickard, Robert E. DeFrancesco, III, Maureen E. Thorson, and Laura El-Sabaawi, Wiley Rein, LLP, of Washington, D.C., for Consolidated Plaintiff and Defendant-Intervenor Wind Tower Trade Coalition.

Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, U.S. Department of Justice, of Washington, D.C., for Defendant United States.  With him on the brief were Brian M. Boynton, Acting Assistant Attorney General, and Jeanne E. Davidson, Director.  Of counsel on the brief were Kirrin A. Hough, Attorney, and Natalie M. Zink, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Choe-Groves, Judge:  Plaintiffs Marmen Inc., Marmen Energy Co., and

Marmen Energie Inc. (collectively, "Marmen") and Consolidated Plaintiff Wind

Tower Trade Coalition ("WTTC") filed this consolidated action challenging the

final determination published by the U.S. Department of Commerce ("Commerce")

in the antidumping duty investigation on utility scale wind towers from Canada.

See Utility Scale Wind Towers from Canada ("Final Determination"), 85 Fed. Reg.

40,239 (Dep't of Commerce July 6, 2020) (final determination of sales at less than

fair value and final negative determination of critical circumstances; 2018–2019);

see also Issues and Decision Mem. for the Final Affirmative Determination in the

Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from Canada

(June 29, 2020) ("Final IDM"), ECF No. 18-5.  Before the Court are the Rule 56.2

Motion for Judgment on the Agency Record on Behalf of Plaintiffs Marmen Inc.,

Marmen Energie Inc., and Marmen Energy Co., ECF Nos. 23, 24, and Wind Tower

Trade Coalition's Rule 56.2 Motion for Judgment on the Agency Record, ECF

Nos. 25, 26.  See also Mem. P. & A. Supp. Pls.' Rule 56.2 Mot. J. Agency R.

("Marmen's Br."), ECF Nos. 23-2, 24-2; Wind Tower Trade Coalition's Mem.

Supp. Rule 56.2 Mot. J. Agency R. ("WTTC's Br."), ECF Nos. 25-1, 26-1.  For the

following reasons, the Court sustains in part and remands in part the Final

Determination.

## ISSUES PRESENTED

The Court reviews the following issues:

1.   Whether Commerce's determination to weight-average product-
     specific plate costs is supported by substantial evidence;

2.   Whether Commerce's determination to reject Marmen's additional
     cost reconciliation information was an abuse of discretion;

3.   Whether Commerce's determination to apply an average-to-
     transaction comparison method is supported by substantial evidence;

4.   Whether Commerce's determination regarding the home market and
     the U.S. date of sale is supported by substantial evidence;

5.   Whether Commerce's determination to treat Marmen's home market

sales as being sales of tower sections rather than complete towers is

supported by substantial evidence; and

6.   Whether Commerce's determination not to apply facts otherwise

available with an adverse inference is supported by substantial

evidence.

## BACKGROUND

In August 2019, Commerce initiated an antidumping duty investigation into

wind towers from Canada for the period covering July 1, 2018 through June 30,

2019.  Utility Scale Wind Towers from Canada, Indonesia, the Republic of Korea,

and the Socialist Republic of Vietnam, 84 Fed. Reg. 37,992, 37,992–93 (Dep't of

Commerce Aug. 5, 2019) (initiation of less-than-fair-value investigations).

Commerce selected Marmen Inc. and Marmen Energie Inc. as mandatory

respondents.  See Decision Mem. for the Prelim. Determination in the Less-Than-

Fair-Value Investigation of Utility Scale Wind Towers from Canada (Feb. 4, 2020)

("Prelim. DM") at 1–2, PR 146.[1]

In the Final Determination, Commerce assigned weighted-average dumping

---

[1] Citations to the administrative record reflect public record ("PR") document
numbers.

margins of 4.94% to Marmen Inc. and Marmen Energie Inc.[2]  Final Determination, 85 Fed. Reg. at 40,239.  Commerce determined the all-others weighted average dumping margin of 4.94% based on Marmen's dumping margin.  Id.

Commerce determined that Marmen's steel plate costs did not reasonably reflect the costs associated with the production and sale of the products and weight-averaged Marmen's reported steel plate costs.  Final IDM at 4–6. Commerce rejected a portion of the supplemental cost reconciliation information submitted by Marmen as untimely, unsolicited new information.  Id. at 7–9. Commerce applied a differential pricing analysis, using the Cohen's *d* test, and determined that there was a pattern of export prices that differed significantly.  Id. at 10–11.  As a result, Commerce calculated Marmen's weighted-average dumping margin by using the alternative average-to-transaction method.  Id.  Commerce determined that Marmen complied with its instructions by reporting invoice dates as the home market and U.S. dates of sale and by reporting home market sales as sales of wind tower sections.  Id. at 13–18.  Further, Commerce determined that the record contained the necessary information to calculate Marmen's dumping margin

---

[2] The Court notes that, although Marmen Energy Co. was not included as a mandatory respondent alongside Marmen Inc. and Marmen Energie Inc., comments and questionnaire responses were submitted collectively by the three Plaintiffs during Commerce's investigation.  The Court herein refers to their assigned weighted-average dumping margins collectively as "Marmen's dumping margin."

and relied on the data provided by Marmen, declining to apply facts otherwise

available or an adverse inference.  Id. at 18–20.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28

U.S.C. § 1581(c), which grant the Court authority to review actions contesting the

final determination in an antidumping duty investigation.  The Court shall hold

unlawful any determination found to be unsupported by substantial evidence on the

record or otherwise not in accordance with the law.  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.   Commerce's Determination to Weight-Average Marmen's Steel Plate Costs

In order to determine whether certain products are being sold at less than fair

value in the United States, Commerce compares the export price, or constructed

export price, with normal value.  19 U.S.C. § 1677b(a)(1)(A).  Export price or

constructed export price is the price at which the subject merchandise is being sold

in the U.S. market, while normal value is the price at which a "foreign like

product" is sold in the producer's home market or in a comparable third-country

market.  Id. § 1677a(a)–(b).  Before calculating a dumping margin, Commerce

must identify a suitable "foreign like product" with which to compare the exported

subject merchandise.  A "foreign like product," in order of preference, is:

(A)   The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

(B)   Merchandise —

   (i)    produced in the same country and by the same person as the subject merchandise,

   (ii)   like that merchandise in component material or materials and in the purposes for which used, and

   (iii)  approximately equal in commercial value to the subject merchandise.

(C)   Merchandise —

   (i)    produced in the same country and by the same person and of the same general class or kind as the subject merchandise,

   (ii)   like that merchandise in the purposes for which used, and

   (iii)  which the administering authority determines may reasonably be compared with that merchandise.

Id. § 1677(16); see NSK Ltd. v. United States, 26 CIT 650, 656, 217 F. Supp. 2d 1291, 1299–1300 (2002).  To identify such merchandise, Commerce employs a "model match" methodology consisting of a hierarchy of certain characteristics used to sort merchandise into groups.  See SKF USA, Inc. v. United States, 537 F.3d 1373, 1378–80 (Fed. Cir. 2008).  Each group is assigned a control number ("CONNUM"), used to match home market sales with U.S. sales.  See Thuan An Prod. Trading & Serv. Co. v. United States, 42 CIT __, __, 348 F. Supp. 3d 1340,

1344 n.7 (2018).

> When determining costs of production, the statute states that:
>
> [c]osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such record are kept in accordance with the generally accepted accounting principles ["GAAP"] of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise.

19 U.S.C. § 1677b(f)(1)(A).  The statute requires that "reported costs must normally be used only if (1) they are based on the records . . . kept in accordance with the GAAP *and* (2) reasonably reflect the costs of producing and selling the merchandise."  See Dillinger France S.A. v. United States, 981 F.3d 1318, 1321 (Fed. Cir. 2020) (emphasis in original) (internal quotation marks and citations omitted).  Commerce is not required to accept the exporter's records.  Thai Plastic Bags Indus. Co. v. United States, 746 F.3d 1358, 1365 (Fed. Cir. 2014) (citing 19 U.S.C. § 1677b(f)(1)(A)).  Commerce may reject a company's records if it determines that accepting them would distort the company's true costs.  See Am. Silicon Techs. v. United States, 261 F.3d 1371, 1377 (Fed. Cir. 2001).  Commerce is directed to consider all available evidence on the proper allocation of costs.  19 U.S.C. § 1677b(f)(1)(A).  Physical characteristics are a prime consideration when Commerce conducts its analysis.  Thai Plastic Bags, 746 F.3d at 1368.  If factors beyond the physical characteristics influence the costs, however, Commerce will

normally adjust the reported costs in order to reflect the costs that are based only on the physical characteristics.  See id.

To determine whether the subject merchandise wind towers from Canada were sold in the United States at less than fair value under section 731 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1673, Commerce first considered all products produced and sold by Marmen in Canada during the period of investigation for the purpose of determining the appropriate product comparisons to U.S. sales.  Prelim. DM at 13; see also Final IDM at 2–3, 5–6.  Commerce determined that there were no sales of identical merchandise in the ordinary course of trade in Canada that could be compared to U.S. sales.  Prelim. DM at 13; see also Final IDM at 5–6.  Instead, Commerce applied a hierarchy of characteristics, matching foreign like products based on physical characteristics reported by Marmen in the following order of importance: type (tower or section), weight of tower/section, height of tower/section, total sections, type of paint or coating, metalizing, electrical conduit – bus bars, electrical conduit – power cable, elevators, number of platforms, and other internal components.  Prelim. DM at 13 (citing Product Characteristics for the Antidumping Duty Investigation of Utility Scale Wind Towers from Canada (Sept. 17, 2019) ("Model Matching Questionnaire"), PR 77); see also Final IDM at 5–6.

Commerce did not dispute whether Marmen's records were kept properly,

noting that "the record is clear that the reported costs are derived from the Marmen Group's normal books and records and that those books are in accordance with Canadian GAAP."  Final IDM at 5; see also Utility Scale Wind Towers from Canada: Resp. to Question 14.g of Suppl. Section Questionnaire (Dec. 13, 2019) ("Marmen SDQR") at 2–4, PR 123–25.  Commerce focused on the second prong of 19 U.S.C. § 1677b(f)(1)(A), calling into question whether Marmen reasonably reflected the costs of producing and selling the merchandise.  Commerce reviewed evidence submitted by Marmen, concluding that the evidence demonstrated steel plate cost differences between CONNUMs unrelated to the products' physical characteristics, and Commerce weight-averaged the reported steel plate costs for all reported CONNUMs, except the CONNUM for the thickest plate.  See Final IDM at 5.

Marmen argues that differences in its reported costs were related to differences in physical characteristics and that Commerce's determination that Marmen's records did not reflect the costs associated with the production and sale of products is not supported by substantial evidence.  Marmen's Br. at 15–16.  Marmen asserts that Commerce incorrectly determined that Marmen's costs did not reasonably reflect the costs associated with the production and sale of products.  See id.  Marmen argues that Commerce should have used Marmen's reported costs and should not have weight-averaged the reported costs.  Id.

Commerce determined that the most significant physical characteristics in differentiating costs of steel plate were type, thickness, weight, width, and height. See Final IDM at 5.  Commerce reviewed Marmen's questionnaire response and determined that Marmen's suppliers did not charge different prices for plates of different grade, thickness, width, or length.  Id. (citing Utility Scale Wind Towers from Canada: Resubmission of Second Suppl. Section D Resp. (Feb. 28, 2020) ("Marmen RSSDQR") at 2, Ex. D-2, PR 162–65).  Commerce excluded the CONNUM for the thickest plates because the record indicated that there was a surcharge applied to high thickness plates that was not applied to lower thickness plates.  Id. at 5–6; see Cost of Production and Constructed Value Calculation Adjustments for the Final Determination—Marmen Inc. and Marmen Energie Inc. (June 29, 2020) ("Marmen Final Cost Calculation Mem.") at 2, PR 194. Commerce explained that there should be little difference in plate costs for different dimensions and grade based on record evidence on a per-unit weight basis, and that reported differences in plate costs are based on factors other than physical differences, such as timing of production.  See id. (citing Marmen RSSDQR Ex. D-2).  Commerce determined that most of the higher-priced CONNUMs were sold earlier in the period of review, citing information in Marmen's Final Cost Calculation Memorandum.  Id. at 6 (citing Marmen Final Cost Calculation Mem. at 1).  In the Marmen Final Cost Calculation

Memorandum, Commerce relied on record evidence showing that Marmen's steel

suppliers did not charge different prices for plates of different grade, thickness

width, or length.  Marmen Final Cost Calculation Mem. at 2 (citing Marmen

RSSDQR at 2, Ex. D-2).  Commerce determined, therefore, that differences in

plate prices were related to timing of production and factors other than differences

in physical characteristics.  Final IDM at 6.

Based on its determination that differences in plate costs were related to

factors other than differences in the physical characteristics of the plates,

Commerce determined that Marmen's records did not reflect the costs associated

with the production and sale of products.  Id.  As a result, Commerce determined

costs of production using the weight-average of the reported steel plate costs.  Id.;

see Marmen Final Cost Calculation Mem. at 1–3.

Commerce's stated practice is to adjust costs to address distortions when

cost differences are attributable to factors beyond differences in the physical

characteristics of such products, as required by statute.  See Final IDM at 6;

Welded Carbon Steel Standard Pipe and Tube Products from Turkey, 82 Fed. Reg.

49,179 (Dep't of Commerce Oct. 24, 2017) (final results of antidumping duty

admin. review and final determination of no shipments; 2015–2016).  The Court

notes that the relevant statute and Commerce's stated practice focus on whether

reported costs reasonably reflect the costs of producing and selling the

merchandise—without requiring examined CONNUMs to be nearly identical. <u>See</u> <u>id.</u>; 19 U.S.C. § 1677b(f)(1)(A). The Court concludes, therefore, that Commerce's weight-averaging of Marmen's steel plate costs is consistent with the relevant statute and Commerce's stated practice.

The Court observes that Marmen's questionnaire response and record documents cited by Commerce, including one of Marmen's supplier agreements, indicate that plate costs did not vary for plates of different thickness, length, width, and weight. <u>See</u> Marmen RSSDQR Exs. D-1, D-2. Record documents reviewed by Commerce support the determination that Marmen's suppliers did not charge different prices for plates of varying physical characteristics, except to apply an upcharge for plates over a certain thickness. <u>See</u> <u>id.</u> Ex. D-2. The Court notes that record documents cited by Commerce support Commerce's determination that a majority of the higher-priced CONNUMs were sold earlier in the period of investigation. <u>See</u> Marmen Final Cost Calculation Mem. Attachs. 1, 2. Because record evidence cited by Commerce indicates that Marmen's plate costs did not differ between plates of varying physical characteristics and that higher priced CONNUMs were sold earlier in the period of investigation, the Court concludes that Commerce's determination that differences in plate prices were related to timing of production and factors other than differences in physical characteristics is supported by substantial evidence.

The Court concludes that Commerce followed statutory requirements and

Commerce's stated practices, and supported with substantial evidence its

determination that Marmen's records did not reasonably reflect the costs associated

with the production and sale of Marmen's merchandise.  The Court sustains

Commerce's determination to weight-average Marmen's steel plate costs.

## II.   Commerce's Rejection of Marmen's Additional Cost Reconciliation Information

Commerce determined that a portion of Marmen's cost reconciliation

information in Marmen's February 7, 2020 response constituted untimely and

unsolicited new information and rejected Marmen's submission.  See Final IDM at

8–9.  Marmen argues that the information was corrective, and not new, and that

Commerce abused its discretion by rejecting the correction.  Marmen's Br. at 26–

27.

A party may submit factual information to rebut, clarify, or correct

questionnaire responses.  19 C.F.R. § 351.301(c).  The regulations state that

> [i]f the factual information is being submitted to rebut, clarify, or
> correct factual information on the record, the submitter must provide a
> written explanation identifying the information which is already on the
> record that the factual information seeks to rebut, clarify, or correct,
> including the name of the interested party that submitted the
> information and the date on which the information was submitted.

19 C.F.R. § 351.301(b)(2).  The regulations outline time limits for submissions of

information to Commerce.  See id. § 351.301(c).  Section 351.301(c)(1)(v)

discusses time limits for factual information submitted to correct or clarify

questionnaire responses by "an interested party other than the original submitter."

Id. § 351.301(c)(1)(v).  Section 351.301(c)(5) requires that miscellaneous new

factual information must be submitted either 30 days before the scheduled date of

the preliminary determination in an investigation, or 14 days before verification,

whichever is earlier.  Id. § 351.301(c)(5).  Commerce has the right to reject

information that is untimely or unsolicited.  See 19 C.F.R. § 351.302(d).

Nevertheless, Commerce has a duty "to determine dumping margins as

accurately as possible."  See NTN Bearing Corp. v. United States, 74 F.3d 1204,

1208 (Fed. Cir. 1995) (internal quotation marks and citation omitted).

"[A]ntidumping laws are remedial not punitive."  Id. (citation omitted).  The U.S.

Court of Appeals for the Federal Circuit has stated that "Commerce is obliged to

correct any errors in its calculations during the preliminary results stage to avoid an

imposition of unjustified duties."  Fischer S.A. Comercio, Industria & Agricultura

v. United States, 471 F. App'x 892, 895 (Fed. Cir. 2012) (citation omitted).

Further, "Commerce is free to correct any type of importer error—clerical,

methodology, substantive, or one in judgment—in the context of making an

antidumping duty determination, provided that the importer seeks correction before

Commerce issues its final determination and adequately proves the need for the

requested corrections."  Timken United States Corp. v. United States ("Timken"),

434 F.3d 1345, 1353 (Fed. Cir. 2006).  The Court reviews whether Commerce

abused its discretion when rejecting submitted information.  See Papierfabrik

August Koehler SE v. United States, 843 F.3d 1373, 1384 (Fed. Cir. 2016)

("Commerce abused its discretion in refusing to accept updated data when there

was plenty of time for Commerce to verify or consider it.") (citations omitted).

When reviewing Commerce's determination to reject corrective information, this

Court may consider factors such as Commerce's interest in ensuring finality, the

burden of incorporating the information, and whether the information will increase

the accuracy of the calculated dumping margins.  Bosun Tools Co. v. United

States, 43 CIT __, __, 405 F. Supp. 3d 1359, 1365 (2019) (citations omitted).

Marmen argues that the information submitted was a minor correction and

not new information.  See Marmen's Br. at 26–27.  Marmen contends that

Commerce abused its discretion by rejecting the information.  See id.  Commerce

determined that the information was not responsive to its questionnaire and was

new factual information that had not been requested.  See Final IDM at 8 (citing

Utility Scale Wind Towers from Canada: Second Suppl. Section D Resp. (Feb. 7,

2020) ("Marmen SSDQR") Ex. D-9, PR 151–54).

The Court notes that the cost reconciliation information submitted by

Marmen in its February 7, 2020 response corresponded directly to prior cost

reconciliation information submitted in Marmen's October 11, 2019 response.  See

Marmen SSDQR Ex. D-9; Utility Scale Wind Towers from Canada: Sections B, C,

and D Resp. (Oct. 11, 2019) ("Marmen SBCDR") Ex. D-14, PR 89–97.  The Court

observes that Marmen's submission stated that the information updated purchase

information that had not been properly converted to Canadian dollars.  <u>See</u>

Marmen SSDQR Ex. D-9.  Commerce itself called Marmen's submission a

"correction."  <u>See</u> Final IDM at 8–9.  Because of Commerce's own

characterization of the submission, and because the information directly

corresponds to a prior submission, the Court concludes that Commerce's

determination that the additional cost reconciliation information submitted by

Marmen was new factual information is not supported by substantial evidence.

The Court concludes that Marmen's submission is a correction and reviews

whether Commerce abused its discretion when rejecting Marmen's submission.

When rejecting Marmen's corrective submission, Commerce stated that

because it was submitted after the preliminary determination, the information was

submitted too late for Commerce to use.  <u>Id.</u> at 9.  This Court and the U.S. Court of

Appeals for the Federal Circuit have repeatedly held that Commerce must accept

corrections when there is sufficient time for Commerce to consider the submission

prior to the final determination.  <u>See, e.g.</u>, <u>Timken</u>, 434 F.3d at 1353–54 (holding

that the court did not err by remanding a case to Commerce for analysis of

corrective evidence that was submitted after the preliminary results but before the

final results); <u>Pro-Team Coil Nail Enter. v. United States</u>, 43 CIT __, __, 419 F.

Supp. 3d 1319, 1332 (2019) (finding that finality concerns were not implicated

when the information was submitted eight months prior to publication of the final

results).

The information was submitted on February 7, 2020, approximately five

months before publication of the <u>Final Determination</u>.  <u>See</u> Marmen SSDQR at 1.

The Court notes that Commerce cites no other reason for there being insufficient

time to consider Marmen's submission other than the fact that the submission was

made after the preliminary determination.  <u>See</u> Final IDM at 8–9.  Because the

information was submitted to Commerce five months prior to the <u>Final</u>

<u>Determination</u>, the Court concludes that finality concerns are not implicated in this

case and rejects Commerce's determination that the information was filed too late

to be considered.

The Court notes that Commerce stated summarily that Marmen's submission

was "not supported by factual information on the record," but did not point to

record evidence that contradicts the supplemental information submitted.  <u>See</u>

Final IDM at 9.  Absent record evidence indicating a reason to question the

veracity of Marmen's cost reconciliation information, concerns over the accuracy

of the calculated dumping margin favor accepting Marmen's submitted cost

reconciliation information.  <u>See</u> <u>Pro-Team Coil Nail</u>, 43 CIT at __, 419 F. Supp. 3d

at 1332.  Record documents cited by Commerce indicate that Marmen's cost

reconciliation worksheet stated prices in Canadian dollars.  <u>See</u> Marmen SSDQR

Ex. D-9.  The Court observes that record documents also indicate that, prior to

Marmen's supplemental submission, Marmen had not converted one line of the

cost reconciliation sheet from U.S. dollars to Canadian dollars.  <u>See id.</u>  The Court

notes that Marmen explained that its submission corrected one line of the cost

reconciliation worksheet to properly list prices in Canadian dollars.  <u>See id.</u>  In

light of record evidence that supports Marmen's corrective submission and its

explanation, and absent evidence questioning the veracity of the submission, the

Court concludes that Commerce has not supported with substantial evidence its

determination that Marmen's supplemental cost reconciliation information is

inaccurate and, therefore, that Commerce abused its discretion by failing to

consider Marmen's corrective submission.

The Court holds that Commerce's determination to reject Marmen's

supplemental cost reconciliation information was an abuse of discretion.  The

Court remands Commerce's determination for further explanation or consideration

in accordance with this opinion.

### III.    Commerce's Use of an Average-to-Transaction Methodology

Commerce determined that its differential pricing analysis showed a pattern

of prices that differed significantly for Marmen's U.S. sales of five CONNUMs

that justified the use of an alternative average-to-transaction ("A-to-T")

methodology to calculate Marmen's dumping margin.  See Final IDM at 11.

Marmen argues that Commerce's application of its differential pricing analysis

methodology is unreasonable because there is not a significant difference in

Marmen's U.S. prices and that, therefore, Commerce's determination to use an A-

to-T method to calculate Marmen's dumping margin is unreasonable and not

supported by substantial evidence.  See Marmen's Br. at 32–34.

Commerce ordinarily uses an average-to-average ("A-to-A") comparison of

"the weighted average of the normal values [of subject merchandise] to the

weighted average of export prices (and constructed export prices) for comparable

merchandise" when calculating a dumping margin.  See 19 U.S.C. § 1677f-

1(d)(1)(A)(i); 19 C.F.R. § 351.414(c)(1).  The statute allows Commerce to depart

from using the A-to-A methodology and instead use an A-to-T comparison of the

weighted average of normal values to the export prices and constructed export

prices of individual transactions for comparable merchandise when: (1) Commerce

observes "a pattern of export prices (or constructed export prices) for comparable

merchandise that differ significantly among purchasers, regions, or periods of

time;" and (2) "[Commerce] explains why such differences cannot be taken into

account using [the A-to-A methodology]."  19 U.S.C. § 1677f-1(d)(1)(B)(i)–(ii).

In contrast to the A-to-A method, which may mask dumped sales at low prices by

averaging them with sales at higher prices, the A-to-T method allows Commerce

"to identify a merchant who dumps the product intermittently—sometimes selling

below the foreign market value and sometimes selling above it." Apex Frozen

Foods Priv. Ltd. v. United States, 862 F.3d 1337, 1341 (Fed. Cir. 2017) (citation

and internal quotation marks omitted).

　　　　The statute does not set forth the analysis for how Commerce is to identify a

pattern of price differences. See 19 U.S.C. §§ 1677, 1677f-1; see also Apex

Frozen Foods, 862 F.3d at 1346; Dillinger France S.A., 981 F.3d at 1325. The

Court affords Commerce deference in determinations "involv[ing] complex

economic and accounting decisions of a technical nature." See Fujitsu Gen. Ltd. v.

United States, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (citation omitted). However,

Commerce still "must [] explain [cogently] why it has exercised its discretion in a

given manner." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463

U.S. 29, 48 (1983) (citation omitted).

　　　　Commerce uses a differential pricing analysis to determine if a pattern of

significant price differences exist and whether the difference can be taken into

account using the A-to-A method. See Final IDM at 11. The standard of review

for considering Commerce's differential pricing analysis is reasonableness. Stupp

Corp. v. United States, 5 F.4th 1341, 1353 (Fed. Cir. 2021). The U.S. Court of

Appeals for the Federal Circuit and this Court have held the steps underlying the

differential pricing analysis as applied by Commerce to be reasonable.  See e.g.,

Mid Continent Steel & Wire, Inc. v. United States, 940 F.3d 662, 670–74 (Fed.

Cir. 2019) (discussing zeroing and the 0.8 threshold for the Cohen's $d$ test); Apex

Frozen Foods Priv. Ltd. v. United States, 40 CIT __, __, 144 F. Supp. 3d 1308,

1314–35 (2016) (discussing application of the A-to-T method, the Cohen's $d$ test,

the meaningful difference analysis, zeroing, and the "mixed comparison

methodology" of applying the A-to-A method and the A-to-T method when 33–

66% of a respondent's sales pass the Cohen's $d$ test), aff'd, 862 F.3d 1337; Apex

Frozen Foods Priv. Ltd. v. United States, 862 F.3d 1322 (Fed. Cir. 2017)

(affirming zeroing and the 0.5% *de minimis* threshold in the meaningful difference

test).  However, the U.S. Court of Appeals for the Federal Circuit has stated that

"there are significant concerns relating to Commerce's application of the Cohen's

$d$ test . . . in adjudications in which the data groups being compared are small, are

not normally distributed, and have disparate variances."  Stupp, 5 F.4th at 1357.

        The Cohen's $d$ test is "a generally recognized statistical measure of the

extent of the difference between the mean of a test group and the mean of a

comparison group."  Apex Frozen Foods, 862 F.3d at 1342 n.2.  The Cohen's $d$ test

relies on assumptions that the data groups being compared are normal, have equal

variability, and are equally numerous.  See Stupp, 5 F.4th at 1357.  Applying the

Cohen's *d* test to data that do not meet these assumptions can result in "serious flaws in interpreting the resulting parameter." See id. at 1358.

In Stupp Corp. v. United States, 5 F.4th 1341 (Fed. Cir. 2021), the U.S. Court of Appeals for the Federal Circuit remanded Commerce's use of the Cohen's *d* test for further explanation because the data Commerce used may have violated the assumptions of normality, sufficient observation size, and roughly equal variances. Id. at 1357–60. The Court addressed Commerce's argument that it does not need to worry about normality because it is using a population instead of a sample, stating that Commerce's argument "does not address the fact that Professor Cohen derived his interpretive cutoffs under the assumption of normality." Id.

Marmen contends that the price differences of its U.S. sales of five of the seven CONNUMs used in the differential pricing analysis were less than one percent and were not significant. See Marmen's Br. at 32. Marmen argues that Commerce's application of its differential pricing analysis in this case was unreasonable. Id.

Commerce applied its two-step differential pricing methodology to determine if a pattern of significant price differences existed and whether the difference could be taken into account using the A-to-A method. See Final IDM at 11. Commerce chose the Cohen's *d* test "to evaluate the extent to which the prices

to a particular purchaser, region, or time period differ significantly from the prices

of all other sales of comparable merchandise."  Prelim. DM at 10.  Commerce

applied the Cohen's *d* test and determined that 68.29% of Marmen's U.S. sales

passed.  Final IDM at 11; Analysis for the Final Determination of Utility Scale

Wind Towers: Final Margin for Calculation for the Marmen Group (June 29, 2020)

("Marmen Final Margin Calculations Mem.") at 3, PR 195.  Based on the results of

its Cohen's *d* test and its meaningful difference test, Commerce determined that a

pattern of prices that differed significantly among purchasers, regions, or time

periods existed, that the A-to-A method could not account for the pattern of price

differences, and that the A-to-T method was appropriate to calculate Marmen's

dumping margin.  Final IDM at 11; Marmen Final Margin Calculations Mem. at 3.

Commerce determined that Marmen's U.S. prices differed significantly and

decided to use the A-to-T method based on its differential pricing analysis, which

utilized the Cohen *d* test.  See Marmen Final Margin Calculations Mem. at 3–4.

Commerce applied the Cohen's *d* test to data that showed differences that were not

large in absolute terms, because the overall differences for five of the CONNUMs

were less than one percent.  See id. Attach. 2.  The Court notes that Commerce did

not explain whether the data applied to the Cohen's *d* test were normally

distributed or contained roughly equal variances.  See Final IDM at 10–11.

Because the record appears to indicate that the price differences were not large in

absolute terms, the evidence before the Court calls into question whether the data

Commerce used in its differential pricing analysis violated the assumptions of

normality and roughly equal variances associated with the Cohen's *d* test.

The Court remands the issue of Commerce's use of the Cohen's *d* test for

Commerce to explain further whether the limits on the use of the Cohen's *d* test

were satisfied in this case in the context of the Stupp case.  The Court remands

Commerce's use of the A-to-T method for further explanation of Commerce's

differential pricing analysis in accordance with this opinion.

### IV.   Commerce's Determination to Use Marmen's Invoice Dates as the Date of Sale for Marmen's Home Market and U.S. Sales

Commerce determined the date of sale for Marmen's home market and U.S.

sales based on reported invoice dates.  Final IDM at 15–16.  WTTC argues that

Commerce should use a date other than the invoice date when determining

Marmen's home market and U.S. dates of sale.  See WTTC's Br. at 18–19.

Commerce must conduct a "fair comparison" of normal value and export

price in determining whether merchandise is being, or is likely to be, sold at less

than fair value.  See 19 U.S.C. § 1677b(a); see also Smith-Corona Grp. v. United

States, 713 F.2d 1568, 1578 (Fed. Cir. 1983).  In doing so, normal value must be

from "a time reasonably corresponding to the time of sale used to determine the

export price or constructed export price."  19 U.S.C. § 1677b(a)(1)(A).  Commerce

has promulgated the following regulation regarding the date that should be used as

the date of sale for purposes of comparing normal value and export price:

> In identifying the date of sale of the subject merchandise or foreign like
> product, [Commerce] normally will use the date of invoice, as recorded
> in the exporter or producer's records kept in the ordinary course of
> business. However, [Commerce] may use a date other than the date of
> invoice if [Commerce] is satisfied that a different date better reflects
> the date on which the exporter or producer establishes the material
> terms of sale.

19 C.F.R. § 351.401(i). This Court has previously held that the material terms of a

sale generally include the price, quantity, payment, and delivery terms. See, e.g.,

ArcelorMittal USA LLC v. United States, 42 CIT __, __, 302 F. Supp. 3d 1366,

1378 (2018); Nakornthai Strip Mill Pub. Co. v. United States, 33 CIT 326, 337,

614 F. Supp. 2d 1323, 1333 (2009); USEC Inc. v. United States, 31 CIT 1049,

1055, 498 F. Supp. 2d 1337, 1343 (2007); see also Viraj Grp., Ltd. v. United

States, 343 F.3d 1371, 1377 n.1 (Fed. Cir. 2003). The important factor to

determine is when the parties have reached a "meeting of the minds." Nucor Corp.

v. United States, 33 CIT 207, 249, 612 F. Supp. 2d 1264, 1300 (2009).

In promulgating the implementing regulation, Commerce explained that it

will normally rely on the date provided on the invoice "as recorded in a firm's

records kept in the ordinary course of business." See Antidumping Duties;

Countervailing Duties ("Preamble"), 62 Fed. Reg. 27,296, 27,348 (Dep't of

Commerce May 19, 1997). Commerce prefers to use a single and uniform source

for the date of sale for each respondent, rather than determining the date of sale for

each sale individually.  Id.  Commerce stated that "as a matter of commercial

reality, the date on which the terms of a sale are first agreed is not necessarily the

date on which those terms are finally established" because "price and quantity are

often subject to continued negotiation between the buyer and the seller until a sale

is invoiced."  Id.  Commerce explained that:

> absent satisfactory evidence that the terms of sale were finally
> established on a different date, [Commerce] will presume that the date
> of sale is the date of invoice . . . .  If [Commerce] is presented with
> satisfactory evidence that the material terms of sale are finally
> established on a date other than the date of invoice, [Commerce] will
> use that alternative date as the date of sale.

Id. at 27,349.  The party seeking a date other than the invoice date bears the burden

of presenting Commerce with sufficient evidence demonstrating that "another date

. . . 'better reflects the date on which the exporter or producer establishes the

material terms of sale.'"  Viraj Grp., Ltd., 343 F.3d at 1377 n.1 (quoting 19 C.F.R.

§ 351.401(i)).

WTTC argues that Commerce has stated that "in situations involving large

custom-made merchandise in which the parties engage in formal negotiation and

contracting procedures, [Commerce] usually will use a date other than the date of

invoice."  WTTC's Br. at 19 (citing Preamble, 62 Fed. Reg. at 27,349).  However,

the Court notes that "[Commerce] emphasizes that in these situations, the terms of

sale must be firmly established and not merely proposed." <u>Preamble</u>, 62 Fed. Reg.

at 27,349.  The regulatory presumption exists that Commerce will use the date of

invoice, and WTTC had the burden of proving to Commerce that another date

better reflects the date on which the material terms of sale were established.  <u>See</u>

19 C.F.R. § 351.401(i).

WTTC argues that Commerce should have used a date other than the invoice

date as Marmen's date of sale for home market and U.S. sales.  <u>See</u> WTTC's Br. at

18–19.  WTTC asserts that the material terms of sale for Marmen's sales did not

change between when purchase orders were issued and when invoices were issued.

<u>See</u> <u>id.</u> at 21.  Commerce determined that Marmen had reported the invoice dates

as the date of sale for home market and U.S. sales, as instructed, and that Marmen

had responded to Commerce's request for examples in which the terms of sale

changed between the purchase order date and the invoice date.  Final IDM at 15–

16.  Commerce reviewed Marmen's questionnaire responses and determined that

the record supported that "changes to the material terms of sale occurred between

the purchase order and the invoice date in both the home and U.S. markets."  <u>Id.</u>

(citing Utility Scale Wind Towers from Canada: Section A Resp. (Sept. 13, 2019)

("Marmen AQR"), PR 76; Utility Scale Wind Towers from Canada: Sections B, C,

and D Resp. (Oct. 11, 2019) ("Marmen BCDQR"), PR 89–97; Utility Scale Wind

Towers from Canada: Suppl. Sections A, B, and C Resp. (Feb. 6, 2020) ("Marmen

First SABCQR"), PR 120–21; Utility Scale Wind Towers from Canada: Second

Suppl. Sections A, B, and C Resp. (Feb. 6, 2020) ("Marmen Second SABCQR"),

PR 181–83; Marmen SDQR.  In support of using the invoice date as the date of

sale for both home market and U.S. sales, Commerce cited the examples that

Marmen provided of a change to the delivery terms in a home market sale and

changes to the price, quantity, and payment terms in a U.S. sale.  Id. at 16 (citing

Marmen First SABCQR Exs. FSQ-6, FSQ-7, FSQ-12, FSQ-14).

        The Court notes that Commerce's questionnaires requested that Marmen

state the "date of sale (e.g., invoice date, etc.)" and provide an example of a change

in the terms of sale between the purchase order and invoice date for both home

market and U.S. sales.  See Antidumping Duty Investigation Req. for Information

for Marmen Inc., Utility Scale Wind Towers from Canada (Aug. 19, 2019) ("Initial

Questionnaire") at A-8, PR 54; Antidumping Duty Investigation on Utility Scale

Wind Towers from Canada: Suppl. Questionnaire for Marmen ("Nov. 20, 2019")

("Supplemental Questionnaire") at 5, PR 103.  The Court observes that Marmen's

responses complied with Commerce's requests, because Marmen reported the

invoice date as the date of sale for its home market and U.S. sales, in line with

Commerce's questionnaire.  See Initial Questionnaire at A-8; Marmen AQR at A-

20.  The Court notes that Marmen also provided examples of changes to the

material terms of sale between the purchase order and invoice date, consistent with

Commerce's request.  See Supplemental Questionnaire at 5; Marmen First

SABCQR at 12–14.

The record evidence cited by Commerce supports a determination that the

material terms of sale were not established prior to the invoice date, because the

evidence shows changes to the terms between the purchase order and invoice date.

The Court observes that record documents cited by Commerce show an example of

a change in the delivery terms for one of Marmen's home market sales between the

purchase order and invoice.  See Marmen First SABCQR at 12 (stating that the

change in delivery terms resulted in additional costs for the delivery of the sale)).

Record documents cited by Commerce also show a change in the terms of one of

Marmen's U.S. sales, showing that price, quantity, and payment terms changed

between the letter of intent and the invoice date.  See id. at 13–14, Ex. FSQ-7.

Because record evidence cited by Commerce show changes to delivery terms,

price, quantity, and payment terms, and these terms are considered material, the

Court concludes that Commerce's determination that there were changes to the

material terms between the purchase order and invoice date is supported by

substantial evidence.

Commerce has supported its determination that there were changes to the

material terms of sale between the purchase order and invoice date, and the Court

concludes that Commerce has supported with substantial evidence its

determination that the invoice date best reflects when the material terms of sale were established.  Therefore, the Court concludes that Commerce correctly applied the regulatory presumption to use the invoice date as the date of sale and that Commerce's determination to use Marmen's reported invoice dates as the date of sale for home market and U.S. sales is supported by substantial evidence.

### V.    Commerce's Use of Marmen's Reporting of Home Market Sales of Tower Sections

Commerce determined that Marmen correctly reported its home market sales as sales of wind tower sections and relied on Marmen's reported information. Final IDM at 17–18.  WTTC argues that Marmen incorrectly reported its home market sales as sales of sections and that Commerce should not use Marmen's reported home market sales information.  WTTC's Br. at 34–37.

Commerce cited Marmen's questionnaire responses, which showed that Marmen issued invoices for each section of its home market sales.  See Final IDM at 17–18 (citing Marmen AQR; Marmen BCDQR; Marmen First SABCQR Exs. FSQ-11, FSQ-12).  Despite Marmen issuing purchase orders for whole towers, Commerce noted that Marmen issued invoices by section.  See id.; see also Marmen First SABCQR Exs. FSQ-11, FSQ-12.  Commerce determined, therefore, that Marmen's reporting was consistent with Commerce's instructions and with the manner in which Marmen actually invoiced its customer.  See Final IDM at 17–18.

The Court notes that Commerce's questionnaires requested that Marmen report its sales by wind tower section as invoiced.  See Initial Questionnaire at B-2; Model Matching Questionnaire Attach. 1.  The Court observes that record documents cited by Commerce show that Marmen invoiced customers by section.  See Marmen First SABCQR Exs. FSQ-11, FSQ-12.  Because Marmen invoiced customers by wind tower section and Commerce instructed Marmen to report its sales as they were invoiced, the Court agrees with Commerce's determination that Marmen accurately reported its sales as sales of wind tower sections, consistent with Commerce's requests.

The Court concludes that Commerce's reliance on Marmen's reported information as accurate and treatment of Marmen's home market sales as sales of tower sections is reasonable and supported by substantial evidence on the record.

## VI. Commerce's Determination Not to Apply Facts Otherwise Available or an Adverse Inference to Marmen

Commerce determined that the record provided sufficient information to calculate Marmen's dumping margin and declined to apply adverse facts available to Marmen.  See Final IDM at 19–20.  WTTC contends that Marmen was not responsive to Commerce's questionnaires and that Marmen reported inaccurate and incomplete data.  See WTTC's Br. at 37–44.  WTTC argues that Commerce should have applied facts otherwise available or an adverse inference.  Id. at 38.

Section 776 of the Tariff Act of 1930, as amended, provides that if "necessary information is not available on the record" or if a respondent "fails to provide such information by the deadlines for submission of the information or in the form and manner requested," then the agency shall "use the facts otherwise available in reaching" its determination. 19 U.S.C. § 1677e(a)(1), (a)(2)(B). If Commerce finds further that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information" from the agency, then Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." Id. § 1677e(b)(1)(A). When Commerce can fill in gaps in the record independently, an adverse inference is not appropriate. See Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1348 (Fed. Cir. 2011).

WTTC asserts that Marmen's reporting was incomplete and that the record lacked necessary information. WTTC's Br. at 39–41. WTTC argues that Commerce should have applied facts otherwise available to calculate Marmen's dumping margin. See id. at 41. WTTC asserts that Marmen mischaracterized its home market date of sale and misreported its sales as sales of wind tower sections. See id. at 38–41. As a result, WTTC argues that Marmen's reporting did not comply with Commerce's requests and Commerce should have applied an adverse inference. See id. at 40–44. Commerce cited Marmen's questionnaire responses

and determined that Marmen was "responsive to the information requested," that

its responses were submitted in a timely manner, and that there was "no missing

information from the record that is a condition necessary for applying facts

available." Final IDM at 19–20. Commerce also determined that Marmen's

reporting of its home market date of sale based on invoice date and its sales of

wind tower sections was consistent with Commerce's requests and Marmen's

invoicing practices. Id. at 20. Because Marmen complied with Commerce's

requests and the record contained sufficient information for Commerce's

determination, Commerce declined to apply facts otherwise available or an adverse

inference. Id. at 20.

   The Court observes that Marmen's questionnaire responses, cited by

Commerce, were consistent with Commerce's instructions. See Marmen AQR;

Marmen BCDQR; Marmen First SABCQR. As discussed above, the Court

concludes that Commerce's determinations that Marmen reported invoice dates as

the date of sale for home market and U.S. sales and reported home market sales as

sales of wind tower sections, in accordance with Commerce's questionnaire

instructions, are supported by substantial evidence. See supra Parts IV & V. The

Court concludes that Commerce's determination that Marmen's reporting was

responsive to Commerce's requests and no information was missing from the

record is supported by substantial evidence. The Court holds that Commerce's

determination not to apply facts otherwise available or an adverse inference to Marmen is supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, the Court sustains Commerce's determination to weight-average Marmen's plate costs; Commerce's use of invoice dates as the date of sale; Commerce's use of Marmen's reported sales of tower sections; and Commerce's decision not to apply facts otherwise available or an adverse inference.  The Court remands Commerce's determination rejecting Marmen's additional cost reconciliation information and Commerce's use of the A-to-T methodology to calculate Marmen's dumping margin for further consideration in accordance with this opinion.

Accordingly it is hereby

**ORDERED** that the <u>Final Determination</u> is remanded to Commerce for further proceedings consistent with this opinion; and it is further

**ORDERED** that this action shall proceed according to the following schedule:

1.      Commerce shall file the remand determination on or before December 17, 2021;

2.      Commerce shall file the remand administrative record on or before January 14, 2022;

Consol. Court No. 20-00169                                                    Page 36

3.      Comments in opposition to the remand determination shall be filed on

        or before February 11, 2022;

4.      Comments in support of the remand determination shall be filed on or

        before March 4, 2022; and

5.      The joint appendix shall be filed on or before March 25, 2022.


                                            /s/  Jennifer Choe-Groves
                                          Jennifer Choe-Groves, Judge


Dated:   October 22, 2021
         New York, New York