May 26, 2022

A-122-867
Remand
Slip. Op. 21-148
**Public Version**
E&C/OVI:  MJH

***Marmen Inc., Marmen Energie Inc., and Marmen Energy Co., v. United States***
**Court No. 20-00169 Slip Op. 21-148 (CIT October 22, 2021)**
**Utility Scale Wind Towers from Canada**

**FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND**

## I.     SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT or the Court) issued on October 22, 2021.[1]  This action arises from the *Final Determination* in the less-than-fair-value (LTFV) investigation of utility scale wind towers (wind towers) from Canada.[2]  On October 22, 2021, the Court sustained Commerce on the following issues:  (1) Commerce's determination to weight-average product-specific plate costs;[3] (2) Commerce's selection of invoice date as the home market and U.S. market dates of sale;[4] (3) Commerce's determination to treat the home market sales of Marmen Inc., Marmen Energie Inc., and Marmen Energy Co (collectively, Marmen) as being sales of tower sections rather than complete towers;[5] and (4) Commerce's decision not to apply facts available to Marmen's sales.[6]  However, the Court remanded two issues for further consideration:  (1) Commerce's determination to reject the

---

[1] *See Marmen Inc., Marmen Energie Inc., and Marmen Energy Co. v. United States*, 545 F. Supp 3d 1305 (CIT 2021) (*Remand Order*).
[2] *See Utility Scale Wind Towers from Canada:  Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 85 FR 40239 (July 6, 2020) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See Remand Order* at 1314-15.
[4] *Id.* at 1322.
[5] *Id.* at 1323.
[6] *Id.* at 1324.

additional cost reconciliation information provided in Marmen's February 7, 2020 Second

Supplemental Section D Response;[7] and (2) Commerce's use of the differential pricing average-

to-transaction (A-to-T) method to calculate Marmen's weighted-average dumping margin. The

Court directed Commerce to explain whether the limits on the use of the Cohen's *d* test were

satisfied in the context of the recent opinion by the U.S. Court of Appeals for the Federal Circuit

(CAFC or Federal Circuit) in *Stupp*.[8]

      In accordance with the *Remand Order*, we have further considered the cost reconciliation

information contained in Marmen's Second Supplemental D Response. Additionally, we have

further considered whether Commerce's use of the use of the Cohen's *d* test as part of the

differential pricing analysis is consistent with *Stupp*.

## II.   BACKGROUND

      Commerce published the *Final Determination* on July 6, 2020, and published the *Order*

on August 26, 2020.[9] In the *Final Determination*, Commerce: (1) declined to use the previously

rejected data provided by Marmen in its February 7, 2020 Second Supplemental Section D

Response,[10] and (2) calculated Marmen's weighted average margin using the A-to-T method.[11]

Regarding the data contained in Marmen's February 7, 2020 Second Supplemental Section D

Response, the Court found that Commerce's rejection of Marmen's supplemental cost

reconciliation information was an abuse of discretion insofar as Commerce failed to consider

Marmen's corrective submission.[12] With regard to Commerce's use of the A-to-T method to

---

[7] *Id.* at 1317; *see also* Marmen's Letter, "Utility Scale Wind Towers from Canada: Second Supplemental Section D Response," dated February 7, 2020.

[8] *See Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021) (*Stupp*).

[9] *See Utility Scale Wind Towers from Canada, Indonesia, the Republic of Korea, and the Socialist Republic of Vietnam: Antidumping Duty Order*, 85 FR 52546 (August 26, 2020) (*Order*).

[10] *See Final Determination* IDM at Comment 3.

[11] *See* Memorandum, "Analysis for the Final Determination of Utility Scale Wind Towers: Final Margin Calculation for the Marmen Group," dated June 29, 2020, at 3-4.

[12] *See Remand Order*, 545 F. Supp 3d at 1317.

calculate Marmen's weighted-average dumping margin, the Court remanded Commerce's use of the Cohen's *d* test as part of the differential pricing analysis for Commerce to explain whether the limits on the use of the Cohen's *d* test were satisfied in the context of the recent Federal Circuit decision in *Stupp*.[13]

To permit Commerce to fully analyze its use of the Cohen's *d* test as part of the differential pricing analysis, and to explain whether the limits on the use of the Cohen's *d* test were satisfied in the context of the recent Federal Circuit decision in *Stupp,* on November 29, 2021, the Court issued an extension, until April 26, 2022, for Commerce to issue its final results of redetermination.[14]  On December 2, 2021, Commerce issued a request to Marmen to refile the information provided by Marmen in its February 7, 2020 Second Supplemental Section D Response that was previously rejected by Commerce.[15]  On December 8, 2021, Marmen filed the information requested by Commerce.[16]

On April 11, 2022, Commerce released the Draft Results of Redetermination and invited comments from interested parties.[17]  On April 15, 2022, the Court granted Commerce a 30-day extension, until May 26, 2022, to file its final results of redetermination.[18]  On May 2, 2022, Marmen and the Wind Tower Trade Coalition (the petitioner) provided comments on the Draft Results of Redetermination.[19]  On May 16, 2022, Commerce rejected Marmen's Remand

---

[13] *Id.* at 1320.

[14] *See* Amended Scheduling Order, ECF No. 53 (CIT November 29, 2021).

[15] *See* Letter to Marmen, "Request for additional information:  Marmen Inc., Marmen Energie Inc., and Marmen Energy Co. v. United States, Slip Op. 21-148, Court No. 20-00169," dated December 2, 2021.

[16] *See* Marmen's Letter, "Utility Scale Wind Towers from Canada:  Request for Additional Information Concerning Second Supplemental Section D Response," dated December 8, 2021 (Marmen December 8, 2021 Supplemental Remand Section D Response).

[17] *See Marmen Inc., Marmen Energie Inc., and Marmen Energy Co., v. United States* Court No. 20-00169 Slip Op. 21-148 (CIT October 22, 2021) Utility Scale Wind Towers from Canada:  Draft Results of Redetermination dated April 11, 2022 (Draft Results of Redetermination).

[18] *See* Second Amended Scheduling Order, ECF No. 59 (CIT April 15, 2022).

[19] *See* Marmen's Letter, "Utility Scale Wind Towers from Canada:  Comments on Draft Results of Redetermination Pursuant to Court Remand," dated May 2, 2022 (Marmen Remand Comments); *see also* Petitioner's Letter, "Utility

Comments because certain exhibits contained untimely filed new factual information within the meaning of 19 CFR 351.301 and 351.102(b)(21), and provided Marmen an opportunity to re-file its comments on the Draft Results of Redetermination without the new factual information.[20]  On May 18, 2022, Marmen re-filed its comments on the Draft Remand Redetermination.[21]

## III.   ANALYSIS

### A.  Cost Reconciliation Data

In accordance with the Court's direction, we obtained Marmen's additional reconciliation information that Commerce originally rejected during the course of the LTFV investigation. This included a revised cost reconciliation for Marmen, Inc. which contains an additional reconciling item related to converting purchases of sections from Marmen Energie from U.S. dollars (USD) to Canadian dollars (CAD).[22]  We have thoroughly evaluated the additional information, and the information already on the record, and find that there is insufficient record evidence to support this new reconciling item because it adjusts for amounts already accounted for in the costs that were reported to Commerce.  Therefore, because the overall cost reconciliation difference remains outstanding, we continue to conclude that the amount must be attributed to Marmen's cost of production (COP) for purposes of this redetermination.

Marmen (which, as indicated above, is the collective respondent entity encompassing Marmen Inc. and Marmen Énergie Inc., both of whom are producers of the merchandise under

---

Scale Wind Towers from Canada:  Comments on Draft Results of Redetermination," dated May 2, 2022 (Petitioner Remand Comments).
[20] *See* Letter to Marmen, "*Marmen Inc., Marmen Energie Inc., and Marmen Energy Co. v. United States*, Slip Op. 21-148, Court No. 20-00169—Rejection of New Factual Information," dated May 16, 2022.
[21] *See* Marmen Letter "Utility Scale Wind Towers from Canada:  Resubmission of Comments Pursuant to Court Remand dated May 18, 2022 (Marmen Draft Remand Comments).
[22] *See* Marmen December 8, 2021 Supplemental Remand Section D Response.

consideration) reported its costs of manufacturing (COM) based on the costs incurred during the period as reflected in the 2018 audited financial statements for each entity.[23]

After reviewing Marmen's initial section D questionnaire response, we issued our supplemental section D questionnaire.[24]  The questions in our supplemental D questionnaire brought to light an error in the Marmen audited financial statements for which it was necessary for Marmen's auditors to restate and reissue the Marmen Inc. December 31, 2018 audited financial statements.  A week after Marmen filed its December 6, 2019 supplemental D questionnaire response, Marmen filed an addendum to its supplemental D questionnaire response on December 13, 2019, in which Marmen submitted its auditor's restated 2018 audited financial statements.[25]  Marmen explained, subsequent to receiving our supplemental section D questionnaire, that errors related to the recording of U.S. currency transactions and the presentation of foreign exchange were discovered.[26]  The restated financial statements effectively moved some of the expenses, mostly exchange gains and losses, from other categories to the cost of goods sold (COGS), thus increasing the COGS.  In the December 13, 2019, supplemental D response, Marmen informed us that the auditors had since identified another error and that it was necessary to revise the audited financial statements for Marmen Energie, as well.  We accepted yet another set of restated audited financial statements along with a corresponding revised financial expense ratio.[27]

In a second supplemental questionnaire, dated January 31, 2020, Commerce referred to the two amendments to the originally presented exchange gains and losses:  one for conversion

---

[23] *See* Marmen's Letter, "Utility Scale Wind Towers from Canada:  Section B, C, and D Response," dated October 11, 2019 (Marmen Initial Section D Response), at Exhibit 14.
[24] *See* Commerce's Letter, "Supplemental Section D Questionnaire," dated November 21, 2019.
[25] *See* Marmen's Letter, "Utility Scale Wind Towers from Canada:  Response to Question 14.g of the Supplemental Section Questionnaire," dated December 13, 2019 (Marmen December 13, 2019 Supplemental Section D Response).
[26] *See* Marmen December 13, 2019 Supplemental Section D Response at 2-3.
[27] *Id.* at Exhibit SD-19.

of expenses incurred in USD to CAD and the other for compliance with Canadian generally accepted accounting principles for the accounting of financial transactions.[28]  To better understand these amendments, we requested additional details on the specific amendments made by the auditors, including an itemized list of all transactions that sum to each of the amendment totals.  Marmen provided those details in the second supplemental response.[29]

Additionally, in our January 31, 2020 supplemental questionnaire, we asked Marmen to submit a revised cost reconciliation based on these restated audited financial statements, where the revised reconciliation would start with the revised (increased) audited COGS.  Because this question was intended to clarify our understanding of the changes to the reported costs that had resulted from the restated financial statements, Commerce specified that Marmen should make changes only to the previously submitted cost reconciliation that relate to the auditor's restatements.  Our question specifically stated that "{}all responses to this combined section D supplemental questionnaire should be limited to the questions contained herein.  Additional information or revisions of previously requested information, not pertinent to this supplemental questionnaire may result in their rejection, pursuant to 19 CFR 351.301."[30]

In response to our request described above, Marmen provided revised cost reconciliations for both Marmen Inc. and Marmen Energie.  In these revised cost reconciliations, Marmen included numerous new revisions to its cost reconciliation that were not related to the auditor's restatements.  We reviewed these items and found that many were for "minor errors" Marmen had found while preparing the revised reconciliations, such as a cell formatting error.  We

---

[28] *See* Commerce's Letter, "Second Supplemental Section D Questionnaire," dated January 31, 2020.

[29] *See* Marmen's Letter, "Utility Scale Wind Towers from Canada:  Second Supplemental Section D Response," dated February 7, 2020, which was later superseded by Marmen's Letter, "Utility Scale Wind Towers from Canada: Second Supplemental Section D Response," dated February 28, 2020 (Second Supplemental D Response) (*i.e.*, excluding the rejected reconciling item).

[30] *See* Marmen's Second Supplemental D Response at Question 4.  Of note, Marmen's response to this question was that it had "complied with {Commerce's} instructions."

accepted these items as they were small clerical errors that did not alter the data presented in the audited financial statements.  In fact, we accepted the revised cost reconciliation for Marmen Energie in its entirety.[31]  However, there was one non-clerical revision that Marmen explained it found while reviewing its records for purposes of preparing the revised cost reconciliations.  This revision resulted from an alleged discovery of certain expenses that Marmen claims were not converted from USD to CAD.[32]

In short, the increase to the COM (*i.e.*, the increase in the unreconciled difference) driven by the restatement of the audited financial statements was offset by this new change to Marmen's cost reconciliation.  According to Marmen, this new reconciling item represents non-booked exchange losses that Marmen Inc. incurred on purchases of wind tower sections from affiliate Marmen Energie.[33]  This explanation is parallel to the adjusting entry to restate Marmen Inc.'s other purchases to the CAD equivalent values, as discussed above, as an auditor amendment to the financial statements.

Marmen stated that it "discovered that it had not convert{ed} those purchases to CAD {from USD} for the original reconciliation."[34]  Marmen did not further explain how, if at all, this error and correction related to the restated financial statements, or whether it was one of the adjustments brought up by the external auditor, Deloitte.  The record does not provide any actual support that this new change is required, nor that it is not already accounted for within Marmen's normal books.  Further, it potentially calls into question the completeness of the efforts to revise Marmen's financial statement and whether additional items remain undisclosed.

---

[31] *See* Marmen's Second Supplemental D Response at Exhibits D-9 and D-10.
[32] *Id.* at 14.
[33] *See* Marmen December 8, 2021 Supplemental Remand Section D Response at Attachment 1.
[34] *Id.*

Under section 773(f)(1)(A) of the Tariff Act of 1930, as amended (the Act), Commerce is directed to calculate costs "based upon the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country ... and reasonably reflect the costs associated with the production and sale of the merchandise." Commerce has asserted that it will rely on the assurances of the company's independent accountants and auditors as the basis for calculating costs.[35] As the company's independent audited financial statements are our starting point, we must rely on the costs that are reported therein.

The record contains a worksheet, demonstrating the calculation of Marmen's late reconciling item.[36] Along with the additional reconciling item,[37] Marmen submitted an Excel worksheet, updated from a prior similar worksheet it provided, that now combines a subgroup of purchase invoices and adjusts the subtotal by an average exchange rate for the period of investigation (POI).[38] There is no support for this worksheet, other than an assertion that a portion of these invoiced purchases was not already properly converted using the actual exchange rate. Marmen provided no support for the average exchange rate that is on the worksheet; rather, it is just an exchange rate that Marmen inserted into the revised version of this worksheet.

In contrast to this Excel spreadsheet calculation, the record supports that Marmen records these amounts into its home currency, CAD, in its normal books and records using an alternative

---

[35] *See, e.g., Notice of Final Results of Antidumping Duty Administrative Review, Final Determination to Revoke the Order in Part, and Partial Rescission of Antidumping Duty Administrative Review: Fresh Atlantic Salmon from Chile,* 68 FR 6878 (February 11, 2003), and accompanying IDM, at Comment 13.

[36] *See* Marmen December 8, 2021 Supplemental Remand Section D Response at Attachment 1, Tab labeled "Marmen Inc."

[37] *See* Marmen's Letter, "Utility Scale Wind Towers from Canada: Supplemental Section D Response," dated December 6, 2019 at Exhibit D-8 (Marmen December 6, 2019 Supplemental D Response).

[38] *See* Marmen December 8, 2021 Supplemental Remand Section D Response at Attachment 1, Tab L1, labeled "Purchases from Marmen Energie."

exchange rate.[39]  For USD denominated purchases, Marmen has reported on the record that in its normal books, Marmen's cost system converts USD purchases to CAD at specific conversion rates.[40]  From the start, Marmen asserted that "to ensure that the company's actual direct material costs are reported in the cost database, Marmen included the actual exchange gain or loss received by Marmen on purchases of direct materials in USD."[41]  In preparation of Marmen's original 2018 audited financial statements, Marmen explained that its auditors periodically further adjusted these already "converted" purchases to be based on the actual exchange rates during 2018.[42]  Thus, Marmen's prior statements and reported calculation indicate these exchange gains and losses are already accounted for in Marmen's costs.

After Marmen discovered the initial errors in its foreign exchange gains and losses, and the Deloitte auditors expressed the need to reevaluate and restate Marmen's audited financial statements, the auditors made an overall correction as shown, in detail, in the revised cost reconciliation worksheet submitted for this remand.[43]  Part of the audit correction affected Marmen's periodic book adjustment to properly state the exchange gains and losses (*See* Excel lines 41-43[44]), which were specifically revised as part of Marmen's auditor exchange rate adjustment for 2018.  The supporting detail for that adjustment shows that it is related to the same accounts which were already restated in the original audited financial statements, involving the very same purchases that Marmen is now claiming need to be converted by another foreign exchange adjustment.[45]  The adjustments in Excel lines 41-43 were in the original cost

---

[39] *See* Marmen Initial Section D Response at Exhibit D-3.
[40] *Id.* at D-15.
[41] *Id*. at D-33.
[42] *See* Marmen December 6, 2019 Supplemental D Response at D-17 and D-18.
[43] *See* Marmen December 8, 2021 Supplemental Remand Section D Response at Attachment 1.
[44] It was necessary to reference to the Excel spreadsheet fields because the data in the fields is of business proprietary nature.
[45] *See* Marmen Second Supplemental D Response, at Excel Exhibit D.09.a.

reconciliation, the second version of the cost reconciliation, as well as the revised cost reconciliation submitted for this redetermination.  In relation to the restatement of the audited financial statements, the third version of the cost reconciliation shows that the auditors made an update to Excel lines 41-43.  The third version of the cost reconciliation also shows that Excel line 29 did not change at all between the second and third versions of the cost reconciliation.  Because the purpose of the third version of the cost reconciliation was to clearly demonstrate all changes from the original audited financial statements to the restated financial statements, it included a difference column which highlights each change between the original and the restated audited financial statements; the fact that line 29 did not change (per the actual audit adjustments) shows that the auditors believed there was no correction necessary.  The amount related to adjusting costs of Marmen's purchases during the year was already included, as shown by the cost reconciliation worksheet, and was adjusted as one part of the many changes in the restated financial statements, including at Excel lines 41-43.

In summary, the record evidence shows that Marmen definitively stated that its reported costs accounted for these exchange gains and losses, based on the fixed exchange rates during the year;[46] then, its auditors made an adjustment to convert those costs to reflect actual exchange rates for purchases initially made in USD;[47] and, the Deloitte auditors then reevaluated the recording of exchange gains and losses and made corrections to the accounts which were incorrect, as shown in Excel lines 6 and 41 of the Marmen Inc. third cost reconciliation, whereas Excel line 29 remained the same.[48]  The record evidence, thus, indicates a conclusion that there would be no additional error, and, therefore, leaving an unexplained difference in the cost

---

[46] *Id.* at D-33.
[47] *See* Marmen December 6, 2019 Supplemental D Response at D-17 and D-18.
[48] *See* Marmen December 8, 2021 Supplemental Remand Section D Response at Attachment 1.

reconciliation. Therefore, from thoroughly retracing the information on the record through the lifecycle of the cost reconciliation schedules and related narratives about Marmen's exchange gains and losses, we agree with Marmen's contention that there is no need to again restate its financial statements. The effects of the financial statement restatements are clearly shown in the designated column in the third cost reconciliation, and have not changed Excel line 29, but have clearly updated Excel line 41.[49] The record evidence thereby demonstrates that the reported costs, including those of the sections purchased from Marmen Energie, were, in fact, already correctly inclusive of exchange rate differences, and it would be inappropriate to adjust them again for those exchange gains and losses.

In conclusion, for this final redetermination, we have obtained additional cost reconciliation information and have evaluated all of the submitted information and find that Marmen's additional cost reconciliation item was already reflected in its audited financial statements. Based on the evidence on the record, it appears that Marmen's proposed additional reconciling item would duplicate an adjustment amount that was already reflected in its revised audited financial statements, which is the basis for a respondent's reporting of costs under section 773(f)(1)(A) of the Act. For these reasons, it is not necessary or accurate to adjust Marmen's reported COM for the item. Therefore, we have not adjusted Marmen's COM and COP for this redetermination.

---

[49] *Id.*

### B. Differential Pricing Analysis

*1. Legal Framework*

Pursuant to section 777A(d)(1)(A) of the Act, in an investigation, Commerce calculates a company's weighted-average dumping margin using one of two "standard comparison methodologies" by comparing either the weighted-average normal value with the weighted-average U.S. price (the average-to-average, or A-to-A, method)[50] or the transaction-specific normal value with the transaction-specific U.S. price (the transaction-to-transaction, or T-to-T, method).[51]

Section 777A(d)(1)(B) of the Act provides that Commerce may use an "alternative comparison methodology" based on the comparison of the weighted-average normal value with the transaction-specific U.S. price (the A-to-T method).[52]  In order to use an alternative comparison methodology based on the A-to-T method, the statute sets out two requirements:  (i) there exists a pattern of prices that differ significantly for comparable merchandise among purchasers, regions or time periods ("pattern" requirement); and (ii) Commerce explains why such differences cannot be taken into account when using a standard comparison methodology ("meaningful difference" requirement).  Accordingly, both requirements must be satisfied in order for Commerce to consider whether to apply an alternative comparison methodology based on the A-to-T method.

Section 771(35)(A) of the Act defines the dumping margin as "the amount by which the normal value exceeds the {U.S. price}," *i.e.*, the result of an A-to-A, T-to-T, or A-to-T comparison.  When such comparisons are made, the U.S. prices and normal values are defined

---

[50] *See* 19 CFR 351.414(b)(1).
[51] *See* 19 CFR 351.414(b)(2).
[52] *See* 19 CFR 351.414(b)(3).

by product and other characteristics of the U.S. sale (*e.g.*, level-of-trade)[53] to ensure a fair comparison of U.S. price with normal value.[54]

Section 771(35)(B) of the Act defines the weighted-average dumping margin as "the percentage determined by dividing the aggregate dumping margins … by the aggregate {U.S. price}." Thus, the individual comparison results must be aggregated to calculate a company's overall weighted-average dumping margin.

Prior to the enactment of the URAA,[55] a company's weighted-average dumping margin was calculated using the A-to-T method in either an investigation or a review.[56] Further, when aggregating individual comparison results, negative comparison results were "zeroed" such that non-dumped sales were not allowed to offset the positive comparison results for dumped sales.[57]

With the enactment of the URAA, the standard comparison methodology in an investigation, pursuant to section 777A(d)(1)(A) of the Act, was normally the A-to-A method, which introduced the concern of "targeted" or masked dumping. The SAA[58] describes "targeted" or masked dumping when "an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions."[59] In other words, dumping could be masked when lower prices would be "offset" by higher prices within the weighted-average U.S. price. As explained by the SAA, section 777A(d)(1)(B) of the Act provided an alternative comparison methodology based on the A-to-T method to address such

---

[53] *See* 19 CFR 351.414(d).
[54] *See* section 773(a) of the Act.
[55] *See* Uruguay Round Agreements Act §§ 121(9), 101(d)(7), PL 103-465, December 8, 1994, 108 Stat 4809 (URAA).
[56] *See Union Steel v. United States*, 713 F.3d 1101, 1104 (Fed. Cir. 2013) (*Union Steel*).
[57] *See, e.g.*, *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004); *Corus Staal BV v. Dept of Commerce*, 395 F.3d 1343, 1345-46 (Fed. Cir. 2005); and *U.S. Steel v. United States*, 621 F.3d 1351, 1362 (Fed. Cir. 2010) (*U.S. Steel*).
[58] *See* Statement of Administrative Action accompanying the URAA, H.R. Doc. No. 103-316, Vol. 1 (1994) (SAA).
[59] *Id.* at 842.

concerns.  Further, the SAA recognizes that "Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another."[60]  The SAA links the pattern requirement to identifying circumstances within the exporter's U.S. pricing behavior "where targeted dumping may be occurring."[61]  The meaningful difference requirement establishes whether masked dumping is actually present in the respondent's pricing behavior and to what extent dumping has been masked or concealed by the use of a standard comparison methodology.

After the enactment of the URAA, concerns of masked dumping were raised as a result of the change from the use of the A-to-T method to Commerce's application of the A-to-A method under section 777A(d)(1)(A) of the Act.[62]  Even though, at that time, the calculation of a weighted-average dumping margin included zeroing[63] when aggregating the individual average-to-average comparison results, dumping could still be masked within the weighted-average U.S. price.  With the subsequent adoption of the *Final Modification for Investigations* in 2006,[64] Commerce changed its practice to remove zeroing in the calculation of the weighted-average dumping margin in an investigation.  Finally, with the later adoption of the *Final Modification for Reviews* in 2012,[65] the same concerns of masked dumping were extended to reviews, most importantly for administrative reviews where the assessment of antidumping duties is determined.

---

[60] *Id.* at 843.

[61] *Id.*

[62] *See Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination:  Certain Pasta from Italy*, 61 FR 1344 (January 19, 1996).

[63] *See Union Steel*, 713 F.3d at 1104.

[64] *See Antidumping Proceedings:  Calculation of the Weighted–Average Dumping Margin During an Antidumping Investigation; Final Modification*, 71 FR 7772 (December 27, 2006) (*Final Modification for Investigations*) (Use of offsets for non-dumped sales when using a standard comparison methodology in an LTFV investigation).

[65] *See Antidumping Proceedings:  Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 FR 8101 (February 14, 2012) (*Final Modification for Reviews*).

As described in the SAA, the potential for masked dumping arises when a company's pricing behavior in the U.S. market results in the dumping of certain sales which are then masked by other non-dumped sales (*i.e.*, "targeted" pricing or sales). This pricing behavior may mask dumping when the low U.S. prices are offset by higher U.S. prices, either within the weighted-average U.S. price, or when the comparison results are aggregated and the comparison results for non-dumped sales offset the comparison results for dumped sales. Such pricing behavior in the U.S. market does not negate the injury caused to domestic producers by the individually dumped sales. The remedy of such injury embodies the purpose of the antidumping statute, *i.e.*, to remedy the injury caused by unfair trade.[66]

Commerce's approach for addressing the two statutory requirements for using an alternative comparison methodology has changed over time since the enactment of the URAA. The approaches used by Commerce to address the statutory requirements have been the "Pasta Test,"[67] the "P/2 Test,"[68] the "Nails Test"[69] and now the "Differential Pricing Analysis,"[70] the last two of which were in response to the United States coming in compliance with adverse

---

[66] *See Koyo Seiko Co., Ltd. v. United States*, 20 F.3d 1156, 1159 (Fed. Cir. 1994) ("The purpose of the antidumping statute is to protect domestic manufacturing against foreign manufacturers who sell at less than fair market value. Averaging U.S. prices defeats this purpose by allowing foreign manufacturers to offset sales made at less-than-fair value with higher priced sales. Commerce refers to this practice as 'masked dumping.' By using individual U.S. prices in calculating dumping margins, Commerce is able to identify a merchant who dumps the product intermittently—sometimes selling below the foreign market value and sometimes selling above it. We cannot say that this is an unfair or unreasonable result." (internal citations omitted)).

[67] *See Borden, Inc. v. United States*, 23 CIT 372, Slip Op. 99-50 (CIT June 4, 1999).

[68] *See Notice of Final Determination of Sales at Less Than Fair Value: Coated Free Sheet Paper from the Republic of Korea*, 72 FR 60630 (October 25, 2007), and accompanying IDM.

[69] *See Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 33977 (June 16, 2008), and accompanying IDM; *see also Certain Steel Nails from the United Arab Emirates: Notice of Final Determination of Sales at Not Less Than Fair Value*, 73 FR 33985 (June 16, 2008), and accompanying IDM.

[70] *See Xanthan Gum From Austria: Final Determination of Sales at Less Than Fair Value*, 78 FR 33354 (June 4, 2013), and accompanying IDM; *see also Xanthan Gum From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 FR 33351 (June 4, 2013), and accompanying IDM; *Polyester Staple Fiber from Taiwan: Preliminary Results of Antidumping Duty Administrative Review*; 2011-2012, 78 FR 17637 (March 22, 2013), and accompanying Preliminary Decision Memorandum (PDM); and *Polyester Staple Fiber from Taiwan: Final Results of Antidumping Duty Administrative Review; 2011–2012*, 78 FR 38938 (June 28, 2013).

World Trade Organization (WTO) rulings resulting in the *Final Modification for Investigations* and the *Final Modification for Reviews*, respectively.  In the *Final Modification for Reviews*, the United States changed its practice in reviews (*e.g.*, an administrative review) of an antidumping duty order to apply the WTO-consistent method as was set forth for an LTFV investigation in the *Final Modification for Investigations*.  Consequently, the concern of addressing masked dumping was expanded to the annual administrative reviews which include the critical purpose of determining the assessment of antidumping duties.

After publishing the *Final Modification for Reviews* in 2012, Commerce replaced the Nails Test with the Differential Pricing Analysis in 2013, which included several conceptual changes.  First, the Differential Pricing Analysis would be applied in each investigation or administrative review to consider whether the A-to-A method would conceal masked dumping.  Further, the Differential Pricing Analysis would more explicitly address the provisions of the WTO Antidumping Agreement,[71] which are also reflected in the U.S. statute through enactment of the URAA, both of which include the pattern requirement and the meaningful difference requirement.

The Differential Pricing Analysis is composed of two parts, which address the statutory pattern and meaningful difference requirements, respectively:  (1) the Cohen's *d* and ratio tests; and (2) the meaningful difference test.  Consistent with aspects of the Differential Pricing Analysis before the CAFC in *Stupp II*, this Court has directed Commerce to consider Commerce's Differential Pricing Analysis.  This Court noted that the CAFC "addressed Commerce's argument that it does not need to worry about normality because it is using a population instead of a sample, stating that Commerce's argument 'does not address the fact that

---

[71] *See* Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade (1994) (Antidumping Agreement).

Professor Cohen derived his interpretative cutoffs under the assumption of normality.'"[72]

Commerce has addressed the CAFC's concern regarding the assumption of normality and

roughly equal variances in the Stupp Draft Redetermination, which is repeated here based on the

Court's specific identification of the CAFC's language.  In particular, for this redetermination,

the Court noted that:

> Commerce did not explain whether the data applied to the Cohen's *d* test were
> normally distributed or contained roughly equal variances.  Because the record
> appears to indicate that the price differences were not large in absolute terms, the
> evidence before the Court calls into question whether the data Commerce used in
> its differential pricing analysis violated the assumptions of normality and roughly
> equal variances associated with the Cohen's *d* test.[73]

Commerce addresses the Court's concerns below.

### 2.  *Differential Pricing Background*

In the *Final Determination*, Commerce calculated the weighted-average dumping margin

for Marmen based on the A-to-T method, as reflected in the *Preliminary Determination*.[74]

Marmen challenged the *Final Determination* before this Court, that "Commerce determined that

minor price differences of *less than one percent* were 'significant,' and applied the A-T method

to Marmen's U.S. sales of five {control numbers (CONNUM)} on this basis."[75]  The Court

recognized that Commerce "applied the Cohen's *d* test to data that showed differences that were

not large in absolute terms, because the overall differences for five of the CONNUMs were less

than one percent"[76] and "{b}ecause the record appears to indicate that the price differences were

not large in absolute terms, the evidence before the Court calls into question whether the data

---

[72] *See Remand Order*, 545 F. Supp. 3d at 1319.

[73] *Id.* at 1319-20.

[74] *See Utility Scale Wind Towers from Canada: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 85 FR 8562 (February 14, 2020) (*Preliminary Determination*), and accompanying PDM at 10-12.

[75] *See Remand Order*, 545 F.Supp.3d at 1319.

[76] *Id.*.

Commerce used in its differential pricing analysis violated the assumptions of normality and roughly equal variances associated with the Cohen's *d* test."[77]  Therefore, the Court remanded "the issue of Commerce's use of the Cohen's *d* test for Commerce to explain further whether the limits on the use of the Cohen's *d* test were satisfied in this case in the context of the *Stupp* case."[78]

> 3.  *Based on the instructions of the Court, in these final results of redetermination, we address the price differences identified by Marmen, and whether the price differences were "significant" given that the differences were less than one percent.*

In these final results of redetermination, and consistent with the position taken by Commerce in response to *Stupp*, we find here, as we found in the *Stupp* redetermination that "the assumptions of normality and roughly equal variances"[79] are not relevant to Commerce's application of the Cohen's *d* test.[80]

Below, Commerce provides further explanation regarding the application of the Cohen's *d* test in determining whether the A-to-A method is appropriate to calculate a respondent's weighted-average dumping margin.  First, Commerce describes the role of effect size as a measure of significance in the Differential Pricing Analysis and explains the distinction between statistical and practical significance.  Next, Commerce examines the role of the U.S. price data and the importance that these data encompass the entire universe of data.  Third, Commerce addresses the alleged data requirements in relation to Dr. Cohen's thresholds and the literature cited by the CAFC.  Lastly, Commerce discusses the differences for specific CONNUMs sold by Marmen in the U.S. market during the POI.

---

[77] *Id.* at 1320.
[78] *Id.*
[79] *Id.*
[80] *See Stupp Corp. et al. v. United States:*  Consol. Court No. 15-00334 (CIT October 8, 2021):  Draft Results of Redetermination Pursuant to Court Remand (Stupp Draft Redetermination).

4. *Effect Size as a Measure of Significance; Distinction Between Statistical and Practical Significance*

The purpose of the Cohen's *d* test is to evaluate the extent by which the prices to a particular purchaser, region, or time period differ significantly from the prices of all other sales of comparable merchandise. The Cohen's *d* coefficient is a recognized measure of effect size which gauges the extent of the difference between the means of two groups.[81] The Cohen's *d* coefficient, as a measure of effect size, provides "a simple way of quantifying the difference between two groups and has many advantages over the use of tests of statistical significance alone."[82] Further, the Cohen's *d* coefficient "quantifies the size of the difference between two groups, and may therefore be said to be a true measure of the significance of the difference."[83] The precise purpose for which Commerce relies on the Cohen's *d* test is to satisfy the statutory language to measure whether a difference in prices is significant.

There are two separate concepts and measurements when analyzing whether the means of two sets of data are different. In *The Essential Guide to Effect Sizes*,[84] Dr. Ellis explains the concept of "effect size" by asking the question "So What?," citing Dr. Cohen that the "primary product of a research inquiry is one or more measures of effect size, not *p* values {*i.e.*, statistical significance}."[85] Dr. Ellis distinguishes effect size from the concept of statistical significance: "{a} statistically significant result is one that is unlikely to be the result of chance. But a practically significant result is meaningful in the real world."[86]

---

[81] *See* Stupp Draft Redetermination at 11 (citing *generally* Cohen, Jacob, *Statistical Power Analysis for the Behavior Sciences*, Second Edition, Lawrence Erlbaum Associates (1988) (*Cohen*)).

[82] *Id.* at 11 (citing Coe, Robert, "It's the Effect Size Stupid: What Effect Size Is and Why It Is Important," paper presented at the Annual Conference of the British Educational Research Association (September 2002) (*Coe*) at 1).

[83] *Id.* at 7.

[84] *Id.* at 11-12 (citing Ellis, Paul D., *The Essential Guide to Effect Sizes: Statistical Power, Meta-Analysis, and the Interpretation of Research Results*, Cambridge University Press, 2010 (*Ellis*)).

[85] *Id.* at 11, n. 43 (citing Ellis at 3 (*quoting* Cohen, Jacob (1990), "Things I have learned (so far)," American Psychologist, 45(12): 1304–1312)).

[86] *Id.* (citing *Ellis* at 3-4).

The first measurement, when these two sets of data are samples of a larger population, is whether this difference is statistically significant, as measured, for example, by a t-test.[87]  This will determine whether this difference rises above the sampling error (or in other words, noise or randomness) in selecting the sample.  When the t-test results indicate that the difference is statistically significant (*i.e.*, the null hypothesis is false), then these results rise above the sampling error and are statistically significant.

The second measurement is whether there is a practical significance of the difference between the means of the two sets of data, as measured by an "effect size" such as the Cohen's *d* coefficient.  As noted above, this measures the real-world relevance of this difference "and may therefore be said to be a true measure of the significance of the difference."[88]  The effect size, which is measured by Cohen's *d* test, is the basis for Commerce's determination of whether prices in a test group differ significantly from prices in a comparison group.

It is critical to understand that Commerce's Differential Pricing Analysis uses the Cohen's *d* test to measure the *practical* significance of the difference in the actual real-world pricing, rather than *statistical* significance.  Accordingly, "{e}ffect size quantifies the size of the difference between two groups and may, therefore, be said to be a true measure of the significance of the difference."[89]

The measurement of practical significance, for researchers and non-specialists alike, "is essential to the interpretation of a study's results,"[90] and can rely on "an estimation of one or more *effect sizes*:"[91]

---

[87] *Id.* at 12 (citing *Cohen* at 19).
[88] *Id.* at 12 (citing *Coe* at 7).
[89] *Id.* at 12.
[90] *Id.* at 13 (citing *Ellis* at 5 (emphasis added)).
[91] *Id.* (citing *Ellis* at 4 (emphasis in original)).

An effect size refers to the magnitude of the results as it occurs, or would be found, in the population. Although effects can be observed in the artificial setting of a laboratory or sample, effect sizes exist in the real world.[92]

Dr. Ellis further states that using the entire population is the best way to measure an effect size, but it is usually not feasible, which leads to the use of an estimate of the effect size based on sampled data:

> The best way to measure an effect is to conduct a census of an entire population but this is seldom feasible in practice. Census-based research may not even be desirable if researchers can identify samples that are representative of broader populations and then use inferential statistics to determine whether sample-based observations reflect population-level parameters.[93]

When the results of the analysis are based on sample-based observations, a researcher must consider both the statistical and the practical significance of the results. To distinguish the difference between statistical significance and practical significance, Dr. Ellis states:

> It is quite possible, and unfortunately quite common, for a result to be statistically significant and trivial. It is also possible for a result to be statistically nonsignificant and important. Yet scholars, from PhD candidates to old professors, rarely distinguish between the statistical and the practical significance of their results.[94]

Accordingly, as recognized by Dr. Ellis, the results of an analysis may have statistical and/or practical significance, but these two distinct measurements of significance are independent of one another.

In conducting its Differential Pricing Analysis in the broader context of a dumping analysis, Commerce is not engaged in an analysis of sampled data that would require an analysis of statistical significance, but, rather, is concerned with measuring the practical significance of price differences among purchasers, regions, or time periods. As we explain below, Commerce's

---

[92] *Id.* (citing *Ellis* at 4-5).
[93] *Id.* (citing *Ellis* at 5).
[94] *Id.* at 13 (citing Ellis at 4).

dumping analysis relies on the entire universe or population of sales, which obviates the need for an analysis of statistical significance and the related underlying statistical criteria.

5. *Application of the Cohen's d Test to the Entire Population of U.S. Sale Price Data Rather Than a Sample*

Commerce's dumping analysis assesses the pricing behavior of the respondent in the U.S. market. The U.S. sale price data on which this analysis is based constitute the entire population of sales data and are not a sample of a respondent's sales data (*i.e.*, the data are for *all* sales in the United States of subject merchandise by a company during the period of investigation or review). The basis for this analysis is the respondent's U.S. sales of the subject merchandise for a given period of time. By definition, these U.S. sales comprise the universe of sales on which the respondent's weighted-average dumping margin depends. The Differential Pricing Analysis examines all sales to determine whether the A-to-A method is the appropriate approach on which to base this calculation. Therefore, in the context of the calculation of the weighted-average dumping margin, the data used are not a sample, but rather constitute the entire population of a respondent's sales of subject merchandise during the period under examination for the calculation of the weighted-average dumping margin.

The Cohen's *d* test evaluates the extent to which the net prices to a particular purchaser, region, or time period differ from the net prices of all other sales of comparable merchandise. In the pattern requirement, the statute requires Commerce to consider whether U.S. prices for comparable merchandise to a particular purchaser, region, or time period (*i.e.*, the test group) differ significantly from the prices to other purchasers, regions, or time periods (*i.e.*, the comparison group). As such, the statute has refocused Commerce's analysis to calculate the respondent's weighted-average dumping margin from the pricing behavior of the respondent in the U.S. market to consider, when addressing the pattern requirement, the pricing behavior to the

22

test group separate from the pricing behavior to the comparison group.  Accordingly, the sales to the test group and the sales to the comparison group are not sampled and each constitutes a separate population of sale prices, each of which represents all of the sales of the comparable merchandise to each group.  Accordingly, the sales to each of these two groups, the test and comparison groups, themselves constitute the full population of data in the context of the calculation of the mean, standard deviation, and Cohen's *d* coefficient for the purpose of the pattern requirement.

The statistical criteria observed in academic literature (such as the number of observations, a normal distribution and approximately equal variances) are related to the statistical significance of sampled data and establish the reliability of an estimated parameter (*e.g.*, mean) based on the sample data to be within a determined confidence interval of the actual parameter.[95]  For example, with an established confidence level (*e.g.*, 95 percent), there is a given risk (*e.g.*, 5 percent) that the actual parameter of the population is not within the confidence interval surrounding the estimated parameter.  However, for the Cohen's *d* test applied in the context of the Differential Pricing Analysis, there is no estimation of the parameters (*i.e.*, mean, standard deviation, and effect size) of the test group or of the comparison group as the calculation of these parameters is based on the complete universe of sale prices to the test and comparison groups.  Unlike with a sample of data where the estimated parameters will change with each sample selected from a population, each time these parameters would be calculated as part of Commerce's Cohen's *d* test, the exact same results would be found because the calculated parameters are the parameters of the entire population and not an estimate of the parameters based on a sample.  Accordingly, the means, standard deviations, and Cohen's *d*

---

[95] *See, e.g.*, Stupp Draft Redetermination at 15 (citing *Ellis* at 17-21).

coefficients calculated are not estimates with confidence levels or sampling errors as would be associated with sampled data, but, rather, are the actual values which describe a company's pricing behavior.  Consequently, the statistical significance of the results of the Cohen's *d* test is not relevant in Commerce's application of the differential pricing analysis, which measures practical significance.

6. *Dr. Cohen's Thresholds Are Derived from Real-World Observations and Are Not Tied to Statistical Criteria*

The CAFC has previously affirmed the use of Dr. Cohen's large, 0.8, threshold as a measure of significance in the difference in prices.[96]  In its opinion, however, the CAFC expressed concern that the conditions asserted by SeAH in *Stupp* may "undermine the usefulness of the interpretive cutoffs,"[97] *i.e.*, the large 0.8 threshold used in the Cohen's *d* test to determine that the price difference is significant.  However, the academic literature does not diminish the logic or relevance of Commerce's application of the Cohen's *d* test or the use of the large 0.8 threshold.

As stated above, the purpose of the Cohen's *d* test is to determine the significance of the difference in the prices between a given purchaser, region, or time period and all other sales of the comparable merchandise.  The Cohen's *d* coefficient is calculated as the ratio of the difference in the mean prices of the test and comparison groups, and the variance of the underlying prices,[98] such that the variance serves as the "yardstick" by which to measure the significance of the difference.  There are many approaches to the calculation of the yardstick,[99]

---

[96] *See Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 673 (Fed. Cir. 2019) ("Commerce reasoned that even a small absolute difference in the means of the two groups can be significant (for the present statutory purpose) if there is a small enough dispersion of prices within the overall pool as measured by a proper pooled variance or standard deviation; the 0.8 standard is "widely adopted" as part of a "commonly used measure" of the difference relative to such overall price dispersion; and it is reasonable to adopt that measure where there is no better, objective measure of effect size.  We agree with the Trade Court that this rationale adequately supports Commerce's exercise of the wide discretion left to it under {section 777A(d)(1)(B) of the Act}" (citation omitted)).
[97] *See Stupp II* at 1357.
[98] *Id.* at 1346.
[99] *See, e.g.*, *Stupp Draft Redetermination* at 17 (citing *Ellis* at 10; and *Cohen* at 44).

24

of which Commerce has relied upon a pooled standard deviation based on a simple average of the variances of the test and comparison groups.[100]

Once the size of the effect, *i.e.*, the Cohen's *d* coefficient, has been calculated, such measurements "must be interpreted to extract meaning."[101] Dr. Ellis provides three avenues by which one may interpret the measurements of effect size: context, contribution to knowledge, and Dr. Cohen's thresholds.[102] Dr. Cohen established thresholds for evaluating the magnitude of the effect size which are "easy to grasp" and "are sufficiently grounded in logic for Cohen to hope that his cut-offs 'will be found to be reasonable by reasonable people.'"[103] Despite some criticism of Dr. Cohen's thresholds, they are nevertheless widely accepted.[104]

Dr. Cohen established operational definitions of a small, medium, and large effect to describe the magnitude of the effect size based on the difference in the means.[105] These are derived from real-world observations where the observed effect size is 0.2, 0.5 or 0.8 and are not dependent on the statistical criteria cited by the CAFC in *Stupp II*. For the "large" 0.8 threshold, Dr. Cohen described the effect as the difference in IQ of a PhD graduate and a college freshman, the difference in IQ between a college graduate and a student with only a 50-50 chance of passing high school, or the difference in height between 13 and 18 year-old girls.[106] This level of difference was selected by Commerce as a conservative standard to determine that the observed

---

[100] In *Stupp II* at 1359, footnote 15, the CAFC took notice of the ongoing litigation in *Mid-Continent* concerning the calculation of the pooled standard deviation. *See Mid Continent Steel & Wire, Inc. v. United States*, No. 21-1747 (Fed. Cir. filed Mar. 17, 2021) (*Mid-Continent*). Although the plaintiff in *Mid-Continent*, as here, asserts that Commerce's application of the Cohen's *d* test erroneously concludes that there exists a pattern of prices, the issue in *Mid-Continent* involves the appropriate formula to calculate the pooled standard deviation and not whether the characteristics of the data groups causes the calculated Cohen's *d* coefficient to be inflated.

[101] *See* Stupp Draft Redetermination at 17 (citing *Ellis* at 32).

[102] *Id.* at 35.

[103] *Id.* at 41 (citation omitted).

[104] *Id.* at 40 ("Cohen's cut-offs provide a good basis for interpreting effect size and for resolving disputes about the importance of one's results.").

[105] *Id.* at 17 (citing *Cohen* at 24-27).

[106] *Id.* at 18 (citing *Cohen* at 27; and *Ellis* at 41).

price differences are significant since this threshold is "grossly perceptible and therefore {represents} large differences."[107]  Commerce could have also used the medium 0.5 threshold as it "is conceived as one large enough to be visible to the naked eye."[108]  However, Commerce elected to use the most conservative, large threshold to provide the strongest evidence that the observed prices differed significantly.

Since, as discussed above, Dr. Cohen's thresholds are operational and not based on a statistical analysis, the concerns about the statistical criteria do not impact the usefulness of the thresholds.  These thresholds are derived from real-world observations and, thus, are not tied to any particular statistical criterion such as normality of distribution or approximately equal variances.  In general, each of the quotations to the literature concerns either the potential inaccuracies in the estimate of effect size which is based on a sample of data, or the analysis of the sampled data to be able to visualize the difference in the means between the sampled data sets.  In Commerce's application of the Cohen's $d$ test, such additional analysis is not relevant because the data in both the test group and the comparison group use the full population of sales in each group and are not determined based on controlled random and independent samples of the population.  Rather, the results of the Cohen's $d$ test are based on the entire population of sale price data for comparable merchandise for the test and comparison groups as discussed above.

7.  *Statistical Criterial in Academic Literature Are Not Relevant to the Cohen's d Test*

The CAFC in *Stupp II* ordered Commerce to provide further explanation regarding three statistical criteria, which the plaintiff in *Stupp* argued must be met for the application of the Cohen's $d$ test in the context of the differential pricing analysis.  However, as explained above, these assumptions relate to measuring the statistical significance of the difference in the means

---

[107] *Id.* at 18 (citing *Cohen* at 27).
[108] *Id.* at 26.

when using samples, whereas Commerce utilizes the Cohen's *d* test to measure the practical

significance of the difference in the means when using the entire population of data rather than

samples.

The CAFC's first concern, based on Dr. Cohen's work, is that "we maintain the

assumption that the populations being compared are normal and with equal variability, and

conceive them further as equally numerous."[109]  However, the context of this quotation is better

understood when the entire sentence is considered:

> If we maintain the assumption that the populations being compared are normal
> and with equal variability, and conceive them further as equally numerous, it is
> possible to define measures of nonoverlap (U) associated with *d* which are
> intuitively compelling and meaningful.[110]

In this analysis, Dr. Cohen is considering the extent that two compared sets of sampled

data do not overlap one another.  Below is a common approach to visualize the difference

between two hypothetical sets of data:



In this illustration, the closer together the two bell curves, the smaller the difference in

the means, the smaller associated effect size, and the smaller the non-overlap area (*i.e.*, the area

under one curve and not under the other).  Conversely, the further apart the two bell curves, the

greater the difference in the means, the larger the associated effect size, and the larger the non-

---

[109] See *Stupp II* at 1357 (citation omitted).
[110] *See* Stupp Draft Redetermination at 19 (citing *Cohen* at 21).

overlap area.  In order to quantify the amount of non-overlap, one must know the areas under

each bell curve, which requires the statistical criteria cited by Dr. Cohen and questioned by the

CAFC.  However, these measurements of non-overlap in statistical analysis involving sampled

data do not define the real-world observed differences used by Dr. Cohen to define the small,

medium and large thresholds, as discussed above.

Similarly, the CAFC's first citation to *Grissom*,[111] that the "usual interpretation … of

estimating the percentile standing …with the supposed normal distribution … would be

invalid,"[112] also involves a similar analysis concerning the overlap of the two compared sets of

sampled data.  Figure 3.1 graphically demonstrates the percent of the comparison group whose

values are less than the mean of the test group ($\mu_e$).[113]  Similar to Dr. Cohen's calculation of non-

overlap of two sets of data, the calculation of the "percentile standing" of 84 percent requires the

assumptions that the two sets of data be normally distributed and have equal variances.  Without

the assumptions of normality and equal variances, the area beneath the curve of the control group

that is less than the mean of the experimental group could not be quantified (*i.e.*, the "density

function" permits the calculation of 84 percent of the control group (the area under the curve) is

less than the mean of the experiment group).  This, however, does not impact Commerce's

application of the Cohen's *d* test.

The CAFC's second citation to *Grissom*[114] must also be taken in its complete context:

Glass et al. (1981) suggested the use of Equations 3.1 and 3.2 because treatment
can affect variances and, therefore, cause heteroscedasticity. However, *if the two
populations that are being compared are assumed to have equal variances*, then
a better estimate of the denominator of a standardized difference between
population means can be made if one pools the data from both samples to

---

[111] *Id.* at 20 (citing Grissom, Robert J. and Kim, John J., *Effect Size for Research, Univariate and Multivariate
Applications*, Second Edition, San Francisco State University (2012) (*Grissom*)).
[112] *See Stupp II* at 1358 (quoting *Grissom* at 66).
[113] *See* Stupp Draft Redetermination at 20 (citing *Grissom* at 62).
[114] *See Stupp II*, 5 F.4th at 1358 (quoting *Grissom* at 68).

estimate the common σ {*i.e.*, the standard deviation of a population} instead of using $s_b$ {*i.e.*, the standard deviation of sample data b} that is based on the data of only one sample.[115]

Equations 3.1 and 3.2 define the denominator of the effect size as the standard deviation of the control (*i.e.*, comparison) group, whereas Dr. Grissom is stating that, in the situation involving sampling where the variances are equal, the denominator can be an average of the two variances.[116]  This does not indicate that the use of the calculated standard deviations distorts the calculation or estimation of the effect size, but only suggested an alternative approach to calculate the denominator of the "*d*" coefficient in Dr. Grissom's equations.[117]

As cited by the CAFC, Professor Coe states that "the interpretation of the 'standardized mean difference' measure of effect size {(*e.g.*, Cohen's *d*)} is very sensitive to violations of the assumptions of normality,"[118] including where "interpretation of effect sizes in terms of percentiles is very sensitive to violations of this assumption {of a normal distribution}."[119]  This involves the same issue raised with respect to sampled data discussed in *Cohen* and *Grissom* above, that the interpretation of the effect size, based on non-overlap or standing percentile, must necessarily be based on a normal distribution to permit the calculation of the percentages in those analyses.  Further, Professor Coe discusses the issue of a non-normal distribution in sampled data and its potential impact on the estimation of effect size when the effect size is identical.[120]  In Professor Coe's example, as with the hypothetical sample data in *Grissom*, 84 percent of the data

---

[115] *See* Stupp Draft Redetermination at 21 (citing *Grissom* at 68 (emphasis as quoted in *Stupp II*)).
[116] Although if the variances are equal between the test and comparison groups, then presumably the average of these two values would be the same as the value of the standard deviation for either group.
[117] *See* Stupp Draft Redetermination at 21 (citing *Grissom* at 63 (the "*d*" coefficient is equal to the ratio of the difference in the means of the sampled data of the experimental and control groups divided by the standard deviation of the sampled data of the control group)).
[118] *See Stupp II* at 1358 (quoting *Coe* at 14).
[119] *See* Stupp Draft Redetermination at 22 (citing *Coe* at 5).
[120] *Id.* at 12-13 ("The interpretations of effect-sizes given in Table I {*i.e.*, standing percentiles} depend on the assumption that both control and experimental groups have a 'Normal' distribution").

in the comparison group with a normal distribution is less than the mean of the test group, but with the non-normal distribution, 97 percent of the data in the comparison group is less than the mean of the test group.  Because these two comparisons both have an effect size of one, the effect size of the data with a non-normal distribution is underestimated since the difference in the means, as seen in Figure 3(b), is greater than the data with a normal distribution in Figure 3(a). Thus, the effect size of the non-normal distribution, equal to one, underestimates the actual difference in the means.  This suggests that a non-normal distribution has the opposite effect from the plaintiff's allegation in Stupp that estimated effect size is positively biased, and resolves the concerns expressed by the CAFC about finding "false positives."  If anything, this aspect of the Cohen's *d* coefficient makes it less likely that Commerce's approach will result in finding prices that differ significantly among purchasers, regions or time periods.  Moreover, when using the entire population instead of a sample, the issue concerning an inherent bias in an estimated effect size is no longer relevant.

The CAFC also references Dr. Lane's online text concerning the interpretation of effect size.[121]  Dr. Lane's statement is simply a recognition, as discussed above, that the measure of effect size uses the variability of the underlying data to determine the yardstick by which the difference in the means is measured:

> When the effect size is measured in standard deviation units as it is for Hedges's *g* and Cohen's *d* {*i.e.*, both different measures of effect size}, it is important to recognize that the variability in the subjects has a large influence on the effect size measure.  Therefore, if two experiments both compared the same treatment to a control but the subjects were much more homogeneous in Experiment 1 than in Experiment 2, then a standardized effect size measure would be much larger in the former experiment than in the latter.[122]

---

[121] *See Stupp II* at 1358.
[122] *See* Stupp Draft Redetermination at 23 (citing Lane, David, *et. al.*, *Introduction to Statistics*, Online Edition, Chapter XIX, Part 3:  "Difference Between Two Means").

In other words, the variability in the data (*i.e.*, variance) is the yardstick by which the difference in the means is measured.  For a given difference in the means, the effect size is smaller when the variability in the underlying data is larger; conversely, the effect size is larger when the variability in the underlying data is smaller.

The CAFC also identifies a concern regarding a conclusion by Dr. Algina and his co-authors[123] that:

> After simulating Cohen's *d* on various data that followed a mixed-normal distribution, *e.g.*, a heavy-tailed distribution, they concluded that Cohen's *d* was not robust to mixed-normal distributions, and that applying Cohen's *d* to such data caused serious flaws in interpreting the resulting parameter. [124]

The purpose of the *Algina* paper is to propose for specific circumstances an alternative formula to calculate effect size based on the difference of the means,[125] analogous to those proposed by Glass and Hedges as different approaches to quantify the variations in the data.  As a result of their analysis, the authors ask:

> Why then is δ so much smaller for the mixed normal distributions?  The answer is that because the mixed normal distribution is a heavy-tailed distribution and there are more scores in the tails than one would find in a normal distribution, the standard deviation, which is very sensitive to the tails of a distribution, is quite large. This, in turn, reduces δ.[126]

The situation addressed here is the same as that discussed in *Coe* concerning a heavy-tailed distribution.  As noted in *Coe* and *Algina*, this results in an estimated effect size that *understates* the magnitude of the difference in the means, which contradicts the plaintiff's claim

---

[123] *See* Stupp Draft Redetermination at 23 (citing Algina, James, Keselman, H.J., and Penfield, Randall D., "An Alternative to Cohen's Standardized Mean Difference Effect Size:  A Robust Parameter and Confidence Interval in the Two Independent Groups Case," Psychological Methods, Volume 10, Number 3, pp. 317-328 (2005) (*Algina*)).
[124] *See* Stupp II at 1358.
[125] *See* Stupp Draft Redetermination at 24 (citing *Algina* at 317 ("The authors argue that a robust version of Cohen's effect size constructed by replacing population means with 20% trimmed means and the population standard deviation with the square root of a 20% Winsorized variance is a better measure of population separation than is Cohen's effect size.")).
[126] *Id.* at 24 (citing *Algina* at 319).

in Stupp that violations of its alleged statistical criteria result in false positives.  Further, this does not impact Dr. Cohen's definition of his thresholds, which are based on real-world observations.

Dr. Johnson Ching-Hong Li further analyzed the robustness of six proposed alternative approaches to Dr. Cohen's $d$ coefficient.[127]  The CAFC noted the conclusion of Dr. Li's analysis that:

> Li concluded that Cohen's $d$ "was found to be inaccurate when the normality and homogeneity-of-variances assumptions were violated in this study, thereby severely affecting the accuracy of $d$ in evaluating the true {effect size} in the research literature."[128]

Again, the inaccuracies identified by Dr. Li, as well as others, involve "the accuracy of $d$ in evaluating the true {effect size}" where "$d$" is the estimated Cohen's $d$ coefficient of the sampled data in comparison with the actual value of the Cohen's $d$ coefficient for the population.  In Commerce's Cohen's $d$ test, Commerce *does not estimate* the Cohen's $d$ coefficient in the Cohen's $d$ test, but *calculates the actual* Cohen's $d$ coefficient based on the entire population of sale prices, not on a limited sample of the sale price data.  Thus, the concerns raised by Dr. Li and others are not germane to Commerce's application of the Cohen's $d$ test.

Lastly, in Stupp II, the CAFC returns to *Grissom* with the concern that:

> Both Cohen's $d$ and Glass's $d_G$ have some positive bias (*i.e.*, tending to overestimate their respective parameters), the more so the smaller the sample sizes and the larger the effect size in the population."  An upward bias might produce more "passing" results under the Cohen's $d$ test, which would tend to exaggerate dumping margins.[129]

As discussed above, Commerce's application of the Cohen's $d$ test *does not estimate* the Cohen's $d$ coefficient, let alone overestimate it, but rather *calculates the actual* Cohen's $d$ coefficient

---

[127] *See* Stupp Draft Redetermination at 24 (citing Li, Johnson Ching-Hong, "Effect Size Measures in a Two-Independent Samples Case with Nonnormal and Nonhomogeneous Data," Behavior Research 48, pp. 1560-1574, Springer (2016) (*Li*)).
[128] *See Stupp II* at 1358 (quoting *Li* at 1571).
[129] *Id.* at 1359 (quoting *Grissom* at 70).

based on the entire population of sale prices.  Accordingly, there is no bias, positive or negative, in the results of Commerce's application of the Cohen's *d* test.  Additionally, as discussed below, the results of the Cohen's *d* test determine whether the requisite prices differ significantly among purchasers, regions, or time periods, and do not "exaggerate dumping margins."

### 8.  *Marmen's Five CONNUMs*

Marmen argued before this Court that under the circumstances of this case, "less-than-one percent difference in price cannot reasonably be considered significant."[130]  Marmen simply disagrees with the definition of "significant" used by Commerce in the Cohen's *d* test.  Marmen chooses to measure the difference in the means relative to the mean price of the merchandise rather than relative to the variance of the prices with the test and comparison groups.[131]

As the Court has recognized, Commerce applies "the Cohen's *d* test 'to evaluate the extent to which the prices to a particular purchaser, region, or time period differ significantly from the prices of all other sales of comparable merchandise.'"[132]  The Cohen's *d* coefficient is a recognized measure which gauges the extent (or "effect size") of the difference between the means of two groups.  In the final determination for *Xanthan Gum from China*, Commerce explained that "{e}ffect size is a simple way of quantifying the difference between two groups and has many advantages over the use of tests of statistical significance alone."[133]  In addressing Deosen's comment in *Xanthan Gum from China*, Commerce continued:

> Effect size is the measurement that is derived from the Cohen's *d* test.  Although Deosen argues that effect size is a statistic that is "widely used in meta-analysis,"

---

[130] *See* Marmen's Letter, "Utility Scale Wind Towers from Canada:  Case Brief," dated April 24, 2020 (Marmen Case Brief) at 31.

[131] *Id.*  Marmen's calculation of the "Difference between Low & High Prices" is generally the ratio of the difference in the "Average of DP_NETPRI" divided by the "Average of DP_NETPRI" although the numbers for certain CONNUMs is ambiguous.

[132] *See Remand Order* at 1319 (quoting *Preliminary Determination* PDM at 10).

[133] *See Xanthan Gum from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 78 FR 33351 (June 4, 2013) (*Xanthan Gum from China*), and accompanying IDM at 24 (emphasis in original, internal citation omitted).

we note that the article also states that "{e}ffect size quantifies the size of the difference between two groups, and may therefore be said to be a true measure of *the significance of the difference*."  The article points out the precise purpose for which the Department relies on the Cohen's *d* test to satisfy the statutory language, to measure whether a difference is significant.[134]

The Cohen's *d* coefficient is based on the difference between the means of the test and the comparison groups relative to the variances within the two groups, *i.e.*, the pooled standard deviation.  When the difference in the weighted-average sale prices between the two groups is measured relative to the pooled standard deviation, then this value is expressed in standardized units, and is based on the dispersion of the prices within each group.  In other words, the "significance" of differences between the average prices of the test group and the comparison group (*i.e.*, between a specific purchaser, region or time period and all other purchasers, regions or time periods, respectively) is measured by how widely the individual prices differ within these two groups.  When there is little variation in prices within each of these groups (*i.e.*, not between the two groups), then a small difference in the mean prices of the test and comparison groups will be found to be significant.  Conversely, when there are wide variations in prices within each of these groups, then a much larger difference in the mean prices of the test and comparison groups will be necessary in order to find that the difference is significant.

Commerce thus relies on the Cohen's *d* coefficient as a measure of effect size to determine whether the observed price differences are significant.  In this application, the difference in the weighted-average (*i.e.*, mean) U.S. price to a particular purchaser, region or time period (*i.e.*, the test group) and the weighted-average U.S. price to all other purchasers, regions or time periods (*i.e.*, the comparison group) is measured relative to the variance of the U.S. prices within each of these groups (*i.e.*, all U.S. prices).

---

[134] *See Xanthan Gum from China* IDM at 24 (emphasis in original, internal citations omitted).

Once it has calculated the Cohen's *d* coefficient for each test group (*i.e.*, sale prices of comparable merchandise to a specific purchaser, region or time period), Commerce must interpret that value to determine whether the prices in the test group differ significantly from the prices in the comparison group.  As stated in the *Preliminary Determination*:

> The extent of these differences can be quantified by one of three fixed thresholds defined by the Cohen's *d* test:  small, medium or large (0.2, 0.5 and 0.8, respectively).  Of these thresholds, the large threshold provides the strongest indication that there is a significant difference between the mean of the test and comparison groups, while the small threshold provides the weakest indication that such a difference exists.  For this analysis, the difference is considered significant, and the sales in the test group are found to pass the Cohen's *d* test, if the calculated Cohen's *d* coefficient is equal to or exceeds the large, *i.e.*, 0.8, threshold.[135]

The CAFC has held that Commerce's application of the large, 0.8, threshold is reasonable.[136]

Commerce's use of the variances of the underlying prices further conforms to the SAA, which states that "Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another."[137]  As discussed above, reliance on the variances in the prices allows for the measured consideration of the significance of the difference in prices where a larger variance in prices requires a larger difference in the mean prices to be significant than if the variance was smaller.  Accordingly, Commerce continues to find that the use of the Cohen's *d* test is reasonable to determine whether the price differences between purchasers, regions or time periods are significant.

---

[135] *See Preliminary Determination* PDM at 11.

[136] *See Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 673 (Fed. Cir. 2019) (*Mid Continent*) ("The Trade Court described Commerce's rationale for adhering to the 0.8 line and explained why that rationale is reasonable…. We agree with the Trade Court that this rationale adequately supports Commerce's exercise of the wide discretion left to it under {section 777A(d)(1)(B) of the Act}.  We therefore reject {respondent's} challenge." (internal citation omitted)).  Commerce notes that the CAFC in *Mid Continent* remanded the formula used by Commerce to calculate the Cohen's *d* coefficient, however, that did not impact the CAFC's finding that the large threshold was reasonable.  The court has sustained Commerce redetermination to continue to use its formula to calculate the Cohen's *d* coefficient in *Mid Continent Steel & Wire, Inc. v. United States*, 495 F.Supp.3d 1298 (CIT January 2021).  This judgement concerning the formula for the Cohen's *d* coefficient is currently under appeal again before the CAFC.

[137] *See* SAA at 843.

Marmen also argued before this Court that for four of the five CONNUMs where the difference in the mean prices was less than one percent, Marmen charged a single gross unit price throughout the POI, and that the only reason for Commerce finding a difference in prices was the price adjustments for duty drawback and credit expenses.[138]  Commerce disagrees that such a situation may disqualify the difference in prices from being significant.  The purpose of the differential pricing analysis is to determine whether the use of the A-to-A method is appropriate or whether an alternative comparison methodology is permitted consistent to section 777A(d)(1) or the Act.[139]  The concern is whether dumping is masked as a result of offsetting of lower U.S. prices by higher U.S. prices.  Accordingly, the differential pricing analysis examines the same U.S. prices and U.S. price adjustments that are used to calculate a respondent's weighted-average dumping margin.  Therefore, any differences that arise out of a respondent's U.S. prices or U.S. price adjustments which are used to calculate the net U.S. price (*i.e.*, the export price or constructed export price pursuant to section 772 of the Act) may create differences which lead to masked dumping.  Further, the magnitude of the difference does not determine whether the difference is "significant" as the SAA instructs that "Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another."[140]

Further, the CAFC has found that Commerce is not required to identify a reason or cause for this observation, but only that such price differences are found as a result of a company's pricing behavior in the U.S. market.[141]  Whether differences in the net U.S. prices are due to

---

[138] *See* Marmen Case Brief at 31-32.
[139] *See* 19 CFR 351.414(c)(1).
[140] *See* SAA at 843.
[141] *See JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015) ("{Section 777A(d)(1)(B) of the Act} does not require Commerce to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods.").

differences in the gross unit price charged to the customer, price adjustments for costs associated with the sales (*e.g.*, freight), imputed credit expenses or exchange rates, differences in the U.S. prices or the U.S. price adjustment may contribute to masked dumping, and, therefore, appropriately are part of the net U.S. prices used to determine whether prices differ significantly in Commerce's Cohen's *d* test.

Lastly, as noted above, Marmen claimed that under the circumstances of this investigation, the less-than-one-percent price differences were not significant  In the *Preliminary Determination*, Commerce stated that it "will continue to develop its approach in this area based on comments received in this and other proceedings"[142] and invited interested parties to "present arguments and justifications in relation to the above-described differential pricing approach used in this preliminary determination…"[143]  Beyond defining the significance of the difference in prices based on the absolute price level in the U.S. market, Marmen did not identify the specific circumstances which would support a change from the use of the Cohen's *d* test except for the results of the analysis – *i.e.*, that the price differences were not significant.  Accordingly, we find that Marmen's argument is simply results oriented and unsupported by the record of the investigation.

## IV.   COMMENTS ON DRAFT RESULTS OF REDETERMINATION

On April 11, 2022, we released our Draft Results of Redetermination to interested parties.[144]  On May 2, 2022, Marmen and the petitioner provided comments.[145]  No other interested party submitted comments.

---

[142] *See Preliminary Determination* PDM at 10.
[143] *Id.* at 12.
[144] *See* Draft Results of Redetermination.
[145] *See* Marmen Remand Comments; *see also* Petitioner Remand Comments.

**Comment 1:  Marmen Cost Reconciliation Data**

*Marmen Comments*[146]

- Commerce incorrectly analyzed the data provided by Marmen in its December 8, 2021 Supplemental D Response.[147]
    - In its Second Supplemental D Response, Marmen properly added a line item to clarify that Marmen Inc. purchased wind tower sections from its Canadian Affiliate.
    - Marmen Inc.'s purchases from Marmen Energie were denominated in Canadian dollars (CDN).[148]
    - The reconciling item at issue in this redetermination does not relate to cost items previously reported by Marmen but rather to the cost of manufactured sections by Marmen Energie which are reflected nowhere else in Marmen's COP/Constructed Value (CV) response.[149]
    - This item (line 31 of Marmen's Excel spreadsheet) is necessary, Marmen argues, in order to reconcile Marmen Inc.'s 2018 Cost of Goods Sold (COGS) to Marmen's reported costs.[150]
- The reconciling item simply corrects the currency reporting utilized by Marmen during the July 1, 2018-December 31, 2018 POI.[151]  Additionally, the information reported in this Excel line 31 item, is distinct from the exchange rate information provided by Marmen at line items 41-43 of the cost reconciliation.[152]
- Commerce's failure to account for the reconciling item at issue represents an incorrect and unsupported addition to Marmen's cost of manufacturing.[153]

*Petitioner Comments*[154]

- The line item at issue offsets adjustments that Marmen's auditor made to Marmen's financial statements, and that it is unsupported by the record.[155]

**Commerce's Position**:

We continue to find that no adjustment to Marmen's COP/CV data is merited because of

the additional reconciling item presented at Line 31 of the Marmen Excel Spreadsheet set forth

---

[146] *See* Marmen Remand Comments at 2-10.
[147] *Id* at 2.
[148] *Id*.
[149] *Id*.
[150] *Id*.
[151] *Id.* at 3-6.
[152] *Id.* at 8.
[153] *Id.* at 10.
[154] *See* Petitioner Remand Comments at 2.
[155] *Id.*

in Marmen's December 8, 2021 response.[156]  Marmen asserts that the reconciling item (reported

in Line 31 of the Excel version of Marmen Inc.'s cost reconciliation) is necessary to reconcile

Marmen Inc.'s 2018 cost of goods sold (COGS) to the company's reported costs and is not

double counted.[157]  Marmen states that this adjustment was necessary because both the starting

point and ending point of Marmen Inc.'s cost reconciliation are expressed in CDN.[158]  To this,

Marmen argues that we incorrectly stated, "Marmen explained that its auditors periodically

further adjusted these already 'converted' purchases to be based on the actual exchange rates

during 2018."[159]  Marmen asserts that "{r}ather, Marmen recorded USD purchases in its normal

accounting records without converting those values to CAD, and Marmen's auditor converted

the value of these purchases to CAD for presentation in Marmen Inc.'s year-2018 financial

statements."[160]  Respectfully, Marmen's assertion is incorrect and we reference the record

evidence from the response.  In the pages that we cited, the table provided at page 18 of

Marmen's First Supplemental D response shows all of the auditor's adjustments that were made

to Marmen's trial balance in order to compute the figures presented in Marmen's final audited

2018 financial statements.  As shown in the table on page 18, the auditor's main adjustment

([          ] was made to GL account [                              ].  Marmen explained

that in this account, Marmen Inc. records the purchases of raw materials for the Wind Division.

The auditor's adjustment reflects an exchange rate adjustment for purchases made in USD.[161]  As

reported in Marmen's Original Section D Response, during calendar year 2018, Marmen's cost

---

[156] *See* Marmen Remand Comments at 2-10.
[157] *Id.* at 2.
[158] *Id.* at 3 (citing Draft Results of Redetermination at 8 and Marmen Letter, "Utility Scale Wind Towers from Canada:  Supplemental Section D Response," dated December 6, 2019 (Marmen December 6, 2019 Supplemental Section D Response.
[159] *Id.* at n.2.
[160] *Id.*
[161] *See* Marmen's December 6, 2019 supplemental section D response at 18.

system converted USD purchases to CAD at a conversion rate of [   ] (*i.e.*, [   ] USD equal to [   ] CDN).[162]   The auditor adjustment of ([            ] reflects the "true up" to the actual USD/CDN exchange rate for the year (average).[163]   Commerce properly referred to Marmen's explanation that for USD denominated purchases; Marmen's cost system converts USD purchases to CDN at specific conversion rates.[164]   Subsequently, in preparation of Marmen's original 2018 audited financial statements, Marmen's auditors further adjusted these already "converted" purchases to be based on the actual exchange rates during 2018.[165]   Therefore, it would not be correct to say that, based on this record information, "Marmen recorded USD purchases in its normal accounting records without converting those values to CDN, and Marmen's auditor converted the value of these purchases to CDN for presentation in Marmen Inc.'s year-2018 financial statements."[166]   In actuality, although the conversion rate used for part of 2018 was [   ], apart from the periodic "true ups," that was the specified conversion rate that Marmen elected to use for that timeframe.[167]   Thus, the record evidence still supports a conclusion that Marmen's prior statements and reported calculation indicate the exchange gains and losses are already accounted for in Marmen's costs.[168]

Further, Marmen asserts that Commerce erred in concluding that the exchange rate adjustment reconciling item is already accounted for in the reporting of Marmen's costs.[169] Marmen argues that this adjustment was necessary because both the starting point (financial

---

[162] *See* Marmen Initial Section D Response at 33.
[163] *See* Marmen December 8, 2021 Supplemental Remand Section D Response at 18.
[164] *Id*.
[165] *Id*.
[166] *See* Marmen Remand Comments at 3.
[167] *See* Marmen's December 6, 2019 supplemental section D response at 18.
[168] In addition, Marmen affirms this later in its brief when it states that "the Department is correct that Marmen Inc.'s year-2018 purchases from Marmen Énergie were already converted to CAD for purposes of presenting COGS in the company's year-2018 audited financial statements."   *See* Marmen Remand Comments at 8.
[169] *See* Marmen Remand Comments, at 2-6.

statement COGS) and ending point (costs reported in the cost database for Marmen Inc.'s production of subject merchandise) of Marmen Inc.'s cost reconciliation are expressed in CDN.[170]  Marmen explains that to tie Marmen Inc.'s audited COGS to its reported COM, it was necessary to deduct Marmen Inc.'s purchases of wind tower sections from Marmen Énergie.[171] Marmen asserts that it had inadvertently omitted the conversion of its purchases from Marmen Énergie during the period July through December 2018.[172]  To demonstrate this computation, Marmen included a schedule of the invoices issued by Marmen Énergie during the POI and Marmen multiplied these amounts by [      ], claiming this was the actual exchange gain or loss received by Marmen (based on its exchange rate contracts in place during the POI).[173]  In conclusion, Marmen argues that with the reconciling item added in Excel Line 31, the unreconciled difference between Marmen Inc.'s cost of manufacturing (COM) recorded in its accounting records and its reported COM is only [    ] percent, which "*corroborates*" Marmen's explanation that the reconciling item L1 is accurate and necessary.[174]  Commerce disagrees.

In response to Marmen's submission, Commerce reviewed in detail the information submitted in conjunction with Marmen's comments regarding our analysis of the record evidence and found that Marmen's arguments do not dispel the concern that its proposed new reconciling item would be double-counting exchange gains and losses in the reported costs.  As discussed above, the record evidence shows that Marmen conclusively stated that its reported costs accounted for these exchange gains and losses, based on the fixed exchange rates during the year, and that its auditors made an adjustment to convert those costs to reflect actual exchange

---

[170] *Id.*
[171] *Id.* at 2.
[172] *Id.* at 2-6.
[173] *Id.*
[174] *Id.*

rates for purchases initially made in USD.[175]  The Deloitte auditors then reevaluated the recording of exchange gains and losses and made corrections to only the accounts which were incorrect, nowhere changing Excel line 29, which remained the same.[176]  The record evidence thus indicates that there is no additional error, and therefore leaving an unexplained difference in the cost reconciliation.  In this regard, we agreed with Marmen that there is no need to restate its financial statements again, noting that the record evidence conclusively demonstrates that the reported costs, including those of the sections purchased from Marmen Energie, were in fact already, and correctly, inclusive of exchange rate differences, and it would be inappropriate to adjust them again for those exchange gains and losses.  Based on the report of the Deloitte auditors, and no record of any changes being made to Excel line 29 as a result, we continue to find it reasonable that the unreconciled difference remains and should continue to be added to the reported wind tower costs.

As to Marmen's computation of the additional reconciling item, when Commerce reviewed the underlying list of invoices to which Marmen refers, virtually every invoice listed in the document, which encompasses the entire POI, is designated as a USD-denominated sale.[177]  Although Marmen has summed up the purchases during July to December 2018, the document is not certain which currency these transactions actually occurred in (*i.e.*, USD or CDN), as all of the purchases were shown to be in USD.  Marmen has expressed that the January to June 2019 purchases were in CDN; however, they are not designated as such in the submitted document with the listing of invoices.[178]  Next, although Marmen contends that the exchange rate it used to

---

[175] *See* Marmen's December 6, 2019 supplemental section D response at 18.
[176] *See* Marmen's February 28, 2020 supplemental section D response at 14; see also Marmen December 8, 2021 Supplemental Remand Section D Response at attachment D-09a.
[177] *See* Marmen December 8, 2021 Supplemental Remand Section D Response at attachment 1, tab L1.
[178] *Id.*

convert the July to December 2018 purchases is substantiated, there is no documentation on the record showing from where it was derived, nor is there any support for it being an actual average rate from the period in question.[179]  The reference provided in the supporting exhibit classified the rate as "average exchange rate 2018," which is reasonably construed as including January through December 2018, and not the actual period of July through December 2018.[180]  But, again, there is no further detail, source document or any other support provided.  The SAA explains that "as with all adjustments which benefit a responding firm, the respondent must demonstrate the appropriateness of such adjustment."[181]  In addition, the CAFC has explained that Commerce has reasonably placed the burden to establish entitlement to adjustments on the party seeking the adjustment and the party with access to the necessary information.[182]  Accordingly, Marmen should have provided supporting information that would have supported its claims that the exchange rate was computed based on actual rates from July, through December 2018.  However, Marmen failed to provide any such information.

Marmen argues that Commerce incorrectly stated that the reconciling item reported in Excel line 31 is already included in Excel lines 41-43.[183]  In Excel line 41, Marmen deducted the auditor's USD-CDN exchange rate adjustment applicable to Marmen Inc.'s USD purchases during the period January through June 2018 (*i.e.*, before the POI).  Then, in Excel lines 42 and 43, Marmen added back the USD-CDN exchange rate adjustments applicable to Marmen Inc.'s USD purchases of steel plate, flanges, and paint (made during the period January-June 2018) that were consumed by Marmen Inc., during the POI to produce wind towers, and therefore, are

---

[179] *Id.*
[180] *Id*.
[181] *See* SAA at 829.
[182] *See Fujitsu General Ltd. v. United States,* 88 F.3d 1034, 1040 (Fed. Cir. 1996).
[183] *See* Marmen Remand Comments at 6.

amounts included in the cost database.  Our draft redetermination correctly stated that the

amount related to adjusting costs of Marmen's purchases during the year was already included,

as shown by the cost reconciliation worksheet, and was adjusted as part of the many changes in

the restated financial statements, including at Excel lines 41-43.  Although this argument was in

support of a point that Marmen and Commerce have since agreed on, that these exchange gains

and losses are already accounted for in Marmen's costs, we merely state the point because Excel

line 41 is deducting the auditor's USD-CDN exchange rate adjustment applicable to Marmen

Inc.'s USD purchases during the period January to June 2018.  The same auditor exchange rate

adjustments for the months within the POI (*i.e.*, July 2018 through June 2019) remained in the

reportable costs at Excel line 45, as only the exchange rate adjustments made by the auditor

changed.

  As for Marmen's final argument that the elimination of the reconciling difference

corroborates that this reconciling item was missing, we emphasize that the premise of this

argument presupposes that the unreconciled difference must be small, and that if the unsupported

amount is treated as a reconciling item, then the presupposition its fulfilled.  It is not a valid

argument, however, and fails to take into account the concern that important larger unknown

errors remain, including those that might offset each other in the net figures.  Ignoring the actual

other complexities involved in analyzing a cost reconciliation difference cited, and just

addressing Marmen's surface level overall difference argument by itself, it is clear that

Marmen's conclusion is not accurate.  As Marmen has established, aside from the restatement

amount that largely related to steel plate,[184] the amounts for the exchange gains and losses have

---

[184] Marmen indicates that almost the entire exchange rate difference related to its auditor's restatement of the 2018 audited financial statements, which relates to a single purchase of steel plate from another supplier, establishes that the difference had nothing to do with purchase of wind tower sections from Marmen Énergie for resale.  *See* Marmen Remand Comments at 7.

been recorded in Marmen's 2018 books and records, as presented in the original audited financial statements.  Relying on these original audited financial statements, incorporating adjustments to Excel lines 41-43 for the exchange gains and losses related to the merchandise under consideration, Marmen originally submitted a cost reconciliation with a difference of [     ] percent.[185]  With the auditor's corrections, Marmen needed to account for a difference of [     ] percent.[186]  Marmen attempts to erase this difference in the face of contradicting record evidence, which does not support Marmen's theory that the resulting overall difference corroborates that the reconciling item L1 is accurate and necessary.

Marmen has presented nothing more than a *post hoc* narrative that lacks the support of record evidence.  At the point when Commerce requested that Marmen demonstrate the effect of the change of its auditor's restatement of its audited financial statements, the difference increased their reportable costs for dumping purposes.  However, when Marmen prepared the revised cost reconciliations, it moved this additional cost to a reconciliation item of [     ] percent,[187] which thereby eliminated the actual overall difference of [     ] percent.[188]  As demonstrated above, the additional reconciliation item is not supported by the record and is merely an unsupported calculation of a summary of invoice figures times an unsupported exchange rate figure.[189]  However, the weight of the evidence on the record actually shows that Marmen's theory is, in fact, unsubstantiated, unsupported, and contrary to its own earlier assertions.

---

[185] *See* Marmen's December 6, 2019 supplemental D response at Exhibit D-08a.
[186] Computed by adding Excel line 31 to the original total reportable costs in Excel line 45 [                    ] CDN and subtracting the total reported costs at Excel line 47.  Then, divide this difference by original Excel line 45.
[187] Computed as the percentage of Excel line 31 divided by the total reportable costs in Excel line 45 [                ] CDN.
[188] *See* Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Final Determination– Marmen Inc. and Marmen Energie Inc.," dated June 29, 2022 at 2 (Final Determination COP/CV Memorandum).
[189] *See* Final Determination COP/CV Memorandum at 2; *see also* Excel Line 31 and Excel line 47 to Marmen COP/CV Reconciliation.

**Comment 2:  Differential Pricing Analysis**

*Marmen Comments*[190]

- Commerce's draft redetermination failed to address the Court's concerns involving the limits of the Cohen's *d* test as identified by the CAFC in *Stupp*.[191]
- In the instant redetermination, with respect to the U.S. sales of five CONNUMs identified by Marmen, the price differences identified by Commerce are less than 1.00 percent.[192] Commerce's assumptions of "normal distribution and equivalent variances" are not satisfied with variations which include variances that are this small.[193]  Accordingly, in the final redetermination Commerce cannot continue to apply the average to transaction (A-to-T) method.[194]
- Reliance on the results of the Cohen's *d* test is misplaced if the underlying assumptions of normal distribution and equivalent variances are left unsatisfied.[195]  In its draft redetermination, Commerce misinterpreted existing academic literature,[196] and has impermissibly equated variances in a population with variances in a sample.[197]
- Nothing in the academic literature supports Commerce's contention that the assumptions of normal distribution and equivalent variances are inapplicable when the analysis measures the entire population universe of U.S. data rather than measurement of a sample.[198]  Citing *Algina*, Marmen argues that use of the Cohen's *d* test has overstated differences in the distribution of data sets and thereby generated "false positive" measurements with regard to variations in the U.S. price data.[199]
- Marmen further asserts that Commerce has failed to address the concerns expressed by the CAFC in *Stupp* relating to data sets lacking "equivalent variances."[200]  Marmen further contends that the concerns expressed by CAFC relating to "equivalent variances" in *Stupp* parallel the situation at issue here.  Marmen argues that for five of its seven CONNUMs the observed price differences are less than one percent, and, thus, not a significant difference.[201]
- Based on the foregoing, Marmen concludes that because underlying assumptions of normal distribution and equivalent variances are unsatisfied, Commerce cannot apply the A-to-T method to calculate margins for the five CONNUMs at issue in this redetermination.[202]

---

[190] *See* Marmen Remand Brief at 10-26.
[191] *Id.* at 10.
[192] *Id.*
[193] *Id.* at 10-11.
[194] *Id.* at 11.
[195] *Id.* at 11-24.
[196] *Id.* at 12); Jacob Cohen, *Statistical Power Analysis for the Behavioral Sciences* 20 (2d. ed. 1988); James Algina et al., *An Alternative to Cohen's Standardized Mean Difference Effect Size:  A Robust Parameter and Confidence Interval in the Two Independent Groups Case*, 10 Psychological Methods 317, 318 (2005) (*Algina*)).
[197] *Id.* at 13.
[198] *Id.* at 15.
[199] *Id.* at 15-19.
[200] *Id.* at 20.
[201] *Id.* at 23.
[202] *Id.*

*Petitioner Comments*[203]

- The petitioner agrees with Commerce's draft redetermination concerning its differential pricing analysis.
- Commerce should continue to employ the A-to-A method to calculate margins for Marmen. However, Commerce should place on the record of this redetermination information supporting its statistical analysis, equations, and formulas which Commerce presented at Section 7 of the draft redetermination.[204]

**Commerce's Position**:

Consistent with the position taken in the Stupp Draft Results of Redetermination, we continue to find that the A-to-A method represents the proper basis for calculating Marmen's weighted-average dumping margin. As also noted in the draft redetermination, section 777A(d)(1)(A) of the Act specifies two conditions which must be met for Commerce to employ an alternative comparison methodology. First, there must exist a pattern of prices that differ significantly for comparable merchandise among purchasers, regions or time periods (the "pattern" requirement). Second, Commerce must explain why such differences cannot be taken into account when using a standard comparison methodology (the "meaningful difference" requirement).[205] Moreover, we continue to maintain that Commerce's application of the Cohen's *d* test represents a reasonable approach to measure a respondent's pricing behavior because this analysis incorporates the entire population of the respondents' U.S. sales rather than a sample of a respondent's behavior.[206] Additionally, the effect of the Cohen's *d* test is to measure the practical significance of a respondent's U.S. pricing behavior rather than a statistical significance of such behavior.[207] We, therefore, continue to find uncompelling Marmen's reliance upon the *Algina* literature.[208]

---

[203] *See* Petitioner Remand Comments at 2.
[204] *Id.*
[205] *See* Section 777A(d)(1)(A) of the Act; *see also* Draft Results of Redetermination at 11.
[206] *See* Draft Results of Redetermination at 21.
[207] *Id.*; *see also Ellis* at 4-5.
[208] *See* Marmen Remand Brief at 12; *Algina* at 317, 318.

As we noted in the draft redetermination, Commerce employs the Cohen's *d* test in order to evaluate the extent by which the prices to a particular purchaser, region, or time period differ significantly from the prices of all other sales of comparable merchandise.[209] Such analysis inherently involves analysis of a respondents' entire set or population of its U.S. sales rather than of a statistical sample. Additionally, in its differential pricing analysis, Commerce does not estimate the Cohen's *d* coefficient. Rather, Commerce calculates the Cohen's *d* coefficient using the entire population of the respondent's U.S. sales.[210] Moreover, we continue to note that Commerce applies the Cohen's *d* test only for purposes of determining whether U.S. prices differ significantly among purchasers, regions or time periods from the prices of all other sales of comparable merchandise. Commerce does not utilize the Cohen's *d* test for purposes of determining the magnitude of dumping itself.[211]

Therefore, we continue to maintain that the academic literature relating to sample size and reliability of an estimated parameter (*e.g.*, mean) are not relevant to analysis wherein the analysis involves the entire population of a respondents' U.S. sales.[212] In this regard, we continue to view the Cohen's *d* test thresholds (*i.e.* the 0.8 threshold which measures differences in prices) as operational definitions of the magnitude of the difference in the prices rather than as a measure of the statistical significance of the difference in prices.[213] Similarly, as also noted in the draft redetermination, we continue to find that the concerns expressed by the CAFC in *Stupp* relating to small sample sizes does not establish that the application of the Cohen's *d* test distorts

---

[209] *See* Draft Results of Redetermination at 18.

[210] *Id.* at 26.

[211] *Id.* at 32,

[212] *Id.* at 23; *see also Ellis* at 17-21.

[213] *See, e.g.*, *Mid Continent* at 662, 673.

Commerce's differential pricing analysis or creates "false positives" in Commerce's differential pricing analysis.[214]  As noted in both the draft redetermination and *Ellis*:

> Dr. Cohen established thresholds for evaluating the magnitude of the effect size which are "easy to grasp" and "are sufficiently grounded in logic for Cohen to hope that his cut-offs 'will be found to be reasonable by reasonable people.'"[215]

We continue to dispute Marmen's characterization that less than one percent differences in the prices of five of Marmen's U.S. CONNUMs are insignificant.[216] As previously noted, the operational standards employed by Commerce in administering the Cohen's *d* test are reasonable to measure the significance of the difference in prices relative to the underlying variances in the prices within each group rather than relative to the absolute price level of the merchandise. Accordingly, we continue to find the Cohen's *d* test to be a recognized measure of effect size which "measures the real-world relevance of this difference 'and may therefore be said to be a true measure of the significance of the difference,'"[217] and which fulfills the statutory requirement to determine whether prices differ significantly between purchasers, regions, or time periods.[218]

Finally, we disagree with the petitioners' assertion that Commerce should place the statistical analysis, equations, and formulas which Commerce provided at Section 7 of the draft redetermination on the record of this proceeding.[219]  For purposes of this redetermination, Commerce provided ready access to all of the academic references cited and addressed by the Federal Circuit decision in *Stupp* by placing the Stupp draft redetermination on the record of this case, which fully referenced the sources cited in the Federal Circuit decision in *Stupp*.

---

[214] *See* Marmen Remand Brief at 12
[215] *See* Draft Results of Redetermination at 24; *see also Ellis* at 41.
[216] *See* Marmen Remand Brief at 23.
[217] *See* Stupp Draft Redetermination at 12 (citation omitted).
[218] *See, e.g.*, *Xanthan Gum from China* IDM at 24 (quoting *Coe* at 5).
[219] *See* Petitioner Remand Brief at 2.

Commerce provided ready access to all of the academic references cited and addressed by the Federal Circuit decision in *Stupp* by placing the Stupp draft redetermination on the record of this case, which fully referenced the sources cited in the Federal Circuit decision in *Stupp*.

## V.    FINAL RESULTS OF REDETERMINATION

In accordance with the *Remand Order*, and consistent with the instructions of the Court, Commerce has:  (1) reconsidered its determination rejecting the cost data provided by Marmen in its Second Supplemental D Response and analyzed such data for these final results of redetermination; and (2) reconsidered whether Commerce's use of the Cohen's *d* test as part of the Differential Pricing Analysis unreasonably finds that the U.S. prices differ significantly for five specific CONNUMs and whether the application of the Cohen's *d* test is consistent with the opinion set forth in *Stupp*.  Based on the analysis detailed above, the estimated weighted-average dumping margin, for the POI for Marmen is unchanged from the *Final Determination* and continues to be 4.94 percent.

☒                                    ☐

_____                   _____

Agree                               Disagree


X   ~~Lisa W. Wang~~
_____

Signed by: LISA WANG
_____
Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance