UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| MARMEN INC., MARMEN ÉNERGIE INC., MARMEN ENERGY CO., <br><br> Plaintiffs, <br><br> WIND TOWER TRADE COALITION, <br><br> Consolidated Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> WIND TOWER TRADE COALITION, <br><br> Defendant-Intervenor, <br><br> and <br><br> MARMEN INC., MARMEN ÉNERGIE INC., MARMEN ENERGY CO., <br><br> Defendant-Intervenors. | Consolidated Court No. 20-00169 <br><br> **NON-CONFIDENTIAL** <br> **Business Proprietary Information Has Been Deleted on Pages 4–7, 11–15, and 26.** |

**PLAINTIFFS' COMMENTS IN OPPOSITION TO THE FINAL RESULTS OF
REDETERMINATION PURSUANT TO COURT REMAND**

Jay C. Campbell
Ron Kendler
Allison J.G. Kepkay

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

July 21, 2022

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................... 1

II.     STANDARD OF REVIEW ........................................................................................ 1

III.    ARGUMENT ............................................................................................................. 2

        A.      Commerce's Decision to Reject the Correction to Marmen Inc.'s Cost
                Reconciliation Is Unsupported by Substantial Evidence ...........................................2

                1.      Factual background ........................................................................................2

                        a.      The basic structure of a cost reconciliation in AD
                                proceedings .........................................................................................2

                        b.      The minor correction to Marmen Inc.'s cost reconciliation
                                worksheet ............................................................................................3

                        c.      The Department's remand proceeding .............................................9

                2.      Commerce mistakenly concludes that acceptance of the correction
                        to Marmen Inc.'s cost reconciliation would "double count"
                        exchange gains and losses ..........................................................................10

                3.      Commerce unreasonably concludes that the correction to Marmen
                        Inc.'s cost reconciliation worksheet was unsupported .............................14

        B.      Commerce's Application of the Cohen's *d* Test to Marmen's U.S. Sales
                Data Is Unsupported by Substantial Evidence .......................................................16

                1.      Contrary to the Court's remand order, Commerce declined to
                        explain whether the limits on the use of the Cohen's *d* test were
                        satisfied with respect to Marmen's U.S. price data ..................................16

                2.      Commerce's premise – that the assumptions of normality and
                        equivalent variances cease to apply when the data sets to be
                        compared are populations, as opposed to samples – is unsupported
                        by substantial evidence ..............................................................................18

                        a.      Nothing in the academic literature – let alone substantial
                                evidence – supports Commerce's premise ......................................18

                        b.      Commerce fails to address the *Stupp* Court's specific
                                concern about data sets lacking equivalent variances ...................23

IV.     CONCLUSION ........................................................................................................ 26

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Chr. Bjelland Seafoods A/S v. United States,*
   19 C.I.T. 35 (1995) ............................................................................. 10-11, 22

*Marmen Inc. v. United States,*
   545 F. Supp. 3d 1305 (Ct. Int'l Trade 2021) ................................................ 1, 9, 17

*Stupp Corp. v. United States,*
   5 F.4th 1341 (Fed. Cir. 2021) ....................................................... 2, 17-26

*Timken U.S. Corp. v. United States,*
   421 F.3d 1350, 1355 (Fed. Cir. 2005) ....................................................... 23

*Trust Chem Co. v. United States,*
   819 F. Supp. 2d 1373 (Ct. Int'l Trade 2012) ................................................ 2, 16

*Universal Camera Corp. v. NLRB,*
   340 U.S. 474 (1951) ...................................................................... 10

*USX Corp. v. United States,*
   655 F. Supp. 487 (Ct. Int'l Trade 1987) ................................................ 11

## STATUTES AND REGULATIONS

19 U.S.C. § 1516a(b)(1)(B)(i) ..................................................................... 1

19 U.S.C. § 1677f-1(d)(1)(B)(i) ................................................................... 23

## PUBLICATIONS

Jacob Cohen, *Statistical Power Analysis for the Behavioral Sciences* 20-21 (2d ed. 1988) ......... 19

James Algina et al., *An Alternative to Cohen's Standardized Mean Difference Effect Size:
   A Robust Parameter and Confidence Interval in the Two Independent Groups Case,*
   10 PSYCHOLOGICAL METHODS .................................................................... 19, 21-22

Robert J. Grissom & John J. Kim, *Effect Sizes for Research: Univariate and Multivariate*
   66 (2d ed. 2012) .......................................................................... 20-21

i

I.      **INTRODUCTION**

Plaintiffs Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co. (collectively, "Marmen" or "Plaintiffs") hereby submit comments in opposition to the final results of redetermination issued by the U.S. Department of Commerce ("Commerce") pursuant to the Court's remand order in *Marmen Inc. v. United States*, 545 F. Supp. 3d 1305 (Ct. Int'l Trade 2021). *See Final Results of Redetermination Pursuant to Court Remand*, Court No. 20-00169, Slip Op. 21-151 (May 26, 2022) (ECF 61, 62) ("*Remand Decision*"). This case concerns Commerce's final antidumping ("AD") determination in *Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 40239 (July 6, 2020) (final LTFV determ.) (PR 196),[1] the period of investigation ("POI") for which was July 1, 2018, through June 30, 2019. For the reasons demonstrated below, Commerce's *Remand Decision* cannot be sustained because (1) Commerce's decision to reject the minor correction to Marmen Inc.'s cost reconciliation remains unsupported by substantial evidence, and (2) Commerce's application of the Cohen's *d* test to Marmen's U.S. sales data remains unsupported by substantial evidence.

II.     **STANDARD OF REVIEW**

In reviewing a challenge to Commerce's determination in an antidumping duty proceeding, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i). Moreover, the court will not sustain a remand redetermination if that decision fails to comply with the terms of the court's remand order. *See*,

---

[1] When citing documents from the administrative record of the underlying AD investigation, we assign the prefix "PR" (for "public record") to public documents and the prefix "CR" (for "confidential record") to confidential documents, followed by the reference number for the document. Similarly, when citing documents from the administrative record of Commerce's remand proceeding, we assign the prefix "PR-REM" to public documents and the prefix "CR-REM" to confidential documents, followed by the reference number for the document.

*e.g.*, *Trust Chem Co. v. United States*, 819 F. Supp. 2d 1373, 1378 (Ct. Int'l Trade 2012) (citation omitted).  "The standard of review for considering Commerce's differential pricing analysis is reasonableness."  *Marmen*, F. Supp. 3d at 1318 (citing *Stupp Corp. v. United States*, 5 F.4th 1341, 1353 (Fed. Cir. 2021).

## III.   ARGUMENT

### A.   Commerce's Decision to Reject the Correction to Marmen Inc.'s Cost Reconciliation Is Unsupported by Substantial Evidence

On remand, Commerce unreasonably rejects the minor correction to Marmen Inc.'s cost reconciliation worksheet based on incorrect and confused claims that are unsupportable. Commerce mistakenly claims that the correction would double count an exchange rate adjustment already reflected in the company's audited cost of goods sold and reported cost of production, and unfairly finds that Marmen failed to support the correction.   Commerce's decision on remand to reject the correction to Marmen Inc.'s cost reconciliation is unreasonable and cannot be sustained as supported by substantial evidence.

#### 1.   Factual background

To place Commerce's remand determination into context, it is helpful to understand the structure of a cost reconciliation for AD purposes and to revisit the facts concerning the correction to Marmen Inc.'s cost reconciliation requested by Marmen.

##### a.   The basic structure of a cost reconciliation in AD proceedings

Section D (Cost of Production and Constructed Value) of Commerce's AD Questionnaire instructs the respondent to provide worksheets reconciling the company's cost of goods sold ("COGS") from its audited financial statements to the cost of production reported for the subject merchandise.  *See* Section D Questionnaire (A-122-867) (Aug. 19, 2019) at D-12 to D-13 (PR 54).  In simplest terms, this means the respondent typically must (1) reconcile its ***audited COGS***

*for the fiscal year* to its ***COGS for the POI***; (2) reconcile its ***COGS for the POI*** to its ***cost of manufacture ("COM") for all products during the POI***; (3) subtract ***nonsubject COM items*** (*i.e.*, costs of manufacture for nonsubject merchandise); (4) subtract or add other differences between the audited COGS and the total COM (*i.e.*, reconciling items); and (5) compare the resulting amount (*i.e.*, POI COM for the subject merchandise from the respondent's financial records) to its total COM for the subject merchandise reported to Commerce.  *See id.* at D-13 (PR 54).   The table below illustrates the basic structure of a cost reconciliation worksheet (using the POI for the underlying AD investigation).

| Sample Cost Reconciliation | | | | |
|---|---|---|---|---|
| **Steps** | | **Item** | **Reference** | **Amount** |
| **Step (1):**  Reconcile audited COGS for fiscal year to COGS for POI. | | Audited COGS for 2018 | **A** | 1,000,000 |
| | *Less:* | COGS Jan.-June 2018 | **B** | 600,000 |
| | *Plus:* | COGS Jan.-June 2019 | **C** | 550,000 |
| | *Equals:* | COGS for POI (July 2018 - June 2019) | **D=A-B+C** | 950,000 |
| **Step (2):**  Reconcile COGS for POI to total COM for all products during POI. | *Less:* | Beginning Inventory (July 1, 2018) | **E** | 30,000 |
| | *Plus:* | Ending Inventory (July 1, 2019) | **F** | 20,000 |
| | *Equals:* | Total COM for All Products (POI) | **G=D-E+F** | 940,000 |
| **Step (3):**  Subtract Nonsubject COM. | *Less:* | Total COM for Nonsubject Products (POI) | **H** | 500,000 |
| **Step (4):**  Subtract other differences between audited COGS and COM. | *Less:* | Reconciling Items (i.e., other differences between audited COGS and total COM) | **I** | 40,000 |
| **Step (5):**  Compare the total COM for subject merchandise from financial records to total reported COM for subject merchandise. | *Equals:* | Total COM for Subject Merchandise (POI) from Financial Records | **J=G-H-I** | 400,000 |
| | | Reported Total COM for Subject Merchandise (POI) | **K** | 400,100 |
| | | Difference | **L=J-K** | (100) |
| | | Percentage Difference (%) | **M=L/J** | -0.03% |

### b.   The minor correction to Marmen Inc.'s cost reconciliation worksheet

In the underlying AD investigation, Marmen reported costs of production in response to Section D of the AD Questionnaire for both Marmen Inc. and Marmen Énergie Inc., the two

AMERICAS 115954073

NON-CONFIDENTIAL VERSION

affiliated producers of subject merchandise. *See* Marmen Section D Response (A-122-867) (Oct. 11, 2019) at D-1 (PR 89-97; CR 40-95) ("Marmen Section D Response"). Accordingly, Marmen submitted two cost reconciliations: one tying Marmen Inc.'s reported cost of production to Marmen Inc.'s audited financial statements, and the other tying Marmen Énergie Inc.'s cost of production to Marmen Énergie Inc.'s audited financial statements. *See id.* at Exhibit D-14 (original cost reconciliations); Marmen 1st Supp. D Response (A-122-867) (Dec. 6, 2019) at Exhibits Supp. D-8 & Supp. D-9 (first revised cost reconciliations) (PR 114-119; CR 99-141) ("Marmen 1st Supp. D Response").

As a Canadian company, Marmen's audited financial statements (including COGS) are presented in Canadian dollars ("CAD"), and Marmen reported its costs of production to Commerce in CAD. *See* Marmen Section A Response (A-122-867) (Sept. 13, 2019) at Exhibit A-8 (financial statements at note 3) (PR 76; CR 35-38) ("Marmen Section A Response"); Marmen Response to Question 14.g of Supplemental D Questionnaire (A-122-867) (Dec. 13, 2019) at Exhibit Supp. D-17 (restated financial statements at note 3) (PR 123-125; CR 158-160); Marmen Section D Response at Exhibit D-1 (Cost of Production Database Summary showing all costs reported in CAD). Accordingly, Marmen's cost reconciliations tie Marmen Inc.'s and Marmen Énergie Inc.'s audited COGS expressed in CAD to their reported costs expressed in CAD.

The POI in the underlying AD investigation was July 1, 2018, through June 30, 2019. In its questionnaire responses, Marmen explained that, "{d}uring *the 2018 fiscal year*, Marmen recorded its USD-denominated purchases at a rate of [    ]" (*i.e.*, [    ] USD equal to [    ] CAD). Marmen 2nd Supp. D Response (A-122-867) (Feb. 7, 2020) at 11 (PR 151-154; CR 184-195) ("Marmen 2nd Supp. D Response (Original)") (emphasis added). Effectively, then, *in 2018*

4

AMERICAS 115954073

**NON-CONFIDENTIAL VERSION**

Marmen recorded USD purchases in its normal accounting records in USD. "At year-end, Marmen's auditor, [          ], ma{de} an adjusting entry to convert these purchases to the CAD equivalent values" for presentation in Marmen Inc.'s year-2018 financial statements." *See id.*; *see also* Marmen Section D Response at D-15, D-30; Marmen 1st Supp. D Response at 17-18 (explaining the auditor's exchange rate adjustment for purposes of presentation in Marmen's financial statements). In contrast, ***in 2019*** (which overlaps with the second half of the POI), "Marmen's system converted USD purchases to CAD at a conversion rate of [          ]" (*i.e.*, [      ] USD equal to [    ] CAD). Marmen Section D Response at D-15.

During the POI, Marmen Inc. purchased and resold wind tower sections manufactured by its affiliate, Marmen Énergie Inc. *See* Marmen 1st Supp. D Response at 13, 16. "Marmen Inc.'s cost to purchase the sections is included in COGS, but {was} not included in ***Marmen Inc.'s*** reported costs (because Marmen Inc. did not manufacture the sections). Consequently, to tie Marmen Inc.'s audited COGS to the {company's} reported costs of manufacture, it was necessary to deduct Marmen Inc.'s purchases of wind tower sections from Marmen Énergie." *Id.* at 16 (emphasis added); Marmen Response to Request for Information (A-122-867) (Dec. 8, 2021) at Attachment (PR-REM 2; CR-REM 2-3). Referring to the "Sample Cost Reconciliation" from above, this was an adjustment in Step (4) (reconciling item) to account for a difference between Marmen Inc.'s COGS (which includes the value of its purchases of wind tower sections from Marmen Énergie Inc.) and Marmen Inc.'s reported cost of production (which does ***not*** include the value of its purchases of wind tower sections from Marmen Énergie Inc.).

Originally, Marmen included only **Item L** (Excel Line 29) in the cost reconciliation worksheet for Marmen Inc.'s purchases of wind tower sections from Marmen Énergie Inc. during the POI (*i.e.*, [                ]). *See* Marmen 1st Supp. D Response at Exhibit Supp. D-8

AMERICAS 115954073

**NON-CONFIDENTIAL VERSION**

(Marmen Inc. cost reconciliation).   In addition, Marmen provided a schedule listing all of Marmen Inc.'s purchases building to the [          ] total amount, which showed that each purchase was made in USD.  *See id.* at Exhibit Supp. D-8 (Marmen Inc. cost reconciliation, Item L support).   Inadvertently, however, in Marmen Inc.'s cost reconciliation worksheet, Marmen omitted to convert the company's purchases from Marmen Énergie during the period July 1, 2018, through December 31, 2018 – which were denominated and booked in Marmen Inc.'s accounting records in USD (at a [    ] conversion ratio) – to CAD.  *See* Marmen 2nd Supp. D Response (Original) at 14-15; Marmen Response to Request for Information (A-122-867) (Dec. 8, 2021) at Attachment (PR-REM 2; CR-REM 2-3).

To correct this error, in its revised Marmen Inc. cost reconciliation submitted with the company's response to the Second Supplemental Section D Questionnaire, Marmen added **Item L1** (Excel Line 31) to convert Marmen Inc.'s purchases of sections from Marmen Énergie Inc. during the period July 1, 2018, through December 31, 2018, from USD to CAD (an adjustment of CAD [          ]).  *See* Marmen 2nd Supp. D Response (Original) at Exhibit 2nd Supp. D-9. As support, Marmen included a schedule of the invoices issued by Marmen Énergie Inc. to Marmen Inc. during the POI for wind tower sections, with highlighting to identify the invoices issued in 2018, and a calculation to show the conversion of the year-2018 USD invoice amounts to CAD (tab "L1 USD Purchases from Energie" in the Excel version).  *See id.* at Exhibit 2nd Supp. D-9 ("Marmen Energie Sales to Marmen Inc – Tab L1").   As shown in the schedule, the USD sales value of Marmen Inc.'s purchases during July 1, 2018, through December 31, 2018, was [          ].  Marmen multiplied this amount by [          ], the actual exchange gain or loss received by Marmen (based on its exchange rate contracts in place during the POI) – *see* Marmen Section D Response at D-16, Exhibits D-15 & D-16 (CONNUM buildup worksheets

AMERICAS 115954073

**NON-CONFIDENTIAL VERSION**

using the [          ] conversion rate) – yielding the [                ] reconciling item Marmen added in **Item L1** (Excel Line 31).[2]

The [           ] adjustment reported in **Item L1** (Excel Line 31) of Marmen Inc.'s corrected cost reconciliation was necessary to reconcile Marmen Inc.'s year-2018 COGS expressed in CAD (**Item A** in the reconciliation worksheet) to Marmen Inc.'s total cost of manufacture reported in the cost database (**Item T** in the reconciliation worksheet), which was also expressed in CAD.  Building on the "Sample Cost Reconciliation" from above, the two worksheets shown below illustrate the revision using simplified figures (*i.e.*, not actual figures).

Marmen Inc.'s original cost reconciliation worksheet appeared as follows, with all values expressed in CAD, ***except for* Item L**, Marmen Inc.'s purchases of wind tower sections from Marmen Énergie Inc., the value of which Marmen inadvertently left unconverted in USD.

---

[2] In its remand redetermination, the Department incorrectly claims that "Marmen provided no support for the average exchange rate that is on the worksheet; rather, it is just an exchange rate that Marmen inserted into the revised version of this worksheet." *See Draft Results of Redetermination Pursuant to Court Remand* (A-122-867) (Apr. 11, 2022) at 8.  To the contrary, Marmen used the same [      ] exchange rate consistent with its prior submissions. *See* Marmen Section D Response at D-16, Exhibits D-15 & D-16 (CONNUM buildup worksheets); Marmen 1st Supp. D Response at Exhibit Supp. D-8 (at Items Q & R, , using the same exchange rate to calculate USD-CAD exchange rate variances for Marmen Inc.'s purchases of steel materials and paint in January-June 2018 that were consumed during the period July-December 2018).

AMERICAS 115954073

| Steps | | Item | Reference | Amount (CAD) |
|---|---|---|---|---|
| Sample Cost Reconciliation (Original Version) | | | | |
| **Step (1):** Reconcile audited COGS for fiscal year to COGS for POI. | | Audited COGS for 2018 | **A** | 1,000,000 |
| | *Less:* | COGS Jan.-June 2018 | **B** | 600,000 |
| | *Plus:* | COGS Jan.-June 2019 | **C** | 550,000 |
| | *Equals:* | COGS for POI (July 2018 - June 2019) | **D=A-B+C** | 950,000 |
| **Step (2):** Reconcile COGS for POI to total COM for all products during POI. | *Less:* | Beginning Inventory (July 1, 2018) | **E** | 30,000 |
| | *Plus:* | Ending Inventory (July 1, 2019) | **F** | 20,000 |
| | *Equals:* | Total COM for All Products (POI) | **G=D-E+F** | 940,000 |
| **Step (3):** Subtract Nonsubject COM. | *Less:* | Total COM for Nonsubject Products (POI) | **H** | 500,000 |
| **Step (4):** Subtract other differences between audited COGS and COM. | *Less:* | Marmen Inc.'s purchases of wind tower sections from Marmen Énergie during the POI (USD) | **L** | 35,000 |
| **Step (5):** Compare the total COM for subject merchandise from financial records to total reported COM for subject merchandise. | *Equals:* | Total COM for Subject Merchandise (POI) from Financial Records | **J=G-H-L** | 405,000 |
| | | Reported Total COM for Subject Merchandise (POI) | **K** | 400,100 |
| | | Difference | **N=J-K** | 4,900 |
| | | Percentage Difference (%) | **M=N/J** | 1.21% |

Because Marmen Inc.'s purchase amount from Marmen Énergie Inc. is undervalued in USD (relative to all other amounts in the worksheet valued in CAD), the unreconciled difference between Marmen Inc.'s total COM for subject merchandise from its financial records (**Item J**) and its reported total COM for subject merchandise (**Item K**) is overstated at 1.21% (**Item M**).

Consequently, Marmen submitted a revised cost reconciliation worksheet with an adjustment (**Item L1**), as shown below in purple font.

8

| Sample Cost Reconciliation (Revised Version) | | | |
|---|---|---|---|
| **Steps** | **Item** | **Reference** | **Amount (CAD)** |
| **Step (1):** Reconcile audited COGS for fiscal year to COGS for POI. | Audited COGS for 2018 | **A** | 1,000,000 |
| | *Less:* COGS Jan.-June 2018 | **B** | 600,000 |
| | *Plus:* COGS Jan.-June 2019 | **C** | 550,000 |
| | *Equals:* COGS for POI (July 2018 - June 2019) | **D=A-B+C** | 950,000 |
| **Step (2):** Reconcile COGS for POI to total COM for all products during POI. | *Less:* Beginning Inventory (July 1, 2018) | **E** | 30,000 |
| | *Plus:* Ending Inventory (July 1, 2019) | **F** | 20,000 |
| | *Equals:* Total COM for All Products (POI) | **G=D-E+F** | 940,000 |
| **Step (3):** Subtract Nonsubject COM. | *Less:* Total COM for Nonsubject Products (POI) | **H** | 500,000 |
| **Step (4):** Subtract other differences between audited COGS and COM. | *Less:* Marmen Inc.'s purchases of wind tower sections from Marmen Énergie during the POI (USD) | **L** | 35,000 |
| | *Less:* Adjustment to convert Marmen Inc.'s purchases of wind tower sections from Marmen Énergie from July to December 2018 from USD to CAD | **L1** | 5,000 |
| **Step (5):** Compare the total COM for subject merchandise from financial records to total reported COM for subject merchandise. | *Equals:* Total COM for Subject Merchandise (POI) from Financial Records | **J=G-H-L-L1** | 400,000 |
| | Reported Total COM for Subject Merchandise (POI) | **K** | 400,100 |
| | Difference | **N=J-K** | (100) |
| | Percentage Difference (%) | **M=N/J** | -0.03% |

The adjustment in **Item L1** converts Marmen Inc.'s purchases from Marmen Énergie Inc. during the first half of the POI (July 2018 through December 2018) – the period during which Marmen left USD purchases unconverted in its accounting system – from USD to CAD. With the revision, the unreconciled difference is corrected to 0.03% (**Item M**).

### c.    The Department's remand proceeding

The Court held "that Commerce's determination to reject Marmen's supplemental cost reconciliation information was an abuse of discretion{,}" and remanded "Commerce's determination for further explanation or consideration in accordance with {its} opinion." *Marmen*, 545 F. Supp. 3d at 1317. Subsequently, Commerce instructed Marmen to resubmit

9

Marmen Inc.'s corrected cost reconciliation worksheet and support, all of which Commerce had rejected in the underlying AD investigation.   *See* Commerce's Request for Information Concerning Marmen's Second Supplemental D Questionnaire Response (A-122-867) (Dec. 2, 2021) (PR-REM 1; CR-REM 1) ("DOC Remand Questionnaire").   Marmen resubmitted the corrected cost reconciliation and supporting documentation on December 8, 2021.  *See* Marmen Response to Request for Information (A-122-867) (Dec. 8, 2021) at Attachment 1 (PR-REM 2; CR-REM 2-3) ("Marmen Inc.'s Revised Cost Reconciliation").   Ultimately, however, Commerce again declined to accept the correction, this time claiming that the adjustment in **Item L1** of Marmen Inc.'s cost reconciliation would double count an exchange rate adjustment already reflected in the company's audited COGS and reported costs.  *See Remand Decision* at 4, 9, 11 & 41.

> **2.**     **Commerce mistakenly concludes that acceptance of the correction to Marmen Inc.'s cost reconciliation would "double count" exchange gains and losses**

On remand, Commerce unreasonably rejects the minor correction to Marmen Inc.'s cost reconciliation based on incorrect and confused claims – none of which is supported by any record evidence, let alone substantial evidence.   In particular, Commerce mistakenly claims that the correction Marmen reported as **Item L1** in Marmen Inc.'s revised cost reconciliation would double count an exchange rate adjustment already reflected in the company's audited COGS and reported costs.   In doing so, Commerce employs confused logic and refuses to accept the simple explanation certified as accurate by Marmen and its counsel:   that Marmen inadvertently had misreported one line in a reconciliation worksheet in USD instead of in CAD.   Commerce's decision on remand to reject the correction to Marmen Inc.'s cost reconciliation is unreasonable and cannot be sustained as supported by substantial evidence.  *See*, *e.g.*, *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (holding that substantial evidence "means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion"); *Chr. Bjelland Seafoods A/S v. United States*, 19 C.I.T. 35, 37 (1995) (citing *USX Corp. v. United States*, 655 F. Supp. 487, 489 (Ct. Int'l Trade 1987)) (stating that a determination based on inadequate reasoning cannot survive the "substantial evidence" standard of review).

According to Commerce, "Marmen's proposed additional reconciling item would duplicate an adjustment amount that was already reflected in its revised audited financial statements," as well as in Marmen Inc.'s "reported costs, including those of the sections purchased from Marmen Energie . . . ." *Remand Decision* at 11; *see also id.* at 4, 9, 41. There are a couple errors to unpack here. First, while Commerce is correct that Marmen Inc.'s revised audited financial statements for 2018 (*i.e.*, COGS) include Marmen Inc.'s purchases of wind tower sections from Marmen Énergie Inc. in CAD, this does not mean the reconciling item Marmen reported as **Item L1** in Marmen Inc.'s Revised Cost Reconciliation would be double counting. As explained above, Marmen inadvertently omitted to convert Marmen Inc.'s July-December 2018 purchases (which amounted to [          ] of the [          ] reported in **Item L**) from USD to CAD. Contrary to Commerce's flawed reasoning, it is necessary to deduct Marmen Inc.'s July-December 2018 purchases from Marmen Énergie *in CAD* precisely because Marmen Inc.'s year-2018 audited COGS and reported costs are also expressed *in CAD*.[3]

_____

[3] Commerce also wrongly claims that "Marmen did not further explain how, if at all, this error and correction related to the *restated* financial statements, or whether it was one of the adjustments brought up by the external auditor, Deloitte." *Remand Decision* at 7 (emphasis added). To the contrary, Marmen explained that the change to Marmen Inc.'s cost reconciliation was "*unrelated* to the financial statement amendments." *See* Marmen 2nd Supp. D Response (Original) at 14-15 (emphasis added). Further, Marmen documented and explained the auditor's revisions to Marmen Inc.'s year-2018 financial statements. *See* Marmen 2nd Supp. D Response (Original) at 11-12 & Exhibit 2nd Supp. D-7. As Marmen explained, whereas the auditor made an amendment of CAD [          ] to Marmen Inc.'s year-2018 financial statements to account for USD purchases that were not converted to CAD in the original year-2018 financial statements, Marmen demonstrated that nearly the full amount ([    ]%) related to a single

AMERICAS 115954073

NON-CONFIDENTIAL VERSION

Second, while Commerce is correct that Marmen reported its costs to produce wind towers in CAD, Marmen Inc.'s purchases of wind tower sections from Marmen Énergie Inc. were properly excluded from Marmen Inc.'s reported costs.  This is because Marmen Inc. did not produce the wind tower sections purchased from Marmen Énergie Inc.; rather, Marmen Inc. purchased and resold these tower sections.  This also explains why, in Marmen Inc.'s cost reconciliation, it was necessary to ***deduct*** the value of Marmen Inc.'s purchases of sections from Marmen Énergie Inc. in order to reconcile Marmen Inc.'s audited COGS to its COM for subject merchandise reported to Commerce.  Whereas Marmen Inc.'s purchases of sections from Marmen Énergie Inc. are reflected in the company's audited COGS, such purchases were not included in Marmen Inc.'s reported cost of production because Marmen Inc. was not the producer.

Additional assertions in the *Remand Decision* manifest Commerce's confusion and failure to render a determination supported by substantial evidence.  Referring to Marmen Inc.'s cost reconciliation worksheet, Commerce states, "the fact that line 29 did not change (per the actual audit adjustments) shows that the auditors believed there was no correction necessary." *Remand Decision* at 10.  "Line 29" refers to **Item L** in Marmen Inc.'s cost reconciliation worksheet, where Marmen reported the value of Marmen Inc.'s purchases of tower sections from Marmen Énergie Inc., but inadvertently had omitted to convert the portion of purchases made in

---

purchase of steel plate from [                    ].  *See* Marmen 2nd Supp. D Response (Original) at 12 & Exhibit 2nd Supp. D-7 (including general ledger listing and a copy of [          ] invoice).  Elsewhere in its remand decision, however, Commerce correctly observes that the currency correction to Marmen Inc.'s cost reconciliation worksheet (**Item L1**) was unrelated to the company's restated 2018 audited financial statements.  *See Remand Decision* at 45 ("As Marmen has established, aside from the restatement amount that largely related to steel plate, the amounts for the exchange gains and losses have been recorded in Marmen's 2018 books and records, as presented in the original audited financial statements.").

12

**NON-CONFIDENTIAL VERSION**

July-December 2018 ([          ] of the [              ] total amount reported as **Item L**) from USD to CAD.  This was not an error for Marmen's auditor to correct, as COGS in Marmen's audited financial statements was correctly presented in CAD.  Rather, this was simply an inadvertent currency error in one line of Marmen Inc.'s cost reconciliation worksheet.  Consequently, it was necessary for Marmen to add the adjustment reported as **Item L1** (Excel Line 31) to convert the [              ] in USD purchases to CAD.

In addition, Commerce mistakenly concludes that the **Item L1** exchange rate adjustment in Marmen Inc.'s corrected cost reconciliation worksheet is already included in **Items P**, **Q**, and **R** (Excel Lines 41-43), stating:  "The amount related to adjusting costs of Marmen's purchases during the year was already included, as shown by the cost reconciliation worksheet, and was adjusted as one part of the many changes in the restated financial statements, including Excel lines 41-43." *Remand Decision* at 10.  Commerce is incorrect.  In **Item P** (Excel Line 41), Marmen deducts the auditor's USD-CAD exchange rate adjustment applicable to Marmen Inc.'s USD purchases during the period January-June 2018 (*i.e.*, **before** the POI).[4]  *See* Marmen Inc.'s Revised Cost Reconciliation.  In contrast, in **Item L1** Marmen deducts the exchange rate adjustment with respect to Marmen Inc.'s USD purchases from Marmen Énergie Inc. during the period July-December 2018 (*i.e.*, **during** the POI).  *See id.*  Consequently, the correction made in **Item L1** does not double count an adjustment already made in **Item P**.

---

[4] In **Items Q** and **R** (Excel Lines 42 and 43) of the reconciliation worksheet, Marmen adds back the USD-CAD exchange rate adjustments applicable to Marmen Inc.'s USD purchases of steel plate, flanges, and paint (made during the period January-June 2018) that were consumed by Marmen Inc. during the POI to produce wind towers, and therefore are amounts included in the cost database.  *See* Marmen 1st Supp. D Response at 18-19.  Notably, the amount reported as **Item P** (Excel Line 41) is not already deducted in **Item B** (Excel Line 8, "COGS Jan-Jun 2018"), because the amount in **Item B** was taken from Marmen Inc.'s general ledger, and therefore does not reflect the auditor's year-end adjustment to convert USD purchases to CAD.  *See* Marmen Inc.'s Cost Reconciliation Worksheet.

AMERICAS 115954073

**NON-CONFIDENTIAL VERSION**

For these reasons, Commerce's justification for rejecting the minor correction to Marmen Inc.'s cost reconciliation on remand – double counting – is unsupported by substantial evidence.

> **3.     Commerce unreasonably concludes that the correction to Marmen Inc.'s cost reconciliation worksheet was unsupported**

In addition to claiming (mistakenly) that the minor correction to Marmen Inc.'s cost reconciliation worksheet (reported as **Item L1**) was unnecessary, Commerce also unfairly concludes that Marmen failed to support the reconciling item.  As noted, to support the **Item L1** adjustment, Marmen provided Commerce a schedule of the invoices issued by Marmen Énergie Inc. to Marmen Inc. during the POI for wind tower sections, with green highlighting to identify the invoices issued in 2018, and a calculation to show the conversion of the year-2018 USD invoice amounts to CAD (tab "L1 USD Purchases from Energie" in the Excel version).  *See* Marmen Inc.'s Revised Cost Reconciliation; *see also* Marmen 2nd Supp. D Response (Original) at Exhibit 2nd Supp. D-9 ("Marmen Energie Sales to Marmen Inc – Tab L1").  Commerce's decision to dismiss this exhibit is unsupported by substantial evidence.

Referring to the schedule of Marmen Énergie Inc. invoices, Commerce opines, "There is no support for this worksheet, other than an assertion that a portion of these invoiced purchases was not already properly converted using the actual exchange rate."  *Remand Decision* at 8; *see id.* at 42-43.  To the contrary, the schedule of Marmen Énergie Inc. invoices is consistent with Marmen's explanation of its accounting of USD purchases during the POI.  As Marmen reported in its questionnaire responses, ***during the 2018 fiscal year*** Marmen recorded USD purchases in its normal accounting records in USD values (at a conversion rate of [     ] with CAD), while ***during the 2019 fiscal year*** Marmen recorded USD purchases in CAD, using a conversion rate of [     ] (*i.e.*, [     ] USD equal to [     ] CAD).  *See* Marmen 2nd Supp. D Response (Original) at

14

11; Marmen Section D Response at D-15, D-30; Marmen 1st Supp. D Response at 17-18. As shown in the schedule, all of Marmen Énergie Inc.'s invoices to Marmen Inc. were denominated in USD. *See* Marmen Inc.'s Revised Cost Reconciliation. Further, the schedule shows that, whereas sales prices for year-2018 invoices average approximately [      ] in value, the year-2019 invoices average approximately [      ] in value. *See id.* [      ] multiplied by [    ] – the USD-CAD conversion rate Marmen used in 2019 – equals [      ]. Consequently, the schedule is consistent with Marmen's explanation of its accounting practices with respect to USD purchases in 2018 and 2019, and corroborates Marmen's certified representation to Commerce that the **Item L1** adjustment to Marmen Inc.'s cost reconciliation was necessary to convert the value of Marmen Inc.'s purchases of wind tower sections from Marmen Énergie Inc. during the period July 2018 – December 2018 from USD to CAD.

With respect to the exchange rate ([      ]) used in the schedule to calculate the **Item L1** adjustment, Commerce incorrectly claims, "Marmen provided no support for the average exchange rate that is on the worksheet; rather, it is just an exchange rate that Marmen inserted into the revised version of this worksheet." *Remand Decision* at 8; *see id.* at 43. To the contrary, Marmen used the same [      ] exchange rate consistent with its prior submissions. *See* Marmen Section D Response at D-16, Exhibits D-15 & D-16 (CONNUM buildup worksheets); Marmen 1st Supp. D Response at Exhibit Supp. D-8 (at Items Q & R, using the same exchange rate to calculate USD-CAD exchange rate variances for Marmen Inc.'s purchases of steel materials and paint in January-June 2018 that were consumed during the period July-December 2018).

Moreover, context is relevant. The detailed support for the **Item L1** adjustment Commerce claims to have needed is normally the type of documentation Commerce would

AMERICAS 115954073

review at verification.  During the underlying AD investigation, however, Commerce canceled the sales and cost verifications of Marmen Inc. and Marmen Énergie Inc, despite Marmen's objection.  *See* Marmen's Case Br. (A-122-867) (Apr. 24, 2020) at 32-33 (PR 178; CR 219).  Moreover, Commerce rejected the support Marmen provided for the correction to Marmen Inc.'s cost reconciliation (**Item L1**) during the AD investigation, and, on remand, instructed Marmen to limit the support provided for the correction to the same materials Commerce previously had rejected.  *See* Letter from Commerce to White & Case LLP (A-122-867) (Dec. 2, 2021) (PR-REM 1; CR-REM 1).  Marmen cannot reasonably be faulted for not providing more detailed support when Commerce denied it the opportunity to do so.

**B.    Commerce's Application of the Cohen's *d* Test to Marmen's U.S. Sales Data Is Unsupported by Substantial Evidence**

On remand, Commerce is unable to support its application of the Cohen's *d* test to Marmen's U.S. sales data – and consequent use of the average-to-transaction method to calculate Marmen's dumping margin – with substantial evidence.  First, Commerce fails to comply with the Court's instruction to explain whether the assumptions underlying the Cohen's *d* test were satisfied with respect to Marmen's U.S. sales data.  Second, Commerce fails to identify any support in the academic literature supporting its contention that the assumptions underlying the Cohen's *d* test do not apply in the context of the differential pricing analysis.

**1.    Contrary to the Court's remand order, Commerce declined to explain whether the limits on the use of the Cohen's *d* test were satisfied with respect to Marmen's U.S. price data**

The court will not sustain a remand redetermination if that decision fails to comply with the terms of the court's remand order.  *See*, *e.g.*, *Trust Chem Co. v. United States*, 819 F. Supp. 2d 1373, 1378 (Ct. Int'l Trade 2012) (citation omitted).  Here, the Court "remand{ed} the issue of Commerce's use of the Cohen's *d* test for Commerce to explain further whether the limits on

16

the use of the Cohen's *d* test {(*i.e.*, the assumptions that the test and comparison data sets both exhibit normal distributions and have equivalent variances)} were satisfied in this case in the context of the *Stupp* case." *Marmen*, 545 F. Supp. 3d at 1320. On remand, however, Commerce declined to answer the Court's question. Instead, Commerce argues that the assumptions underlying the Cohen's *d* test are not relevant in the context of its differential pricing analysis, because the data sets to be compared (U.S. sales prices during the POI) are entire populations – as opposed to samples. *See Remand Decision* at 21-23, 26-27, 47-48. Commerce maintains this position despite the Court's recognition that, in *Stupp*, the U.S. Court of Appeals for the Federal Circuit ("Appellate Court") questioned "Commerce's argument that it does not need to worry about normality because it is using a population instead of a sample . . . ." *Marmen*, 545 F. Supp. 3d at 1319. Because Commerce neglected to explain whether the assumptions underlying the Cohen's *d* test were satisfied with respect to Marmen's U.S. sales data, Commerce failed to comply with the Court's remand order and its remand determination cannot be sustained.[5]

---

[5] Commerce not only failed to answer the Court's question, but also rejected portions of Marmen's comments on Commerce's draft remand decision, which Marmen submitted to demonstrate that the Cohen's *d* assumptions were **not** satisfied with respect to Marmen's U.S. sales data. *See* Letter from White & Case LLP to Commerce (A-122-867) (May 2, 2022), RE: Comments on Draft Results of Redetermination Pursuant to Court Remand at 24-25 & Attachments 6, 7 (PR-REM 8-12; CR-REM 4-17) ("*Marmen's Comments*"). Commerce rejected Marmen's comments as "untimely filed new, factual information." *See* Letter from Commerce to Marmen (A-122-867) (May 16, 2022) (PR-REM 15). In response, Marmen explained that the information included in its comments was neither new nor untimely, *see* Letter from White & Case LLP to Commerce (A-122-867) (May 17, 2022) (PR-REM 16), but Commerce declined to reconsider its decision. Regardless of whether Marmen's information could be considered "new" information on the record, Commerce abused its discretion by rejecting information relevant to the question the Court instructed Commerce to reconsider on remand: *i.e.*, whether the assumptions of normality and equal variances associated with the Cohen's *d* test were satisfied in this case.

17

    **2.**    **Commerce's premise – that the assumptions of normality and equivalent variances cease to apply when the data sets to be compared are populations, as opposed to samples – is unsupported by substantial evidence**

In *Stupp*, the Appellate Court expressed "significant concerns relating to Commerce's application of the Cohen's *d* test in {that} case and, more generally, in adjudications in which the data groups being compared are small, are not normally distributed, and have disparate variances." *Stupp*, 5 F.4th at 1357.  On remand, despite the issues raised by the Appellate Court, Commerce maintains that the assumptions of normal distributions and equivalent variances are not relevant to its application of the Cohen's *d* test, because Commerce is examining the complete population of the respondent's U.S. price data – as opposed to samples.  *See Remand Decision* at 21-23, 26-27, 47-48.  In doing so, however, Commerce fails to cite support in the academic literature for this premise, and ignores the Appellate Court's specific concern related to data sets with "very similar" sales prices, the same issue raised by Marmen.  For these reasons, Commerce's conclusion – that the assumptions underlying the Cohen's *d* test do not apply in the context of the differential pricing analysis – is unreasonable and unsupported by substantial evidence.

    **a.**    **Nothing in the academic literature – let alone substantial evidence – supports Commerce's premise**

According to Commerce, the assumptions of normal distribution and equivalent variance underlying the Cohen's *d* test do not apply in the context of the differential pricing analysis, because Commerce relies on the complete universe of U.S. sales prices (*i.e.*, populations) – as opposed to samples.  *See Remand Decision* at 21-23, 26-27, 47-48.   Nothing in the academic literature supports Commerce's claim.

Critically, Professor Cohen himself used ***populations*** – not samples – to explain the Coehn's *d* coefficient, yet still represented that the test was based on assumptions of normal

18

distributions and equivalent variances.  *See* Letter from White & Case LLP to Commerce (A-122-867) (May 18, 2022), RE: Resubmission of Comments on Draft Results of Redetermination Pursuant to Court Remand (PR-REM 18-21; CR-REM 18-21) ("*Marmen's Resubmitted Comments*") at Attachment 2 (Jacob Cohen, *Statistical Power Analysis for the Behavioral Sciences* 20-21 (2d ed. 1988) (PR-REM 19-20; CR-REM 19-20) ("*Cohen*") (calculating the Cohen's *d* coefficient using populations, not samples, and explaining that normal distributions and equivalent variances are assumed) & Attachment 3 (James Algina et al., *An Alternative to Cohen's Standardized Mean Difference Effect Size: A Robust Parameter and Confidence Interval in the Two Independent Groups Case*, 10 PSYCHOLOGICAL METHODS 317, 318 (PR-REM 21; CR-REM 21) ("*Algina*").

The Cohen's *d* test, named after Professor Jacob Cohen, is used to measure whether there is a significant difference between the "means" of a test group and a comparison group.  The formula for calculating the Cohen's *d* coefficient is as follows:

$$d = \frac{|\mu_1 - \mu_2|}{\sigma}$$

Where:
$\mu_1$ = mean of population 1
$\mu_2$ = mean of population 2
$\sigma$ = population standard deviation (assumed to be equal for both populations)

*See Cohen* at 20; *Algina* at 318.  As shown above, Professor Cohen used the symbol "$\mu$" for the means, signifying that the test and comparison data sets consists of ***populations*** – not samples. Further, as recognized by the *Stupp* Court, Professor Cohen explicitly stated that, for the Cohen's *d* coefficient to be meaningful, "we maintain the assumption that ***the populations*** being compared are normal and with equal variability, and conceive them further as equally numerous."  *Cohen* at 21 (emphasis added); *Stupp*, 5 F.4th at 1357.  In response, Commerce

19

asserts that, "{i}n this analysis, Dr. Cohen is considering the extent that two compared sets of **sampled data** do not overlap one another." *Remand Decision* at 27 (emphasis added). This position is untenable, however, because Professor Cohen himself referred to "populations" in the context of explaining the underlying assumptions that must be satisfied, and also used the **population** symbol for mean (μ) in the formula for the Cohen's *d* coefficient.[6]

Nor does Commerce find support for its premise – that the Cohen's *d* assumptions of normal distributions and equivalent variances can be disregarded when comparing populations – in the academic literature cited by the *Stupp* Court. For example, the Appellate Court cited Robert J. Grissom and John J. Kim as further evidence that the assumptions of normal distributions and equivalent variances must be satisfied for the Cohen's *d* coefficient to be a reliable measure of effect size between two populations:

> When **the distribution** of scores of a comparison **population** is **not normal**, the usual interpretation of a $d_G$ or $d$ in terms of estimating the percentile standing of the average-scoring members of another group with respect to the supposed normal distribution of the comparison group's scores **would be invalid**. Also, because standard deviations can be very sensitive to a distribution's shape, . . . nonnormality can greatly influence the value of a standardized-mean-difference effect size and its estimate.

*Stupp*, 5 F.4th at 1358 (quoting Robert J. Grissom & John J. Kim, *Effect Sizes for Research: Univariate and Multivariate* 66 (2d ed. 2012)) (emphasis added). On remand, Commerce claims the authors were describing "a similar analysis concerning the overlap of the two compared sets

---

[6] In commenting on Commerce's draft remand decision, Marmen submitted a graph illustrating a "normal distribution" to help explain why the assumption of normal distributions applies regardless of whether the data sets to be compared are populations or samples. *See Marmen's Comments* at 13-14. Commerce, however, rejected this information, as well as textbook definitions of "mean" and "standard deviation," as untimely filed, new factual information. *See* Letter from Commerce to Marmen (A-122-867) (May 16, 2022) (PR-REM 15). Commerce's decision to reject textbook definitions for terms it uses throughout its *Remand Decision* is unreasonable.

AMERICAS 115954073

of *sampled data*{,}" *Remand Decision* at 28 (emphasis added) – but that interpretation cannot be squared with the authors' explicit reference to "population," as quoted above.

The *Stupp* Court also recognized that Grissom and Kim "not{ed} that 'Cohen's *d*' is appropriate 'if the two ***populations*** that are being compared are assumed to have equal variances.'" *Stupp*, 5 F.4th at 1358 (emphasis added). On remand, Commerce provides the complete quote from Grissom's and Kim's text, and asserts that the authors merely stated that, "in the situation involving sampling where the variances are equal, the denominator can be an average of the two variances." *Remand Decision* at 29.

> However, *if the two populations that are being compared are assumed to have equal variances*, then a better estimate of the denominator of a standardized difference between population means can be made if one pools the data from both samples to estimate the common σ {*i.e.*, the standard deviation of a population} instead of using $s_b$ {*i.e.*, the standard deviation of sample data b} that is based on the data of only one sample.

*Remand Decision* at 28-29 (quoting Robert J. Grissom & John J. Kim, *Effect Sizes for Research: Univariate and Multivariate* 68 (2d ed. 2012)). Even if Commerce's interpretation is correct, however, that does not negate the authors' representation that "equal variances" is an assumption that applies to "populations" – not only to samples of data.

The *Stupp* Court also noted the work of James Algina, who "inspected the robustness of Cohen's *d* as an effect-size parameter, seeking to determine 'if a small change in ***the population*** distribution can strongly affect the parameter.'" *Stupp*, 5 F.4th at 1358 (emphasis added) (quoting *Algina* at 318). James Algina and his collaborators concluded that Cohen's *d* has a "serious limitation" as a measure of effect size when the data sets do not both exhibit normal distributions. *See Algina* at 318; *see also Stupp*, 5 F.4th at 1358 ("they concluded that Cohen's *d* was not robust to mixed-normal distributions, and that applying Cohen's *d* to such data caused serious flaws in interpreting the resulting parameter'") (quoting *Algina* at 318-319). Importantly,

21

the authors arrived at this conclusion after analyzing the Cohen's *d* coefficient as derived from **populations** – not samples. The authors specifically noted that they preferred to use the Greek letter δ to refer to the **population** effect size, and to use "d" when referring to the **sample** effect size. *See Algina* at 318 n.1. The authors calculated δ using the following formula:

$$\delta \; = \; \frac{\mid \mu_1 - \mu_2 \mid}{\sigma}$$

Where:
      $\mu_1$ = mean of **population** 1
      $\mu_2$ = mean of **population** 2
      $\sigma$ = **population** standard deviation (assumed to be equal for both populations)

*See id.* at 318. Algina's paper further demonstrates the unreasonableness of Commerce's conclusion that the assumptions underlying the Cohen's *d* coefficient matter only when the data sets to be compared are samples, as opposed to populations.[7]

"In general," Commerce contends that "each of the {*Stupp* Court's} quotations to the {academic} literature concerns either the potential inaccuracies in the estimate of effect size which is based on a sample of data, or the analysis of the sampled data to be able to visualize the difference in the means between the sampled data sets." *Remand Decision* at 26. As detailed above, however, Commerce is wrong, because Professor Cohen himself, Grissom/Kim, and

---

[7] Instead, Commerce contends that the example discussed in Algina's paper estimated an "effect size that *understates* the magnitude of the difference in the means, which contradicts the plaintiff's claim in Stupp that violations of its alleged statistical criteria result in false positives." *Remand Decision* at 31-32. One example, however, does not reasonably lead to the conclusion that the Cohen's *d* coefficient is underestimated in all cases when the assumptions of normal distributions and equivalent variances are not satisfied. The point of Algina's (and others') work was not to exhaust the entire range of possibilities, but rather to illustrate the Cohen's *d* coefficient's shortcomings when the underlying assumptions are not satisfied. In the absence of normal distributions or equal variances, the Cohen's *d* coefficient may underestimate or overestimate the effect size. In either circumstance, the Cohen's *d* coefficient is an unreliable measure of significance. Commerce's inadequate reasoning fails to satisfy the "substantial evidence" standard of review. *See Chr. Bjelland Seafoods*, 19 C.I.T. at 37.

Algina discussed the Cohen's *d* coefficient's limitations with respect to data sets consisting of complete populations, not samples.  Moreover, even to the extent other authors cited by the Appellate Court examined the Cohen's *d* text with respect to sampled data sets, Commerce fails to identify any evidence that these authors limited their conclusions to comparisons involving sampled data, as opposed to populations.[8]

For these reasons, the record lacks substantial evidence supporting Commerce's assertion that the limitations on the use of the Cohen's *d* test do not apply when the data sets to be compared consist of complete populations.

> **b.      Commerce fails to address the *Stupp* Court's specific concern about data sets lacking equivalent variances**

In *Stupp*, the Appellate Court described a hypothetical example in which the Cohen's *d* test yields a large coefficient even though the price differences are not significant in the real world.  *See Stupp*, 5 F.4[th] at 1359.  On remand, Commerce makes no attempt to address the *Stupp* Court's concern.  This is problematic, because the Appellate Court's hypothetical – in which the test group and comparison groups contain "sales prices that hover around the same value" – mirrors the issue raised by Marmen in this case.  *See* Marmen's Memorandum of Points and Authorities in Support of Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record (ECF 23, 24) ("Pls.' Br.") at 32-36 (arguing that, despite the Cohen's *d* coefficient, price differences of less than one percent are not significant).  Commerce's failure to consider "an

---

[8] For example, in commenting on Commerce's draft remand decision, Marmen explained that the Cohen's *d* formula's use of a single standard deviation in the denominator means that the two data sets to be compared must exhibit equivalent variances (even when both data sets are normally distributed).  *See Marmen's Resubmitted Comments* at 14-15.  "The problem is inherent to the Cohen's *d* coefficient itself – regardless of whether the test and comparison groups consist of populations or samples."  *Id.* at 15.

important aspect of the problem" further renders its *Remand Decision* unsupported by substantial evidence.  *See Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005).

In the *Stupp* Court's example, the per-unit sales prices for a particular purchaser (the test group) are not normally distributed and fluctuate within a very narrow range (*e.g.*, $100.01, $100.01, $100.01, $100.01, and $99.99).  *See Stupp*, 5 F.4th at 1359.  Meanwhile, the per-unit sales prices across the entire set of purchasers (the comparison group) also "fall{} within a relatively small range (such as between $99.92 and $101.01)."  *Id.*  The *Stupp* Court explained the problem raised by this fact pattern as follows:

> Applying Cohen's *d* to that hypothetical data seems problematic:  As the variance within each test group approaches zero, the denominator in the Cohen's *d* equation is greatly reduced and, in fact, approaches half of the values of the standard deviations of the larger comparison groups.  . . .  As the denominator is reduced, the resulting effect-size parameter is increased, tending to artificially inflate the dumping margins for a set of export sales prices that has minimal variance.  An objective examiner inspecting those export sales prices would be unlikely to conclude that they embody a 'pattern' of prices that 'differ significantly.'

*Id.* (citing 19 U.S.C. § 1677f-1(d)(1)(B)(i)).

Here, during Commerce's remand proceeding, Marmen highlighted the *Stupp* Court's hypothetical, adding calculations to illustrate the problem.  *See Marmen's Resubmitted Comments* at 20-23.  Fleshing out the Appellate Court's example, Marmen posited that, in the test (or control) group, the prices vary from $99.2 to $101.01, and each such price occurs with the same frequency (that is, their distribution is uniform).  Likewise, in the comparison group, the prices also occur with the same frequency (uniform distribution), but range from $99.99 and $100.01.  Although the price levels are very similar, Marmen explained, the variance is broader in the test group than in the comparison group (with standard deviations of 0.314 and 0.006, respectively).  *See id.* at 21.  Consequently, not only is the assumption of normal distributions violated, but also there is no homogeneity in the variances.  This is illustrated below:

24



*See Marmen's Resubmitted Comments* at 22.

Further, to simplify the example, Marmen assumed that the prices in the range of $99.92 to $101.01 (test group) are as numerous as the prices in the range of $99.99 to $100.01 (comparison group), so that the simple average of both standard deviations (equal to 0.1602) can be used in the Cohen's *d* coefficient formula (following Commerce's normal practice). Plugging the values into the Cohen's *d* formula yields the following:

- Uniform Distribution 1 (99.92 to 101.01) versus Uniform Distribution 2 (99.99 to 100.5):

$$\text{d'Cohen} = \delta = \frac{|avg(99.92,101.01) - avg(99.99,100.5)|}{0.1602} = \frac{|100.47 - 100|}{0.1602} = \frac{0.47}{0.1602} = 2.93 > 0.8$$

As shown, the difference in the average prices (means) amounts to less than half a dollar ($0.47); in other words, the price levels in the test and comparison groups are very similar – with means differing by only 0.47%.

As observed by the *Stupp* Court, "{a}n objective examiner inspecting those export sales prices would be unlikely to conclude that they embody a 'pattern' of prices that 'differ significantly.'" *Stupp*, 5 F.4th at 1359. Yet the Cohen's *d* coefficient (2.93) exceeds the "large" threshold (0.8). The distortion arises because the price variances within each group are not

25

homogeneous (and the distributions are not normal).  Moreover, this distortion would arise regardless of whether the data sets include the universe of prices (populations) or samples thereof.

Importantly, the *Stupp* Court's example mirrors the issue presented by Marmen.  In Marmen's case, Commerce concluded based on application of the Cohen's *d* test that price differences of less than 1.00% (ranging from [     ]% to [     ]% for five CONNUMs) were "significant."  *See* Pls.' Br. at 34.  An objective examiner in the "real world" would not consider such minor price differences to be significant (particularly when considering that the net price differences for four of the five CONNUMs arose solely from exempted import duties and imputed credit expenses, which are not booked in the company's accounting system).  *See id.* at 35.

It is ironic, then, that Commerce justifies its disregard of the assumptions underlying the Cohen's *d* test (*i.e.*, normal distributions and equivalent variances) on the ground that its use of complete data sets (populations) means that Commerce is measuring "practical significance" based on "real-world observations" as opposed to "statistical significance."  *See Remand Decision* at 21, 25-26.  In Marmen's case, Commerce's blind application of the Cohen's *d* test yields false results – attributing significance to price differences that are considered minor in the "real world."  This is the problem highlighted by the *Stupp* Court, and Commerce's failure to address it further renders its *Remand Decision* unsupported by substantial evidence.

## IV.   CONCLUSION

For the reasons discussed above, Plaintiffs respectfully request that the Court hold and declare that Commerce's *Remand Decision* is unsupported by substantial evidence and otherwise not in accordance with law; remand this matter to Commerce to issue a revised final

AMERICAS 115954073

determination in conformity with the Court's decision; and grant Plaintiffs such additional relief as the Court may deem just and proper.

Respectfully submitted,

WHITE AND CASE LLP

 /s/ Jay C. Campbell
Jay C. Campbell
Ron Kendler
Allison J.G. Kepkay
White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiffs Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co.

Date: July 21, 2022

27

CERTIFICATE OF COMPLIANCE

I, Jay C. Campbell, certify that the attached comments in opposition to the final results of redetermination pursuant to court remand comply with the word limitation requirement, as stated in the Standard Chambers Procedures. The word count for these comments, as computed by the White & Case word processing system (Microsoft Word 2016) and manual tally, is 9,448.

_____/s/ Jay C. Campbell_____
Jay C. Campbell