UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | | |
|---|---|---|
| MARMEN INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WIND TOWER TRADE COALITION, | ) | |
| | ) | |
| Consolidated Plaintiff, | ) | |
| | ) | |
| v. | ) | Consol. Court No. 20-00169 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WIND TOWER TRADE COALITION, *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

## **ORDER**

Upon consideration of the Department of Commerce's remand redetermination, plaintiffs' comments on the remand redetermination, defendant's and defendant-intervenor's responses thereto, and all other pertinent papers and proceedings in this action, it is hereby

ORDERED that the remand redetermination is sustained; and it is further

ORDERED that judgment is entered in favor of the United States; and it is further

ORDERED that the subject entries enjoined in this action shall be liquidated in accordance with the final court decision, as provided in section 516A(e) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(e).

Dated: _____, 2022          _____
      New York, NY                                    JUDGE

IN THE UNIITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| _____ ) | |
| MARMEN INC., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| and ) | |
| ) | |
| WIND TOWER TRADE COALITION, ) | |
| ) | |
| Consolidated Plaintiff, ) | Consol. Court No. 20-00169 |
| ) | |
| v. ) | **<u>PUBLIC VERSION</u>** |
| ) | Business Proprietary Information |
| UNITED STATES, ) | Denoted by Brackets on Pp. 25, 31 |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| WIND TOWER TRADE COALITION, *et al.*, ) | |
| ) | |
| Defendant-Intervenors. ) | |
| _____ ) | |

---

**DEFENDANT'S CORRECTED RESPONSE TO PLAINTIFFS'
COMMENTS ON COMMERCE'S REMAND REDETERMINATION**

---

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:
JESUS N. SAENZ
Attorney
Office of the Chief Counsel
for Trade Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.

JOSHUA E. KURLAND
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-0477
E-mail: Joshua.E.Kurland@usdoj.gov

October 3, 2022

*Attorneys for Defendant United States*

## **TABLE OF CONTENTS**

ARGUMENT ....................................................................................................................2

I.    Standard Of Review ..............................................................................................2

II.    Commerce Complied With The Court's Remand Order To Further Explain The
Limits On Its Use Of The Cohen's *d* Test ...........................................................3

        A.    Commerce Explained That The Statistical Criteria Marmen Highlights Are
Not Applicable To The Cohen's *d* Test That Commerce Applied To Marmen ......3

        B.    Commerce Explained, Based On Record Evidence, Why The Statistical
Criteria Need Not Be Observed When Commerce Uses The Cohen's *d* Test.........6

            1.  The Academic Literature Supports Commerce's Position................................7

        C.    Marmen's Arguments Based On Its Hypothetical Lack Merit ............................15

        D.    Commerce Lawfully Rejected Marmen's New Factual Information ...................19

III.    Commerce Reasonably Rejected Marmen's Additional Cost Reconciliation Item..........21

        A.    Background ........................................................................................................21

        B.    Commerce Reasonably Determined Not To Rely On Marmen's Additional
Revision To Its Financial Information ..................................................................25

CONCLUSION.................................................................................................................32

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Canadian Solar Int'l Ltd. v. United States*,
   399 F. Supp. 3d 1379 (Ct. Int'l Trade 2019) ............................................................... 20

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938) .................................................................................................... 2

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) .................................................................................................... 2

*Fieger v. Mich. Sup. Ct.*,
   553 F.3d 955 (6th Cir. 2009) ..................................................................................... 15

*Fischer S.A. Comercio, Industria & Agricultura v. United States*,
   2014 WL 2853909 (Ct. Intl Trade 2014) ................................................................... 29

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996) ......................................................................... 5, 29, 31

*Ghigi 1870 S.P.A. v. United States*,
   547 F. Supp. 3d 1332 (Ct. Int'l Trade 2021) ............................................................. 32

*I.N.S. v. Elias-Zacarias*,
   502 U.S. 478 (1992) .................................................................................................... 3

*JBF RAK LLC v. United States*,
   790 F.3d 1358 (Fed. Cir. 2015) .............................................................................. 5, 19

*MacLean-Fogg Co. v. United States*,
   100 F. Supp. 3d 1349 .................................................................................................. 2

*Marmen Inc. v. United States*,
   545 F. Supp. 3d 1305 (Ct. Int'l Trade 2021) ................................................... *passim*

*Mid Continent Steel & Wire, Inc. v. United States*,
   940 F.3d 662 (Fed. Cir. 2019) ..................................................................... 13, 17, 19

*Mid Continent Steel & Wire, Inc. v. United States*,
   31 F.4th 1367 (Fed. Cir. 2022) ........................................................................... 14, 17

*Ningbo Dafa Chem. Fiber Co. v. United States*,
   580 F.3d 1247 (Fed. Cir. 2009) ................................................................................. 5

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ................................................................. 3

*PSC VSMPO-Avisma Corp. v. United States*,
    688 F.3d 751 (Fed. Cir. 2012) ......................................................... 20, 29

*Rita v. United States*,
    551 U.S. 338 (2005) ............................................................................. 15

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) ............................................................. 20

*Stupp Corp. v. United States*,
    5 F.4th 1341 (Fed. Cir. 2021) ....................................................... *passim*

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009) ............................................................................... 5

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) ............................................................................. 15

**Statutes & Regulations**

19 U.S.C. § 1516 ...................................................................................... 2

19 U.S.C. § 1677 .................................................................................... 16

19 C.F.R. § 351.102 ............................................................................... 20

19 C.F.R. § 351.301 ............................................................................... 23

**Legislative Authorities**

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act,
    H.R. Rep. No. 103-316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ................... 24

**Administrative Determinations**

*Utility Scale Wind Towers from Canada*,
    85 Fed. Reg. 40,239 (Dep't of Commerce July 6, 2020) ........................................... 1

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

_____

| | |
|---|---|
| MARMEN INC., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| and | ) |
| | ) |
| WIND TOWER TRADE COALITION, | ) |
| | ) |
| Consolidated Plaintiff, | )  Consol. Court No. 20-00169 |
| | ) |
| v. | )  <u>**PUBLIC VERSION**</u> |
| | )  Business Proprietary Information |
| UNITED STATES, | )  Denoted by Brackets on Pp. 25, 31 |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| WIND TOWER TRADE COALITION, *et al.*, | ) |
| | ) |
| Defendant-Intervenors. | ) |

_____

## DEFENDANT'S RESPONSE TO PLAINTIFFS' <br> <u>COMMENTS ON COMMERCE'S REMAND REDETERMINATION</u>

Defendant, the United States, respectfully submits this response to the comments filed by

plaintiffs Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co. (collectively, Marmen)

concerning the Department of Commerce's (Commerce's) remand redetermination in this matter.

*See* Final Results of Redetermination Pursuant to Court Remand, ECF No. 61-62 (May 26, 2022)

(Remand Redetermination).  Commerce's remand redetermination supplements its determination

in its less-than-fair-value investigation concerning wind towers from Canada.  *See Utility Scale*

*Wind Towers from Canada*, 85 Fed. Reg. 40,239 (Dep't of Commerce July 6, 2020), and the

accompanying Issues and Decision Memorandum (IDM) (P.R. 192) (Final Determination).

This Court's October 22, 2021 opinion and order remanded two issues to Commerce for further explanation or reconsideration:  (1) Commerce's use of its differential pricing analysis leading to use of an alternative comparison methodology based on the average-to-transaction (A-to-T) method to calculate Marmen's weighted-average dumping margin; and (2) Commerce's determination to reject additional cost reconciliation information that Marmen submitted in its February 7, 2020 Second Supplemental Section D Response.  *See Marmen Inc. v. United States*, 545 F. Supp. 3d 1305, 1324 (Ct. Int'l Trade 2021).  On remand, Commerce further considered its final determination regarding the cost reconciliation information contained in Marmen's Second Supplemental Section D Response and its use of the Cohen's *d* test in light of *Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021).  Because Commerce has complied with the Court's order, and the remand redetermination is supported by substantial evidence and otherwise lawful, we respectfully request that the Court sustain the remand redetermination.

## ARGUMENT

## I.    Standard Of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order, are supported by substantial evidence, and are otherwise in accordance with law."  *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).  "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial evidence may be "less than the weight of the evidence" and "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted).  Indeed, when Congress entrusts an agency to administer a statute demanding

inherently fact-intensive inquiries, the agency's conclusions may be set aside only if the record evidence is "so compelling that no reasonable factfinder" could reach the same conclusion. *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992). Thus, a party challenging a determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted).

## II. Commerce Complied With The Court's Remand Order To Further Explain The Limits On Its Use Of The Cohen's *d* Test

Marmen claims that Commerce failed to address whether the assumptions of normality and equivalent variances must apply to the use of the Cohen's *d* test with respect to Marmen's United States sales prices, and that Commerce's findings are unsupported by record evidence. Contrary to Marmen's arguments, Commerce's remand redetermination complies with the Court's order, is supported by substantial evidence, and is otherwise lawful.

### A. Commerce Explained That The Statistical Criteria Marmen Highlights Are Not Applicable To The Cohen's *d* Test That Commerce Applied To Marmen

This Court remanded Commerce's final determination to "explain further whether the limits on the use of the Cohen's *d* test were satisfied in this case in the context of the *Stupp* case." *Marmen*, 545 F.Supp.3d at 1320. The Court questioned whether Commerce's differential pricing analysis "violated the assumptions of the normality and roughly equal variances associated with the Cohen's *d* test." *Id*. *Stupp*, in turn, remanded to Commerce "to explain whether the limits on the use of the Cohen's *d* test . . . were satisfied in this case or whether those limits need not be observed when Commerce uses the Cohen's *d* test in less-than-fair-value adjudications." 5 F.4th at 1360. Addressing these issues on remand, Commerce explained that the concerns that this Court and *Stupp* had raised do not establish that Commerce's use of the Cohen's *d* test distorts its differential pricing analysis. *E.g.*, Remand Redetermination at 49.

Specifically, Commerce described the role of effect size as a measure of practical significance in the Cohen's *d* test, explained the distinction between statistical and practical significance, and examined the role of United States sales price data in its analysis in conjunction with the important fact that a respondent's United States sales data represent the entire universe of the respondent's sales prices.  Remand Redetermination at 18 (summarizing Commerce's analysis).

Commerce further explained its understanding that the limitations cited by the Court of Appeals for the Federal Circuit in *Stupp*, which are discussed in academic literature, arise in the context of an analysis that uses samples and serve to ensure that *estimated* values calculated using a sample accurately represent the actual parameter values of the broader complete population of data or observations.  *See* Remand Redetermination at 23.  Such limitations are thus unnecessary when Commerce's "Cohen's *d* test" uses the full population of relevant observations rather than a sample of that population.  *See id*. at 23-24.  Commerce in its differential pricing analysis calculates the exact actual mean and standard deviation of each test and comparison group based on the entire population of relevant observations, and does not rely on estimates of these population parameters.

Commerce consequently explained that the statistical criteria specified in the Court's remand order and in *Stupp*, as the basis for statistical inferences for estimated values, are not relevant to Commerce's analysis because the results of the Cohen's *d* test are based on the entire population of data as opposed to a sample.  *See id*.  Indeed, given Commerce's explanation, there is no logical, mathematical, or legal reason for Commerce to use the assumptions/limitations discussed in academic literature outside of the context in which such limitations are designed to apply.  If the entire population of relevant observations is considered, it is irrelevant whether prices in each comparison group satisfy statistical significance criteria.

Moreover, as the Federal Circuit recognized in *Stupp*, Commerce's selection of a methodology for implementing the statutory directive of 19 U.S.C. § 1677f-1(d)(1)(B) is "an interpretation of that statutory language" that the Court reviews for reasonableness. *Stupp*, 5 F.4th at 1352; *see also Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1256 (Fed. Cir. 2009) ("It is well established that statutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under *Chevron*."); *see also United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous."). Thus, this Court should defer to the agency's expertise with respect to this technical-methodological issue. *See Ningbo*, 580 F.3d at 1256 ("this court gives Commerce's interpretation of antidumping laws significant deference because of its special expertise in administering antidumping duty law" (citation omitted)); *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (courts afford Commerce especially great deference "when a statute fails to make clear any Congressionally mandated procedure or methodology for assessment of the statutory tests" (citation omitted)); *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (Commerce receives "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when exercising its technical expertise to select and apply methodologies to implement trade statute).

Finally, to the extent that Marmen claims that Commerce failed to comply with this Court's remand order because it concluded that the statistical limitations at issue do not apply in this investigation, *see* Marmen Br. 16-17, that argument ignores *Stupp*'s recognition that the limitations may not apply in the context of Commerce's less-then-fair-value determinations and invitation to Commerce "to clarify its argument that having the entire universe of data rather than

a sample makes it permissible to disregard the otherwise-applicable limitations on the use of the Cohen's *d* test." 5 F.4th at 1360.  It also ignores this Court's remand for further explanation from Commerce "in the context of the *Stupp* case."  *Marmen*, 545 F.Supp.3d at 1320.  Thus, Marmen's claim that Commerce failed to comply with the remand order lacks merit.

### B.  Commerce Explained, Based On Record Evidence, Why The Statistical Criteria Need Not Be Observed When Commerce Uses The Cohen's *d* Test

Commerce also explained *why* its reliance on the entire universe or population of sales "obviates the need for an analysis of statistical significance and the related underlying statistical criteria."  Remand Redetermination at 21-22.  Cohen's *d* "is a recognized measure of effect size which gauges the extent of the difference between the means of two groups" and provides "a simple way of quantifying the difference between two groups and has many advantages over the use of tests of statistical significance alone."  Remand Redetermination at 19 (citations omitted). As a component of the differential pricing analysis, Commerce explained that the "purpose of the Cohen's *d* test is to evaluate the extent by which the prices to a particular purchaser, region, or time period differ significantly from the prices of all other sales of comparable merchandise."[1] *Id.* at 19; *id.* at 22.  When applying the Cohen's *d* test, Commerce, in accordance with the statute, considers "whether U.S prices for comparable merchandise to a particular purchaser, region, or time period (*i.e.*, test group) differ significantly from the prices to other purchasers, regions, or time periods (*i.e.*, the comparison group)."  *Id.*  Consequently, the sales to these two groups are not sampled and encompass the entire population of data.  *See id.* at 23.

---

[1] Crucially, Commerce uses the Cohen's *d* test in its differential pricing analysis to measure the *practical* significance of differences in real-world pricing, rather than *statistical* significance (which arises when one is seeking to determine the likelihood that a result observed based on estimation through sampling is a result of chance).  *See* Remand Redetermination at 19-20.

Because the calculations in Commerce's Cohen's *d* analysis "are not estimates with confidence levels or sampling errors as would be associated with sampled data," the limitations needed to ensure that such estimates are statistically significant are "not relevant in Commerce's application of the differential pricing analysis, which measures practical significance." *Id.* at 23-24. Likewise, because the Cohen's *d* coefficients are operational and not based on statistical analysis, the concerns about statistical criteria do not undermine their usefulness. *Id.* at 26, 38-49. Moreover, within this context, Commerce does not rely on the Cohen's *d* test to calculate the respondent's weighted-average dumping margin, but only to determine whether it is appropriate to use the average-to-transaction comparison method rather than the average-to-average comparison method in calculating the dumping margin. *See id.* at 22, 48; *Stupp*, 5 F.4th at 1347 (describing role of Cohen's *d* test).

Marmen asserts that "Commerce fails to cite support in the academic literature for this premise {that the statistical criteria are not relevant}, and ignores the Appellate Court's specific concern related to data sets with 'very similar' sales prices." Marmen Br. 18. Accordingly, Marmen claims that Commerce's Cohen's *d* test is "unreasonable and unsupported by substantial evidence." *Id.* Commerce's redetermination, which expressly relies on the antidumping duty statute and academic literature, demonstrates that Marmen's contention lacks merit.

### 1.   The Academic Literature Supports Commerce's Position

In *Stupp*, the Federal Circuit's order directed Commerce "to explain whether the limits on the use of the Cohen's *d* test prescribed by Professor Cohen and other authorities were satisfied in this case or whether those limits need not be observed when Commerce uses the Cohen's *d* test." *Stupp*, 5 F.4th at 1360. Commerce first addressed this issue in its draft redetermination in *Stupp*, explaining why the academic literature on the record of that proceeding that the Federal

Circuit had cited was not relevant to Commerce's application of Cohen's *d*.  *See Stupp* Draft Redetermination at 10-11 (Remand P.R. 4 at Att. 1).[2]  Similarly, in this case, Commerce addressed the alleged limitations pertaining to Dr. Cohen's thresholds and the literature cited by the Federal Circuit.  *See* Remand Redetermination at 24-33.  As in *Stupp*, Commerce concluded that the statistical criteria are not relevant to Commerce's application of the Cohen's *d* test when based on the full, complete population of sales price data.  *See id.*

Contrary to Marmen's claims, the academic literature supports Commerce's conclusion that the statistical criteria are not relevant in Commerce's use of the Cohen's *d* test when used with a full population of United States sales prices.  Commerce explained:

> The statistical criteria observed in academic literature (such as the number of observations, a normal distribution and approximately equal variances) are related to the statistical significance of sampled data and establish the reliability of an estimated parameter (*e.g.*, mean) based on the sample data to be within a determined confidence interval of the actual parameter.

Remand Redetermination at 23; *see also id.* at 26, 26-27.  In contrast, when the Cohen's *d* test is applied in the context of differential pricing analysis, Commerce calculates the *actual* parameters (mean, standard deviation, and effect size) without having to estimate the parameters through sampling the underlying data, as one would if using less than the entire population.  *Id.* at 23-24.  The criteria/assumptions that Marmen highlights do not apply in this context.

The academic literature does not require otherwise.  As an initial matter, none of the texts cited in *Stupp* or the record in this case discusses anything like Commerce's "Cohen's *d* test." None opined on the application of the concept of effect size to examine whether prices differ significantly among purchasers, regions, or time periods under the antidumping statute.  Nor

---

[2] Commerce placed the *Stupp* draft remand redetermination on the record of this remand proceeding as an attachment to its draft remand redetermination.

would one expect an academic author to describe all possible applications of his or her concepts, including the situation addressed by Commerce in its use of its Cohen's *d* test. Nonetheless, the academics did describe the general principles behind both the concept of effect size and its place in research and data analysis, which Commerce has applied in its differential pricing analysis. Commerce has followed these principles in conceptualizing and applying the Cohen's *d* test.

Second, Marmen is incorrect that Dr. Cohen represented that his measure of effect size for the population was based on assumptions of normal distributions and equivalent variances. *See* Marmen Br. 18-19. Dr. Cohen's discussion setting forth the general equation for effect size, which appears at section 2.2 of his text on the record, contains no such assumption. *See* Jacob Cohen, *Statistical Power Analysis for the Behavioral Sciences* 20-21 (2d. ed. 1988) (*Cohen*), *available at* Marmen Cmts. on Draft Remand at Att. 2 (Remand P.R. 19-20; Remand C.R. 19-20). Dr. Cohen presents his general formulation of effect size as the difference in the "population means" of groups A and B, divided by "the standard deviation of either population (since they are assumed equal)," mathematically expressed as:

$$d = \frac{m_A - m_B}{\sigma}$$

when

$$\sigma = \sigma_A = \sigma_B$$

*See id.* at 20, 27; *see also* Marmen Br. 19 (listing a "two-tailed" version of the formula corresponding to Dr. Cohen's equation 2.2.2).

Further, when "there is no longer a common within-population σ," (*i.e.*, the standard deviation of group A and group B are not equal), then Dr. Cohen provides for an alternative calculation of the denominator of effect size, as used by Commerce to calculate the Cohen's *d* coefficient in this investigation:

$$\sigma' = \sqrt{\frac{\sigma_A^2 - \sigma_B^2}{2}}$$

*See Cohen* at 44 (equation 2.3.2)).  Each of these formulations involve the full populations of (sales price) data and are not based on estimates of the population means or standard deviations. However, they do not articulate the assumptions of normal distribution and equivalent variance that Marmen asserts are required.  Indeed, Dr. Cohen states regarding equation 2.3.2:  "The unequal variability need not affect the conception of *d* developed in Section 2.2."  *Id.*

Additionally, Dr. Cohen explicitly distinguishes situations in which effect size is based on full populations, as just described, and in which effect size is based on sampled data (*i.e.*, when an estimate of the population parameters must be used).  *See Cohen* at 66-67 (defining *d* "so that its elements are sample results" and setting forth equations for "tests of the difference between means of independent samples").  More generally, in his introductory discussion of the relationship between effect size and statistical significance, Dr. Cohen explains that "{g}enerally, we can define the effect *in the sample* (ES$_s$) using sample statistics in the same way as we define it for the population, . . ."  *Cohen* at 17 (emphasis in original)); *see also id.* at 6 ( "Depending upon the statistic in question, and the specific statistical model on which the test is based, reliability {of a sample} may or may not be directly dependent upon . . . the shape of the population distribution.").  As discussed above, the results of Commerce's Cohen's *d* test are based on the full population of sales prices, and therefore are not samples or estimates that are dependent upon the statistical criteria to determine their reliability or precision to represent the actual mean, standard deviation, and effect size.

The language from *Cohen* on which Marmen focuses, and that the Federal Circuit cited in *Stupp*, comes from a section of the text focusing on a specific method of interpreting a Cohen's *d*

coefficient—which Commerce does not employ in its differential pricing analysis—called "The U Measures." *Id.* at 21. As Commerce observed, this interpretation method considers the extent to which the curves of two compared data sets overlap one another, which is one way to look at effect size.[3] *See* Remand Redetermination at 27. Because that is not how Commerce analyzes sales price data in its differential pricing analysis, the assumptions from that context do not apply. *See id.* at 28 (explaining that inability to perform such analysis "*does not impact* Commerce's application of the Cohen's *d* test" (emphasis added)). Indeed, Dr. Cohen explained in relation to equation 2.3.2 cited above that "{i}n interpreting *d* for this case {corresponding to the type of analysis that Commerce applies}, the U (percent nonoverlap) measures can no longer be generally defined and the Table 2.2.1 U columns will not obtain." *Cohen* at 44. Further, even though "U measures" no longer apply, Dr. Cohen confirms that "the conventional definitions of small, medium, and large *d* can also *continue to be used*." *Id.* (emphasis added). It is precisely Dr. Cohen's large threshold that Commerce uses to identify differences that are significant in its Cohen's *d* test. Marmen disputes whether the assumptions articulated in the context of the "U Measures" apply to the analysis of samples or entire populations, *see* Marmen Br. 19-20, but that does not change the fact that this is not the type of interpretive analysis that Commerce employs. *See* Remand Redetermination at 28 (explaining that "these measurements of non-overlap in statistical analysis involving sampled data do not define the real-world observed differences used by Dr. Cohen to define the small, medium and large thresholds, as discussed above.").

---

[3] The assumptions of normal distribution and equivalent variance make sense in this context because one cannot specify the overlap of two curves as Dr. Cohen does in the "U Measures" without curves that meet the assumptions. *See* Remand Redetermination at 27 (illustration); *id.* at 28 ("Without the assumptions of normality and equal variances, the area beneath the curve of the control group that is less than the mean of the experimental group could not be quantified").

Likewise, Commerce explained that the quotation Marmen highlights from a text by Grissom & Kim regarding the assumption of normality in "interpretation of a $d_G$ or $d$ in terms of estimating the percentile standing of the average-scoring members of another group with respect to the supposed normal distribution of the comparison group's scores" arises in the same context of analyzing the percentile overlap of data sets.  *See* Remand Redetermination at 28 (citing Robert J. Grissom & John J. Kim, *Effect Size for Research, Univariate and Multivariate Applications* 66 (2d. ed. 2012) (*Grissom*)).  Thus, notwithstanding Marmen's dispute about whether the assumption applies when working with samples or entire populations in this context, Commerce explained that it "does not impact Commerce's application of the Cohen's $d$ test."  *Id.* Further, the second quote that Marmen cites from *Grissom* explicitly involves assumptions about a *population* in the context of comparing data based on *sampling*, and Commerce explained that it suggests "an alternative approach to calculate the denominator of the 'd' coefficient in Dr. Grissom's equations" without undermining Commerce's analysis.  *See id.* at 28-29.

Marmen's reliance on *Algina* is also misplaced.  *See* Marmen Br. 21-22 (citing James Algina, *et al.*, *An Alternative to Cohen's Standardized Mean Difference Effect Size: A Robust Parameter and Confidence Interval in the Two Independent Groups Case*, 10 PSYCHOLOGICAL METHODS 317, 318-19 (2005)) (*Algina*), *available at* Marmen Cmts. on Draft Remand at Att. 3 (Remand P.R. 21; Remand C.R. 21)).  The purpose of the *Algina* paper is to propose, for specific circumstances, an alternative formula to provide a more "robust version" of effect size based on the difference of the means, analogous to other alternative approaches discussed in the academic literature.  *See Algina* at 317 ("The authors argue that a robust version of Cohen's effect size constructed by replacing population means with 20% trimmed means and the population standard deviation with the square root of a 20% Winsorized variance is a better measure of

population separation than is Cohen's effect size."). Thus, the authors of *Algina* merely provide an alternative approach to calculating effect size, when, as the Federal Circuit has recognized, the Cohen's *d* 0.8 coefficient "is 'widely adopted' as part of a 'commonly used measure' of the difference relative to such overall price dispersion; and it is reasonable to adopt that measure where there is no better, objective measure of effect size." *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 673 (Fed. Cir. 2019) (*Mid Continent I*) (citation omitted).

Moreover, Commerce explained that the potential bias *Algina* identifies is that Cohen's *d* may *understate* effect size when dealing with heavy-tailed distributions (*i.e.*, ones with greater data toward the end(s) of the curve). *See* Remand Redetermination at 31-32. This contradicts Marmen's claim that violations of the statistical limitations it alleges result in false positives. *See id.* If anything, this "limitation" of the Cohen's *d* coefficient makes it less likely that Commerce's approach will result in finding prices that differ significantly among purchasers, regions or time periods. *See id.* at 30. Further, Commerce explained that, when basing the calculations on the entire population instead of a sample, the issue concerning an inherent bias in an estimated effect size is no longer relevant (given that the results are not an estimate). *See id.* Because Commerce does not sample sales prices and compares data for all of the sales in the test group to all of the sales in the comparison group, Commerce's analyzes the entire population and calculates of the actual means, standard deviations, and Cohen's *d* coefficient. *See id.* at 23.

Other literature further supports Commerce's interpretation of the academic literature in its redetermination. Dr. Ellis recognizes that,

> The best way to measure an effect is to conduct a census of an entire population but this is seldom feasible in practice. Census-based research may not even be desirable if researchers can identify samples that are representative of broader populations and then use inferential statistics to determine whether *sample-based* observations reflect *population-level* parameters.

13

Paul D. Ellis, *The Essential Guide to Effect Sizes: Statistical Power, Meta-Analysis, and Interpretation of Research Results* 5 (Cambridge Univ. Press 2010) (*Ellis*) (emphasis added), *available at* Marmen Cmts. on Draft Remand at Att. 5 (Remand P.R. 21; Remand C.R. 21); *see also* Remand Redetermination at 21 (citing *Ellis*).  In other words, Dr. Ellis explains that using the entire population is the best way to measure an effect size, but is generally not feasible, which leads to use of an estimate of effect size based on sampled data.  Likewise, quoting *Ellis*, the Federal Circuit has observed that the "tricky part in this {effect size} calculation is figuring out the population standard deviation.  If this number is unknown, some approximate value must be used instead."  *Mid Continent Steel & Wire, Inc. v. United States*, 31 F.4th 1367, 1377 (Fed. Cir. 2022) (*Mid Continent II*) (quoting *Ellis* at 10).  Both quotations recognize that researchers generally work with samples to estimate population-level parameters.[4]  However, a population-based approach is feasible in antidumping proceedings because all of the sales prices used to calculate a respondent's weighted-average dumping margin are also used in the differential pricing analysis, eliminating the need to estimate the effect size using sampled data.

Overall, the academic literature, mathematical principles, and logic do not require use of the statistical assumptions that Marmen advocates when the full population of sales is used, because Commerce determines the *practical* significance (rather than statistical significance) of a price difference between two groups of prices by calculating and comparing *actual* parameters.  *See* Remand Redetermination at 47-49.  The statistical requirements regarding the normality of distribution and similarity of the variances in samples are not relevant to the application of the Cohen's *d* test in Commerce's differential pricing analysis, which does not use sampled pricing data and calculates the actual parameters using all of the pricing data. *Id.*

---

[4] Also consistent with Commerce's approach, *Ellis* explains that "{w}e can draw no conclusions about the practical significance of a result from tests of statistical significance."  *Ellis* at 5.

### C.  **Marmen's Arguments Based On Its Hypothetical Lack Merit**

Marmen contends that it further developed a hypothetical example set forth in *Stupp* by adding calculations to illustrate the problem, and that the *Stupp* hypothetical "in which the test group and comparison groups contain 'sales prices that hover around the same value'" mirrors the issues raised by Marmen.  Marmen Br. 23-26 (citation omitted).  Marmen's version of the hypothetical yields a difference in average prices (or means) of 0.47 percent.  *See id*. at 25.  Marmen asserts that its hypothetical calls Commerce's Cohen's *d* analysis into question by illustrating that unjustifiable results obtain when assumptions of normal distribution and equal variance are absent.  *See id*. at 24-26.

As an initial matter, outside of First Amendment litigation, claims based on hypotheticals are disfavored.  *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449-50 (2008) (stating in context of facial challenge "we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases" (citation omitted)); *Fieger v. Mich. Sup. Ct.*, 553 F.3d 955, 961 (6th Cir. 2009) ("While litigation based on hypotheticals is disfavored, it is allowed under certain circumstances in the First Amendment context." (citation omitted)).  When a party repeatedly attempts to imagine an extreme set of facts, which do not stem from its own data to which the relevant methodology was applied, hoping to obtain an unusual outcome that is at odds with normal outcomes of methodology, it only demonstrates that the methodology is unlikely to lead to an unreasonable or problematic outcome.  *Cf. Rita v. United States*, 551 U.S. 338, 353 (2005) ("Justice Scalia concedes that the Sixth Amendment concerns he foresees are not presented by this case.  And his need to rely on *hypotheticals* to make his points is consistent with our view that the approach adopted here will not 'raise a multitude of constitutional problems.'" (emphasis in original)).  Even if Marmen

could demonstrate that there might be a situation with cherry-picked, hypothetical facts that could lead to an unusual outcome that differs from the normal outcome under the methodology, it would not demonstrate that Commerce's methodology as a whole is unreasonable.

Notwithstanding the relevance of hypothetical examples to be determinative, and even if the statistical criteria that Marmen advocates were relevant (they are not), the issue presented in the hypothetical is unrelated to Marmen's underlying claim that the sales price data must be normally distributed, of equal variances, and of sufficient sample size. One can propose an alternative hypothetical example in which each of these statistical criteria are satisfied and "in which the test and comparison groups contain 'sales prices that hover around the same value." Marmen Br. 23. As Commerce explained in its draft redetermination in *Stupp*, the issue is that, when the variance of the sales prices in each of the test and comparison groups becomes very small (even if the sales prices in each group are normally distributed, have equal variances, and a large sample size), then the difference in the mean sales prices may be significant even with a relatively small difference in the means. *See Stupp* Draft Redetermination at 29-30 (Remand P.R. 4 at Att. 1). Indeed, to use a similarly extreme hypothetical, in a situation in which the sales prices within each group are nearly identical, any difference in the means would be significant because the standard deviation denominator for each group is close to zero.

In this context, it is also important to bear in mind the nature and role of the Cohen's *d* test within Commerce's differential pricing analysis. It *does not* constitute a given respondent's dumping margin. *See* Remand Redetermination at 48. Rather, it serves only as the method by which Commerce meets the first prong of the statutory standard for employing the average-to-transaction comparison method in calculating the dumping margin. *See Stupp*, 5 F.4th at 1347. The statute at 19 U.S.C. § 1677f-1(d)(1)(B) provides that Commerce may use an average-to-

transaction methodology if it finds a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods.  Commerce employs the Cohen's *d* test within its differential pricing analysis to determine whether the price differences are significant among purchasers, regions or time periods.  *See* Remand Redetermination at 19.  The Cohen's *d* test is based on the concept of "effect size" which measures the difference in the means of a measurement between two groups relative to the variance in that measurement within each of the two groups.  *See Stupp*, 5 F.4th at 1346; *Mid Continent II*, 31 F.4th at 1371-72.  In effect, the ratio's denominator is the "yardstick" by which the difference in the means is measured.  *See Mid Continent II*, 31 F.4th at 1377 ("The central purpose of using the Cohen's *d* ratio is to provide the missing basis of comparison—the 'yardstick.'").  Cohen's *d* relates, by division, the difference in mean prices of the two particular groups to a figure representing the magnitude of differences in (dispersion of) the prices in the data pool more generally.  *Id.* (citation omitted).  When this difference in the means relative to the variances within the data, which produces the Cohen's *d* coefficient, is found to be "large" (0.8 or greater), the difference in the prices is found to be "significant."  *See id.*; Remand Redetermination at 24.

This context highlights a key flaw in Marmen's reasoning based upon its hypothetical. Marmen suggests that an observer would deem the small price differences in its hypothetical—in terms of dollar value—to be insignificant.  *See* Marmen Br. 25-26.  However, the Federal Circuit has recognized that "even a small absolute difference in the means of the two groups can be significant (for the present statutory purpose) if there is a small enough dispersion of prices within the overall pool as measured by a proper pooled variance or standard deviation" and that the Cohen's *d* "0.8 standard is 'widely adopted' as part of a 'commonly used measure' of the difference relative to such overall price dispersion."  *Mid Continent I*, 940 F.3d at 673.  In other

words, just because price differences are small in absolute terms does not mean that they cannot

be "significant" in terms of their ability to mask potential dumping that would be identified using

the average-to-transaction method.  The description from *Mid Continent I* is also consistent with

guidance in the Statement of Administrative Action stating that "the Administration intends that

in determining whether a pattern of significant price differences exist, Commerce will proceed

on a case-by-case basis, because *small differences may be significant for one industry or one*

*type of product, but not for another*."  Statement of Administrative Action accompanying the

Uruguay Round Agreements Act, H.R. Rep. No. 103-316,  at 843  (1994), *reprinted in* 1994

U.S.C.C.A.N. 4040, 4178 (SAA) (emphasis added).

    This also makes logical sense:  When the variances in the sales prices are small, a smaller

difference in the mean sales prices may be significant; but when variances in the sales prices is

large, there will need to be a larger difference in the mean sales prices for the difference to be

significant.  Contrary to the thrust of Marmen's argument it is not unreasonable that, for a given

difference in the mean sales prices, the difference will more likely be significant when the

variances in the sales prices are smaller than when the variances are larger.

    In addition to the hypothetical argument, Marmen briefly references its argument during

initial briefing that the price differences for five of its CONNUMs are not "significant" because

the relative price differences are less than one percent.  See Marmen Cmts. at 26 ("An objective

examiner in the 'real world' would not consider such minor price differences to be significant

(particularly when considering that the net price differences for four of the five CONNUMs

arose solely from exempted import duties and imputed credit expenses, which are not booked in

the company's accounting system).").  This is inappropriate because Marmen simply replaces

Commerce's definition of "significance" based on the "yardstick" of variance-based effect size,

with its own alternative definition based on the "yardstick" of absolute price differences.  As we establish above, the Federal Circuit and SAA both recognize that a small absolute difference in the means of two groups can be significant (for the present statutory purpose), depending on the dispersion of prices within the overall pool.  *See Mid Continent I*, 940 F.3d at 673; SAA at 843. Commerce's approach to define significance in terms of effect size rather than absolute price differences is reasonable.  *See Mid Continent I*, 940 F.3d at 673.  Moreover, as Commerce indicated in the *Stupp* draft redetermination, the absolute price level *ultimately is* taken into consideration in the "meaningful difference" test aspect of its differential pricing analysis, when Commerce examines whether the A-to-A method can account for the observed price differences. *See Stupp* Draft Redetermination at 31 (Remand P.R. 4 at Att. 1).

Finally, Marmen's assertion that Commerce must take into consideration the cause of the price differences as part of its definition of whether the differences are "significant" is meritless. *See* Marmen Br. 26.  The Federal Circuit has held that Commerce is not required to identify a reason or cause for the observed price differences, but only that such price differences are found as a result of a company's pricing behavior in the United States market.  *See JBF*, 790 F.3d at 1368 ("{Section 1677f-1(d)(1)(B)} does not require Commerce to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods").  Therefore, Marmen's arguments that its hypothetical example as well as its contentions based on its own sales data demonstrate that Commerce's reliance on effect size in its Cohen's *d* test is unreasonable are meritless.

### D.  Commerce Lawfully Rejected Marmen's New Factual Information

Marmen claims in two footnotes that Commerce abused its discretion by rejecting portions of Marmen's comments on Commerce's draft redetermination.  *See* Marmen Br. 17, 20

nn. 5-6.  Arguments raised in footnotes are waived.  *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006).  Nonetheless, Marmen's claim lacks merit.

During the remand proceeding, Commerce rejected attachments 1, 4, 6, and 7 to Marmen's comments on the draft redetermination because they comprised new and unsolicited factual information not previously on the record or cited by Commerce in its draft.  *See* Rejection of New Factual Information (May 16, 2022) (Remand P.R. 15).  Requesting reconsideration, Marmen argued that the rejected information merely defined "mean" and "normal distribution" and provided basic SAS programing.  *See* Request for Reconsideration at 2 (May 17, 2022) (Remand P.R. 16).  However, Commerce had also concluded that Marmen failed to provide a "written explanation identifying the subsection of 19 CFR 351.102(b)(21) under which {it was} submitting this new factual information."  Rejection of New Factual Information (Remand P.R. 15).  Additionally, on remand, Commerce explained that it provided "ready access to all academic references cited and addressed by the Federal Circuit decision in *Stupp* by placing the Stupp draft redetermination on the record of this case, which fully referenced the sources cited in the Federal Circuit decision in *Stupp*."  Remand Redetermination at 50.

"Generally, a court will not consider matters outside of that administrative record, unless the omission prevents effective judicial review."  *Canadian Solar Int'l Ltd. v. United States*, 399 F. Supp. 3d 1379, 1382 (Ct. Int'l Trade 2019) (citations omitted).  Moreover, the Federal Circuit has recognized that "courts must not improperly intrude upon an agency's power to implement and enforce proper procedures for constructing an agency record."  *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761 (Fed. Cir. 2012).  Accordingly, Commerce acted within its discretion in rejecting Marmen's new factual information.

## III.    Commerce Reasonably Rejected Marmen's Additional Cost Reconciliation Item

Commerce has also complied with the Court's direction to Commerce to provide further explanation or consideration regarding Marmen's supplemental cost reconciliation information. *See Marmen*, 545 F. Supp. 3d 1317.  This issue centrally concerns an additional reconciling item included in the supplemental reconciliation that Marmen asserts is required to convert from U.S. dollars (USD) to Canadian dollars (CAD) the cost of its wind tower purchases from its affiliate Marmen Énergie.  On remand, Commerce accepted and thoroughly evaluated the supplemental reconciliation information, in conjunction with the information already on the record, and found that the record did not support using Marmen's new reconciliation item because it adjusts for amounts that are already reflected in the costs that Marmen reported to Commerce and is otherwise nonreliable.  *See* Remand Redetermination at 4-11, 38-46.

### A.  Background

During the investigation, while responding to Commerce's requests for information, Marmen discovered errors in its audited financial statements.  *See* Marmen Supplemental Section D Question 14.g Response at 2 (Dec. 13, 2019) (P.R. 123; C.R. 158).  Marmen stated that the errors related to "a misstatement in the presentation of net foreign exchange gains and losses." *Id*.  Marmen further stated that its auditors subsequently discovered an additional error in Marmen Énergie's financial statements relating to foreign currency transactions.  *See id*.  Regarding these errors, Marmen explained:

> {S}ubsequent to the issuance of the original audited financial statements, after further investigation of its foreign currency transactions for the year, Marmen discovered that certain USD purchases for both Marmen Inc. and Marmen Énergie had not been converted.  Consequently, Marmen's auditor determined it was necessary to issue amendments for Marmen Inc. to convert into CAD certain expenses incurred in USD, and in addition recognize the impact of a net loss for the year on forward exchange contracts

> in sales revenue (*i.e.*, as a reduction in revenue) rather than as part
> of exchange gains/losses, in conformance with Canadian Generally
> Accepted Accounting Principles ("GAAP").  With respect to
> Marmen Énergie, the company's auditor also determined that an
> amendment was necessary to separately present gains/losses on the
> income statement related to foreign currency transactions to align
> with Canadian GAAP.

Marmen Second Supplemental Section D Response at 11 (Feb. 28, 2020) (P.R. 162; C.R. 206).

As a result, the auditors restated Marmen's amended financial statement and amended Marmen

Énergie's financial statement.  *See id*.; *see also* Marmen First Supplemental Section D Response

at 32-33 (Dec. 6, 2019) (P.R. 118; C.R. 99) (discussing restatement).

    After Marmen revised these errors, Commerce accepted Marmen's restated financial

statement and Marmen Énergie's amended financial statement.  Notably, the restatement to

Marmen's financial statement to account for foreign exchange gains and losses resulted in an

increase to Marmen's Cost of Goods Sold (COGS) listed in its financial statement, and thus its

Cost of Manufacturing (COM) for its merchandise.  *See* Remand Redetermination at 5.

    As a result of the changes to the financial statements, Commerce solicited a revised cost

reconciliation based on the restated audited financial statements.  *See* Second Supplemental

Section D Questionnaire at 4 (Jan. 31, 2020) (P.R. 144; C.R. 169).  Commerce's question stated:

> Provide a revised cost reconciliation for Marmen Inc. and Marmen
> Énergie, Inc., *which starts with the cost of goods sold (COGS) as
> reported in the amended audited financial statements*, and ends
> with the extended cost file. Using the format you have formerly
> used to report your cost reconciliations, provide a comparative
> analysis to these new cost reconciliations using the chart below.
> Quantify and explain all new reconciling items . . . Ensure that the
> COGS figures tie to the December 6, 2019 and December 13, 2019
> supplemental D responses.

*Id.* (emphasis added).  Commerce further specified that the submission should be "limited to the

questions contained herein.  Additional information or revisions of previously requested

information, not pertinent to this supplemental questionnaire may result in their rejection, pursuant to 19 CFR 351.301."  *Id.*

Despite Commerce's instructions, Marmen included numerous new revisions unrelated to the auditor restatements in providing the revised cost reconciliation.  *See* Commerce Rejection Letter (Feb. 25, 2020) (P.R. 160; C.R. 203); *see generally* Remand Redetermination at 5-7 (describing these issues).  Although Commerce accepted nearly all of the revisions as "minor errors" that did not alter the data presented in Marmen's audited financial statements, Commerce rejected one non-clerical revision.  *See id.*  According to Marmen, this revision was the result of its alleged discovery, after its auditor had already restated its financial statement, of another error by which certain purchases of wind towers from Marmen Énergie were not converted from United States to Canadian dollars.  *See* Remand Redetermination at 7 (citation omitted).

As Commerce observed on remand, this additional revision put forward by Marmen offset the increase to its COM stemming from its auditor's previous adjustments for exchange gains and losses (which otherwise resulted an unreconciled difference in the cost reconciliation).  *See* Remand Redetermination at 7.  As Commerce further observed, Marmen's explanation for the additional adjustment is parallel to the auditor's previous adjustments to restate purchases to their CAD equivalent values.  *See id.*  Marmen at the time did not further explain how, if at all, its additional correction (which was *not* made by its auditor) related to the restated financial statements, or whether it was one of the adjustments brought up by the external auditor.  *See id.*

Commerce found that the additional revision amounted to new factual information, and thus rejected the submission.  *See* Commerce Rejection Letter (P.R. 160; C.R. 203).  The Court found Commerce's explanation for the rejection insufficient, and remanded the issue for further explanation or consideration.  *See Marmen*, 545 F. Supp. 3d 1315-17.

On remand, Commerce reopened the record and solicited Marmen's supplemental cost reconciliation information.  *See* Commerce Request for Additional Information (Dec. 2, 2021) (Remand P.R. 1; Remand C.R. 1).  Marmen resubmitted its revised cost reconciliation and other supporting documentation not previously on the record.  *See* Marmen Response to Request for Additional Information Concerning Second Supplemental Section D Response (Dec. 8, 2021) (Remand P.R. 2; Remand C.R. 2-3).  Marmen alleged that—on top of its *auditor*'s conversion of various purchases to account for exchange rate gains and losses (amounts included in the COGS that serves as the starting value in Marmen's cost reconciliation)—Marmen had omitted in its cost reconciliation a conversion factor that it applied to a line subtracting from its overall COGS a figure for the company's purchases from Marmen Énergie during the period July 1, 2018 to December 31, 2018.  *See* Remand Redetermination at 7; *see also* Marmen Resubmitted Second Supplemental Section D Response at Att. 1, Tab "Marmen Inc." (Dec. 8, 2021) (Remand C.R. 3) (showing starting COGS amount (Excel line 6), subtracting value for Marmen Énergie purchases (Excel line 29), and additional exchange rate conversion (Excel line 31)).  Therefore, as a result of the error, Marmen claimed that it needed to further correct its reconciliation.  Marmen Cmts. On Draft Remand Results at 4, 10 (May 18, 2022) (Remand P.R. 18; Remand C.R. 18).

After reviewing Marmen's revised cost reconciliation on remand, Commerce determined that permitting Marmen's new reconciling item would duplicate the adjustments for exchange gains and losses already reflected in Marmen's financial statements.  Remand Redetermination at 7-11.  Commerce found that information in the cost reconciliation spreadsheet, in conjunction with Marmen's representations regarding its auditor's adjustments, indicated that Marmen's auditor had already made any necessary adjustment in restating Marmen's financial statements (which produced the COGS figure used in the reconciliation).  *See id.*  Conversely, Commerce

24

observed that the record failed to support the notion that Marmen's additional change was not already reflected in Marmen's restated books, and that the claimed need for a further change otherwise would call into question the completeness of the auditor's revision to Marmen's financial statement.  *See id.* at 7.  Finally, Commerce also observed that Marmen provided no support for the exchange rate of [          ] CAD to USD that it used to calculate the additional exchange rate adjustment.  *See id.* at 8.  Thus, Commerce found it inappropriate to accept the additional cost reconciliation adjustment.  *See id.* at 11.

### B. Commerce Reasonably Determined Not To Rely On Marmen's Additional Revision To Its Financial Information

Marmen claims that Commerce is mistaken that Marmen's additional cost reconciliation adjustment would "double count" the previous adjustments for exchange gains and losses made by Marmen's auditor.  *See* Marmen Br. 10-14.  Although Marmen acknowledges that its restated financial statement included its purchases of wind towers from Marmen Énergie in Canadian dollars, Marmen argues that the reconciling item is the result of a separate inadvertent omission. *See id.* at 11.  Thus, Marmen claims that it is necessary, when deducting Marmen's July to December 2018 purchases from Marmen Énergie as part of the reconciliation, to convert the figure from one expressed in United States dollars to one expressed in Canadian dollars.  *See id.*

A review of Marmen's revised cost reconciliation demonstrates that the claimed adjustment is not warranted.  As an initial matter, the context for Marmen's further adjustment is that it (1) came late in the investigation, after Commerce had issued a questionnaire instructing Marmen not to make further changes beyond updating its cost reconciliation to reflect those that its auditor had made to its financial statements; (2) was *not* made by Marmen's auditor, but by Marmen itself without the auditor's endorsement; and (3) offsets the otherwise unreconciled COGS value resulting from the auditor's similar adjustments to account for foreign exchange

25

gains and losses.  Beyond this problematic context, moreover, Commerce explained why the record does not support the adjustment.

Marmen's revised cost reconciliation follows a series of steps to reconcile Marmen's COGS to its financial statement.  It begins with Marmen's calendar year 2018 COGS from the restated financial statement, which appears at Item A (Excel line 6).  *See* Marmen Resubmitted Second Supplemental Section D Response at Att. 1, Tab "Marmen Inc." (Remand C.R. 3). Marmen then updates this figure to cover the period of investigation by subtracting the portion of the COGS stemming from January to June 2018 (which is prior to the period of investigation) in Item B (Excel line 8), and adding the COGS for January to June 2019 in Item C (Excel line 10), to arrive at the total COGS for the period of investigation in Item D (Excel line 12).  *Id.*  To reconcile this figure with the cost of manufacturing (COM) reported in its cost database, Marmen next adds and subtracts various accounting items in Items H through R (Excel lines 20-43).  *Id.* These include subtracting the value of Marmen's wind tower purchases from Marmen Énergie in Item L (Excel line 29).  *Id.*  Marmen, however, increases this figure by *also* subtracting Item L1, the additional reconciling items at issue in this action, which it describes as "Exchange Rate Variance on July to Dec 2018 Affiliated Purchases of Wind Sections from Energie."  *Id.*

Several other lines from the reconciliation are notable in relation to the exchange rate adjustment issue and Commerce's findings.  Specifically, in Item P (Excel line 41), Marmen subtracts an item that it describes as the "Auditor Exchange Rate Adjustment" for the period from January to June 2018 (which is outside the period of investigation).  *Id.*  Then, in Items Q and R (Excel lines 42 and 43) Marmen adds back the portions of the auditor's exchange rate adjustment for the first half of 2018 relating to inputs that were purchased prior to the period, but still consumed during the period of investigation and thus reported in Marmen's cost database.

*Id.* These lines are important because they show, contrary to Marmen's claims that a further exchange rate adjustment is necessary, that the auditor's exchange rate adjustment amounts are *already* included in the starting COGS figure taken from Marmen's restated financial statement and carried forward in the various reconciliation adjustments.

Finally, in Item S (Excel line 45), Marmen then sums the total of Items H through R to calculate the cost of manufacturing specific to subject merchandise. *Id.* Item T (Excel line 47) represents the cost of manufacturing specific to subject merchandise reported to Commerce. *Id.* The difference of Items S and T is the reconciling difference between what Marmen reported to Commerce as the cost of manufacturing in its cost database and the total amount calculated in its revised cost reconciliation. *Id.*

Commerce explained the significance of these facts in its remand redetermination. It explained that Marmen had reported on the record that, for USD-denominated purchases in its normal books, Marmen's cost system converts USD purchases to CAD at specific conversion rates. *See* Remand Redetermination at 9 (citing Marmen Initial Section D Response at D-15 (Oct. 11, 2019) (P.R. 90; C.R. 83)). Marmen also stated that "to ensure that the company's actual direct material costs are reported in the cost database, Marmen included the actual exchange gain or loss received by Marmen on purchases of direct materials in USD." *Id.* (citing Marmen Initial Section D Response at D-33). Additionally, in connection with Marmen's original 2018 audited financial statement, Marmen explained that its auditors periodically adjusted these already "converted" purchases to be based on the actual exchange rates during 2018. *Id.* (citing Marmen First Supplemental Section D Response at 17-18 (P.R. 116; C.R. 99)). Thus, Marmen's statements regarding adjustments for exchange rates indicate that these gains and losses are already accounted for in Marmen's costs. *See id.* at 39-40, 41-42.

Turning to the reconciliation spreadsheet, Commerce explained why the information in the spreadsheet indicates that the additional exchange rate adjustment is duplicative of the auditor's previous adjustments. *See* Remand Redetermination at 9-11. Because Item P (Excel line 41) deducts the portion of the auditor's exchange rate adjustments applicable to Marmen's U.S. dollar purchases from January to June 2018 (since that portion is *outside* the investigation period), it indicates that the same auditor exchange rate adjustments for the months falling *within* the period of investigation (July to December 2018) are also included in the costs carried through from Item A to Item S. *See* Remand Redetermination at 10-11. Indeed, this point is reinforced by the fact that Items Q and R (Excel lines 42 to 43) revise the exchange rate adjustment figure to *add back* portions of the adjustment relating to materials consumed during the investigation period. *See* Marmen Resubmitted Second Supplemental Section D Response at Att. 1, Tab "Marmen Inc." (Remand C.R. 3).[5] Moreover, as Commerce further explained, the cost reconciliation spreadsheet Item L (Excel line 29), which is the figure that Marmen claims requires further exchange rate adjustment, did not change at all based on the auditor's adjustment to Marmen's financial statement, indicating that the auditor did not believe that there was any correction necessary to that figure. *See id.*; Remand Redetermination at 10. This is consistent with Commerce's finding that any needed exchange adjustment is already included in Marmen's cost figures (consistent with Marmen's representations discussed above). *See id.*[6]

---

[5] Marmen mischaracterizes Commerce's point by claiming that Commerce asserted that the Item L1 adjustment that Commerce rejected is already included in these figures. *See* Marmen Br. 13. The figures merely show that any needed adjustment was already included in Marmen's overall cost figures carried through from Items A to S, not that Items P to R duplicate Item L1.

[6] As to Marmen's computation of the additional reconciling item, Commerce explained that when it reviewed the underlying list of invoices to which Marmen refers, virtually every invoice listed in the document, which encompasses the entire period of investigation, is designated as a USD-denominated sale. *See* Remand Redetermination at 42-43. Marmen has stated that the January to June 2019 purchases were in CAD; however, they are not designated as such in the

Overall, as Commerce explained, the record evidence shows that Marmen definitively stated that its reported costs account for the exchange gains and losses based on fixed rates during the year; next, its auditors made an adjustment to convert those costs to reflect actual exchange rates for purchases initially made in USD; and the auditors then reevaluated the recording of exchange gains and losses and made any needed corrections to the accounts, as reflected in Excel lines 6 and 41 of the amended cost reconciliation (whereas Excel line 29 remained the same).  Remand Redetermination at 10 (citations omitted).  Thus, there was no basis for Marmen to make a further adjustment because its reported costs, including those for the wind tower sections purchased from Marmen Énergie, were already inclusive of exchange rate differences, and it would be improper to adjust them again for that purpose.

It is also appropriate to sustain Commerce's determination because "Commerce is entitled to substantial deference in its choice of accounting methodology." *Fischer S.A. Comercio, Industria & Agricultura v. United States*, No. 12-00340, 2014 WL 2853909, at *10 (Ct. Intl Trade 2014) (quoting *PSC VSMPO-Avisma*, 688 F.3d at 764); *see also Fujitsu*, 88 F.3d at 1039 (requiring "tremendous deference" to Commerce's resolution of technical accounting issues because "agencies possess far greater expertise than courts" in such areas).

Nonetheless, Marmen maintains that the additional adjustment is not duplicative. *See* Marmen Br. 10-14.  Marmen claims that, as a result of its purchasing (instead of producing) the tower sections in question, it was necessary to deduct the value of Marmen Inc.'s purchases of sections from Marmen Énergie in order to reconcile Marmen Inc.'s audited COGS to its cost of

---

document listing the invoices.  *See id.*  Thus, although Marmen has summed up the purchases during July to December 2018, Commerce determined that the document does not reliably reflect in which currency these transactions actually occurred between USD  and CAD because all of the purchases are shown as USD.  *See id.*; Marmen Resubmitted Second Supplemental Section D Response at Att. 1, Tab "L1 USD Purchases for Energie" (Remand C.R. 3).

manufacturing for the subject merchandise it reported to Commerce.  *See id*. at 12.  Marmen further contends that "this was not an error for Marmen's auditor to correct, as COGS in Marmen's audited financial statement was correctly presented in Canadian dollars.  Rather, this was simply an inadvertent currency error in one line of Marmen Inc.'s cost reconciliation worksheet."  *Id*. at 13.

This does not address the issue that Commerce identified, however, because (1) Marmen concedes that the costs of its wind tower purchases from Marmen Énergie are already included in the COGS and ensuing cost figures listed in the cost reconciliation (which based on Marmen's statement and the information in the reconciliation itself would also include any exchange rate adjustment pertaining to those purchases); and (2) it does not address Commerce's finding that Marmen's premise that Item L in the reconciliation needs further adjusting because it is stated in USD is unreliable, because virtually all of the underlying invoices (including those that Marmen agrees reflect CAD) are listed as being in USD.  *See* Remand Redetermination at 42-43.  Thus, there is no support for Marmen's adjustment, other than Marmen's assertion that a portion of its purchases has not already been converted using the actual exchange rate.  *See id.* at 8.[7]  Nor does Marmen's argument address Commerce's findings that the figure in Item L did not change as a result of the restatement to Marmen's financial statements, indicating that Marmen's auditor did believe any exchange rate adjustment to that figure was needed.  *See id.* at 10, 11, 42.  In any event, without a detailed listing of the inputs and adjustments made to Marmen's COGS figure reflected in Item A, Commerce cannot reasonably ascertain whether it is necessary to deduct the additional adjustment reflected in Item L1 as Marmen claims.

---

[7] Although Marmen's list of sales multiplied by Marmen's selected exchange rate totals the adjustment at L1, that does not demonstrate that the adjustment is needed and non-duplicative of the adjustments already included in the cost figures.  *See* Marmen Br. 14-15.

Finally, apart from finding that the record does not support Marmen's new adjustment, Commerce reasonably found that the [      ] CAD to USD exchange rate that Marmen used for the adjustment was unsupported.  *See* Remand Redetermination at 8, 43.  As Commerce found, "Marmen provided no support for the average exchange rate that is on the worksheet."  *Id.* at 8. Although Marmen now points to places in the record of the investigation where it used the same exchange rate, *see* Marmen Br. 15, there is still no documentation on the record showing from where that rate was derived, nor is there any support for it being an actual average rate for the period in question.  *See* Remand Redetermination at 43.  The supporting tab from Marmen's cost reconciliation characterizes the rate as "Average exchange rate 2018," which would include the *entire* period from January through December 2018, rather than the *relevant* period from July to December 2018 that overlaps with the period of investigation.  *Id.* (quoting Marmen Resubmitted Second Supplemental Section D Response at Att. 1, Tab "L1 USD Purchases for Energie" (Remand C.R. 3)).  As Commerce explained, "there is no further detail, source document or any other support provided."  *Id.*  The SAA states that "as with all adjustments which benefit a responding firm, the respondent must demonstrate the appropriateness of such adjustment," SAA at 829, and the Federal Circuit similarly has held that Commerce reasonably places the burden to establish entitlement to adjustments on the party seeking the adjustment.  *See Fujitsu*, 88 F.3d at 1040.  Accordingly, it was Marmen's burden to provide information supporting its claims that the exchange rate it used was based on actual rates from July to December 2018.

Marmen blames Commerce for failing to develop the record supporting Marmen's new adjustment by declining to conduct on-site verification (despite Marmen's objection) during Spring 2020, and by limiting the information that it requested on remand to the materials that it had previously rejected.  *See* Marmen Br. 15-16.  In this regard, Marmen suggests that the

burden is on Commerce to supplement a respondent's submissions at verification.  "The purpose

of verification," however, "is to test information provided by a party for accuracy and

completeness."  *Ghigi 1870 S.P.A. v. United States*, <mark>547 F. Supp. 3d 1332, 1346</mark> (Ct. Int'l Trade

2021) (citation omitted).  Thus, "{v}erification is not intended to be an opportunity for

submission of new factual information." *Id*.  Accordingly, even if an on-site verification had

occurred, Commerce likely would not have sought to supplement the record with respect to

Marmen's adjustment in the manner that Marmen asserts.

     Consequently, the Court should sustain Commerce's determination not to rely on

Marmen's additional exchange rate adjustment.

## <u>CONCLUSION</u>

     For these reasons, we respectfully request that the Court sustain Commerce's remand

*r*edetermination.

                    Respectfully submitted,

                    BRIAN M. BOYNTON
                    Principal Deputy Assistant Attorney General

                    PATRICIA M. McCARTHY
                    Director

                    /s/ Reginald T. Blades, Jr.
                    REGINALD T. BLADES, JR.
                    Assistant Director

/s/ Joshua E. Kurland

OF COUNSEL:                               JOSHUA E. KURLAND
JESUS N. SAENZ                   Senior Trial Counsel
Attorney                                  U.S. Department of Justice
Office of the Chief Counsel         Civil Division
for Trade Enforcement and Compliance   Commercial Litigation Branch
U.S. Department of Commerce        P.O. Box 480
Washington, D.C.                   Ben Franklin Station
                                         Washington, D.C. 20044
                                         Telephone: (202) 616-0477
                                         E-mail: Joshua.E.Kurland@usdoj.gov

October 3, 2022                 *Attorneys for Defendant United States*

## **<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that defendant's attached filing complies with the Court's type-volume limitation rules. According to the word count calculated by the word processing system with which the motion was prepared, the confidential version of the brief contains a total of 9,959 words.

<u>/s/ Joshua E. Kurland</u>

October 3, 2022