A-122-867
Remand
Fed. Cir. 23-1877
**Public Document**
E&C/OVI: Team

**Marmen Inc., et al v. United States et al, Ct. No. 23-1877 (Federal Circuit 2025)**
**Utility Scale Wind Towers from Canada**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the opinion and remand order of the U.S. Court of Appeals for the Federal Circuit (Federal Circuit), in *Marmen Inc. et al v. United States et al*, issued on April 22, 2025.[1]  This action arises out of the final determination in the less-than-fair-value (LTFV) investigation of utility scale wind towers from Canada.[2]  The period of investigation (POI) is July 1, 2018 through June 30, 2019.

The Federal Circuit remanded to Commerce to recalculate the estimated weighted-average dumping margin of Marmen Inc. / Marmen Énergie Inc. (collectively, Marmen) by:  (1) reconsidering Commerce's decision to reject Marmen's corrective information concerning U.S. dollar (USD) to Canadian dollar (CAD) cost conversions for affiliated purchase of wind tower sections from Marmen Énergie; and (2) reconsidering its differential pricing analysis without reliance on the Cohen's *d* test.[3]

---

[1] *See Marmen Inc. et al v. United States et al*, Ct. No. 23-1877 (Fed. Cir. April 22, 2025) (*Remand Order*).
[2] *See Utility Scale Wind Towers from Canada:  Final Determination of Sales at Less than Fair Value and Final Negative Determination of Critical Circumstances*, 85 FR 40239 (July 6, 2020) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See Remand Order* at 14 and 23-24.

As set forth in detail below, pursuant to the Federal Circuit's *Remand Order*, Commerce has recalculated Marmen's estimated weighted-average dumping margin by: (1) reconsidering and accepting USD to CAD cost conversions for affiliated purchase of wind tower sections from Marmen Énergie; and (2) conducting Commerce's differential pricing analysis without reliance on the Cohen's *d* test.

## II.     BACKGROUND

Commerce published the *Final Determination* on July 6, 2020. As discussed in the *Final Determination*, Commerce rejected portions of a questionnaire response due to the submission containing what Commerce determined was untimely filed new factual information (NFI) concerning 2018 exchange rate data between USD and CAD. Commerce also continued to apply the average-to-transaction (A-to-T) method for calculating Marmen's estimated weighted-average dumping margin. Following publication of the *Final Determination*, certain parties challenged Commerce's *Final Determination* before the Federal Circuit.

First, in its opinion sustaining, in part, and remanding, in part, Commerce's *Final Determination*, the Federal Circuit assessed whether Commerce's continued rejection of Marmen's 2018 exchange rate data was flawed. Commerce argued that: (1) Marmen's exchange rate adjustments were "duplicative of other adjustments," and (2) the data underlying the exchange rate conversion were unreliable. The Federal Circuit held that Commerce's double counting and unreliability concerns were not supported by substantial evidence given that the exchange rate adjustments did not cover the same time periods as the other adjustments and that representations from Marmen's auditors that the cost reconciliation was complete and already accounted for were made before the error was identified. It further held that there was no reason to question the reliability of Marmen's identification of sales that needed to be converted from

USD to CAD.  Accordingly, the Federal Circuit vacated the U.S. Court of International Trade's (CIT) opinion, and remanded to Commerce for further proceedings consistent with its opinion.

Next, the Federal Circuit assessed whether Commerce's continued reliance on the Cohen's $d$ test is reasonable.  Commerce argued:  (1) that it is unnecessary to meet the statistical assumptions of normal distribution, equal variability, and equally and sufficiently numerous data when Commerce uses a full population of prices in applying the Cohen's $d$ test, and (2) that Commerce does not rely on the Cohen's $d$ test to calculate a weighted-average dumping margin but rather to determine whether the use alternative A-to-T comparison method to the standard average-to-average (A-to-A) method is permitted.  Citing its decision in *Stupp I*,[4] the Federal Circuit held that Commerce's reliance on the Cohen's $d$ test is unreasonable.

First, the Federal Circuit rejected Commerce's argument that reliance on the Cohen's $d$ test was reasonable because the Cohen's $d$ test is not used to calculate a weighted-average dumping margin but rather to determine which comparison method to use.  It explained that the Cohen's $d$ test is the first step in the differential pricing analysis and, accordingly, flaws in the application of Cohen's $d$ test will lead to flawed results further in Commerce's calculations.

Second, the Federal Circuit rejected Commerce's argument that it is not necessary for the statistical assumptions underlying the Cohen's $d$ test to be met where the full population of prices are used.  The Federal Circuit stated that the Cohen's $d$ test measures effect size which requires certain statistical assumptions to be met, and that the academic literature cited to by Commerce for support relates to an entirely different test.  Further, the use of the full population of prices is not meaningful when the value of the calculated Cohen's $d$ coefficient is incorrect.

---

[4] *See Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021) (*Stupp I*).

On June 17, 2025, the CIT issued an order remanding the *Final Determination* to Commerce "for further proceedings in conformity with the Federal Circuit's opinion."

On November 24, 2025, we released our Draft Redetermination to interested parties.[5] The estimated weighted-average dumping margin for Marmen and for all other producers and exporters changed from 4.94 percent in the *Final Determination* to 2.93 percent. On December 5, 2025, we received comments from Marmen.[6] We respond to these comments below.

After considering the comments raised by interested parties, we made no changes to the Draft Redetermination with regard to Commerce's revised differential pricing analysis for these final results of redetermination. As a result, the estimated weighted-average dumping margin for Marmen remains unchanged from the Draft Redetermination at 2.93 percent.[7] Additionally, the estimated weighted-average dumping margin for all other producers and exporters remains at 2.93 percent.[8]

## III.    ANALYSIS

### I.    USD to CAD Exchange Rates

In light of the Federal Circuit's opinion, with regard to Commerce's rejection of Marmen's cost reconciliation item related to certain USD to CAD exchange rate conversion data

---

[5] *See* Draft Results of Redetermination Pursuant to Court Remand, *Marmen Inc. et al v. United States et al*, Court No. 23-1877 (Fed. Cir. April 22, 2025), dated November 24, 2025 (Draft Redetermination).
[6] *See* Marmen's Letter, "Comments on Draft Remand Results," dated December 5, 2025 (Marmen's Draft Redetermination Comments).
[7] *See* Memorandum, "Calculation Memorandum for the Final Results of Redetermination," dated concurrently with these Final Results of Redetermination (Marmen Final Calculation Memorandum).
[8] *Id.*

and, accordingly, we have recalculated Marmen's estimated weighted-average dumping margin to reflect this reconciling difference in the reported costs.

During the LTFV investigation, Marmen had originally reported its costs of manufacturing based on its audited financial statements.[9]  Marmen's auditors, however, subsequently restated (*i.e.*, corrected) the audited financial statements which caused shifts in expenses that prompted Commerce to request a revised cost reconciliation from Marmen.[10] Commerce instructed Marmen that it should show only the changes to the previously submitted cost reconciliation that related specifically to the auditors' restatement.[11]  Marmen submitted a revised cost reconciliation but included an additional reconciling item which Commerce found to be unrelated to the auditor's restatement of the audited financial statements.[12]  Accordingly, Commerce disregarded the reconciling line item as an unsolicited questionnaire response.[13]  In *Marmen I*, the CIT remanded Commerce's determination to disregard the reconciling line item as an abuse of discretion, reasoning that Commerce "must accept corrections when there is sufficient time for Commerce to consider the submission prior to the final determination."[14]

On remand, and in compliance with the CIT's opinion in *Marmen I*, Commerce accepted Marmen's corrective information onto the record.[15]  However, Marmen's corrective information raised new concerns and Commerce concluded that Marmen's proposed additional reconciling item would duplicate an adjustment amount that was already reflected in its revised audited

---

[9] *See Final Determination* IDM at 8.
[10] *Id.*
[11] *Id.*
[12] *Id.* at 8-9.
[13] *Id.* at 9.
[14] *See Marmen Inc. v. United States*, 545 F. Supp. 3d 1305, 1317 (CIT 2021) (*Marmen I*).
[15] *See* Commerce's Letter, "Request for additional information: Marmen Inc., Marmen Energie Inc., and Marmen Energy Co. v. United States, Slip Op. 21-148, Court No. 20-00169," dated December 2, 2021; *see also* Marmen's Letter, "Request for Additional Information Concerning Second Supplemental Section D Response," dated December 8, 2021.

financial statements, which is the basis for a respondent's reporting of costs under section 773(f)(1)(A) of the Act.[16]  Therefore, Commerce did not include the reconciling item in Marmen's cost of manufacturing and cost of production for purposes of computing its estimated weighted-average dumping margin.[17]  In *Marmen II*, the CIT sustained Commerce's determination to reject Marmen's corrective information, explaining that record information showed "Marmen's auditors already adjusted the reported costs to account for exchange rate differences" and, therefore, "Commerce did not abuse its discretion by rejecting Marmen's proposed corrective information."[18]  Marmen appealed the CIT's holding in *Marmen II* to the Federal Circuit.

On appeal, the Federal Circuit held that Commerce's determination to reject a reconciling item related to Marmen's exchange rate data was unsupported by substantial evidence, explaining that Commerce's double counting concerns were unwarranted because Marmen's auditor's statement that the cost reconciliation was complete was made before Marmen's error was discovered.[19]  The Federal Circuit also rejected Commerce's arguments disputing the reliability of Marmen's data, stating that the record is clear in that Marmen unambiguously demonstrated its "2018 sales were recorded in USD and should be converted to CAD" and that "any other interpretation of the data amounts to a question of the veracity of Marmen's representations."[20]  Following the issuance of the Federal Circuit's mandate, the CIT remanded

---

[16] *See Final Results of Redetermination Pursuant to Court Remand, Marmen Inc., et al., v. United States*, Ct. No. 20-00169 Slip Op. 21-148 (CIT 2021), dated May 26, 2022, at 11 (*First Remand Redetermination*), available at https://access.trade.gov/Resources/remands/21-148.pdf.
[17] *Id.*
[18] *See Marmen Inc. v. United States*, 627 F. Supp. 3d 1312, 1320 (CIT 2023) (*Marmen II*).
[19] *See Remand Order* at 12-13.
[20] *Id.* at 14; *see also* Marmen's Letter, "Request for Additional Information Concerning Second Supplemental Section D Response," dated December 8, 2021 (Marmen's Supplemental Remand Second D QR), at Attachment I.

the *Final Determination* "for further proceedings in conformity with the {Federal Circuit's} opinion."[21]

For the purposes of this redetermination and consistent with the Federal Circuit's decision in *Marmen Inc v. United States*, we have included the reconciling line item in Marmen's calculation of its cost of production to reflect the cost reconciliation difference related to these exchange rate differences, as part of our recalculation of Marmen's estimated weighted-average dumping margin.

## II.    Commerce's Application of the Cohen's *d* Test

The Federal Circuit also held that Commerce did not sufficiently explain how its use of the Cohen's *d* test was reasonable in light of concerns raised by the Federal Circuit in *Stupp*, when the data groups being compared are small, not normally distributed, and have disparate variances (*i.e.*, certain statistical criteria are not satisfied).[22]  Specifically, the Federal Circuit remanded Commerce's differential pricing analysis, instructing that the new "analysis may not rely on Cohen's *d* test," but did not "preclude Commerce from fashioning and justifying a statistical analysis that uses some of the ideas underlying Cohen's analysis of group difference as long as the resulting analysis is itself justified as sound for gauging differences in the data sets at issue."[23]

Following the Federal Circuit's remand order, Commerce sought information and public comment on alternatives to the Cohen's *d* test as part of its differential pricing analysis under section 777A(d)(1)(B)(i) of the Act, to identify whether prices for comparable merchandise differ significantly among purchasers, regions, and time periods.[24]  To comply with the Federal

---

[21] *See CIT Remand Order* at 1.
[22] *See Stupp I*, 5 F.4th at 1344-48, 1357-60.
[23] *See Remand Order* at 24.
[24] *See Alternatives to the Use of Cohen's d; Request for Comment*, 90 FR 21277 (May 19, 2025).

Circuit's holding, Commerce discontinued the use of the Cohen's *d* test in administrative proceedings and adopted a new test for evaluating whether price differences among purchasers, regions, or time periods are significant.[25] Additionally, and concurrent with this change, Commerce also discontinued the use of the "mixed method" in administrative proceedings.[26] In its revised differential pricing analysis, Commerce adopted the "price difference test" as part of its differential pricing analysis to determine whether prices differ significantly. Accordingly, for these results of redetermination, in light of Commerce's revised approach in administrative proceedings pursuant to the Federal Circuit's *Remand Order*, Commerce reconsidered and discontinued its application of the Cohen's *d* test to Marmen's U.S. sales data, and, in the alternative, applied the "price difference test," and discontinued the use of the mix method as detailed below.

### i. Comparisons to Normal Value

Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), in order to determine whether Marmen's sales of the subject merchandise from Canada to the United States were made at less than normal value (NV), Commerce compared the export price (EP) and constructed export price (CEP) to the NV as described in the "Constructed Export Price" and "Normal Value" sections of the *Preliminary Determination*.[27]

---

[25] *See, e.g.*, *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2022–2023*, 90 FR 30050 (July 8, 2025), and accompanying IDM at 2-5.
[26] *Id.*
[27] *See Utility Scale Wind Towers from Canada: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 85 FR 8562 (February 14, 2020) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum at 13-14.

**1. Determination of Comparison Method**

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates a weighted-average dumping margin by comparing weighted-average NVs to weighted-average EPs or CEPs (*i.e.*, the A-to-A method) unless Commerce determines that another method is appropriate in a particular situation. In an LTFV investigation, Commerce examines whether to compare weighted-average NVs with the EPs or CEPs of individual sales (*i.e.*, the A-to-T method) as an alternative comparison method using an analysis consistent with section 777A(d)(1)(B) of the Act.

In numerous investigations and administrative reviews, Commerce has applied a "differential pricing" analysis for determining whether application of the A-to-T method is appropriate in a particular situation, consistent with 19 CFR 351.414(c)(1) and section 777A(d)(1)(B) of the Act. Commerce finds that the differential pricing analysis is instructive for purposes of examining whether to apply an alternative comparison method here. Commerce will continue to evaluate its approach in this area based on comments received and the application of the differential pricing analysis on a case-by-case basis, and on Commerce's additional experience with addressing the potential masking of dumping that can occur when Commerce uses the A-to-A method in calculating a respondent's weighted-average dumping margin.

The differential pricing analysis used here examines whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods. The analysis evaluates all U.S. sales by purchaser, region, and time period to determine whether a pattern of prices that differ significantly exists. If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the A-to-A method to calculate the weighted-average dumping margin. The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable

merchandise.  Purchasers are based on the reported consolidated customer codes.  Regions are defined using the reported destination code (*i.e.*, ZIP code) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau.  Time periods are defined by the quarter within the POI based upon the reported date of sale.  For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the product control number (CONNUM) and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP or CEP and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used here, the "price difference test" is applied to determine whether prices differ significantly.  For comparable merchandise, the price difference test examines whether the weighted-average net price to a given purchaser, region, or time period is within two percent of the weighted average net price to all other purchasers, regions, or time periods.  If the weighted-average net price to the given purchaser, region, or time period falls outside of the plus or minus two percent band around the weighted-average net price to all other purchasers, regions, or time periods, then the prices to that given purchaser, region, or time period are found to differ significantly and those sales to the given purchaser, region, or time period pass the price difference test.

Next, the "ratio test" assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test.  The ratio test calculates the ratio of the total value of sales that pass the price difference test to the total value of sales by the respondent in the United States during the POI.  If 33 percent or less of the total value of sales passes the price difference test, then the results of the price difference and ratio tests do not support consideration of the A-to-T method.  If more than 33 percent of the total value of U.S. sales passes the price

difference test, then Commerce will find that a pattern of prices existed during the POI. Consequently, Commerce will examine whether there is a meaningful difference in the weighted-average dumping margins calculated using the standard A-to-A method and using the alternative A-to-T method.

If both tests in the first stage (*i.e.*, the price difference test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that the A-to-T method could be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the A-to-A method can account for such differences. In considering this question, Commerce examines whether using the A-to-T method yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-to-A method. If the difference between the two calculations is meaningful, then this demonstrates that the A-to-A method cannot account for differences in the respondent's pricing behavior in the U.S. market, such as those observed in this analysis, and, therefore, use of the A-to-T method may be appropriate. A difference in the weighted-average dumping margins is considered meaningful if: (1) there is a 25 percent relative change in the weighted-average dumping margins between the A-to-A method and the A-to-T method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-to-A method and the A-to-T method move across the *de minimis* threshold.

## 2. Results of the Differential Pricing Analysis

For Marmen, based on the results of the differential pricing analysis, Commerce preliminarily finds that 38.18 percent of the value of U.S. sales pass the price difference test, and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.[28]  Further, Commerce preliminarily determines that the A-to-A method cannot account for such differences because the weighted-average dumping margin crosses the *de minimis* threshold when calculated using the A-to-A method and when calculated using the A-to-T method.  Thus, for these results of redetermination, Commerce is applying the A-to-T method to calculate the weighted-average dumping margin for Marmen.

## IV.    INTERESTED PARTY COMMENTS

On November 24, 2025, Commerce issued its Draft Redetermination and provided interested parties an opportunity to comment.[29]  Commerce received comments from Marmen.[30] Marmen contests Commerce's use of the price difference test and discontinued use of the mixed methodology and provided comments on the final liquidation rate of its suspended entries of subject merchandise.  After considering these comments, we have not made any changes to our analysis for these final results of redetermination.

---

[28] *See* Memorandum, "Calculation Memorandum for the Final Results of Remand Redetermination for Marmen Energy Co.," dated concurrently with these final results of redetermination.
[29] *See* Draft Redetermination.
[30] *See* Marmen's Draft Redetermination Comments.

**Comment 1: Commerce's Use of a "Price Difference Test" to Make "Targeted Dumping" Findings is Arbitrary and Unlawful**

The following is a verbatim executive summary of argument submitted by Marmen. For further details, *see* Petitioner's Draft Redetermination Comments at 5-7 (internal citations omitted).

> The "price difference" test applied by Commerce in the remand redetermination (instead of the Cohen's *d* test) does not meet the statutory requirements for using an average-to-transaction ("A-T") comparison in two ways. First, the 2% threshold of the price difference test does not provide a reasonable basis to determine if prices for comparable merchandise differ "significantly" among purchasers, regions, or time periods. Second, it fails to conform with Congress's intent for a case-by-case differential pricing analysis as highlighted in the Uruguay Round Agreements Act, Statement of Administrative Action, thereby producing arbitrary results.

**Commerce's Position:** We disagree with Marmen's argument that the price difference test is not a reasonable measure of significance, and we have continued to apply the price difference test as part of a revised differential pricing analysis for these final results of redetermination, consistent with the statute and the Federal Circuit's *Remand Order*. Marmen argues that "Commerce's price difference test does not establish that prices differ significantly as required by the statute."[31] Marmen's argument is tripartite. First, Marmen argues that "Commerce's mere 2% threshold for its price difference test fails to indicate that prices different significantly during the period of investigation, under the plain meaning of the word."[32] Second, citing to Commerce's ministerial error regulations and Commerce's initial questionnaire, Marmen argues that "{t}he 2% threshold also is inconsistent with Commerce's own practice for determining significant differences in other antidumping contexts, where it deems 25% to be the threshold for significant differences."[33] Third, Marmen argues that "the 2% threshold used in

---

[31] Marmen's Draft Redetermination Comments at 6.
[32] *Id.* (internal quotations omitted).
[33] *Id.* (internal quotations omitted).

Commerce's price difference test contravenes Congress's intent to require Commerce to determine whether significant price differences exist on a case-by-case (*i.e.*, industry-specific) basis."[34]  As explained below, Marmen's arguments are meritless.

A.  *Commerce has Discretion in Determining Whether Prices Differ "Significantly"*

As an initial matter, the Federal Circuit has established that Commerce's differential pricing analysis is evaluated under a reasonableness standard, not substantial evidence.[35] Further, the CIT has held that the language in section 777A of the Act affords Commerce flexibility to implement a test that Commerce deems appropriate to identify significant price differences.[36]  Indeed, as the CIT reasoned "{t}he word 'significantly' is an open-ended qualifier, akin to 'appropriate' or 'reasonable.'"[37]  Thus, Commerce finds no basis for using a dictionary definition, as Marmen proffers, in exercising its discretion, as determined by the courts, to determine whether prices differ significantly.  By Marmen's own proffered definition of the word "significant" a two percent threshold could be "sufficiently great or important to be worthy of attention."[38]

B.  *The Two Percent Threshold is a Reasonable Measure of Significance*

We find that a two percent threshold is a reasonable measure of significance and is consistent with other aspects of Commerce's practice in antidumping proceedings.  For example, Commerce's regulations at 19 CFR 351.403 clarifies which sales Commerce may use in calculating NV.  In the arm's-length test conducted pursuant to 19 CFR 351.403(c), Commerce evaluates whether sale prices made by a respondent to an affiliated party in the comparison

---

[34] *Id.* (internal quotations omitted).
[35] *See Stupp*, 5 F.4th at 1353 ("Our precedents make clear that the relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness, not substantial evidence.") (citations omitted).
[36] *See Garg Tube Export LLP v. United States*, 740 F.Supp.3d 1355, 1366-67 (CIT 2024).
[37] *Id.* at 1367 (citing *Kisor v. Wilkie*, 588 U.S. 558, 632 (2019); *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2263 (2024)).
[38] *See* Marmen's Draft Redetermination Comments at 6 (citing Oxford English Dictionary).

market are within the ordinary course of trade and, therefore, usable in Commerce's NV calculation. Commerce will find that sale prices to an affiliated customer in the comparison market are not at arm's length and fall outside the ordinary course of trade if the average, product-specific, comparison market prices to an affiliated customer are not within a range of 98 percent to 102 percent of the average, product-specific, comparison market prices to unaffiliated customers (*i.e.*, a plus or minus two percent difference from the weighted-average prices to unaffiliated customers). In fact, Commerce has found that average prices to an affiliated customer that differ by at least two percent, and therefore fail the arm's-length test, "differ significantly" from market prices.[39] The distinction between being within or outside of the ordinary course of trade is a significant difference, as sales which are found to be outside the ordinary course of trade are excluded from Commerce's margin calculations, *e.g.*, excluded from the calculation of NV. Similarly, in determining which comparison method to use, Commerce seeks to determine whether one of the standard comparison methodologies can account for differences exhibited in the respondent's U.S. pricing behavior. Thus, the two percent threshold as used in the arm's-length test and the two percent threshold as used in the price difference test both seek to determine whether a respondent's pricing behavior in either the comparison market or U.S. market, respectively, could affect Commerce's calculation of a respondent's weighted-average dumping margin. As a result, we find that the two percent threshold in the price difference test is a reasonable measure of significance.

Moreover, pursuant to sections 733(b)(3) and 735(a)(4) of the Act, the *de minimis* threshold for an estimated weighted-average dumping margin in an investigation is two percent. In other words, an estimated weighted-average dumping margin of at least two percent is

---

[39] *See Large Diameter Welded Pipe from the Republic of Turkey: Final Determination of Sales at Less than Fair Value*, 84 FR 6382 (February 27, 2019), and accompanying IDM at Comment 4.

significant, and not zero.  Commerce has synonymously referred to non-*de minimis* levels of

dumping as a "significant" amount of dumping.[40]  If a weighted-average difference of two

percent between U.S. prices and NV is significant enough to warrant an affirmative

determination of sales at LTFV, then it is reasonable to conclude that a two-percent price

difference is significant within the context of section 777A(d)(1)(b)(ii) of the Act.  Furthermore,

in an administrative review, the *de minimis* threshold is one half of one (0.5) percent, which

suggests that the two percent threshold from investigations is more conservative.[41]  Accordingly,

Commerce's determination that a two percent threshold reasonably measures significance is

supported by statute.

Marmen proposes that Commerce use a 25 percent threshold rather than a two percent

threshold in the price difference test.  We disagree.  Marmen supports its proposed 25 percent

threshold first with reference to one of the thresholds which determines whether a ministerial

error in an investigation's preliminary determination is significant.[42]  The significant ministerial

error standard of a 25 percent change is with respect to differences in weighted-average dumping

margins, not differences in prices for subject merchandise as with the price different test.  In fact,

the thresholds set forth in 19 CFR 351.224(g) are the model for the meaningful difference test

---

[40] *See Circular Welded Non-Alloy Steel Pipe from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 26401 (June 6, 2019), and accompanying IDM at Comment 2 ("Under scenario (4), there is a significant (*i.e.*, non-*de minimis*) amount of dumping...").

[41] *See* 19 CFR 351.106(c) (providing that, in an administrative review, Commerce will treat as *de minimis* any weighted-average dumping margin that is less than 0.5 percent and will liquidate without regard to antidumping duties all entries during the relevant period of review, but dumping duties will be collected if the weighted-average dumping margin is 0.5 percent or more).

[42] *See* 19 CFR 351.224(g) {"Definition of "significant ministerial error."  Under this section, significant ministerial error means a ministerial error (see paragraph (f) of this section), the correction of which, either singly or in combination with other errors:

> (1) Would result in a change of at least five absolute percentage points in, but not less than 25 percent of, the weighted-average dumping margin or the countervailable subsidy rate (whichever is applicable) calculated in the original (erroneous) preliminary determination; or
> (2) Would result in a difference between a weighted-average dumping margin or countervailable subsidy rate (whichever is applicable) of zero (or *de minimis*) and a weighted-average dumping margin or countervailable subsidy rate of greater than *de minimis*, or vice versa."}.

within the differential pricing analysis, which does compare the weighted-average dumping

margins calculated using the standard A-to-A method and the alternative A-to-T method.

Second, Marmen points to Commerce's 25 percent threshold establishing whether "high

inflation"[43] exists within the exporting country, and whether Commerce's high inflation

methodology is warranted in a given investigation or review, which is based on the change in an

inflation index with the exporting country that is subject to an investigation.  Marmen does not

identify why a threshold used to judge a change in an inflation index is relevant to Commerce's

purpose in using the price difference test.  Nonetheless, we find Marmen's arguments

unpersuasive and continue to find that the two percent threshold is reasonable in determining

whether U.S. prices for comparable merchandise differ significantly among purchasers, regions,

or time periods.  Indeed, the arm's-length test with its two percent threshold offers the most

similar situation to that in the price difference test where prices to different groups are compared

to determine whether they differ significantly.

*C.  The Revised Price Difference Test Does Not Amount to a Brightline Rule*

    We also disagree that the revised price difference test amounts to a brightline rule that is

inconsistent with language in the Statement of Administrative Action (SAA) to conduct the

analysis on a case-by-case basis.  The test does not stipulate an absolute value as a threshold

(*e.g.*, $5 per kg) but a threshold that measures relative differences (*i.e.*, a percentage) that is

dependent on the price level for a given proceeding on a case-by-case basis by a comparison to

case-specific averages dependent on the customer, region, and time period data provided by the

---

[43] Commerce notes that "high inflation" and "hyper-inflation" (as included in Marmen's comments) are distinct circumstances under Commerce's practice.  Marmen appears to address Commerce's current "high inflation" practice, and we refer to it as such.

respondent, specific to the period under examination and to the merchandise, and thus, the market under consideration.

**Comment 2:  Commerce Acted Beyond the Bounds of the Federal Circuit's Remand Order by Impermissibly Abandoning Its Mixed Method Calculation**

The following is a verbatim executive summary of argument submitted by Marmen.  For further details, *see* Marmen's Draft Redetermination Comments at 7-10 (internal citations omitted).

> The CAFC's remand order directed Commerce to recalculate Marmen's dumping margin without using the Cohen's *d* test.  The CAFC's opinion did not address Commerce's mixed method calculation because that method was not subject to the appeal.  Commerce may not use a remand proceeding as an opportunity to reconsider issues that were not properly addressed by the Court.  Commerce lacks the authority to alter its methodology on remand in a manner that was not authorized or addressed by the Court.  Moreover, Commerce's methodological change was made without any justification or explanation.

**Commerce's Position:**  We disagree that Commerce acted beyond the bounds of the Federal Circuit's *Remand Order* in discontinuing the mixed method as an alternative comparison methodology.  While Commerce does not presume to speak for the Federal Circuit, in its *Remand Order*, the Federal Circuit explicitly permitted Commerce to reconsider its differential pricing analysis:

> We therefore vacate Commerce's calculated dumping margin based on the unreasonable use of Cohen's d test to justify the A-to-T methodology. **On remand, Commerce may re-perform a differential pricing analysis**, and that analysis may not rely on Cohen's d test for data sets like those here.[44]

Thus, Commerce's discontinuance of the mixed method is permissible under the Federal Circuit's *Remand Order*.  Marmen's argument to the contrary and Marmen's bare citations to several CIT holdings as support, are inapposite.  Confusingly, Marmen appears to argue that "Commerce impermissibly went beyond the CAFC's remand order" when it "replaced the

---

[44] *See Remand Order* at 23 (emphasis added).

Cohen's *d* test with the 2% difference test," when the Federal Circuit explicitly prohibited Commerce from using the Cohen's *d* test on remand.[45]

According to Marmen, "{i}t is well-established that Commerce may only address issues specified in the remand order."[46]  In *Hussey Copper*, the CIT assessed whether Commerce "actually adjusted the {adverse facts available (AFA)} rate or inadvertently neglected to do so."[47]  As the CIT explained, "{i}n its original *Final Determination*, Commerce selected as {AFA} 'the highest weighted-average margin for any member of the Wieland Group.'  In its third remand, the court ordered Commerce to recalculate those dumping margins, eliminating three methodological errors."[48]  Therefore, "{i}t was within the scope of the remand order for Commerce to recalculate any figure based on margins that the remand order had held were not in accordance with law."[49]  Indeed, the CIT reasoned that "a remand order would be meaningless if Commerce were not permitted to recalculate its final results after changing the underlying formulas."

Like in *Hussey Copper*, it would render the Federal Circuit's *Remand Order* meaningless if Commerce were not permitted to address the probative value of continuing to use the mixed method in its differential pricing analysis.  Similarly, it is within the scope of the Federal Circuit's *Remand Order* that where the margins calculated as a result of Commerce's differential pricing analysis were deemed not in accordance with law, that Commerce would be permitted on remand to make changes to its differential pricing analysis.

---

[45] *See* Marmen Draft Redetermination Comments at 9.
[46] *See* Marmen's Draft Redetermination Comments at 8 (citing *Hussey Copper, Ltd. v. United States*, 960 F. Supp. 315, 318 (CIT 1997) (*Hussey Copper*)).
[47] *See Hussey Copper*, 960 F. Supp. at 317.
[48] *Id.* at 318.
[49] *Id.*

Marmen continues that "Commerce may not adopt a change in methodology that was 'neither requested by the parties nor authorized by the court.'"[50]  In *Outukumpu Copper*, the CIT assessed whether Commerce's exclusion of certain entries reported in a respondent's U.S. sales database constituted an unauthorized change in methodology.[51]  In the final determination of the underlying proceeding, Commerce had included all entries made during the period of review, regardless of sale date.[52]  Following litigation relating to *ministerial errors* in *Hussey Copper* (referenced above), Commerce's issued its remand redetermination to correct for the ministerial errors but inadvertently excluded entries sold before the period of review but entered during the period of review.[53]  Notably, Commerce *had requested a voluntary remand* in *Outukumpu Copper*.  The CIT agreed, reasoning that "the change to the scope of the U.S. sales database was neither requested by the parties nor authorized by the court."[54]

Unlike in *Outukumpu Copper*, Commerce's actions on remand in this redetermination were explicitly authorized by the Federal Circuit, which instructed that "{o}n remand, Commerce may *re-perform a differential pricing analysis*."[55]  Further, the Federal Circuit "decline{d} to conclude that a flawed output in step one of a calculation can be transformed into meaningful data by further manipulating it."[56]  Thus, far from acting "beyond the CAFC's remand order," Commerce's reevaluation of the probative value of the mixed method strikes at the heart of the Federal Circuit's concern.  In other words, the Federal Circuit's concern was whether "Commerce has then selected the wrong weight-averaged methodology" as required

---

[50] *See* Marmen's Draft Redetermination Comments at 8 (citing *Outokumpu Copper Strip, B.V. v. United States*, 15 F. Supp. 2d 806, 806-07 (CIT 1998) (*Outukumpu Copper*)).
[51] *See Outokumpu Copper*, 15 F. Supp. 2d at 806.
[52] *Id.* at 806-07.
[53] *Id.* at 806.
[54] *Id.* at 807.
[55] *See Remand Order* at 23 (emphasis added).
[56] *Id.* at 20.

under the Act.[57]  Accordingly, Commerce's discontinuance of the mixed method is squarely

within the bounds of the Federal Circuit's *Remand Order* and the reasoning underlying its

holding.

Marmen concludes that "a court's decision not to issue . . . specific limiting instructions

is a far cry from authorizing Commerce to reopen on remand its decision on an issue."[58]  The

issue in *Zhaoqing Tifo*, however, was whether Commerce impermissibly "re-analyze{d} the

issue of the relative merits of the different financial statements on the administrative record"

when the court's remand order instructed Commerce on remand "to ascertain how to properly

account" for certain factors of production using the financial statements of a particular

company.[59]  The *Zhaoqing Tifo* court concluded that "{w}hat Commerce was not permitted to do

on remand was reopen and re-review the settled issue . . . to select the financial statements" of

the particular company.[60]  Thus, *Zhaoqing Tifo* is distinguishable because here the Federal

Circuit's remand order permits Commerce to "re-perform a differential pricing analysis," and its

concern was how a flawed output in one step of the differential pricing analysis could render the

results of the analysis erroneous.  Thus, unlike in *Zhaoqing Tifo*, the issue of Commerce's

differential pricing analysis was not laid to rest in the final determination.

Nor did Commerce "fail{} to justify its change in methodology."  As Marmen itself

points out, the Federal Circuit has affirmed a change in methodology when Commerce has

"show{ed} that its methodology is permissible under the statute and that it had good reasons for

the new methodology."  Here, the statute does not require Commerce to use a mixed method as

---

[57] *Id.*

[58] *See* Marmen's Draft Redetermination Comments at 8 (quoting *Zhaoqing Tifo New Fibre Co. v. United States*, 256 F. Supp. 3d 1314, 1335 (CIT 2017) (*Zhaoqing Tifo*)) (internal quotations removed).

[59] *See Zhaoqing Tifo*, F. Supp. 3d at 1334.

[60] *Id.*

an alternative comparison methodology. While the statute permits Commerce's previous policy that adopted a hybrid version of the two available comparison methodologies, Commerce's new policy aligns more closely with the statutory text, which permits Commerce to use the A-to-T method when certain conditions set forth in section 777A(d)(1)(B) of the Act are satisfied. In light of the foregoing, Commerce does not consider it necessary to continue to use the mixed method, particularly when discontinuation of the mixed method enhances the ability to address masked dumping, which is consistent with the objective of the statute, and more closely aligns with the statutory language that expressly authorizes the use of the A-to-T comparison method when the conditions set forth in section 777A(d)(1)(B) of the Act are satisfied. The Federal Circuit has recognized Commerce's "growing experience" in applying section 777A(d)(1)(B) of the Act as a basis for establishing what ratio justifies application of an alternative methodology.[61] Regarding the price difference test, its use is consistent with the statute. The CIT has held that the language in section 777A of the Act affords Commerce flexibility to implement a test that it deems appropriate to identify significant price differences.[62] As such, when Commerce revised its differential pricing methodology in response to *Marmen* and *Stupp II*,[63] taking out the Cohen's *d* test and using the price difference test, Commerce also discontinued the use of the mixed method.

Marmen argues discontinuing the mixed method is beyond the scope of this remand in the absence of an explanation as to why a change in the test for determining significance would require the elimination of the mixed method.[64] Commerce, however, has supplied an explanation. As explained above, the mixed method was not statutorily required, and to align

---

[61] *See Stupp*, 5 F.4th at 1355.
[62] *See Garg Tube Export LLP v. United States*, 740 F.Supp.3d 1355, 1366 (CIT 2024).
[63] *See Stupp Corp. v. United States*, No. 2023-1663, 2025 WL 1178392 (Fed. Cir. Apr. 23, 2025) (*Stupp II*).
[64] *See* Marmen's Draft Redetermination Comments at 7-10.

more closely with the statute, Commerce has discontinued the mixed method as a matter of administrative practice for all of its administrative proceedings.  Therefore, Commerce is applying its revised differential pricing methodology including its discontinuation of the mixed method consistently across all cases including remand redeterminations.[65]  To apply only a portion of the Commerce's revised differential pricing methodology here would be an inconsistent application of its new policy and the Federal Circuit's *Remand Order*.

**Comment 3:   Marmen's Suspended Entries Should be Liquidated at the Amended Cash Deposit Rate Established by Commerce's Final Remand Redetermination**

The following is a verbatim executive summary of argument submitted by Marmen.  For further details, *see* Marmen's Draft Redetermination Comments at 10-11 (internal citations omitted).

> The liquidation of Marmen's entries of wind towers from February 14, 2020, through July 31, 2023, has been suspended by preliminary injunctions issued by the CIT in connection with the appeal.  If Commerce determines (unlawfully) in its final redetermination that Marmen's final dumping margin is above *de minimis*, Marmen's entries should be liquidated at that AD rate (2.93%) – not at the invalidated AD cash deposit rate that was in effect upon entry.

**Commerce's Position:**  We agree with Marmen and intend to liquidate Marmen's entries of subject merchandise at the revised cash deposit rate of 2.93 percent at the conclusion of litigation.

## V.     FINAL RESULTS OF REDETERMINATION

In consideration of the Federal Circuit's *Remand Order*, we have continued to use the "price difference test" as a part of our differential pricing analysis to determine whether prices

---

[65] *See, e.g.*, *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea*, 90 FR 30050 (July 8, 2025), and accompanying IDM; *see also SKF USA Inc. v. United States*, 630 F.3d 1365, 1377 (Fed. Cir 2011) (affirming Commerce's change in practice because of its reasoned explanation); and *SKF USA, Inc. v. United States*, 254 F.3d 1022 (Fed. Cir. 2001) (granting a remand request when an agency has materially changed its policy).

differ significantly.  We have also discontinued our use of the mixed method as an alternative comparison methodology.  Marmen's estimated weighted-average dumping margin remains unchanged from the Draft Redetermination at 2.93 percent and the estimated weighted-average dumping margin for all other producers and exporters remains unchanged at 2.93 percent for these final results of redetermination.

Because the estimated weighted-average dumping margin for Marmen and for all other producers and exporters differ from those in the *Final Determination*, we intend to issue a *Timken*[66] notice with an amended final determination should the Federal Circuit sustain these final results of redetermination.

1/29/2026

X ~~Chris J Abbott~~

Signed by: CHRISTOPHER ABBOTT
Christopher Abbott
**Deputy Assistant Secretary**
  for Policy and Negotiations,
  performing the non-exclusive function and duties
  of the Assistant Secretary for Enforcement and Compliance

---

[66] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*).