### UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| MARMEN INC., MARMEN ÉNERGIE INC., MARMEN ENERGY CO., <br><br>     Plaintiffs, <br><br> WIND TOWER TRADE COALITION, <br><br>     Consolidated Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br>     Defendant, <br><br> WIND TOWER TRADE COALITION, <br><br>     Defendant-Intervenor, <br><br> and <br><br> MARMEN INC., MARMEN ÉNERGIE INC., MARMEN ENERGY CO., <br><br>     Defendant-Intervenors. | Consolidated Court No. 20-00169 <br><br> # Public |

### PLAINTIFFS' COMMENTS IN OPPOSITION TO THE FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

Jay C. Campbell
Allison J.G. Kepkay
Cristina M. Cornejo

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

March 13, 2026

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................. 1

II.     STANDARD OF REVIEW ............................................................................... 1

III.    ARGUMENT ..................................................................................................... 2

        A.    Background .............................................................................................3

        B.    Because Commerce's 2% "Price Difference" Test Is Inconsistent with the
              Statutory Requirements for Using the A-to-T Comparison, the Test Is Not
              in Accordance with Law ........................................................................5

              1.    The reasonableness standard referenced by Commerce in the
                    *Remand Results* is not the appropriate standard for review of its
                    modified differential pricing analysis after *Loper Bright* ............6

              2.    Commerce's 2% "price difference" test is inconsistent with the best
                    interpretation of the statutory requirements for invoking the
                    exception and using the A-to-T price comparison method ........................7

                    a.    Commerce's 2% price difference test is contrary to the plain
                          language of the statute which requires that prices "differ
                          significantl." ................................................................8

                    b.    Commerce's rigid 2% "price difference" test violates
                          Congress's intent to require a case-by-case analysis of price
                          differences ...............................................................10

              3.    Conclusion ...........................................................................11

        C.    Commerce's Modification to the "Ratio Test" Is Outside the Bounds of the
              CAFC's Remand Order and Thus Not In Accordance With Law .........................12

IV.     CONCLUSION ................................................................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Apex Frozen Foods Private Ltd. v. United States*,
  862 F.3d 1337 (Fed. Cir. 2017)...........................................................................7

*Bostock v. Clayton Cnty.*,
  140 S. Ct. 1731 (2020)........................................................................................9

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984).........................................................................................2, 6

*Garg Tube Export LLP v. United States*,
  740 F. Supp. 3d. 1355 (Ct. Int'l Trade 2024) ..........................................................9

*Hussey Copper, Ltd. v. United States*,
  960 F. Supp. 315 (Ct. Int'l Trade 1997) .........................................................13, 15

*Huvis Corp. v. United States*,
  570 F.3d 1347 (Fed. Cir. 2009).........................................................................18

*Jacobi Carbons AB v. United States*,
  365 F. Supp. 3d 1323 (Ct. Int'l Trade 2019) ..........................................................11

*JBF RAK LLC v. United States*,
  790 F.3d 1358 (Fed. Cir. 2015)...........................................................................7

*Learning Resources, Inc. v. Trump*,
  No. 24-1287, Slip Op. (U.S. 2026) ....................................................................8, 9

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)..............................................................................2, 6, 7, 10

*Marmen Inc. v. United States*,
  134 F.4th 1334 (Fed. Cir. 2025) ................................................................ *passim*

*Mid Continent Steel & Wire, Inc. v. United States*,
  940 F.3d 662 (Fed. Cir. 2019)............................................................................7

*Nucor Corp. v. United States*,
  927 F.3d 1243 (Fed. Cir. 2019)...........................................................................7

*Outokumpu Copper Strip, B.V. v. United States*,
  15 F. Supp. 2d 806 (Ct. Int'l Trade 1998) .......................................................13, 16

*SKF USA, Inc. v. United States*,

254 F.3d 1022 (Fed. Cir. 2001)................................................................................18

*Stupp Corp. v. United States*,
5 F.4th 1341 (Fed. Cir. 2021) ....................................................................7, 14, 17

*Stupp Corp. v. United States*,
No. 2023-1663, 2025 LX 240043 (Fed. Cir. Apr. 23, 2025)....................................18

*Trust Chem Co. v. United States*,
819 F. Supp. 2d 1373 (Ct. Int'l Trade 2012) ............................................................2

*Yates v. United States*,
574 U.S. 528 (2015)..................................................................................................9

*Zhaoqing Tifo New Fibre Co. v. United States*,
256 F. Supp. 3d. 1314 (Ct. Int'l Trade 2017) ...............................................15, 17

## STATUTES AND REGULATIONS

19 C.F.R. § 351.403(c)...........................................................................................8

19 C.F.R. § 351.414(b)(1), (c)(1)......................................................................3, 11

19 C.F.R. § 351.414(b)(3).................................................................................3, 4, 6

19 U.S.C. § 1516a(b)(1)(B)(i)..................................................................................2

19 U.S.C. § 1677f-1(d)(1)(A)(i)........................................................................14, 18

19 U.S.C. § 1677f-l(d)(l)(A).............................................................................3, 11

19 U.S.C. § 1677f-l(d)(l)(B).............................................................................3, 4, 6

## ADMINISTRATIVE DETERMINATIONS

*Final Results of Redetermination Pursuant to Court Remand*,
Court No. 23-1877 (Federal Circuit 2025) (January 30, 2026) .................................1

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the
Republic of Korea: Final Results of Antidumping Duty Administrative Review;
2022–2023*,
90 Fed. Reg. 30050 (July 8, 2025), and accompanying Issues and Decision
Memorandum...........................................................................................................18

*Utility Scale Wind Towers from Canada*,
85 Fed. Reg. 40239 (July 6, 2020),
and accompanying Issues and Decision Memorandum.......................................1, 4

ii

**MISCELLANEOUS**

"Significant," OXFORD ENGLISH DICTIONARY, available at
    https://www.oed.com/dictionary/significant_adj?tab=meaning_and_use#22826154 ...............8

## I.      INTRODUCTION

Plaintiffs Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co. (collectively, "Marmen" or "Plaintiffs") hereby submit comments in opposition to the final results of redetermination issued by the U.S. Department of Commerce ("Commerce") pursuant to the Court of Appeals of the Federal Circuit's ("CAFC") remand order in *Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025) ("*Remand Order*").  *See Final Results of Redetermination Pursuant to Court Remand*, Court No. 23-1877 (Federal Circuit 2025) (January 30, 2026) (ECF 101) (PR-REM 9) ("*Remand Results*").[1]  This case concerns Commerce's final antidumping duty ("AD") determination in *Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 40239 (July 6, 2020) (final LTFV determ.) (PR 196), the period of investigation ("POI") for which was July 1, 2018, through June 30, 2019.  For the reasons demonstrated below, Commerce's *Remand Results* cannot be sustained because: (1) Commerce's 2% "price difference" test does not comply with the best reading of the statute and runs counter to the case-by-case analysis Congress intended, as noted in the Statement of Administrative Action, and (2) Commerce made an unlawful policy change to its "ratio test" that was unauthorized by the CAFC and impermissible based on relevant case precedent.

## II.     STANDARD OF REVIEW

In reviewing a challenge to Commerce's determination in an AD proceeding, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by

---

[1] When citing documents from the administrative record of the underlying AD investigation, we assign the prefix "PR" (for "public record") to public documents and the prefix "CR" (for "confidential record") to confidential documents, followed by the reference number for the document.  Similarly, when citing documents from the administrative record of Commerce's remand proceeding, we assign the prefix "PR-REM" to public documents and the prefix "CR-REM" to confidential documents, followed by the reference number for the document.

substantial evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C.

§ 1516a(b)(1)(B)(i).  In determining whether an agency's decision is "in accordance with law,"

the court "must exercise {its} independent judgment in deciding whether an agency has acted

within its statutory authority . . . ."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

If a statute is ambiguous, the court must "use every tool at {its} disposal to determine the best

reading of the statute and resolve the ambiguity."  *Id.* at 400.  The court "may not defer to an

agency interpretation of the law simply because a statute is ambiguous."  *Id.* at 412–13 (overruling

the deferential statutory interpretation framework established in *Chevron, U.S.A., Inc. v. Natural

Resources Defense Council, Inc.*, 467 U.S. 837 (1984)).  If the agency's interpretation of the law

"is not the best, it is not permissible."  *Id.* at 400.  Moreover, the court will not sustain a remand

redetermination if that decision fails to comply with the terms of the court's remand order.   *See*,

*e.g.*, *Trust Chem Co. v. United States*, 819 F. Supp. 2d 1373, 1378 (Ct. Int'l Trade 2012) (citation

omitted).

## III.    ARGUMENT

Commerce's determination to use only the Average-to-Transaction ("A-to-T") price

comparison method rather than the Average-to-Average ("A-to-A") comparison method when

calculating Marmen's dumping margin on remand was not in accordance with law for two reasons.

First, Commerce's 2% "price difference" test replacing the Cohen's *d* test (1) is

inconsistent with the best reading of the statutory requirements for using the A-to-T method under

the standard of review articulated in *Loper Bright*; and (2) fails to satisfy Congress's intent for a

case-by-case differential pricing analysis as highlighted in the Uruguay Round Agreements Act,

Statement of Administrative Action, thereby producing arbitrary results.  *See* H.R. Doc. No. 103-

316, at 842–43 (1994) ("SAA").

Second, Commerce's decision to modify step two of its differential pricing analysis, the "ratio test" – by lowering the threshold for applying the A-to-T comparison method to ***all*** U.S. sales made by Marmen from 66% to 33% and by abandoning the mixed method calculation altogether – was not in accordance with law because (1) Commerce's methodological change was outside the bounds of the CAFC's remand order; (2) Commerce's methodological change was impermissible on remand, as demonstrated by very the case law cited by Commerce in the *Remand Results*; and (3) even if the court were to construe the CAFC's remand order as allowing Commerce to make this impermissible policy change, Commerce erred by failing to provide an adequate explanation for its aggressive "ratio test."

## A.     Background

The statute and regulations require Commerce normally to use an A-to-A price comparison method to calculate the dumping margin, which involves a comparison of "the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise . . . ."  19 U.S.C. § 1677f-l(d)(l)(A); *see also* 19 C.F.R. § 351.414(b)(1), (c)(1).  The statute provides an exception to this rule if "there is a pattern of export prices (or constructed export prices) for comparable merchandise ***that differ significantly*** among purchasers, regions, or periods of time{,}" and "the administering authority explains why such differences cannot be taken into account using' the A-to-A method (or a Transaction-to-Transaction method).  19 U.S.C. § 1677f-l(d)(l)(B) (emphasis added); *see also* 19 C.F.R. § 351.414(b)(3).  If both conditions are met, Commerce may use an A-to-T price comparison method, which involves a comparison of "the weighted average of the normal values to the export

3

prices (or constructed export prices) of individual transactions for comparable merchandise . . . ." 19 U.S.C. § 1677f-l(d)(l)(B); *see also* 19 C.F.R. § 351.414(b)(3).

In the *Remand Results*, Commerce modified its differential pricing approach in two key respects.  First, Commerce introduced a new 2% "price difference" test in place of the Cohen's *d* test.  Commerce explained the "price difference" test as follows:

> {T}he price difference test examines whether the weighted-average net price to a given purchaser, region, or time period is ***within two percent*** of the weighted average net price to all other purchasers, regions, or time periods.  If the weighted-average net price to the given purchaser, region, or time period ***falls outside of the plus or minus two percent band*** around the weighted-average net price to all other purchasers, regions, or time periods, then the prices to that given purchaser, region, or time period are found to ***differ significantly*** and those sales to the given purchaser, region, or time period pass the price difference test.

*See Remand Results* at 10 (emphases added).

Second, Commerce used a modified "ratio test" to assess "the extent of the significant price differences for all U.S. sales as measured by the price difference test."  *Remand Results* at 10. Specifically, under the new ratio test, "{i}f more than 33 percent of the total value of U.S. sales passes the price difference test, then Commerce will find that a pattern of prices existed during the POI."  *Remand Results* at 10–11.  This approach is a fundamental departure from Commerce's previous "ratio test," which was never at issue in this action.  Under Commerce's prior "ratio test," if at least 33%, but less than 66% of U.S. sales passed the significant price difference test (the Cohen's *d* test, at the time), Commerce would apply a "mixed" method calculation, using the A-to-T method for U.S. sales that passed the significant price difference test, and using the A-to-A method for all remaining U.S. sales.  *See Utility Scale Wind Towers From Canada,* 85 Fed. Reg. 40239 (July 6, 2020) (final LTFV determination), and accompanying Issues and Decision Memorandum at 11 (describing the mixed method calculation).

Commerce did not change the "meaningful difference" test. Accordingly, as Commerce explained in the *Remand Results*, if both the new 2% "price difference" test and "ratio test" are satisfied, Commerce will consider "whether using the A-to-T method yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-to-A method." *Remand Results* at 11. As before, Commerce will find a "meaningful difference" if "(1) there is a 25 percent relative change in the weighted-average dumping margins between the A-to-A method and the A-to-T method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-to-A method and the A-to-T method move across the *de minimis* threshold." *Remand Results* at 11.

Applying this analysis to Marmen, Commerce found that 38.18% of Marmen's U.S. sales (by value) passed the new 2% threshold "price difference" test and thus found "the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods." *Remand Results* at 12. Further, Commerce determined that the A-to-A comparison method could not account for these price differences because "the weighted-average dumping margin crosses the *de minimis* threshold when calculated using the A-to-A method and when calculated using the A-to-T method." *Remand Results* at 12. Commerce therefore applied the A-to-T comparison method to all of Marmen's U.S. sales, calculating a dumping margin of 2.93%. *Remand Results* at 12, 24.

**B.     Because Commerce's 2% "Price Difference" Test Is Inconsistent with the Statutory Requirements for Using the A-to-T Comparison, the Test Is Not in Accordance with Law**

Commerce's new 2% "price difference" test for determining whether there is a pattern of prices that significantly differ is unlawful because it is inconsistent with the best reading of the statutory requirements for applying the A-to-T comparison methodology to all of a respondent's U.S. sales.

**1.    The reasonableness standard referenced by Commerce in the *Remand Results* is not the appropriate standard for review of its modified differential pricing analysis after *Loper Bright***

Under *Loper Bright*, Commerce's differential pricing analysis, including the 2% "price difference" test, must be consistent with the ***best interpretation*** of the exceptional statutory conditions that allow Commerce to use the A-to-T methodology.  The statute permits Commerce to use the A-to-T methodology only where there "is a pattern of export prices (or constructed export prices) for comparable merchandise that ***differ significantly*** among purchasers, regions, or periods of time" that cannot be taken into account by using the A-to-A or Transaction-to-Transaction comparison methods.  19 U.S.C. § 1677f-l(d)(l)(B) (emphasis added); *see also* 19 C.F.R. § 351.414(b)(3).  It is not enough for the court to find that Commerce's 2% "price difference" test is a reasonable interpretation of the statute, it must find that the 2% "price difference" test is consistent with the ***best*** interpretation of the statute as read by the court, not the agency.

In *Loper Bright*, the Supreme Court overruled the deferential *Chevron* analysis whereby courts deferred to an agency's interpretation of an ambiguous statute as long as the agency's determination was reasonable.  *See* 603 U.S. at 412–13 (overruling *Chevron, U.S.A., Inc.*, 467 U.S. at 837).  Now under *Loper Bright*, courts may not simply defer to an agency's reasonable interpretation of an ambiguous statute, but instead must use all available interpretive tools to independently determine the statute's best meaning.  *Id.* at 400, 412–13.  An agency's statutory interpretation is only permissible if it reflects the best reading of the statute, as determined by the court.  *See id.* at 400.  As the CAFC recognized in *Stupp Corp. v. United States*, "Commerce's differential pricing analysis . . . interprets the statutory provision that applies to patterns of significantly differing export prices by providing a mechanism for identifying such patterns."  5 F.4th 1341, 1352 (Fed. Cir. 2021).  Thus, the appropriate standard of review for Commerce's

differential pricing analysis is the one articulated in *Loper Bright*.

In the *Remand Results*, however, Commerce incorrectly states that the standard of review for its differential pricing analysis continues to be reasonableness, citing the CAFC's prior decision in *Stupp*. *See Remand Results* at 14 (citing *Stupp*, 5 F.4th at 1353). The CAFC's reference to the reasonableness standard in *Stupp* no longer applies under the Supreme Court's decision in *Loper Bright*. Each of the cases cited by the CAFC in *Stupp* as support for the reasonableness standard relied directly on *Chevron*, which has been overruled.[2] Moreover, while the Supreme Court in *Loper Bright* noted that "{m}ere reliance on *Chevron* cannot constitute a 'special justification' for overruling" a prior case's statutory interpretation, *Loper Bright*, 603 U.S. at 412, Commerce's new interpretation of the statute embodied in the 2% price difference test must be analyzed under the current standard of review. The court must answer the question: Is Commerce's 2% "price difference" test for identifying a pattern of significantly different export prices consistent with the best reading of 19 U.S.C. § 1677f-l(d)(l)(B)? It is not.

> **2.** **Commerce's 2% "price difference" test is inconsistent with the best interpretation of the statutory requirements for invoking the exception and using the A-to-T price comparison method**

Commerce's 2% "price difference" test is contrary to the best interpretation of the statute's requirements for invoking the exception and applying the A-to-T price comparison method for two reasons. First, Commerce's 2% "price difference" test is contrary to the plain language of the statute which requires that prices "***differ significantly***" among purchasers, regions, or periods of

---

[2] *See Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 667 (Fed. Cir. 2019) (citing, *inter alia*, *Nucor Corp. v. United States*, 927 F.3d 1243, 1248–49 (Fed. Cir. 2019), which relies on *Chevron* to support the court's reasonableness review); *Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337, 1346–47 (Fed. Cir. 2017) (relying on *Chevron* framework to review Commerce's statutory interpretations for reasonableness); *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363–65 (Fed. Cir. 2015) (reviewing Commerce's approach to targeted dumping under the *Chevron* framework).

time for Commerce to apply the A-to-T price comparison method.  Second, Commerce's application of a rigid 2% "price difference" threshold in all administrative proceedings contravenes the legislative intent behind the statute, which envisioned a case-by-case approach to Commerce's differential pricing analysis, as described in the SAA.

> **a.    Commerce's 2% price difference test is contrary to the plain language of the statute which requires that prices "differ significantly"**

Commerce's "price difference" test does not establish that prices "differ significantly" as required by the statute.  "Significant" is defined in the Oxford English Dictionary as "sufficiently great or important to be worthy of attention; noteworthy; consequential, influential" and also "noticeable, substantial, considerable, large."  "Significant," OXFORD ENGLISH DICTIONARY, accessed on Dec. 3, 2025, available at https://www.oed.com/dictionary/significant_adj?tab=meaning_and_use#22826154.  Commerce's mere 2% threshold for its "price difference" test fails to indicate that prices differed ***significantly*** under the plain meaning of the word ("significantly").  Therefore, Commerce's interpretation of the phrase "differ significantly" under the new "price difference" test is contrary to the plain meaning of the statute.[3]

---

[3] Commerce points to its arm's-length test pursuant to 19 C.F.R. § 351.403(c) – which relies on "a plus or minus two percent difference" between the weighted-average prices to affiliated customers and the weighted-average prices to unaffiliated customers to determine which sales prices fall outside the ordinary course of trade – as evidence that its 2% threshold measures significant price differences.  *See Remand Results* at 14-15.  Identifying significant differences between prices charged by one company to affiliated and unaffiliated customers is a different analysis than identifying a pattern of export prices that differ significantly as required by the statute at issue in this case.  Moreover, when interpreting statutes, courts look to analogous uses of terms in statutes rather than regulations.  *See e.g.*, *Learning Resources, Inc. v. Trump*, No. 24-1287, Slip Op. at 14–15 (U.S. 2026) (reviewing other instances in the U.S. Code that use the term "regulate" to interpret the phrase "regulate ... importation" in the statute at issue in the case).

Commerce wrongly suggests it has the discretion to ignore the dictionary definition of the term "significant" when interpreting the statutory phrase "differ significantly." *See Remand Results* at 14. Not so. When a term is undefined in the statute, courts "normally interpret{} a statute in accord with the ordinary public meaning of its terms at the time of its enactment{,}" as "only the words on the page constitute the law adopted by Congress and approved by the President." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020). Courts routinely rely on dictionary definitions, informed by the context of the statute, to determine a term's ordinary meaning. *See e.g.*, *id.* at 1739 ("{a}ppealing to roughly contemporaneous dictionaries" when interpreting Title VII); *Learning Resources, Inc. v. Trump*, No. 24-1287, Slip Op. at 14 (relying on a dictionary definition for the term "regulate" when interpreting the phrase "regulate . . . importation" in the statute); *Yates v. United States*, 574 U.S. 528, 537 (2015) (relying in part on the dictionary definition and recognizing that, "{o}rdinarily, a word's usage accords with its dictionary definition"). Thus, this Court may also turn to the dictionary definition to interpret the ordinary meaning of "significant."

Commerce also cites to this Court's decision in *Garg Tube* for the proposition that "'{t}he word 'significantly' is an open-ended qualifier akin to 'appropriate' or 'reasonable{,}'" *Remand Results* at 14 (citing *Garg Tube Export LLP v. United States*, 740 F. Supp. 3d. 1355, 1366–67 (Ct. Int'l Trade 2024)), such that Commerce has "some flexibility to implement a test that Commerce deems appropriate to identify significant price differences{,}" *Remand Results* at 14. Commerce's reliance on this case is misplaced. The court's statutory interpretation analysis in *Garg Tube*, in which it upheld Commerce's use of the Cohen's *d* test in its differential pricing analysis, was overruled by the CAFC's opinion in the *Remand Order*.

Even if the phase "differ significantly" affords Commerce some flexibility to regulate, this flexibility is not unbounded. Commerce's discretion is "subject to the limits imposed by {the} term or phrase that 'leaves agencies with flexibility,' . . . such as 'appropriate' or 'reasonable.'" *See Loper Bright*, 603 U.S. at 395 (citations omitted). In other words, Commerce cannot ignore the plain meaning of the authorizing statute by, for example, choosing to ignore the dictionary definition of the term it is allegedly seeking to interpret. Instead, Commerce must exercise its flexibility in a manner consistent with that definition. Here, Commerce's "price difference" test that defines a trivial 2% price difference as significant contradicts the plain meaning of the statute and, thus, is not in accordance with law.

> **b.   Commerce's rigid 2% "price difference" test violates Congress's intent to require a case-by-case analysis of price differences**

The 2% threshold used in Commerce's "price difference" test also contravenes Congress's intent to require Commerce to determine whether significant price differences exist on a case-by-case (*i.e.*, industry-specific) basis. The SAA directs that, "in determining whether a pattern of significant price differences exist, Commerce will proceed ***on a case-by-case basis***, because small differences may be significant for one industry or one type of product, but not for another." *See* SAA at 842–43 (emphasis added). A "one size fits all" 2% approach is inconsistent with the "case-by-case" approach endorsed by the SAA. *See* SAA at 842–43.

Congress's directive makes sense because applying the same standard to different industries and products would create arbitrary results, as the SAA recognizes. *See* SAA at 842– 43. In fact, as this court acknowledged in a different trade context, "Numbers are not 'large' or 'significant' in a vacuum; in order to consider whether such descriptors reasonably apply, the numbers must be placed in context." *Jacobi Carbons AB v. United States*, 365 F. Supp. 3d 1323, 1332 (Ct. Int'l Trade 2019) (remanding Commerce's interpretation of the statutory phrase

"significant producer" for failure to provide sufficient context for the court to evaluate the application of its interpretation to the case at hand). Here, Commerce applies a single and rigid 2% test for significance to all industries and products, producing arbitrary results.

Commerce claims that using a percentage threshold rather than an absolute value satisfies the SAA's requirement of a case-by-case analysis. *Remand Results* at 18. Commerce's test, however, assumes that a 2% price difference across purchasers, time periods, and regions is significant for all merchandise, across all industries, in all markets under consideration. In other words, Commerce's methodology presumes that a 2% difference in price for a cup of coffee is as significant in the market as a 2% difference in price for a car. In addition, Commerce's uniform 2% threshold fails to account for external factors that can lead to volatile pricing, such as the supply chain crisis after the COVID-19 pandemic, which saw dramatic changes in the prices of goods across industries over many months. At the very least, Commerce offers no explanation or evidence to justify its unfounded assumption that a 2% price difference is significant in the context of the wind towers industry.

### 3. Conclusion

For these reasons, the 2% "price difference" test is impermissible under the statute and cannot reasonably be applied to test whether the prices of Marmen's U.S. sales differed significantly. As noted, the statute permits Commerce to use the exceptional A-to-T price comparison method only if there is a pattern of significant price differences among purchasers, regions, or time periods. 19 U.S.C. § 1677f-1(d)(1)(A); *see also* 19 C.F.R. § 351.414(b)(1), (c)(1). Here, however, Commerce's "price difference" threshold – a mere 2% without regard to the industry or products under investigation – fails to meet the statutory requirement for resorting to the exceptional A-to-T comparison method. The 2% threshold does not measure "significant" differences under any reasonable interpretation of the word. The 2% test is an arbitrary,

11

unexplained, and unsupportable change in Commerce's interpretation of "differ significantly" and, therefore, is inconsistent with the statute and is not in accordance with law.

### C.    Commerce's Modification to the "Ratio Test" Is Outside the Bounds of the CAFC's Remand Order and Thus Not In Accordance With Law

Commerce's modification of the "ratio test" – lowering the threshold for applying the A-to-T price comparison method to all of a respondent's U.S. sales from 66% to 33% – was unlawful for three reasons. First, Commerce's policy change exceeded the scope of the CAFC's remand order, particularly when read in light of the court's full opinion, which expressed concern about *overuse* of the A-to-T methodology. Second, the change is precisely the type of modification that courts have held to be impermissible on remand, as the case law cited by Marmen and discussed in Commerce's own *Remand Results* confirms. Third, even if the *Remand Order* could be read to permit a severe change to a policy that was not at issue, Commerce independently erred by failing to provide an adequate explanation for its modification of the "ratio test."

First, Commerce's decision to modify the "ratio test" was outside the bounds of the CAFC's remand order and, thus, is not in accordance with law. In the *Remand Results*, Commerce mischaracterizes the CAFC's remand order, which focused exclusively on replacing the Cohen's *d* test within the agency's differential pricing analysis. Commerce argues that the CAFC's instruction to "re-perform a differential pricing analysis" allowed it to reconsider all aspects of the differential pricing analysis, including the "ratio test." *Remand Results* at 18–20. This reading ignores the rest of the CAFC's instructions. The full text of the CAFC's instructions to Commerce are reproduced below.

> Because there is no dispute that Marmen's data does not satisfy these assumptions, {the} Cohen's *d* test cannot be used here to determine "a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time." § 1677f-1(d)(1)(B). We therefore vacate Commerce's calculated dumping margin **based on the**

12

> ***unreasonable use of Cohen's d test to justify the A-to-T
> methodology***. On remand, Commerce may re-perform a differential
> pricing analysis, ***and that analysis may not rely on {the} Cohen's d
> test for data sets like those here. This conclusion, of course, does
> not preclude Commerce from fashioning and justifying a
> <u>*statistical analysis*</u> that uses some of the ideas underlying Cohen's
> analysis of group differences*** as long as the resulting analysis is
> itself justified as sound for gauging differences in the data sets at
> issue.

*Remand Order*, 134 F.4th at 1348 (emphases added).

This context makes clear that the CAFC was instructing Commerce to re-perform a differential pricing analysis with ***<u>one</u>*** change:  requiring Commerce not to rely on the Cohen's *d* test.  Contrary to Commerce's argument, *Remand Results* at 18–21, this was not an invitation for Commerce to reconsider every aspect of its differential pricing analysis.  The Cohen's *d* test was the only issue raised on appeal and addressed by the CAFC concerning the differential pricing analysis, and, thus, it was the only change that Commerce was authorized to make on remand.  *See Hussey Copper, Ltd. v. United States*, 960 F. Supp. 315, 318 (Ct. Int'l Trade 1997); *Outokumpu Copper Strip, B.V. v. United States*, 15 F. Supp. 2d 806, 806-07 (Ct. Int'l Trade 1998).  This is not a case where the court issued a broad remand order, allowing Commerce to reconsider every aspect of its differential pricing determination.  *C.f.*, *Carpenter Tech. Corp. v. United States*, 519 F. Supp. 3d 1340, 1344–45 (Ct. Int'l Trade 2021) (affirming Commerce's remand redetermination which included changes to Commerce's methodology, based on a broad voluntary remand order which remanded the matter "in its entirety").  Instead, the CAFC's *Remand Order* specifically contemplates Commerce "fashioning and justifying a ***statistical analysis***" to replace the Cohen's *d* test.  *Remand Order*, 134 F.4th at 1348 (emphasis added).  The "ratio test" is not a statistical analysis, further demonstrating that the CAFC did not remand the ratio test to Commerce for reconsideration.  Again, the ratio test was not at issue at all.

Moreover, Commerce's change to the "ratio test" ignores the thrust of the CAFC's opinion, in which the appellate court was concerned that the misapplication of the Cohen's *d* test would result in overuse of the A-to-T price comparison method in cases that do not meet the statutory requirements (*i.e.*, where prices do not differ significantly across purchasers, regions or time periods). In its *Remand Order*, the only discussion of the "ratio test" came when the CAFC described how a flawed output from Commerce's misapplication of the Cohen's *d* test would impact the rest of Commerce's differential pricing analysis and lead to the overuse of the A-to-T price comparison method. *Remand Order*, 134 F. 4th at 1346. Specifically, the CAFC expressed concern that inputting the flawed Cohen's *d* test output into the "ratio test" would lead to Commerce finding patterns of significant price differences where there are none, and, "if the ratio test determines there is a pattern when there is not, Commerce has then selected the wrong weight-averaged methodology as required under § 1677f-1(d)(1)(A)(i)." *Id.* Far from "striking at the heart of the Federal Circuit's concern" as Commerce claims, *Remand Results* at 20, Commerce's change to the "ratio test" has compounded the concern by lowering the threshold for applying the A-to-T methodology to all of a respondent's US sales from 66% to 33%. In fact, the CAFC in *Stupp* directly addressed the "ratio test" and upheld it based in part on Commerce's use of the "mixed method." *See Stupp*, 5 F.4th at 1355. The CAFC held that "Commerce's selection of the 33% and 66% cutoffs is a reasonable choice" because "Commerce's approach{,} . . . providing a middle ground between 33% and 66%, in which the average-to-transaction method is only partially applied{,} . . . provides a better fit, minimizing both the assessment of antidumping duties that are too high and the assessment of duties that are too low." *Id.* Thus, Commerce's decision to lower this threshold impermissibly reopens a settled issue (the ratio test) on remand. *See Zhaoqing Tifo New Fibre Co. v. United States*, 256 F. Supp. 3d. 1314, 1334 (Ct. Int'l Trade 2017).

Second, Commerce's methodological change to the "ratio test" mirrors other methodological changes that courts have deemed to be impermissible on remand, as demonstrated by relevant case law. For example, *Hussey Copper, Ltd. v. United States* supports the conclusion that Commerce was not authorized to make changes to its ratio test based on the CAFC's remand order. In *Hussey Copper*, after holding that certain dumping margins were unlawful due to methodological errors, the court held that it was "within the scope of the remand order for Commerce to recalculate any figure based on {those dumping} margins that the remand order had held were not in accordance with law" – namely, the adverse facts available rate ("AFA"), which was calculated based on "the highest weighted-average {dumping} margin" from the relevant corporate group. *See Remand Results* at 19 (quoting *Hussey Copper*, 960 F. Supp. at 317 ). The AFA rate was directly based on unlawful dumping margins that were recalculated due to the remand order. Thus, to give full effect to the court's order, Commerce had to reperform its calculation of the AFA rate ***using the same methodology*** as before, while accounting for the different input values resulting from changes to the dumping margins explicitly authorized by the court.

Unlike the circumstances of *Hussey Copper*, Commerce did not need to change its "ratio test" to give full meaning to the CAFC's *Remand Order* here. The *Remand Order* only authorized Commerce to reconsider and replace the Cohen's *d* test in its differential pricing analysis. Applying *Hussey Copper* to the facts of this case, Commerce should have reperformed its "ratio test" using the same methodology as before, while accounting for the new inputs provided by Commerce's replacement for the Cohen's *d* test: the 2% "price difference" test. Consequently, *Hussey Copper* further demonstrates that Commerce's change to the "ratio test" was not in accordance with law.

Similarly, the facts presented in *Outukumpu Copper Strip, B.V. v. United States* also show that Commerce's change to the "ratio test" was not in accordance with law.  In *Outukumpu Copper*, the court granted Commerce's request for a voluntary remand to address ministerial errors raised during the litigation.  *See* 15 F. Supp. 2d. at 806–07.  On remand, in addition to resolving the ministerial errors, Commerce impermissibly excluded sales from the sales database, a change that was "neither requested by the parties nor authorized by the court."  *Id.*  Here, Commerce replaced the Cohen's *d* test with the 2% price difference test on remand, as permitted by the CAFC's *Remand Order* (assuming for the sake of argument that Commerce's 2% price difference test is lawful).  But Commerce also changed its "ratio test" without authorization from the court and without the issue being raised on appeal.  The fact that Commerce requested a voluntary remand is irrelevant.  *Remand Results* at 20.  The agency is bound by the *Remand Order* in the same manner, regardless of whether it is requested by the agency or issued by the court of its own accord.

Finally, the "ratio test" used in Commerce's differential pricing analysis was a "settled issue" in the manner described in *Zhaoqing Tifo New Fibre Co. v. United States*, meaning Commerce was not authorized to reopen and re-review it.  *See* 256 F. Supp. 3d. at 1334.  In *Zhaoqing Tifo*, the court held that Commerce impermissibly reconsidered a settled issue on remand based on a remand order addressing a tangentially related issue.  *Id.* at 1335.  This is exactly what Commerce has done in this case.  The *Remand Order* addressed the Cohen's *d* test, which is one part of Commerce's differential pricing analysis.  The cutoffs used by Commerce in the "ratio test," the second part of Commerce's differential pricing analysis, were a settled issue that was not addressed in the CAFC's *Remand Order* and was not raised on appeal.  As discussed above, the CAFC explicitly considered Commerce's "ratio test" in *Stupp* and held that it "reasonably implements the statutory requirement that Commerce determine whether there is 'a pattern of

16

export prices' 'differ[ing] significantly among purchasers, regions, or periods of time'" relying in part on the fact that Commerce used a mixed method approach. *Stupp*, 5 F.4th at 1355. Thus, Commerce's "ratio test" was a settled issue, and much like in *Zhaoqing Tifo*, Commerce was "not permitted" to "reopen and re-review the settled issue" on remand. 256 F. Supp. 3d. at 1335.

Notably, in its *Remand Results*, Commerce was unable to cite a single case in which the court held it was permissible for Commerce to change a methodology or policy that was not litigated on appeal without authorization from the court. Commerce cites to *SKF USA, Inc. v. United States*, for the proposition that it may apply its revised "ratio test" to ongoing remand proceedings but, in fact, the case supports the opposite conclusion. *See Remand Results* at 23 (citing *SKF USA, Inc. v. United States*, 254 F.3d 1022 (Fed. Cir. 2001)). In *SKF USA, Inc.*, the CAFC instructed the Court of International Trade to grant Commerce's **request for a voluntary remand** in which Commerce agreed with the plaintiff's argument **raised on appeal** regarding a methodological change that would lower the plaintiff's dumping margin. That is not the case here. Instead, Commerce has impermissibly reopened a settled issue that was not raised in this appeal and made an unauthorized methodological change that had the effect of increasing Marmen's dumping margin to above *de minimis*. This action was unlawful.

Finally, even if the CAFC's remand order could be read to authorize Commerce to reconsider its entire differential pricing analysis and resulting dumping margin calculation (which it did not), Commerce failed to adequately justify its change to the "ratio test" (and abandoning the mixed method calculation). In the instances where Commerce has changed its methodology during an administrative proceeding, the change was upheld because Commerce "show{ed} that its methodology is permissible under the statute and that it had good reasons for the new methodology" that were fully explained and improved the accuracy of the dumping margin

calculation. *See Huvis Corp. v. United States*, 570 F.3d 1347, 1353 (Fed. Cir. 2009) (affirming Commerce's change of methodology during the original administrative proceeding because it was fully explained and improved the accuracy of the margin calculation, after remanding the case for a clearer explanation). Here, however, Commerce's conclusory explanation for the policy change is inadequate.

In the *Remand Results*, Commerce states that its new "ratio test" "aligns more closely with the statutory text" and "enhances {its} ability to address masked dumping, which is consistent with the objective of the statute . . . ." *Remand Results* at 22. Commerce, however, fails to explain ***how*** its new "ratio test" – which ***lowers*** the threshold for finding a pattern of significant price differences and for using the A-to-T comparison method – is consistent with the statutory conditions for using the A-to-T comparison method laid out in 19 U.S.C. § 1677f-1(d)(1)(A)(i). Commerce also failed to demonstrate that the change will improve the accuracy of its dumping margin calculation.[4] Consequently, even if Commerce were authorized to change aspects of its differential pricing analysis other than the Cohen's *d* test for purposes of recalculating Marmen's dumping margin on remand (which it was not), Commerce has failed to justify its arbitrary change to the "ratio test."

Commerce also emphasizes that it is applying its new "ratio test" consistently "across all cases including remand redeterminations" and that "apply{ing} only a portion of . . . Commerce's revised differential pricing methodology here would be an inconsistent application of its new

---

[4] Commerce cites a separate determination that simply restates this new methodological approach needed to comply with the CAFC's holdings in this case, and the related *Stupp Corp. v. United States*, No. 2023-1663, 2025 LX 240043 (Fed. Cir. Apr. 23, 2025). *See Remand Results* at 8 n.25 (citing *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea*, 90 Fed. Reg. 30050 (July 8, 2025), and accompanying Issued and Decision Memorandum at 2-5).

policy and the Federal Circuit's *Remand Order*." *Remand Results* at 23. Commerce's practice in other ongoing administrative proceedings, however, is irrelevant to this action, which only concerns Commerce's final determination in the antidumping duty investigation of wind towers from Canada. Agency consistency is not a valid reason for violating the *Remand Order* issued by the CAFC in this case.

For these reasons, Commerce's change to the "ratio test" is unlawful. Commerce exceeded the scope of the CAFC's remand order and compounded the CAFC's concern about the overuse of the A-to-T methodology when it lowered the threshold for applying the A-to-T methodology to all of Marmen's U.S. sales. As demonstrated by the case law, changes on remand like Commerce's here have been addressed by the courts and deemed impermissible. Finally, even if this Court were to conclude that the *Remand Order* can be interpreted to permit a change to the ratio test, Commerce independently erred by failing to provide an adequate explanation for its aggressive modification of the "ratio test."

## IV.    CONCLUSION

For the reasons discussed above, Plaintiffs respectfully request that the Court hold and declare that Commerce's *Remand Results* are not in accordance with law; remand this matter to Commerce to issue a revised final determination in conformity with the Court's decision; and grant Plaintiffs such additional relief as the Court may deem just and proper.

Respectfully submitted,

WHITE AND CASE LLP

 /s/ Jay C. Campbell
Jay C. Campbell
Allison J.G. Kepkay
Cristina M. Cornejo
White & Case LLP
701 Thirteenth Street, NW

Washington, DC 20005
(202) 626-3600

Counsel to Plaintiffs Marmen Inc., Marmen Énergie
Inc., and Marmen Energy Co.

Date: March 13, 2026

## CERTIFICATE OF COMPLIANCE

I, Jay C. Campbell, certify that the attached comments in opposition to the final results of redetermination pursuant to court remand comply with the word limitation requirement, as stated in the Standard Chambers Procedures.  The word count for these comments, as computed by the White & Case word processing system (Microsoft Word 2016) and manual tally, is 5,717.

    /s/ Jay C. Campbell

Jay C. Campbell
