**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| MARMEN, INC., MARMEN ENERGY CO., MARMEN ENERGIE INC., | |
| Plaintiffs, | |
| and | |
| WIND TOWER TRADE COALITION, | **Before:  Hon. Jennifer Choe-Groves,** |
| Consolidated Plaintiff, | **Judge** |
| v. | **Consol. Court No. 20-00169** |
| UNITED STATES, | |
| Defendant, | |
| and | |
| WIND TOWER TRADE COALITION, | |
| Defendant-Intervenor, | |
| and | |
| MARMEN, INC., MARMEN ENERGY CO., MARMEN ENERGIE INC., | |
| Defendant-Intervenors. | |

**<u>DEFENDANT-INTERVENOR WIND TOWER TRADE COALITION'S COMMENTS IN
SUPPORT OF THE REMAND RESULTS</u>**

Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Maureen E. Thorson, Esq.
Laura El-Sabaawi, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Wind Tower Trade Coalition*

Dated: April 10, 2026

Consol. Ct No. 20-00169

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................................ 1

II.   BACKGROUND ......................................................................................................... 1

III.   ARGUMENT.............................................................................................................. 5

   A.   Commerce Appropriately Analyzed Whether Prices "Differ Significantly" On Remand .. 7

   B.   Commerce Did Not Err in Declining to Employ a Mixed Comparison Method On Remand ...................................................................................................................11

IV.   CONCLUSION........................................................................................................... 17

Consol. Ct No. 20-00169

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Tube and Conduit Corp. v. United States*,
  24 C.I.T. 1357, 127 F. Supp. 2d 207 (2000) .........................................................9, 11

*Garg Tube Export LLP v. United States*,
  740 F. Supp. 3d. 1355 (Ct. Int'l Trade 2024) ...............................................................8

*Hussey Copper, Ltd. v. United States*,
  21 C.I.T. 217, 960 F. Supp. 315 (1997) ...............................................................13, 14

*Jacobi Carbons AB v. United States*,
  365 F.Supp.3d 1323 (Ct Int'l Trade 2019) ...................................................................8

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)...................................................................................................6, 7, 8

*Marmen Inc. v. United States*,
  134 F.4th 1334 (Fed. Cir. 2025) ..................................................................... *passim*

*Mosaic Co. v. United States*,
  160 F.4th 1340 (Fed. Cir. 2025) .....................................................................................8

*Outokumpu Copper Strip, B.V. v. United States*,
  22 C.I.T. 604, 15 F. Supp. 2d 806 (1998) ...........................................................13, 14

*Parkdale Int'l, Ltd. v. United States*,
  31 C.I.T. 1229, 508 F. Supp. 2d 1338 (2007)...............................................................9

*Stupp Corp. v. United States*,
  5 F.4th 1341 (Fed. Cir. 2021) ....................................................................................2, 3

*U.S. Steel Corp. v. United States*,
  33 C.I.T. 593, 627 F. Supp. 2d 1374 (2009) ................................................................9

*Zhaoqing Tifo New Fibre Co. v. United States*,
  256 F. Supp. 3d. 1314 (Ct. Int'l Trade 2017) .............................................13, 15, 16

*Zhaoqing Tifo New Fibre Co. v. United States*,
  60 F. Supp. 3d 1328 (Ct. Int'l Trade 2014) .........................................................15

**Statutes**

19 U.S.C. § 1673b(3) .........................................................................................................3

**Consol. Ct No. 20-00169**

19 U.S.C. § 1673b(b)(3) ................................................................................................6

19 U.S.C. § 1677f-1(d) ..............................................................................................1, 5

19 U.S.C. § 1677f-1(d)(1)........................................................................................12, 14

19 U.S.C. § 1677f-1(d)(1)(A)(i) ...............................................................................2, 12

19 U.S.C. § 1677f-1(d)(1)(A)(ii) ...................................................................................2

19 U.S.C. § 1677f-1(d)(1)(A)-(B)................................................................................12

19 U.S.C. § 1677f-1(d)(1)(B) .........................................................................2, 5, 11, 16

19 U.S.C. § 1677f-1(d)(1)(B)(i)......................................................................................9

19 U.S.C. § 1677f-1(d)(1)(B)'s..................................................................................5, 17

19 U.S.C. § 3512(d) ........................................................................................................8

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc.
No. 103-316, vol. 1, at 842-43 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040,
4178................................................................................................................9, 12

**Other Authorities**

19 C.F.R. § 351.403(c)....................................................................................................6

19 C.F.R. § 351.414(c)(2)...............................................................................................2

*Certain Carbon and Alloy Steel Cut-To-Length Plate from Italy*,
90 Fed. Reg. 44,633 (Dep't Commerce Sep. 16, 2025) ..........................................4

*Certain Carbon and Alloy Steel Cut-to-Length Plate From Ital*y,
90 Fed. Reg. 20,622 (Dep't Commerce May 15, 2025) .........................................13

*Differential Pricing Analysis*,
79 Fed. Reg. 26,720 (Dep't Commerce May 9, 2014) .............................................2

*Heavy Walled Rectangular Welded Carbon Steel Pipes from the Republic of
Korea*, 90 Fed. Reg. 30,050 (Dep't Commerce July 8, 2025) .................................4

*Steel Concrete Reinforcing Bar from Mexico*, 90 Fed. Reg. 42,740 (Dep't
Commerce Sep. 4, 2025)...........................................................................................4

*Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 40,239 (Dep't Commerce
July 6, 2020)............................................................................................................16

Consol. Ct No. 20-00169

## I.   <u>INTRODUCTION</u>

On behalf of the Wind Tower Trade Coalition ("WTTC"), we respectfully submit these comments in support of the final remand results issued by the U.S. Department of Commerce ("Commerce") on January 30, 2026. *See* Final Results of Redeter. Pursuant to Ct. Remand (Jan. 30, 2026), ECF No. 101 ("Remand Results").

## II.   <u>BACKGROUND</u>

The Remand Results arise from a challenge filed by Marmen Inc., Marmen Energie Inc., and Marmen Energy Co. (collectively "Marmen") regarding Commerce's final determination in an antidumping duty investigation into Canadian utility scale wind towers. *See, e.g., Marmen Inc. v. United States*, 134 F.4th 1334, 1337 (Fed. Cir. 2025). After a remand from this Court and subsequent decision affirming Commerce's remand results, Marmen further appealed to the Court of Appeals for the Federal Circuit ("CAFC"). *Id.* at 1338. Last year, the CAFC vacated this court's decision as to two issues raised in Marmen's appeal, remanding for Commerce to recalculate Marmen's antidumping duty margin (1) inclusive of a reconciling line item that the agency previously rejected and (2) without relying on the Cohen's *d* test in conducting any differential pricing analysis. *Id.* at 1343, 1348.

On remand, Commerce recalculated Marmen's margin to reflect the reconciling line item. *See* Remand Results at 4-7. No party challenged this aspect of either the agency's draft or final remand results. *Id.* at 12; *see also* Pls' Cmts in Opp. to the Final Results of Redeter. Pursuant to Ct. Remand (Mar. 13, 2026), ECF No. 105 at 1 ("Marmen's Comments").

Commerce also conducted its differential pricing analysis anew. Remand Results at 7-12. Title 19 U.S.C. § 1677f-1(d) directs Commerce to calculate dumping margins in less-than-fair-value investigations "by comparing the weighted average of the normal values to the weighted

Consol. Ct No. 20-00169

average of the export prices (and constructed export prices) for comparable merchandise . . . .” 19 U.S.C. § 1677f-1(d)(1)(A)(i).[1] This methodology is commonly known as the “average-to-average” or “A-A” comparison. However, the statute authorizes Commerce to calculate margins by comparing weighted average normal values to the export or constructed export prices of individual transactions, if:

    (i)     there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and

    (ii)    the administering authority explains why such differences cannot be taken into account using {the A-A method}.

19 U.S.C. § 1677f-1(d)(1)(B). Where Commerce finds that so-called “targeted dumping” is occurring pursuant to subsection (i) above, and the agency concludes that the A-A method does not appropriately account for it, the agency will use an “average-to-transaction,” or “A-T” calculation method, to determine dumping margins. *See, e.g., Stupp Corp. v. United States*, 5 F.4th 1341, 1345-46 (Fed. Cir. 2021) (describing statutory structure and Commerce’s developing practice with respect to targeted dumping); *see also Differential Pricing Analysis*, 79 Fed. Reg. 26,720 (Dep’t Commerce May 9, 2014) (request for comments) (describing development of Commerce’s practice through 2014).

    Before the CAFC’s decision, Commerce employed a three-step methodology in determining whether to depart from the A-A methodology in less-than-fair-value investigations,

---

[1]    The statute also authorizes comparison of the normal values for individual transactions to the export or constructed export prices of individual transactions. 19 U.S.C. § 1677f-1(d)(1)(A)(ii). However, the “transaction-to-transaction” or “T-T” method is typically used only in cases involving large, custom goods for which there are few sales in either the home or U.S. markets. 19 C.F.R. § 351.414(c)(2).

Consol. Ct No. 20-00169

including the investigation on appeal. First, Commerce used an analysis rooted in the Cohen's $d$ statistic to determine whether significant differences in price existed among a respondent's sales to different purchasers, regions, or time periods. *Marmen*, 134 F.4th at 1344. Assuming that this first step confirmed that significant price differences existed, Commerce next determined whether there was a "pattern" of such differences by calculating the overall proportion of sales exhibiting the differences. *Id.*; *see also Stupp*, 5 F.4th at 1347. If 33% or fewer sales exhibited such differences, the agency would find that there was no pattern, and employ the normal A-A method. *Stupp*, 5 F.4th at 1347. If 33% - 66% of sales showed such differences, the agency would tentatively select a hybrid approach (or "mixed method") in which it applied the A-A method to sales that did not exhibit significant price differences, while applying the A-T method to those that did. *Id.* If more than 66% of sales showed such differences, it tentatively determined to apply the A-T method to all sales. *Id.* Finally, assuming at least 33% of sales exhibited significant price differences, it would compare the margins resulting from the default A-A method as applied to all sales to the margins resulting from either the mixed method or full A-T method. *Id.* If the differences were less than 25% or failed to move the margin from above *de minimis*[2] to below that level or *vice versa*, the agency would default to the typical A-A method for all sales. *Id.*

In its decision, the CAFC found that Commerce was authorized to conduct a differential pricing analysis, but that it erred in employing the Cohen's $d$ statistic to do so, because the statistical assumptions governing its use were not met. *Marmen*, 134 F.4th at 1345-48. Specifically, the CAFC held that "{o}n remand, Commerce may re-perform a differential pricing analysis, and that analysis may not rely on Cohen's $d$ test for data sets like those here." *Id.* at 1348.

---

[2]    A margin under two percent is considered *de minimis* under the statute. *See, e.g.,* 19 U.S.C. § 1673b(3).

Consol. Ct No. 20-00169

In the wake of the decision, Commerce adopted a new methodology for determining whether to depart from the default A-A comparison. *See, e.g.,* Remand Results at 7-8; *see also* Issues and Decision Memorandum accompanying *Heavy Walled Rectangular Welded Carbon Steel Pipes from the Republic of Korea*, 90 Fed. Reg. 30,050 (Dep't Commerce July 8, 2025) (final results of antidumping duty admin. rev.; 2022-2023) at 3-5; Issues and Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from Mexico*, 90 Fed. Reg. 42,740 (Dep't Commerce Sep. 4, 2025) (final results of antidumping duty admin. rev.; 2022-2023) at 31-35 ("Rebar IDM"); Issues and Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-To-Length Plate from Italy*, 90 Fed. Reg. 44,633 (Dep't Commerce Sep. 16, 2025) (final results and final partial rescission of antidumping duty admin. rev.; 2023-2024) at 9-11, 15-22 ("Plate IDM").

Under the new methodology, Commerce first determines whether the weighted average prices to a given purchaser, region, or time period vary by two percent or more from the weighted average prices to all other purchasers, regions, or time periods. Remand Results at 10. Next, if such differences exist with respect to 33% or less of sales, the agency concludes that the differences, while significant, do not exhibit a pattern. It thus defaults to the A-A methodology. *Id.* If more than 33% of sales exhibit such differences, it concludes that a pattern exists, and tentatively selects the A-T method. *Id.* at 10-11. Finally, it calculates the margins using both the A-A and A-T methods, and, if the differences are less than 25% or fail to move the margin from above to *de minimis* to below *de minimis* or *vice versa*, the agency defaults to the typical A-A method for all sales. *Id.* at 11. If the differences exceed the above thresholds, it uses the A-T method for all sales. *Id.*

4

**Consol. Ct No. 20-00169**

Commerce issued draft results utilizing the new methodology on November 26, 2025. *See* Draft Results of Redeter. Pursuant to Ct. Remand (Nov. 26, 2025), 2P.R.R. 3 at 6-11.[3] Marmen filed comments on December 5, arguing that (1) the two percent threshold for measuring the significance of price differentials is unlawful and (2) the agency exceeded the bounds of the remand order by discontinuing use of the mixed method where more than 33% but less than 66% of a respondent's sales exhibit significant price differences. *See* Letter from White & Case LLP to Sec'y Commerce, re: *Utility Scale Wind Towers from Canada — Comments on Draft Remand Results* (Dec. 5, 2025), 2P.R.R. 7 at 5-10.

## III.    <u>ARGUMENT</u>

The Court should affirm Commerce's recalculation of Marmen's margin on remand.

As explained above, 19 U.S.C. § 1677f-1(d) provides that Commerce will normally calculate dumping margins in less-than-fair-value investigations using an A-A comparison between normal value and export or constructed export prices. However, the statute authorizes Commerce to use the A-T method where (1) the record indicates that there is a pattern in which export prices "differ significantly" among purchasers, regions, or time periods, and (2) that pattern of significant price difference would not be accounted for through the default A-A comparison. 19 U.S.C. § 1677f-1(d)(1)(B).

In *Marmen,* the CAFC confirmed Commerce's statutory authority to conduct an analysis aimed at determining whether 19 U.S.C. § 1677f-1(d)(1)(B)'s conditions are met, but found unreasonable the agency's reliance on the Cohen's *d* statistic to do so. *Marmen*, 134 F.4th at 1348 ("On remand, Commerce may re-perform a differential pricing analysis, and that analysis may not

---

[3]    Documents in the administrative record list that commerce filed with the Court on February 13, 2026 are designated by the rubric "2P.R.R.," followed by the number assigned to that document in the record list.

rely on Cohen's *d* test for data sets like those here.") Commerce therefore abandoned use of the Cohen's *d* statistic on remand, instead adopting a two percent significance threshold, while also abandoning its prior practice of "mixed method" calculations. *See* discussion *supra* at 4 (collecting cases); Remand Results at 7-8, 10-11.

Commerce first explained that the statute's reference to prices that differ "significantly" among purchasers, regions, or time periods indicates that the agency has "flexibility" to determine what quantum of price differential is sufficient. Remand Results at 14; *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (recognizing that statutes may use terms or phrases that "leave{} agencies with flexibility") (internal quotations and citations omitted). Commerce next explained that a two percent threshold is consistent with other aspects of the dumping calculations, such as the two percent threshold for *de minimis* margins and the plus-or-minus two percent threshold used in determining whether prices to affiliated parties are comparable with those to unaffiliated parties. Remand Results at 14-16; *see also* 19 U.S.C. § 1673b(b)(3); 19 C.F.R. § 351.403(c). Commerce emphasized that the two percent significance threshold does not emphasize absolute differences in prices, but relative differences within the respondent's own pricing experience. Remand Results at 17. Finally, Commerce explained that while it formerly employed a mixed comparison method in certain cases, the statute makes no reference to such a method. *Id.* at 21-22. Rather, it plainly endorses using either the A-A method or the A-T method, but not a hybrid approach. *Id.*

Marmen now challenges Commerce's remand analysis on two grounds. First, it argues that the two percent threshold is statutorily infirm. Second, it argues that by declining to employ a mixed comparison method, Commerce unlawfully exceeded the scope of the remand order. Neither argument is compelling.

Consol. Ct No. 20-00169

A.    **Commerce Appropriately Analyzed Whether Prices "Differ Significantly" On Remand**

On remand, Commerce employed a two percent threshold in determining whether Marmen's prices differed significantly among purchasers, regions, or time periods during the period of investigation. Remand Results at 10. To do so, Commerce first calculated the weighted average price for each product sold in the U.S. market, as sold to each purchaser, region, and in specific time periods. *Id.* Then, it compared those product-specific weighted averages for each purchaser, region, or time period to the weighted average price for the same product to all other purchasers, regions or time periods. *Id.* On this basis, the agency found that 38.18% of Marmen's sales exhibited significant price differences among purchasers, regions, or time periods. *Id.* at 12.

Marmen argues that the two percent threshold violates Commerce's statutory obligation to determine whether prices differ "significantly." It first claims that because a two percent difference is facially "trivial," the threshold is inconsistent with the best interpretation of the statute. Marmen's Comments at 6-10. Next, it argues that the two percent threshold is inconsistent with Congress's intention that Commerce analyze targeted dumping on a case-by-case basis. *Id.* at 10-12.

Marmen's argument regarding statutory consistency has no merit. The company argues that, post-*Loper Bright*, Commerce's methodology for analyzing whether prices differ "significantly" cannot merely be reasonable, but must comply with the "best interpretation of the statute." *Id.* at 6-10. But unlike the *Loper Bright* Court, Marmen fails to recognize that while some statutes may bind the agency to a particular course, others use terms or phrases that "leave{} agencies with flexibility." *Loper Bright*, 603 U.S. at 395, quoting *Michigan v. EPA*, 576 U. S. 743, 752 (2015). The Court's role is then to ensure that the agency does not stray beyond the limits of the flexibility afforded by the statute. *Id.*

Consol. Ct No. 20-00169

Against this background, Marmen fails in its argument that the plain meaning of the word "significantly" forbids the course of action Commerce took here. As an initial matter, the dictionary definitions that Marmen offers do not indicate that the word "significantly" necessarily excludes a two percent difference in prices. Remand Results at 14.[4] Indeed, the courts have previously held that "significantly" is not reducible to a single, simple meaning. *See, e.g., Garg Tube Export LLP v. United States*, 740 F. Supp. 3d. 1355, 1366-67 (Ct. Int'l Trade 2024); *Jacobi Carbons AB v. United States*, 365 F.Supp.3d 1323, 1332 (Ct Int'l Trade 2019); Instead, the word gives the agency the same sort of flexibility that the courts have found inherent in the use of words like "reasonable" or "predominant." *See Loper Bright*, 603 U.S. at 395; *Mosaic Co. v. United States*, 160 F.4th 1340, 1347 (Fed. Cir. 2025). And notwithstanding its contention that a two percent difference is necessarily "trivial," Marmen's Comments at 10, Marmen appears to concede just the opposite in citing approvingly to *Jacobi Carbons*, where this court found that what qualifies as "significant" may vary with context. *Id.* at 10-11; *see also Jacobi Carbons*, 365 F.Supp.3d at 1332.

More to the point, a statute must be interpreted to "effectuate the will of Congress." *Loper Bright*, 603 U.S. at 395. Relevantly, 19 U.S.C. § 3512(d) states that the Statement of Administrative Action ("SAA") accompanying the Urugay Round Agreements Act ("URAA") "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the {the Tariff Act of 1930, as amended by the URAA} in any judicial proceeding in which a

---

[4]    Nor is it difficult to imagine such scenarios. Consider the example of two doctors, with a two percent difference in curing patients with the condition you suffer. Which one would you choose? And even if, as Marmen argues, a 2% difference in prices for a cup of coffee reflects a smaller absolute value than a 2% difference in prices for a car, Marmen's Comments at 11, it remains that small absolute differences may be "significant." There is only a 4-cent absolute difference in prices between a gas station that sells its product for $1.96/gallon versus another that sells at $2.00/ gallon – but that two percent difference could easily drive consumers to the cheaper option.

8

**Consol. Ct No. 20-00169**

question arises concerning interpretation or application." *Allied Tube and Conduit Corp. v. United States*, 24 C.I.T. 1357, 1368, 127 F. Supp. 2d 207, 216-17 (2000). In the SAA, Congress stated that, in respect of the phrase "differs significantly" as it appears in 19 U.S.C. § 1677f-1(d)(1)(B)(i), "small differences may be significant," depending on the product or industry. URAA, SAA, H.R. Doc. No. 103-316, vol. 1, at 842-43 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4178.

Having failed to establish that the word "significantly" necessarily excludes a two percent difference, Marmen next argues that the two percent threshold fails to comply with Congress's intent that Commerce determine whether to resort to the A-T method on a "case-by-case basis." Marmen's Comments at 10-12, quoting SAA at 842-43, 1994 U.S.C.C.AN. at 4178. Here, a curious aspect of Marmen's challenge comes into focus. Specifically, it is not making an "as applied" challenge to the two percent threshold. *See id.* Rather, while Marmen implies that the burden rests with Commerce to explain why the two percent threshold is relevant to the wind towers industry, *id.* at 11, it makes no affirmative argument as to why it is not relevant, cites no evidence in that regard, and provides no explanation as to why a two percent threshold is unlawful as applied to Marmen particularly. *See generally id*.

Instead, Marmen mounts a facial challenge – "a broad-based attack on a {policy's} consistency with existing law." *Parkdale Int'l, Ltd. v. United States*, 31 C.I.T. 1229, 1236 n.5, 508 F. Supp. 2d 1338, 1347 n.5 (2007); *see also U.S. Steel Corp. v. United States*, 33 C.I.T. 593, 594 n.1, 627 F. Supp. 2d 1374, 1376 n.1 (2009) (observing that a "facial{} challenge contests the general policy to use a law, regulation or practice"). To succeed in such a challenge, Marmen "must establish that no set of circumstances exists under which the {two percent threshold} would be valid." *Parkdale*, 31. C.I.T. at 1236 n.5, 508 F. Supp. 2d at 1347, n.5, quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987).

**Consol. Ct No. 20-00169**

Marmen has not met this burden. While it argues that the two percent threshold is necessarily incompatible with a "case-by-case" analysis, Commerce has explained why this is not so. Remand Results at 17. Specifically, the two percent threshold does not emphasize absolute differences in prices, but relative differences within a particular respondent's own pricing experience. *Id.* As Marmen concedes, two percent of the price of a car is a much different number than two percent of the price of a cup of coffee. Therefore, rather than binding the agency to any absolute measure of significant price differences, the two percent threshold by nature accommodates the specific facts and situations presented by each record. In other words, it advances precisely the "case-by-case" analysis referenced in the SAA.

Nor has Commerce asserted that participants in individual proceedings will be prevented from arguing that some other means of assessing the significant of price differences may be appropriate in the context of those proceedings. Here, indeed, Marmen argued that the agency should adopt a 25% threshold for significant price differences.[5] *See, e.g., id.* at 16-17. While Commerce rejected the argument, it did not refuse to consider it. *Id.; see also* Rebar IDM at 35 (noting that parties were given the opportunity to present arguments as to why the two percent threshold should not be used in the review, and stating that parties would continue to be permitted to make such arguments in future proceedings); Plate IDM at 9-11, 15-22 (responding to parties' arguments regarding the post-*Marmen* price differences test). It is thus clear that Commerce has not implemented its two percent threshold as an inflexible standard. Rather, the two percent threshold is akin to the agency's presumption in favor of invoice date when selecting dates of sale. And that is something that the courts have upheld as consistent with a statutory mandate that

---

[5]    This, of course, is a rather odd thing to argue if one believes that adopting a percent-based general policy is statutorily infirm.

10

Consol. Ct No. 20-00169

requires case-by-case consideration of specific record facts. *See, e.g., Allied Tube,* 24 C.I.T. at 1367-1368, 127 F. Supp. 2d at 216-17.

> **B.    Commerce Did Not Err in Declining to Employ a Mixed Comparison Method On Remand**

On remand, Commerce determined that 38.18% of Marmen's sales exhibited significant price differences by purchaser, region, or time period. Remand Results at 12. It therefore found that a pattern of such differences existed within the meaning of 19 U.S.C. § 1677f-1(d)(1)(B). *Id.* at 10-12. After calculating the margin using both the A-A and A-T methods, Commerce found that the distinct methods produced, on the one hand, a below-*de minimis* margin of 1.22% (A-A method) and, on the other, an above-*de minimis* margin of 2.93% (A-T method). *Id.* at 12, 24; Memorandum from Jacob Waddell, Int'l Trade Compliance Analyst, AD/CVD Operations, Off. VI to The File, re: *Less-than-Fair-Value Investigation of Utility Scale Wind Towers from Canada: Remand Calculation Memorandum for Marmen Energy Co.* (Nov. 21, 2025), 2P.R.R. 2 at 3.

Marmen argues that Commerce erred in not using the mixed method[6] to calculate the margin here, rather than the A-T method alone. Marmen's Comments at 12-17. Marmen avers that because no party challenged Commerce's use of the mixed method pre-remand, changes to this aspect of Commerce's original less-than-fair value determination are outside the scope of the remand order. *Id.* at 12-14. Marmen further argues that the CAFC's rejection of the Cohen's *d* statistic was animated primarily by concerns that it would lead to overuse of the A-T method; it also claims that the agency's decision not to use the mixed method is precisely the type of change that courts have held impermissible on remand. *Id.* at 15-17.

---

[6]    The mixed method involves applying A-T comparisons to sales that are found to exhibit a pattern of significant price differences, while applying an A-A comparison to the remaining sales. *See* discussion *supra* at 3.

11

**Consol. Ct No. 20-00169**

Marmen does not persuade that the agency erred. While Marmen's challenge to the pre-remand targeted dumping analysis focused on the Cohen's *d* statistic, this does not make Commerce's decision not to use the mixed method unlawful. In this regard, Marmen's characterization of the CAFC as being chiefly concerned with overuse of the A-T method *per se* is flawed. Rather, the court stated that, to the extent that the Cohen's *d* statistic produced a flawed input into subsequent steps of the targeted dumping methodology, the statistic's use increased the chances that Commerce's selected comparison methodology would contradict statutory directives. *Marmen*, 134 F.4th at 1346.[7] As Commerce explained, the CAFC's chief concern was accordingly whether use of the Cohen's *d* statistic promoted selection of a statutorily infirm averaging methodology. *See* Remand Results at 20-21.

Commerce's remand results are fully consistent with this concern. As the agency noted, discontinuing use of the mixed method "more closely aligns with the statutory language . . . ." *Id.* at 22. This is self-evident, as 19 U.S.C. § 1677f-1(d)(1) contains no reference to "mixed method" calculations. Rather, the statute refers to determining margins through use of the A-A methodology or the A-T methodology, but not both. 19 U.S.C. § 1677f-1(d)(1)(A)-(B).[8] Similarly, the SAA refers to use of one methodology or the other, but not both simultaneously. SAA at 842-43, 1994 U.S.C.C.AN. at 4178.

---

[7]     Specifically, the CAFC stated that:

> If the output of Cohen's *d* test is incorrect, then the flawed output becomes a flawed input to the ratio test. That flawed input to the ratio test leads to a flawed output, and that flawed output will be used to determine whether a pattern of significant price differences exists. And if the ratio test determines there is a pattern when there is not, Commerce has then selected the wrong weight-averaged methodology as required under § 1677f-1(d)(1)(A)(i).

[8]     With respect to the statutory reference to transaction-to-transaction comparisons, *see* note 1, *supra*.

Consol. Ct No. 20-00169

Further, the agency did not discontinue the mixed method uniquely in this remand proceeding. Rather, post-*Marmen*, the agency discontinued the mixed method across the board. *See* Remand Results at 22-23; *see also* Rebar IDM at 32-33; Plate IDM at 18-19. It would be strange indeed were the agency to refuse to employ, in the context of a remand, a generally applicable policy used in other proceedings since the *Marmen* decision was issued, including those that were underway before the *Marmen* decision was made. Rebar IDM at 2 (noting that the preliminary results of the review were issued on September 13, 2024); *Certain Carbon and Alloy Steel Cut-to-Length Plate From Ital*y, 90 Fed. Reg. 20,622 (Dep't Commerce May 15, 2025) (prelim. results and intent to rescind, in part, of antidumping duty admin. rev.; 2023-2024) (noting that review was initiated on July 5, 2024). For that matter, Marmen makes no attempt to argue that the statute requires – or even contemplates – mixed comparisons. *See generally* Marmen's Comments.[9]

Finally, the case law that Marmen cites does not compel a finding that Commerce acted inappropriately. Marmen relies principally on *Hussey Copper, Ltd. v. United States*, 21 C.I.T. 217, 960 F. Supp. 315 (1997), *Outokumpu Copper Strip, B.V. v. United States*, 22 C.I.T. 604, 15 F. Supp. 2d 806 (1998), and *Zhaoqing Tifo New Fibre Co. v. United States*, 256 F. Supp. 3d. 1314 (Ct. Int'l Trade 2017) ("*Zhaoqing Tifo II*"). *See* Marmen's Comments at 13-17. None of these cases support Marmen's claim.

In *Hussey Copper*, the Court rejected a challenge to certain remand results as being "untimely and therefore moot." *Hussey Copper,* 21 C.I.T. at 219, 960 F. Supp. at 318. While the

---

[9]    There is, of course, an internal inconsistency in Marmen's attempt to use the CAFC's remand order as a shield against the plain meaning of the statute as it implicates mixed comparisons, while simultaneously arguing that the agency has acted inconsistently with the statute's plain meaning in assessing whether significant price differences exist. *Compare* Marmen's Comments at 12-17 *with id.* at 5-12.

Consol. Ct No. 20-00169

opinion notes that the challenge also had no substantive merit, this is *dicta,* as the untimeliness and mootness of the claim was sufficient to resolve the case. Even if it were otherwise, *Hussey Copper* provides no support for Marmen's arguments. The Court in *Hussey Copper* had previously remanded the calculation of certain dumping margins to correct methodological errors. *Id.* at 217-219, 316-318. These flawed margins had been used to derive an adverse facts available rate applied to certain sales for which a respondent failed to report difference-in-merchandise information. *Id.* at 217, 316. While the adverse facts available rate was not the subject of the prior remand order, the Court held that Commerce had the discretion to alter that rate consistently with the changes to the margins underlying it. *Id.* at 220, 318. In other words, having been directed to make a specific alteration to its margin calculations, Commerce was entitled to make changes to portions of its overall analysis that flowed from, and depended on, the altered portion.

Here, the selection of a comparison methodology under 19 U.S.C. § 1677f-1(d)(1) begins with – and thus flows from and depends on – the determination as to whether a respondent's prices differ significantly among purchasers, regions, or time periods. *See, e.g.,* Remand Results at 19. Thus, discontinuation of the mixed method in selecting a comparison methodology comports with the *dicta* in *Hussey Copper*. And as noted above, the discontinuation – both on remand and in other cases – promotes Commerce's selection of a comparison methodology consistent with the statutory text.

The next case on which Marmen relies, *Outokumpu Copper*, is even less supportive of its claims. There, Commerce asked for a voluntary remand after it inadvertently made changes on remand that it had not intended to make. *Outokumpu Copper,* 22 C.I.T. at 604-605, 15 F. Supp. 2d at 806-807. While the court noted in passing that it had not authorized the inadvertent changes, the statement is *dicta*, as the issue was not in controversy. In any event, the opinion contains no

14

**Consol. Ct No. 20-00169**

substantive discussion of the scope of the specific remand order at issue, and does not address whether and under what circumstances an agency may implement changes to align a remand determination with relevant statutory directives, as well as the agency's overall practices and policies.

The third case, *Zhaoqing Tifo*, fares no better. The plaintiff there argued that in calculating its factors of production, Commerce erroneously double-counted coal costs that were already accounted for in the surrogate financial ratios. *Zhaoqing Tifo II*, 256 F. Supp. 3d. at 1317, 1321; *see also Zhaoqing Tifo New Fibre Co. v. United States*, 60 F. Supp. 3d. 1328, 1339-41 (Ct. Int'l Trade 2014) ("*Zhaoqing Tifo I*"). Because Commerce had not addressed this argument as to coal costs – despite having addressed similar double-counting issues with respect to electricity and water costs – the Court remanded to permit the agency to "consider{} the potential for double counting" of coal costs, while "explaining its reasoning fully and with reference to the record evidence." *Zhaoqing Tifo I*, 60 F. Supp. 3d at 1364-65.

On remand, the agency instead pivoted to an entirely different set of surrogate financial statements. *Zhaoqing Tifo II*, 256 F. Supp. 3d at 1317. In other words, rather than effectuating any portion of the Court's remand order, the agency avoided the court's remand instructions in their entirety. *Id.* Moreover, the plaintiff, despite ultimately disagreeing with the agency's treatment of coal costs, had actively – and successfully – advocated for use of the original set of surrogate financial statements during the review. *Id.* at 1320, 1322. By contrast, although the domestic producer that participated in the review actively opposed use of that set of financial statements in agency briefing, it did not appeal their use. *Id.* at 1322. Nonetheless, the domestic producer found itself the beneficiary of a windfall when Commerce pivoted to its previously rejected, preferred set of statements on remand. *Id.* On these bases, the Court found that Commerce had failed to

15

**Consol. Ct No. 20-00169**

comply with the remand order when it abandoned its prior surrogate financial statement selection rather than take steps to explain why it had not double-counted coal costs or, alternatively, take steps to avoid such double-counting. *See id.* at 1333-34.

The facts here are meaningfully different from those at issue in *Zhaoqing Tifo*. As an initial matter, Commerce hasn't dodged the CAFC's remand instructions. The Court authorized the agency to re-perform its differential pricing analysis, but to do so without relying on Cohen's *d*. *Marmen*, 134 F.4th at 1348. The agency has done exactly that. It is true that Commerce also altered a subsidiary step of its analysis to better match the statutory text, by discontinuing the mixed method. Further, no party advocated one way or another regarding the mixed method pre-*Marmen*. *See, e.g.,* Issues and Decision Memorandum accompanying *Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 40,239 (Dep't Commerce July 6, 2020) (final deter. of sales at less than fair value and final negative deter. of critical circumstances) at 10-11 (describing and responding to parties' arguments regarding the 19 U.S.C. § 1677f-1(d)(1)(B) analysis); Final Results of Redeter. Pursuant to Ct. Remand (May 26, 2022), Ct. No. 20-00169, ECF No. 61 at 46-50 (same). This distinguishes the issue from the selection of the financial statements underpinning the double-counting issue in *Zhaoqing Tifo*, which was actively contested in the parties' agency briefing, and which the domestic industry chose not to appeal, despite having lost on this contested claim before the agency.

Importantly, *Zhaoqing Tifo* did not involve a change that aligned the remand determination with statutory requirements. Nor did it involve a change that aligned the agency's remand determination with a generally adopted policy. Instead, it involved the agency's evidentiary determination as to the most suitable source of surrogate financial data in a specific case. There was no obvious purpose to this change other than to avoid the remand instructions, nor any statute

16

**Consol. Ct No. 20-00169**

or general policy supporting it. Here, of course, Commerce has complied with the remand instructions while also ensuring that its remand determination is statutorily sound overall, and in accordance with generally applicable policy.

Finally, there is no language in the CAFC's remand order that forbids the agency from ensuring that, on remand, its analysis of whether 19 U.S.C. § 1677f-1(d)(1)(B)'s conditions are met conforms with the statute. Rather, the remand order confirms the agency's authority to conduct that analysis in the first instance, but directs that such analysis must be statutorily sound. *Marmen*, 134 F.4th at 1348. That is exactly what the remand results accomplish.

## IV.    CONCLUSION

For the reasons discussed above, the Court should affirm Commerce's remand results.

Respectfully submitted,

*/s/ Alan H. Price*

Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Maureen E. Thorson, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Wind Tower Trade Coalition*

Dated: April 10, 2026

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Defendant-Intervenor Wind Tower Trade Coalition's Comments in Support of the Remand Results, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2026), is 5,258 words.

*/s/ Alan H. Price*
(Signature of Attorney)

Alan H. Price
(Name of Attorney)

Wind Tower Trade Coalition
(Representative Of)

April 10, 2026
(Date)