IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| MARMEN INC., <br> MARMEN ENERGY CO., and <br> MARMEN ÉNERGIE INC., <br><br>       Plaintiffs, <br><br> and <br><br> WIND TOWER TRADE COALITION, <br><br>       Consolidated Plaintiff, <br><br>       v. <br><br> UNITED STATES, <br><br>       Defendant, <br><br> and <br><br> WIND TOWER TRADE COALIATION, <br> MARMEN ÉNERGIE INC., MARMEN <br> ENERGY CO., and MARMEN INC., <br><br>       Defendant-Intervenors. | Consol. Court No. 20-00169 |

<u>ORDER</u>

Upon consideration of the Department of Commerce's final results of redetermination pursuant to remand, all responses thereto, and all other pertinent papers, it is hereby

ORDERED that the remand results are sustained in their entirety; and further

ORDERED that final judgment is entered in favor of the United States.


Dated: _____, 2026    _____
     New York, NY        JENNIFER CHOE-GROVES, JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| MARMEN INC., <br> MARMEN ENERGY CO., and <br> MARMEN ÉNERGIE INC., <br><br>        Plaintiffs, <br><br> and <br><br> WIND TOWER TRADE COALITION, <br><br>        Consolidated Plaintiff, <br><br>        v. <br><br> UNITED STATES, <br><br>        Defendant, <br><br> and <br><br> WIND TOWER TRADE COALIATION, <br> MARMEN ÉNERGIE INC., MARMEN <br> ENERGY CO., and MARMEN INC., <br><br>        Defendant-Intervenors. | Consol. Court No. 20-00169 |

DEFENDANT'S COMMENTS SUPPORTING REMAND REDETERMINATION

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

Of Counsel:

PAUL THORNTON
Attorney
Office of the Chief Counsel
   for Trade Enforcement & Compliance
Department of Commerce

April 10, 2026

DOUGLAS G. EDELSCHICK
Senior Trial Counsel
Commercial Litigation Branch
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel:  (202) 353-9303

Attorneys for Defendant United States

## TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ..................................................................................................... ii

BACKGROUND ...................................................................................................................2

I.      Statutory Framework ...............................................................................................2

II.     The Federal Circuit Invalidates The Cohen's d Test In *Marmen* .........................4

III.    Commerce Changes Its Administrative Practice After *Marmen* ...........................5

IV.     Commerce Followed Its New Practice On Remand .................................................7

ARGUMENT ........................................................................................................................8

I.      Standard of Review ..................................................................................................8

II.     Commerce's Final Remand Results Comply With The Federal Circuit Decision In
        *Marmen* and the Remand Order ..............................................................................9

III.    Commerce's Adoption Of the Price Difference Test Is Supported By Substantial
        Evidence And Otherwise In Accordance With Law ...............................................10

        A.      Marmen Disagrees With The Standard Of Review That The Federal Circuit
                Applied In This Case, And Marmen Misinterprets *Loper Bright* In Any Event ...12

        B.      Marmen's Arguments That Two Percent Threshold Of The Price Difference
                Test Is Inconsistent With The Statute Are Unsupported ..........................14

        C.      Commerce's Adoption of the Price Difference Test Is Consistent With
                Congressional Intent To Require A Case-By-Case Analysis of Price
                Differences ...............................................................................................17

IV.     Commerce's Discontinuance Of The Mixed Method Is Supported By Substantial
        Evidence And Otherwise In Accordance With Law ...............................................20

        A.      The Cases Relied Upon By Marmen Are Distinguishable .......................23

        B.      Commerce Provided An Adequate Explanation For Discontinuance Of The
                Mixed Method And Is Permitted To Apply A Policy Change That Is
                Consistent With A Remand Order Across All Proceedings .....................26

CONCLUSION ....................................................................................................................31

# TABLE OF AUTHORITIES

**Cases:**                                                         **Page(s):**

*Ad Hoc Committee of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States*, No. 95-1129, 1995 U.S. App. LEXIS 34623, 1995 WL 596834 (Fed. Cir. Oct. 10, 1995) ................................................................................23

*Am. Silicon Techs. v. United States*, 334 F.3d 1033 (Fed. Cir. 2003) ...........................21

*Am. Silicon Techs. v. United States*, 63 F. Supp. 2d 1324, 1332 (Ct. Int'l Trade 1999) ..............27

*Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337 (Fed. Cir. 2017) ...............................................3, 7, 16-17, 29-31

*Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252 (Fed. Cir. 2024) (*Asemesa*) ..................................................11, 13

*Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d 1315 (Ct. Int'l Trade 2025) ................................12

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*, 5 F.4th 1367 (Fed. Cir. 2021) ........................................................................12

*BYD (H.K.) Co. v. United States*, 785 F. Supp. 3d 1359 (Ct. Int'l Trade 2025) ............................11

*Carbon Activated Tianjin Co., Ltd. v. United States*, No. 2023-2413, 2025 U.S. App. LEXIS 11226, 2025 WL 1354994 (Fed. Cir. May 9, 2025) ....................19

*Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012) ......................................................................21

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ..........................................................8

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) ......................................................8

*Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369 (Fed. Cir. 2015) ........................19

*Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 178 F. Supp. 2d 1305 (Ct. Int'l Trade 2001) ...................................................26

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996) ...............................................12

*Garg Tube Export LLP v. United States*, 740 F. Supp. 3d 1355 (Ct. Int'l Trade 2024) ..........13, 17

*Hussey Copper Ltd. v. United States*, 960 F. Supp. 315 (Ct. Int'l Trade 1997) ......................23, 24

*Huvis Corp. v. United States*, 570 F.3d 1347 (Fed. Cir. 2009) .............................................29-30

*Huvis Corp. v. United States*, 32 C.I.T. 845 (2008) ........................................................26

## TABLE OF AUTHORITIES

**Cases (continued):**                                                                 **Page(s):**

*INS v. Elias-Zacarias*, 502 U.S. 478 (1992) ...............................................................8

*Jacobi Carbons AB v. United States*, 365 F. Supp. 3d 1323 (Ct. Int'l Trade 2019)..........17, 18, 19

*JBF RAK LLC v. United States*, 790 F.3d 1358 (Fed. Cir. 2015)...................................28

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ........................................10, 11

*MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015).......................8

*Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025)............................................ *passim*

*Melamine Chemicals, Inc. v. United States*, 732 F.2d 924 (Fed. Cir. 1984) .................................12

*Mosaic Co. v. United States*, 160 F.4th 1340 (Fed. Cir. 2025)...........................................9

*Nexteel Co. v. United States*, 28 F.4th 1226 (Fed. Cir. 2022)............................................12

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006).............................................8

*Outokumpu Copper Strip, B.V. v. United States*, 15 F. Supp. 2d 806 (Ct. Int'l Trade 1998)..23, 24

*Russello v. United States*, 464 U.S. 16 (1983) ..............................................................22

*Samsung Electronics Co. v. United States*, 72 F. Supp. 3d 1359 (Ct. Int'l Trade 2015)...............30

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., CO*, 605 U.S. 168, 179-80 (2025) ......................9

*SKF USA, Inc. v. United States*, 254 F.3d 1022 (Fed. Cir. 2001)..................................................26

*Smith-Corona Group v. United States*, 713 F.2d 1568 (Fed. Cir. 1983) ........................................8

*Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021) (*Stupp*).......................3, 10, 14, 28, 30

*Stupp Corp. v. United States*, No. 2023-1663, 2025 U.S. App. LEXIS 9616,
    2025 WL 1178392 (Fed. Cir. Apr. 23, 2025) (*Stupp II*)...........................................21, 22

*Timken Co. v. United States*, 968 F. Supp. 2d 1279 (Ct. Int'l Trade 2014)............................29, 30

*Union Steel v. United States*, 713 F.3d 1101 (Fed. Cir. 2013).......................................................2

*Zhaoqing Tifo New Fibre Co. v. United States*,
    256 F. Supp. 3d 1314 (Ct. Int'l Trade 2017) ......................................................22, 23, 25

## TABLE OF AUTHORITIES

**Statutes And Legislative History:**                                                          **Page(s):**

19 U.S.C. § 1516a .........................................................................................................8

19 U.S.C. § 1673 ...........................................................................................................2

19 U.S.C. § 1673b ......................................................................................15, 16, 17, 20

19 U.S.C. § 1673d ......................................................................................15, 16, 17, 20

19 U.S.C. § 1677a .........................................................................................................2

19 U.S.C. § 1677b .....................................................................................................2, 19

19 U.S.C. § 1677f-1 ............................................................................................. *passim*

28 U.S.C. § 2639 ...........................................................................................................8

Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 (1994) ..3, 4, 7, 13, 17, 18, 27

**Regulations:**

19 C.F.R. § 351.403 .........................................................................................15, 16, 17

19 C.F.R. § 351.414 .......................................................................................................2

**Administrative Determinations:**

*Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*, 84 Fed. Reg. 26,401 (Dep't of Commerce June 6, 2019) ....................................................................15

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea*, 90 Fed. Reg. 30,050 (Dep't of Commerce July 8, 2025) .......................................6

*Xanthan Gum from the People's Republic of China*, 78 Fed. Reg. 33351 (Dep't of Commerce June 4, 2013) ...........................................................................................4

**Other Authorities:**

*Alternatives to the Use of Cohen's d; Request for Comment*, 90 Fed. Reg. 21,277 (Dep't of Commerce May 19, 2025) ....................................................................................5

*Differential Pricing Analysis; Request for Comments*, 79 Fed. Reg. 26,720 (Dep't of Commerce May 9, 2014) .........................................................................................4

Import Admin., U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004) ....................................................19

# TABLE OF AUTHORITIES

**Other Authorities (continued):**                                                        **Page(s):**

*Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping
Duty Investigations*, 73 Fed. Reg. 74,930 (Dep't of Commerce Dec. 10, 2007)...............30

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| MARMEN INC., <br> MARMEN ENERGY CO., and <br> MARMEN ÉNERGIE INC., <br><br>       Plaintiffs, <br><br> and <br><br> WIND TOWER TRADE COALITION, <br><br>       Consolidated Plaintiff, <br><br>       v. <br><br> UNITED STATES, <br><br>       Defendant, <br><br> and <br><br> WIND TOWER TRADE COALIATION, <br> MARMEN ÉNERGIE INC., MARMEN <br> ENERGY CO., and MARMEN INC., <br><br>       Defendant-Intervenors. | Consol. Court No. 20-00169 |

## DEFENDANT'S COMMENTS SUPPORTING REMAND REDETERMINATION

Defendant, the United States, respectfully submits this response to the comments filed by plaintiffs, Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co. (collectively, Marmen), concerning the Department of Commerce's (Commerce) Final Results of Redetermination.  Pl. Comments on Remand Redetermination, Mar. 13, 2026, ECF No. 105 (Marmen's Comments); Final Results of Redetermination, Jan. 30, 2026, ECF No. 101 (Final Remand Results).  The Court should sustain the Final Remand Results because they are in accordance with law, supported by substantial evidence, and comply with the Court's remand order.

BACKGROUND

I.      Statutory Framework

The Tariff Act of 1930, as amended (the Act), establishes a remedial regime to combat unfair trade practices.  The antidumping provisions of the Act provide relief for injury to domestic manufacturers by imposing duties upon imports of foreign products that are sold in the United States at less than fair value.  19 U.S.C. § 1673.  By statute, Commerce must evaluate whether imported products are sold in the United States at unfairly low prices.  19 U.S.C. § 1673; *see also Union Steel v. United States*, 713 F.3d 1101, 1103 (Fed. Cir. 2013).  If Commerce concludes that the U.S. sales are "at less than fair value" – meaning that the products are dumped into the U.S. market, and if the International Trade Commission concludes that a U.S. industry has been injured by such unfair pricing, then Commerce will direct U.S. Customs and Border Protection to assess an "antidumping duty."  *Id.*  A sale generally is at "less than fair value" when the price charged in the U.S. market – the "U.S. price" – is less than the "normal value," generally the price charged in the comparison market.  19 U.S.C. §§ 1677a(a)-(b), 1677b(a)(l)(B)(i).  The antidumping duty is equal to the "amount by which the normal value exceeds the {U.S. price} for the merchandise."  19 U.S.C. § 1673.

In determining whether subject merchandise is being sold at less than fair value, Commerce normally compares "the weighted average of the normal values to the weighted average of the export (and constructed export prices) for comparable merchandise" unless it determines another method is appropriate.  19 U.S.C. § 1677f-1(d)(1)(A)(i); 19 C.F.R. § 351.414(c)(1).  Under this average-to-average ("A-to-A") method, Commerce compares the weighted average of a respondent's comparison market sale prices during the investigation period to the weighted average of the respondent's sales prices in the United States during the same period.  19 C.F.R. § 351.414(b)(1).

One downside of the A-to-A method is that it may fail to detect instances of "targeted" or "masked" dumping, which may occur when an exporter sells at a dumped price to some customers, regions, or time periods, while selling at higher prices to other customers, regions, or time periods.  *See Stupp Corp. v. United States*, 5 F.4th 1341, 1345 (Fed. Cir. 2021) (*Stupp*) (citing *Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337, 1341 (Fed. Cir. 2017) (*Apex*)).  When Commerce uses the A-to-A method, higher-priced U.S. sales can mask these lower-priced U.S. sales that are dumped, which could potentially leave the domestic industry without a remedy from unfair trade practices.  *See* Statement of Administrative Action (SAA), H.R. Doc. No. 103-316, vol. 1 (1994) at 842, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4178 ("In part, the reluctance to use an average-to-average methodology has been based on a concern that such a methodology could conceal 'targeted dumping.'  In such situations, an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions.").  In an investigation, for example, if the full extent of dumping is masked, then the domestic industry may not receive the relief that the statute affords when the calculated weighted-average dumping margin based on the A-to-A method falls below the two percent *de minimis* threshold.

Congress addressed this problem by enacting 19 U.S.C. § 1677f-1(d)(1)(B).  *See Apex*, 862 F.3d at 1342.  Section 1677f-1(d)(1)(B) allows Commerce to compare "the weighted average of the normal values to {U.S. prices} of individual transactions {A-to-T} for comparable merchandise if (i) there is a pattern of {U.S. prices} for comparable merchandise that differ significantly among purchasers, regions or periods of time, and (ii) {Commerce} explains why such differences cannot be taken into account using {the A-to-A method or transaction-to-transaction method}."  19 U.S.C. § 1677f-1(d)(1)(B)(i)-(ii).  But Congress did not specify *how*

- 3 -

Commerce was to determine whether there exists a pattern of prices that differs significantly among purchasers, regions, or time. Nor did Congress mandate that Commerce use statistical tests or techniques in determining if conditions specified in 19 U.S.C. § 1677f-1(d)(1)(B) exist. The SAA explains that Commerce should proceed "on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another." SAA at 843.

II.    The Federal Circuit Invalidates The Cohen's *d* Test In *Marmen*

Beginning in 2013, Commerce had used the Cohen's *d* test in all antidumping proceedings to evaluate whether U.S. prices differ significantly within the meaning of 19 U.S.C. § 1677f-1(d)(1)(B). *See Differential Pricing Analysis; Request for Comments*, 79 Fed. Reg. 26,720, 26,722-23 & n.12 (Dep't of Commerce May 9, 2014) (citing six proceedings applying the Cohen's *d* test, including *Xanthan Gum from the People's Republic of China*, 78 Fed. Reg. 33351 (Dep't of Commerce June 4, 2013) (final AD determination), and issues and decision memo. comment 3)). Commerce also used a ratio test to assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test. *Id.* at 26,722-23. If the Cohen's *d* test and the ratio test demonstrated the existence of a pattern of prices that differed significantly such that an alternative comparison method should be considered, then Commerce examined whether using only the A-to-A method can appropriately account for such differences. *Id.* at 26,723. In considering this question, Commerce determined whether using an alternative comparison method (such as the A-to-T method) yielded a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-to-A method. *Id.* Together, the Cohen's *d* test, the ratio test, and the meaningful difference test, comprised Commerce's differential pricing analysis, *id.*, until *Marmen*.

- 4 -

In June 2025, the Court remanded this case for further proceedings in conformity with the Federal Circuit's decision in *Marmen*.  Order at 1, June 17, 2025, ECF No. 95 (Remand Order) (citing *Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025) (*Marmen*)).  In *Marmen*, the Federal Circuit reviewed Commerce's application of the Cohen's *d* test as part of the agency's differential pricing analysis.  The Federal Circuit held that "it was unreasonable to rely on Cohen's *d* test to determine whether prices differ significantly" when the underlying data did not satisfy certain statistical assumptions.  *Marmen*, 134 F.4th at 1348.  The Federal Circuit further held that on remand "Commerce may re-perform a differential pricing analysis, and that analysis may not rely on Cohen's *d* test for data sets like those here."  *Id.*

III.    Commerce Changes Its Administrative Practice After *Marmen*

*Marmen* had a profound effect on Commerce's practice, affecting hundreds of segments of antidumping proceedings.  Consistent with 19 U.S.C. § 1677f-1(d)(1)(B), Commerce applies its differential pricing analysis to determine which comparison method – average-to-average (A-to-A) or average-to-transaction (A-to-T) – is appropriate.  Because statistical assumptions discussed by the Federal Circuit in *Marmen* are unlikely to be valid in exporters' pricing data, as a practical matter, the Federal Circuit's decision to condition the use of the Cohen's *d* test on such assumptions, rendered the Cohen's *d* test unusable in antidumping proceedings.

Following the Federal Circuit's decision in *Marmen*, Commerce changed its practice.  First, Commerce sought information and public comment on alternatives to the Cohen's *d* test as part of its differential pricing analysis under 19 U.S.C. § 1677f-1(d)(1)(B)(i), to identify whether prices for comparable merchandise differ significantly among purchasers, regions, and time periods.  *Alternatives to the Use of Cohen's d; Request for Comment*, 90 Fed. Reg. 21,277 (Dep't of Commerce May 19, 2025).  To comply with the Federal Circuit's holding in *Marmen*, Commerce discontinued the use of the Cohen's *d* test in antidumping proceedings and adopted

the "price difference" test as the new test for determining whether price differences among purchasers, regions, or time periods are significant.  *See, e.g.*, *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea*, 90 Fed. Reg. 30,050 (Dep't of Commerce July 8, 2025) (final results 2022-2023 admin. review), and accompanying issues and decision memo. at 2-5 (applying the price difference test for the first time).  Additionally, and concurrent with this change, Commerce also discontinued the use of the "mixed method" – a hybrid version of two available comparison methods (A-to-A and A-to-T) – in antidumping proceedings, aligning its practice more closely with the statutory language.[1]  In other words, Commerce has discontinued the use of the Cohen's *d* test and the "mixed method" as a matter of administrative policy for all its antidumping proceedings, and has introduced the price difference test to examine whether U.S. prices differ significantly.

Under Commerce's new practice, the differential pricing analysis operates as follows.  In the first stage, the price difference test is applied to determine whether prices for comparable merchandise differ significantly.  Final Remand Results 10.  Under the price difference test, "{i}f the weighted-average net price to the given purchaser, region or time period falls outside of the plus or minus two percent band around the weighted-average net price to all other purchasers, regions or time periods, then the prices to that given purchaser, region or time period are found to differ significantly and those sales to the given purchaser, region or time period pass the price difference test." *Id.*

---

[1] The relevant statutory provision does not reference the "mixed method," which Commerce used under the old practice, but rather authorizes Commerce to use the average-to-transaction comparison method if certain conditions are satisfied.  19 U.S.C. § 1677f-1(d)(1)(B) ("The administering authority *may determine* whether the subject merchandise is being sold in the United States at less than fair value *by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions* for comparable merchandise, if ….") (emphasis added).

Next, the ratio test assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test. The ratio test calculates the ratio of the total value of sales that pass the price difference test to the total value of sales by the respondent in the United States during the period of investigation or review. *Id.* If 33 percent or less of the total value of sales passes the price difference test, then the results of the price difference and ratio tests do not support consideration of the A-to-T method. *Id.* If more than 33 percent of the total value of U.S. sales passes the price difference test, then Commerce will find evidence that a pattern of prices existed during the relevant period.[2] *Id.* at 10-11.

Finally, if both price difference test and ratio test demonstrate evidence of a pattern of prices that differ significantly such that the A-to-T method may be considered, Commerce will examine whether there is a meaningful difference in the weighted-average dumping margins calculated using the standard A-to-A method and using the alternative A-to-T method. *Id.* at 11. If the difference between the two calculations is meaningful, then this demonstrates that the A-to-A method cannot account for differences in the respondent's pricing behavior in the U.S. market, such as those observed in this analysis, and, therefore, use of the A-to-T method may be appropriate. *Id.*

IV.    Commerce Followed Its New Practice On Remand

On remand, following its new practice, Commerce applied the "price difference" and "ratio" tests to Marmen's U.S. sales and found that "38.18 percent of the value of U.S. sales pass the price difference test, and [this] confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods." *Id.* at 12. Commerce then applied the

---

[2] Masked dumping is more likely to occur where there is a pattern of prices that differ significantly as contemplated by the statute. *See Apex*, 862 F.3d at 1327 (citing 19 U.S.C. § 1677f-1(d)(1)(B); SAA at 843).

meaningful difference test and found that the A-to-A method cannot account for differences in the respondent's pricing behavior in the U.S. market "because the weighted-average dumping margin crosses the *de minimis* threshold when calculated using the A-to-A method and when calculated using the {A-to-T} method." *Id.* Accordingly, consistent with 19 U.S.C. § 1677f-1(d)(1)(B), Commerce applied the A-to-T comparison method to Marmen's U.S. sales and calculated a new estimated weighted-average dumping margin of 2.93 percent. *Id.* at 24.

ARGUMENT

I.      Standard Of Review

Commerce's decisions are "presumed to be correct." 28 U.S.C. § 2639(a)(1). Following a remand, the Court will sustain Commerce's redetermination if it is "in accordance with the remand order," and is "supported by substantial evidence and otherwise in accordance with law." *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). The possibility of drawing inconsistent conclusions from the record does not prevent Commerce's finding from being supported by substantial evidence. *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). The Court will set aside Commerce's finding only if the evidence is "so compelling that no reasonable factfinder" could reach the same conclusion. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992). Thus, the substantial evidence standard is a "high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted).

Moreover, "'when an agency exercises discretion granted by a statute, judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and-

capricious standard.'"  *Mosaic Co. v. United States*, 160 F.4th 1340, 1346 (Fed. Cir. 2025)

(quoting *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., CO*, 605 U.S. 168, 179-80 (2025)).

## II.    Commerce's Final Remand Results Comply With The Federal Circuit Decision In *Marmen* and the Remand Order

This Court remanded this case for further proceedings in conformity with the Federal

Circuit's decision in *Marmen*.  Remand Order.  In *Marmen*, the Federal Circuit held that "it was

unreasonable to rely on the Cohen's *d* test to determine whether prices differ significantly when

the underlying data is not normally distributed, equally variable, and equally and sufficiently

numerous."  *Marmen*, 134 F.4th at 1348.  Additionally, the Federal Circuit held that "{o}n

remand, Commerce may re-perform *a* differential pricing analysis, and that analysis may not rely

on Cohen's *d* test for data sets like those here."  *Id.* (emphasis added).  That is exactly what

Commerce did on remand in this case.  On remand, following its new practice, Commerce

performed *a* differential pricing analysis – without relying on the Cohen's *d* test – consistent

with *Marmen*.  Final Remand Results 2 ("Commerce has recalculated Marmen's estimated

weighted-average dumping margin by … conducting Commerce's differential pricing analysis

*without reliance on the Cohen's d test*") (emphasis added).

Nevertheless, Marmen argues that Commerce's Final Remand Results are in error.  First,

Marmen contends that Commerce's adoption of the price difference test is both inconsistent with

"the best reading of the statutory requirements" and "fails to satisfy Congress's intent for a case-

by-case differential pricing analysis as highlighted in the" Statement of Administrative Action.

Marmen's Comments 2.  Second, Marmen argues that Commerce's discontinuance of the "mixed

method" as a potential alternative comparison method is outside the scope of the Federal Circuit

"remand order" in *Marmen*.  As explained below, Marmen's arguments are meritless.

- 9 -

III.    Commerce's Adoption Of the Price Difference Test Is Supported By Substantial
        Evidence And Otherwise In Accordance With Law

Marmen changes its position from its comments on the draft remand redetermination, and

now argues that "Commerce incorrectly states that the standard of review for its differential

pricing analysis continues to be reasonableness" and that the "best reading of the statute" is the

appropriate standard of review. *Compare* Marmen Comments 7 (citing *Loper Bright Enters. v.

Raimondo*, 603 U.S. 369 (2024) (*Loper Bright*)), *with* Marmen's Draft Remand Comments at 1

("{T}he 2% threshold of the price difference test does not provide a *reasonable* basis ….")

(emphasis added). Further, Marmen argues that a two percent threshold of the price difference

test "does not establish that prices 'differ significantly'" and "contravenes Congress's intent to

require Commerce to determine whether significant price differences exist on a case-by-case (*i.e.*

industry-specific) basis." Marmen's Comments 8, 10. These arguments are without merit.

A.    Marmen Disagrees With The Standard Of Review That The Federal Circuit
       Applied In This Case, And Marmen Misinterprets *Loper Bright* In Any Event

Rather than addressing the substance of Commerce's determination, Marmen faults

Commerce for referencing the "reasonableness standard" that the Federal Circuit applied in

reviewing differential pricing analysis in *Stupp* and *Marmen*. Marmen's Comments 7

(disregarding *Stupp*, 5 F.4th at 1353, and stating "{t}he CAFC's reference to the reasonableness

standard in *Stupp* no longer applies under the Supreme Court's decision in *Loper Bright*.").

Marmen's reliance on *Loper Bright* is misplaced. *Loper Bright* does not disturb the standard for

reviewing Commerce's differential pricing analysis. *See Stupp*, 5 F.4th at 1353 ("Our precedents

make clear that the relevant standard for reviewing Commerce's selection of statistical tests and

numerical cutoffs is reasonableness."); *Marmen*, 134 F.4th at 1338 (same). Indeed, as explained

in *Marmen*, decided after *Loper Bright*, "this case begins where *Stupp* ended – Was it

*unreasonable* for Commerce to use Cohen's *d* test as part of its differential pricing analysis."

- 10 -

*Marmen*, 134 F.4th at 1345 (emphasis added).  The Federal Circuit's application of the reasonableness standard, which Marmen claims "no longer applies," was the basis for remanding the application of the Cohen's *d* test in the first place.  *Marmen*, 134 F.4th at 1348 (holding that held that "it was *unreasonable* to rely on Cohen's *d* test to determine whether prices differ significantly ….") (emphasis added).  The Federal Circuit's use of the reasonableness standard in this case – post-*Loper Bright* – demonstrates that *Loper Bright* has not changed the standard for reviewing Commerce's differential pricing analysis.[3]

Nor does it follow from the *Loper Bright* decision that Commerce is owed no deference.  *See* Marmen's Comments 6 ("{C}ourts may not simply defer to an agency's reasonable interpretation of an ambiguous statute.").  Indeed, the Supreme Court "did not throw out the administrative discretion baby with the *Chevron* deference bathwater."  *BYD (H.K.) Co. v. United States*, 785 F. Supp. 3d 1359, 1377 (Ct. Int'l Trade 2025).  As this Court has recognized, "{i}t will sometimes be the case that the best reading of the statute is that it delegates discretionary authority to an agency.  Broad and open-ended grants of authority … are incapable of precise definition not because they are ambiguous, but because they unambiguously convey discretion."  *Id.*  As this Court concluded, "{i}n those circumstances … the [C]ourt's role is to ensure that the {agency's} action is both reasonable and reasonably explained."  *Id.*

Here, there is such an open-ended grant of authority through use of "general" statutory language.  *See Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252, 1261 (Fed. Cir. 2024) (*Asemesa*).  As the Federal Circuit has recognized, the statute is often written in general terms because Congress is not "prescient" and cannot anticipate

---

[3] Moreover, in *Loper Bright*, the Supreme Court instituted a *prospective* rule, which did not "call into question prior cases that relied on the *Chevron* framework."  *Loper Bright*, 603 U.S. at 412.

- 11 -

in legislation all the factual and legal intricacies that may arise in each proceeding.  *See Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 930 (Fed. Cir. 1984).  For this reason, Commerce has "broad discretion in executing the law" in line with the "general standards" set by Congress.  *Smith-Corona Group v. United States*, 713 F.2d 1568, 1571 (Fed. Cir. 1983) (decided one year prior to *Chevron*).  Commerce's discretion to develop methodologies within its delegated authority to carry out general statutory directives is distinct from *Chevron* deference:

> This court has recognized that the antidumping statute "reveals tremendous deference to the expertise of the Secretary of Commerce in administering the antidumping law."  Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts.  This deference is both greater than and distinct from that accorded the agency in interpreting the statutes it administers, because it is based on Commerce's technical expertise in identifying, selecting and applying methodologies to implement the dictates set forth in the governing statute, as opposed to interpreting the meaning of the statute itself where ambiguous.

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (*Fujitsu*) (internal citations omitted, applying this distinct deference separately from and concurrently with *Chevron* deference in force); *accord Nexteel Co. v. United States*, 28 F.4th 1226, 1239 (Fed. Cir. 2022) ("Commerce has selected a methodology consistent with the statutory language, which we afford greater deference than under the *Chevron* framework") (citing *Fujitsu*, 88 F.3d at 1039); *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*, 5 F.4th 1367, 1374-75 (Fed. Cir. 2021).  Therefore, terms such as "significant," "appropriate," or "comparable" are indefinite, open-ended, or general terms that implicitly delegate authority to Commerce and leave Commerce with flexibility.  *Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d 1315, 1329 (Ct. Int'l Trade 2025).  The provision at issue here, 19 U.S.C. § 1677f-1(d)(1)(B), is written in general terms that leave open-ended how Commerce may assess whether a "pattern" exists and

- 12 -

whether prices differ "significantly" – indicating that Congress "intended to delegate the question of whether particular facts satisfy the statute's requirements to Commerce." *See Asemesa*, 102 F.4th at 1259.

This Court reached the same conclusion in *Garg Tube*, finding that "{t}he text of the statute and its legislative history indicate that Congress gave Commerce flexibility by its use of the one-ended term 'differ significantly.'" *Garg Tube Export LLP v. United States*, 740 F. Supp. 3d 1355, 1366-67 (Ct. Int'l Trade 2024) (*Garg Tube*). As the Court explained, "Congress' mandate to Commerce to assess not merely whether prices differ, but whether they differ 'significantly' necessarily affords Commerce flexibility to assess the degree of difference depending on the particular context." *Id.* at 1367. This Court then observed that the SAA provides that Commerce will proceed on a case-by-case basis, which confirms the flexibility provided by the words of the statute. *Id.* (citing SAA at 843). Finally, this Court found that the context in which the phrase "differ significantly" appears, alongside the subsection that allows Commerce to decline taking into account insignificant adjustments, 19 U.S.C. § 1677f-1(a), and another subsection that exclusively allows Commerce to select averages and statistically valid samples, 19 U.S.C. § 1677f-1(b), further confirms that Congress meant to afford the agency with flexibility and discretion. *Id.* Therefore, this Court held that "Congress delegated to Commerce the power to use its discretion when determining whether prices differ significantly under 19 U.S.C. § 1677f-1." *Id.*

Marmen's assertions that this Court's statutory interpretation of the term "significantly" in *Garg Tube* has been overruled by *Marmen* and, thus, Commerce has no flexibility in selecting appropriate methodologies and numerical thresholds, are unconvincing. Marmen's Comments 9.

- 13 -

In *Marmen*, the Federal Circuit did not reinterpret the term "significantly"[4] or find that

Commerce has no discretion. *Marmen*, 134 F.4th at 1348. To the contrary, not only did the

Federal Circuit evaluate the Cohen's *d* test under "reasonableness" standard, but in remanding

the case back to Commerce it expressly allowed "Commerce to re-perform *a* differential pricing

analysis" without the Cohen's *d* test. *Marmen*, 134 F.4th at 1348 (emphasis added).

B.    Marmen's Arguments That Two Percent Threshold Of The Price Difference Test
      Is Inconsistent With The Statute Are Unsupported

As explained earlier, the statute, 19 U.S.C. § 1677f-1(d)(1)(B)(i), does not specify how

Commerce should determine whether prices "differ significantly." In the first stage of

Commerce's differential pricing analysis, the price difference test is applied to determine

whether prices for comparable merchandise differ significantly. Final Remand Results 10.

Under the price difference test, "{i}f the weighted-average net price to the given purchaser,

region or time period falls outside of the plus or minus two percent band around the weighted-

average net price to all other purchasers, regions or time periods, then the prices to that given

purchaser, region or time period are found to differ significantly and those sales to the given

purchaser, region or time period pass the price difference test." *Id.*

In the Final Remand Results, Commerce explained the reasons for adopting this

numerical threshold in the price difference test as a reasonable measure of significance. *Id.* at

14-15; *see also Marmen*, 134 F.4th at 1338 (holding that the standard for reviewing numerical

---

[4] In *Marmen*, the Federal Circuit declared that it had already discussed the relevant statutory and regulatory background in its prior decision in *Stupp*, that the same background applies to *Marmen*, and stated "we do not repeat all of this background information and instead only include a summary of Cohen's *d* test for the purposes of evaluating the arguments raised here." *Marmen*, 134 F.4th at 1344. Indeed, much of its analysis in *Marmen* focused on consistency of the Cohen's *d* test with statistical literature and statistical formulas, such as measures of non-overlap, rather than any specific aspect of the statutory language. *Id.* at 1346-48.

cutoffs is "reasonableness."). Commerce explained that this threshold is used in the arm's-length test conducted pursuant to 19 C.F.R. § 351.403(c), which determines whether sales prices made by a respondent to affiliated parties in the comparison market are made in the ordinary course of trade, and, therefore, usable in Commerce's margin calculations. Final Remand Results 14-15. Under the arm's-length test, the average prices to an affiliated party customer that differ by at least two percent, and therefore fail the arm's-length test, "differ significantly" from market prices, are outside of the ordinary course of trade, and, thus, would be excluded from calculations. *Id.* at 15 (citing examples of Commerce's practice).

Additionally, Commerce explained that under 19 U.S.C. § 1673b(3) and 19 U.S.C. § 1673d(a)(4), "the *de minimis* threshold for an estimated weighted-average dumping margin in an investigation is two percent." *Id.* at 15. Commerce added that this threshold is higher than the *de minimis* threshold in an administrative review, which suggest that the two percent threshold in an investigation is a more conservative measure. *Id.* at 16. Commerce further explained that it has synonymously referred to non-*de minimis* levels of dumping as a "significant amount of dumping." *Id.* (citing *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*, 84 Fed. Reg. 26,401 (Dep't of Commerce June 6, 2019) (final results 2016-2017 admin. review), and accompanying issues and decision memo. at comment 2 ("Under scenario (4), there is a significant (*i.e.*, non-*de minimis*) amount of dumping ...."). Commerce explained that if a two percent difference between U.S. price and normal value (typically a price in the comparison market) is sufficient to make an affirmative finding of sales at less than fair value (and impose antidumping duties if material injury is found by the International Trade Commission), then it is reasonable to conclude that a two-percent price difference is significant in the context of 19 U.S.C. § 1677f-1(d)(1)(B). Final Remand Results 15.

Marmen fails to address *entirely* Commerce's reasoning that the two percent threshold, which Commerce adopted in the price difference test, is expressly used in other provisions of the statute that consider the significance of price differences, 19 U.S.C. §§ 1673b(3) and 1673d(a)(4) (defining *de minimis* thresholds).  As for the use of the two percent threshold in determining whether prices to affiliates are made in the ordinary course of trade under 19 C.F.R. § 351.403(c), Marmen relegates its response to a footnote, where it asserts that "{i}dentifying significant differences between prices charged by one company to affiliated and unaffiliated customers is a different …" and that "when interpreting statutes, courts look to analogous uses of terms in statutes rather than regulations."  Marmen's Comments 8, n3.  This distinction is without meaning and is not sufficient basis to order a remand, particularly when the statute itself uses two percent threshold in 19 U.S.C. § 1673b(3) and 19 U.S.C. § 1673d(a)(4).

Undeterred, Marmen argues that Commerce "ignore{d} the plain meaning of the statute" because "Commerce's mere 2% threshold for its 'price difference' test fails to indicate that prices differed *significantly* under the plain meaning of the word ('significantly')" because "'{s}ignificant' is defined in the Oxford English Dictionary as 'sufficiently great or important to be worthy of attention; noteworthy; consequential, influential' and also 'noticeable, substantial, considerable, large.'"  Marmen's Comments 8, 10 (emphasis in original).  Far from "ignore{ing} the plain meaning of the authorizing statute," Marmen's Comments 10, Commerce addressed this argument in the Final Remand Results, explaining that under "Marmen's own proffered definition of the word 'significant' a two percent threshold could be 'sufficiently great or important to be worthy of attention.'"  Final Remand Results 14.

The Federal Circuit has also affirmed Commerce's use of the *de minimis* threshold in the latter part of the differential pricing test – the meaningful difference test.  *Apex*, 862 F.3d at

- 16 -

1346. *Apex* held that it reasonable to consider the *de minimis* threshold in Commerce's analysis under this statutory provision (albeit in a different part of Commerce's analysis). *Id.* ("{W}e agree that the difference in the actual antidumping rates that would be assessed – below *de minimis* when calculated with the {A-to-A} methodology; above *de minimis* when calculated with an alternative methodology – indeed informs the question of whether the {A-to-A} methodology can adequately account for a pattern of significant price differences").

Moreover, in interpreting this term, this Court held: "{t}he word 'significantly' is an open-ended qualifier, akin to 'appropriate' or 'reasonable.'" *Garg Tube*, 740 F. Supp. 3d at 1366-67. This Court explained that "Congress' mandate to Commerce to assess not merely whether prices differ, but whether they differ 'significantly' necessarily affords Commerce flexibility to assess the degree of difference depending on the particular context." *Id.* The two percent threshold is consistent with Commerce's practice of determining whether prices between affiliated parties differ significantly from market prices under 19 C.F.R. § 351.403(c). Furthermore, Commerce's adoption of the two-percent threshold that is expressly used in other provisions of the statute that consider significance of price differences, 19 U.S.C. § 1673b(3) and 19 U.S.C. § 1673d(a)(4), satisfies the reasonableness standard, which Federal Circuit applied in this case, and is within the bounds of authority that Congress delegated to Commerce.

C.    Commerce's Adoption of the Price Difference Test Is Consistent With Congressional Intent To Require A Case-By-Case Analysis of Price Differences

Marmen also argues that Commerce impermissibly "applies a single and rigid 2% test for significance to all industries and products," which, in Marmen's view, is contrary to the SAA's direction that "in determining whether a pattern of significant price differences exist, Commerce will proceed *on a case-by-case basis*." Marmen's Comments 10-11. Citing *Jacobi Carbons AB v. United States*, 365 F. Supp. 3d 1323, 1332 (Ct. Int'l Trade 2019) (*Jacobi Carbons*), Marmen

asserts that "applying the same standard to different industries and products would create arbitrary results." *Id.* The logical extension of Marmen's argument is that the agency is prohibited from applying the same standard (*i.e.*, the same numerical threshold) in its analysis and must use some unspecified numerical thresholds that would differ from industry to industry.

The revised differential pricing test considers prices on a case-by-case basis and, thus, is consistent with language in the SAA. Marmen's argument to the contrary erroneously conflates absolute values with relative values. As explained in the Final Remand Results, the price difference test "does not stipulate an absolute value as a threshold," but instead is a "threshold that measures relative differences (*i.e.*, a percentage) that is dependent on the price level for a given proceeding on a case-by-case basis…." Final Remand Results 17. Commerce further explained that the price difference test requires "a comparison to case-specific averages dependent on the customer, region, and time period data provided by the respondent, specific to the period under examination and to the merchandise, and thus, the market under consideration." *Id.* at 17-18. Moreover, far from adopting a "rigid" approach, Commerce expressly stated that it "will continue to evaluate its approach in this area based on comments received and the application of the differential pricing analysis on a case-by-case basis…." *Id.* at 9. Marmen's argument that Commerce differential pricing analysis fails to consider case-specific factors is unsupported.[5]

Marmen's reliance on *Jacobi Carbons* is similarly misplaced. In *Jacobi Carbons*, this Court assessed whether Commerce correctly determined that Thailand was a significant producer

---

[5] Aside from making conclusory statements that express its general disdain for the use of any objective numerical threshold, Marmen offered no industry-specific information, argument or analysis as to why using two percent threshold would not be appropriate with respect to its industry. Marmen's further reference to global COVID-19 pandemic is misplaced, as the global pandemic had a world-wide effect, *i.e.*, it was not limited to any particular industry or region.

of comparable merchandise because it was a net-exporter.[6]  In remanding Commerce's

determination, this Court held that "Commerce has not supplied the court with a well-reasoned

explanation supporting its consideration of total or net exports as a substitute for *production*" and

that "numbers must be placed in context."  365 F. Supp. 3d at 1331-32 (emphasis in original).

Since *Jacobi Carbons* was decided, however, the Federal Circuit has resolved any statutory

ambiguity and held that Commerce may rely on the net exporter criterion.[7]  *Carbon Activated*

*Tianjin Co., Ltd. v. United States*, No. 2023-2413, 2025 U.S. App. LEXIS 11226, 2025 WL

1354994, at *3 (Fed. Cir. May 9, 2025) ("We see no error in Commerce's reliance on the net

exporter criterion of the Policy Bulletin.").  Accordingly, *Jacobi Carbons* is inapposite and

otherwise is not persuasive authority in light of *Carbon Activated Tianjin*.

Marmen further contends, as a hypothetical, that "Commerce's methodology presumes

that a 2% difference in price for a cup of coffee is as significant in the market as a 2% difference

in price for a car."  Marmen's Comments 11.  Marmen's argument that the significance of price

differences should be measured based upon how they might affect activity "in the market" has no

foundation in 19 U.S.C. § 1677f-1(d)(1)(B) or the record.  Whether a price difference is

significant "in the market" as Marmen contends, is a different inquiry from whether a two

---

[6] In antidumping proceedings involving nonmarket economy countries, the statute requires that Commerce to "determine{} normal value by valuing the 'factors of production' used in producing the merchandise in a comparable market economy."  *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1374-75 (Fed. Cir. 2015) (quoting 19 U.S.C. § 1677b(c)(1)(B)).  In selecting the appropriate surrogate country, Commerce, to the extent possible, chooses from a list of potential countries assembled by the Office of Policy that are at a level of economic development comparable to that of the NME and that are significant producers of comparable merchandise.  *See* 19 U.S.C. § 1677b(c)(4); *see also* Import Admin., U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), https://enforcement.trade.gov/policy/bull04-1.html.

[7] In other words, the Federal Circuit's holding directly contradicts Marmen's proposition that Commerce's application of "the same standard to different industries and products" is erroneous *per se*.

percent price difference is significant for the purposes of determining whether there are conditions that could potentially indicate existence of masked dumping for purposes of section 1677f-1(d)(1)(B). In evaluating the significance of price differences in other contexts, the antidumping statute utilizes the same two percent threshold without differentiating between products that are subject to investigation regardless of whether it is an automotive or agricultural product. 19 U.S.C. §§ 1673b(3), 1673d(a)(4).

IV.    Commerce's Discontinuance Of The Mixed Method Is Supported By Substantial Evidence And Otherwise In Accordance With Law

Marmen argues that Commerce's discontinuation of the mixed method is in error. First, Marmen argues that "Commerce's decision to modify the 'ratio test' was outside the bounds of the CAFC's remand order." Marmen's Comments 12. Second, Marmen argues that "Commerce's methodological change to the 'ratio test' mirrors other methodological changes that courts have deemed to be impermissible on remand, as demonstrated by relevant case law." *Id.* at 15. Lastly, Marmen argues that "Commerce failed to adequately justify its change to the 'ratio test.'" *Id.* at 17. These arguments are without merit.

As an initial matter, the Federal Circuit explicitly permitted Commerce to reconsider its differential pricing analysis:

> We therefore vacate Commerce's calculated dumping margin based on the unreasonable use of Cohen's d test to justify the A-to-T methodology. On remand, *Commerce may re-perform a differential pricing analysis*, and that analysis may not rely on Cohen's d test for data sets like those here.

*Marmen*, 134 F.4th at 1348 (emphasis added). The Federal Circuit did not otherwise prescribe the contours of what differential pricing analysis was to be performed. *See id.* Understanding that the differential pricing analysis comprises three tests, the Federal Circuit's express authorization for Commerce to "re-perform *a* differential pricing analysis" necessarily

- 20 -

contemplates that Commerce may reevaluate the differential pricing analysis to be performed. *Marmen*, 134 F.4th at 1348 (emphasis added); *accord Stupp Corp. v. United States*, No. 2023-1663, 2025 U.S. App. LEXIS 9616 at *8 n.1, 2025 WL 1178392 at *3, n.1 (Fed. Cir. Apr. 23, 2025) (*Stupp II*) (nonprecedential) ("{Commerce} has the opportunity, if it prefers, to re-perform a differential pricing analysis without using Cohen's *d*."). The only limitation that the Federal Circuit imposed on Commerce with respect to reconsidering its differential pricing analysis on remand in this case is that Commerce's could no longer use the Cohen's *d* test. Marmen's overly restrictive interpretation of *Marmen* contravenes the Federal Circuit's holdings that it "generally disfavor{s} limited remands" because it would result in only a single avenue for the agency on remand. *Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1367, 1374 (Fed. Cir. 2012) (citing *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1038-39 (Fed. Cir. 2003)). Moreover, Marmen's crabbed arguments about the scope of the remand seem to advocate for an anomalous result where Commerce would have to develop and apply a separate methodology for the differential pricing analysis just in this previously remanded case, even though Commerce has been consistently applying its new differential pricing analysis in hundreds of segments of antidumping proceedings after the conclusion of a public notice and comment process. Marmen fails to justify such an unusual and inconsistent application of the antidumping laws.

Next, Marmen argues that the Federal Circuit's statement – that its holding in *Marmen* "does not prevent Commerce from fashioning and justifying statistical analysis that uses some of ideas underlying Cohen's *d* analysis" – somehow limited Commerce to using statistical tests only, and because the ratio test is not a statistical test, it is beyond the scope of remand. Marmen Comments 13. Marmen misconstrues the Federal Circuit decision. The language at issue is

- 21 -

permissive in stating that it "does not prevent" Commerce from "fashioning and justifying" a statistical analysis; it does not require Commerce to do so.  More fundamentally, the antidumping statute does not specify how Commerce may determine that a pattern exists and whether prices differ significantly, let alone require the use of statistical techniques.  19 U.S.C. § 1677f-1(d)(1)(B).  Had Congress intended to restrict Commerce to a statistical analysis in 19 U.S.C. § 1677f-1(d)(1)(B), it would have done so expressly, as it has done elsewhere in the Tariff Act.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("{W}here Congress includes particular language in one section of a statute but omits it in another ..., it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); *compare* 19 U.S.C. § 1677f-1(d)(1)(B), *with* 19 U.S.C. §§ 1677f-1(a)-(b).  It would be illogical and unreasonable to interpret the permissive language in *Marmen* as imposing upon Commerce a mandatory obligation to use a "statistical" analysis that the statute does not require.

Moreover, the ratio test has not changed within the revised differential pricing analysis. Commerce finds that a pattern exists when more than 33 percent of the total sales value of the sales that pass the price difference test, *i.e.*, those sales are at prices that differ significantly. Thus, the fact that *Stupp II* affirmed Commerce's use of the 33 percent and 66 percent thresholds within its differential pricing analysis to define the appropriate alternative comparison methodology does not prevent Commerce from discontinuing the mixed method where *Marmen* permitted Commerce to "re-perform a differential pricing analysis."  *Marmen*, 134 F.4th at 1348. To that extent, as explained in the Final Remand Results, Marmen's citation to *Zhaoqing Tifo* is distinguishable because "the issue of Commerce's differential pricing analysis was not laid to rest in the final determination."  Final Remand Results 21 (discussing *Zhaoqing Tifo New Fibre Co. v. United States*, 256 F. Supp. 3d 1314, 1334 (Ct. Int'l Trade 2017) (*Zhaoqing Tifo*)).

In any event, the Federal Circuit affirms Commerce's remand results so long as they are consistent with the explicit instructions given. *See Ad Hoc Committee of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States*, No. 95-1129, 1995 U.S. App. LEXIS 34623, 1995 WL 596834 *1 (Fed. Cir. Oct. 10, 1995) (*per curiam*) (affirming Commerce's remand that did not include a prohibited deduction where Commerce implemented new guidelines for applying the deductions rejected where appropriate).  Commerce's analysis on this remand comports with the instructions of the Federal Circuit and should be sustained because Commerce re-performed a differential pricing analysis without using the Cohen's *d* test.

A.      The Cases Relied Upon By Marmen Are Distinguishable

Marmen argues that "Commerce's methodological change was impermissible on remand, as demonstrated by very the {sic} case law cited by Commerce in the *Remand Results*." Marmen's Comments 3, 15-17; *see also* Marmen's Draft Remand Comments at 8, fns. 26-28 (citing *Hussey Copper Ltd. v. United States*, 960 F. Supp. 315, 318 (Ct. Int'l Trade 1997) (*Hussey Copper*); *Outokumpu Copper Strip, B.V. v. United States*, 15 F. Supp. 2d 806, 806-07 (Ct. Int'l Trade 1998) (*Outukumpu Copper*); *Zhaoqing Tifo*, 256 F. Supp. 3d at 1335). Commerce addressed these cases in the Final Remand Results, explaining why they are inapposite.  Final Remand Results 18-21.  These cases do not support Marmen's arguments.

For example, Marmen cites *Hussey Copper*, arguing that it stands for the proposition that "Commerce did not need to change its 'ratio test' to give full meaning to the CAFC's *Remand Order* here," because *Hussey Copper* purportedly required Commerce "to reperform its calculation of the AFA rate *using the same methodology* as before."  Marmen's Comments 15 (emphasis in original).  *Hussey Copper* is inapposite.  In *Hussey Copper*, the Court *sustained* Commerce's third remand redetermination, which concerned three distinct issues that dealt with how Commerce should match U.S. sale prices with normal values based on comparison market

sale prices, and the remand had significantly altered the list of unmatched U.S. sale prices. *Hussey Copper*, 960 F. Supp. at 316.  Because certain information was missing, Commerce applied the best information available (BIA)[8] rate from the original determination but then reduced the BIA rate in the final remand redetermination to equal the highest calculated dumping margin determined on remand in response to an argument of an interested party.  *Id.*  The primary basis for the Court's ruling was that the plaintiffs failed to timely raise their argument, so any further discussion in the opinion is *dicta*.  *Id*. at 318 ("Since plaintiffs did not raise the issue during the second remand, their contention that Commerce should preserve the BIA rate calculated in the *Final Determination* is untimely and therefore moot.").  Even so, the Court stated that it was within the scope of the remand order for Commerce to apply BIA and to recalculate any figure based on margins that the remand order had held were not in accordance with law.  *Id.*  The Court sustained Commerce's remand "in its entirety" finding that Commerce did not abuse its discretion in adjusting the BIA rate.  *Id.*  at 319.  *Hussey Copper* does not support Marmen's argument that Commerce had no discretion to change course on remand, when Commerce did so in *Hussey Copper* and the Court sustained it.

Marmen's further reliance on *Outukumpu Copper* is similarly misplaced.  In *Outkumpu Copper*, during a remand*,* Commerce corrected certain ministerial errors, which this Court had authorized, but Commerce also inadvertently omitted certain sales from the U.S. sales database, which was used to recalculate the respondent's dumping margins.  *Outokumpu Copper*, 15 F. Supp. 2d at 806-07.  The Court granted Commerce's request for voluntary remand to correct the error of inadvertent omission of certain U.S. sales from the margin calculations.  *Id.*  In contrast,

---

[8] Marmen incorrectly refers to BIA rate as the AFA rate, thus blurring these two distinct legal concepts from before and after the Uruguay Round Agreements Act (URAA).

- 24 -

here, as Commerce explained, "Commerce's actions on remand in this redetermination were explicitly authorized by the Federal Circuit, which instructed that '{o}n remand, Commerce may *re-perform a differential pricing analysis*.'" Final Remand Results 20 (emphasis in original, citing *Marmen*). Moreover, on remand, Commerce used its revised differential pricing analysis that it employs in all antidumping proceedings. That differential pricing analysis does not utilize either the Cohen's *d* test or the mixed method, so consistently using the same analysis in this proceeding is not an error.

Lastly, as Commerce explained, *Zhaoqing Tifo* is distinguishable because "the issue of Commerce's differential pricing analysis was not laid to rest in the final determination." Final Remand Results 21; *see Marmen*, 134 F.4th at 1348. In *Zhaoqing Tifo*, 256 F. Supp. 3d at 1335, this Court remanded the issue of double-counting to Commerce, but on remand, instead of addressing the issue of double-counting, which was confined to the financial statement that Commerce initially selected, Commerce *sua sponte* reopened a distinct and separate issue of the selection of financial statements and selected a different financial statement. Because no party sought judicial review with respect to selection of the financial statement, the Court concluded that "finality" trumps "accuracy/completeness …" and that "Commerce was not permitted to do on remand was to reopen and re-review the settled issue of the agency's decision in its Final Determination to select the financial statements of P.T. Tifico – rather than those of P.T. Asia Pacific." *Id.* at 1327, 1334. In contrast, here, the issue of how to perform a differential pricing analysis consistent with 19 U.S.C. § 1677f-1(d)(1)(B), is far from settled, and the Federal Circuit expressly authorized Commerce to "re-perform *a* differential pricing analysis'" without prescribing the contours of that analysis except as it relates to the use of the Cohen's *d* test. *Marmen*, 134 F.4th at 1348 (emphasis added). Moreover, following the change in its policy,

Commerce simply applied its new differential pricing methodology that is consistent with

*Marmen*, which Commerce applies in all antidumping proceedings. *Cf. SKF USA, Inc. v. United

States*, 254 F.3d 1022, 1025 (Fed. Cir. 2001) (*SKF*) (finding that it was an abuse discretion for

the lower court to deny a remand request when an agency has materially changed its policy).[9]

        B.        Commerce Provided An Adequate Explanation For Discontinuance Of The Mixed Method And Is Permitted To Apply A Policy Change That Is Consistent With A Remand Order Across All Proceedings

Marmen's final argument is that "Commerce failed to adequately justify its change to the

'ratio test' (and abandoning the mixed method calculation)" and that Commerce must show that

its discontinuation of the mixed method is permissible under the statute and that there are good

reasons for the new methodology. Marmen's Comments 17. Marmen further contends that the

discontinuation of the mixed method is not "consistent with the statutory conditions for using the

A-to-T comparison method laid out in 19 U.S.C. § 1677f-1(d)(1)(A)(i)," and that Commerce

"failed to demonstrate that the change will improve the accuracy of its dumping margin

calculation." *Id.* at 18. Putting aside that Marmen cites the wrong statutory provision in its

argument,[10] Marmen mischaracterizes Commerce's differential pricing analysis and seeks to

---

[9] Marmen attempts to distinguish *SKF* on the grounds that in *SKF* Commerce agreed with the plaintiff's argument that "lowered" its dumping margin, whereas here Commerce's made a methodological change that Marmen claims "increased" its dumping margin. Marmen Comments 17. However, whether the new methodology results in a lower or higher dumping margin is not a relevant consideration for assessing the reasonableness of a methodology. Moreover, the agency may reconsider its policies and methodologies at any time, if it provides a sufficient explanation for the change, and the agency may implement new policies and methodologies in a consistent manner across all proceedings. *See Huvis Corp. v. United States*, 32 C.I.T. 845, 849-850 (2008) (noting that it is a "well-settled principal that an agency like Commerce is generally free to change its methodology to improve accuracy"), *aff'd*, 570 F.3d 1347 (Fed. Cir. 2009); *Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 178 F. Supp. 2d 1305, 1327 (Ct. Int'l Trade 2001) (holding that Commerce must give reasoned explanations for changing its practice).

[10] The statute lays out the conditions "for using the A-to-T comparison method" as an exception in 19 U.S.C. § 1677f-1(d)(1)(B), not in 19 U.S.C. § 1677f-1(d)(1)(A)(i).

replace it with a results-oriented approach that would likely conceal masked dumping and, thus, artificially lower Marmen's weighted-average dumping margin.[11]

Commerce has supplied an explanation for why it discontinued the mixed method as part of the overall change to its administrative practice with respect to its differential pricing analysis. Final Remand Results 21-22.  As explained above, although the statute permitted Commerce's old policy of using the hybrid version of the two available comparison methods, the mixed method is not statutorily required, and to align more closely with the statute, Commerce has discontinued the mixed method as a matter of administrative policy for all its antidumping proceedings.  *Id.*  Accordingly, Commerce is applying its revised differential pricing methodology including its discontinuation of the mixed method consistently across all cases including remand redeterminations.  *See Am. Silicon Techs. v. United States*, 63 F. Supp. 2d 1324, 1332 (Ct. Int'l Trade 1999) (holding that "it is especially important for all parties that consistent methods be sustained when possible" and that "the agency demonstrated a consistent administrative practice which is reasonable and permitted by the statute.").

The purpose of section 1677f-1(d)(1)(B) is to permit Commerce to address masked dumping.  *See* SAA at 842-83 (discussing 19 U.S.C. § 1677f-1(d)(1)(B)).  The ratio test helps Commerce to determine whether conditions described in 19 U.S.C. § 1677f-1(d)(1)(B) exist in which masked dumping could potentially be occurring when using the A-to-A method. Specifically, the ratio test "assess{es} the extent of the significance price differences" of those sales passing the price difference test to identify whether there is a *pattern* of prices that differ

---

[11] Marmen's argument is premised, in part, on the impact the Final Remand Results have on Marmen's margin.  *See* Marmen's Comments at 17 ("Instead, Commerce has impermissibly reopened a settled issue that was not raised in this appeal and made an unauthorized methodological change that had the effect of increasing Marmen's dumping margin….") (emphasis added).

significantly as contemplated by 19 U.S.C. § 1677f-1(d)(1)(B)(i).  Final Remand Results 10. Both *before and after* Commerce's revision of the differential pricing analysis pursuant to *Marmen*, the ratio test finds evidence that a pattern exists when more than 33 percent of the total sales value pass the price difference test, *i.e.*, these sales are at prices that differ significantly. Commerce need only to determine that there is a pattern of significant price differences,[12] and the Federal Circuit has sustained the use of a "ratio test" to make that determination.  *See Dillinger France S.A. v. United States*, 981 F.3d 1318, 1325-26 (Fed. Cir. 2020); *see also Stupp*, 5 F.4th at 1355-56.

In discontinuing the mixed method, Commerce is not "lower{ing} the threshold for finding a *pattern* of significant price differences" as Marmen contends.  Marmen's Comments 18 (emphasis added).  The mixed method did not determine whether a pattern existed because Commerce previously employed the mixed method only *after* the "ratio test" had confirmed there was a pattern.  Indeed, Commerce has used the same 33 percent threshold in the "ratio test," to identify if there is a *pattern* of significant price differences even before it eliminated the mixed method.  Once the existence of the requisite pattern was established (*i.e.*, the 33 percent threshold of ratio test was satisfied), if the A-to-A method could not adequately account for the pricing behavior of the respondent in the U.S. market, then Commerce as a matter of its discretion considered the mixed method as an alternative comparison methodology when between 33 percent and 66 percent of the sales value of the respondent's U.S. sales were found to be at prices that differ significantly, which was neither required nor prohibited by the statute.

---

[12] Commerce is not required "to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods." *JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015).  Such a requirement "would create a tremendous burden on Commerce that is not required or suggested by the statute."  *Id.*

*See* 19 U.S.C. § 1677f-1(d)(1)(B) ("The administering authority *may* determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if ....") (emphasis added); *see also Timken Co. v. United States*, 968 F. Supp. 2d 1279, 1290 (Ct. Int'l Trade 2014) (*Timken*) ("{R}elying on the word 'may' in the statute ... {t}he sufficiency test serves as a tool to guide Commerce's exercise of its discretion in choosing whether to depart from its normal practice of using the {A-to-A} methodology."). Nor did Commerce abuse its discretion by aligning its application of the alternative A-to-T method more closely with the statutory language, when Commerce discontinued the mixed method, replacing it with A-to-T method for all sales as a matter of administrative policy for all of its antidumping proceedings, including this remand. *See Apex*, 862 F.3d at 1333 (expressly rejecting the argument that the statute limits the A-to-T method to only sales that were found to be "targeted" under the previous "*Nails* test" and cannot be applied to the remaining sales, explaining: "The statute defines the preconditions for applying the {A-to-T} methodology, but it does not limit in any way the application of the {A-to-T} methodology, should the preconditions be met.").

Finally, Marmen cites to *Huvis Corp. v. United States*, 570 F.3d 1347, 1353 (Fed. Cir. 2009) (*Huvis*), for the proposition that Commerce's change in methodology must be "fully explained and improve{} the accuracy of the dumping margin calculation." Marmen's Comments 17-18. As demonstrated, Commerce explained the revisions in its differential pricing analysis. The revised methodology (including elimination of the mixed method) more closely aligns with the language and purpose of 19 U.S.C. § 1677f-1(d)(1)(B), enabling Commerce to enhance the accuracy in calculations by addressing masked dumping more effectively. *Huvis*,

570 F.3d at 1355 (recognizing improving accuracy is generally a good reason for a change in methodology).

Nor is it a particularly new development. Indeed, both the Federal Circuit and this Court have previously affirmed Commerce's application of the A-to-T method to all U.S. sales "to remedy masked dumping" under the *Nails* test, a predecessor to the differential pricing analysis.[13] *See Apex*, 862 F.3d at 1333; *Samsung Electronics Co. v. United States*, 72 F. Supp. 3d 1359, 1375 (Ct. Int'l Trade 2015) (*Samsung*). In *Samsung*, for example, this Court assessed whether Commerce's application of the A-to-T method to all U.S. sales under the *Nails* test was consistent with the statute. *See id.* at 1373-76.[14] The plaintiffs in *Samsung* had argued (1) that Commerce could not apply the A-to-T method to U.S. sales not passing the *Nails* test because "the phrase such differences does not apply to those other transactions that do not have such differences," *id.* at 1374, and (2) that the statute "creates a strong presumption for using the A-to-A or T-to-T methodologies because the A-to-T methodology is a limited exception." *Id.* at 1375.

This Court disagreed with the plaintiffs in *Samsung*. Analyzing 19 U.S.C. §§ 1677f-1(d)(1)(B)(i) and (ii), the Court reasoned the statute establishes "preconditions that must exist before Commerce may apply the A-to-T methodology." *Id.* at 1374-75. It explained, however, that the statutory language, does not "instruct Commerce on how to apply the A-to-T

---

[13] Although the *Nails* test was at issue in *Samsung*, as explained earlier, the *Nails* test used a 33 percent threshold to determine whether there was a pattern of significant price differences, which is similar to Commerce's current differential pricing methodology. *Compare Timken*, 968 F. Supp. 2d at 1283, *with Marmen*, 134 F.4th at 1345, *and Stupp*, 5 F.4th at 1347.

[14] The plaintiffs challenged Commerce's application of the A-to-T method to all of their sales based on the improperly withdrawn regulations in place at the time which did not permit application of A-to-T to sales that did not pass the *Nails* test in investigations. *See id.* at 1369 (citing *Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations*, 73 Fed. Reg. 74,930, 74,930-31 (Dep't of Commerce Dec. 10, 2007)). This Court dismissed the reliance on the improperly withdrawn regulations under the doctrine of exhaustion. *Id.* at 1373.

methodology" after the preconditions are met.  Rather, 19 U.S.C. § 1677f-1(d)(1)(B) "permits Commerce to {apply the A-to-T method} without specifying whether those export prices or constructed prices must be drawn only from targeted sales."  *Id.* at 1375.  The Federal Circuit reached substantially the same conclusion in *Apex*, 862 F.3d at 1333.  Although Commerce has continued to refine various aspects of its differential pricing analysis over the years, the broad discretion conveyed in the statute remains the same.  Here, Marmen does not (and cannot) identify any clear statutory language prohibiting Commerce from applying the A-to-T method to all U.S. sales under circumstances presented here or any unreasonableness in Commerce's decision to eliminate the mixed method and apply the A-to-T method to all U.S. sales.

CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's remand determination and enter judgment in favor of the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

Of Counsel:

PAUL THORNTON
Attorney
Office of the Chief Counsel
    for Trade Enforcement & Compliance
Department of Commerce

April 10, 2026

 s/ Douglas Edelschick
DOUGLAS G. EDELSCHICK
Senior Trial Counsel
Commercial Litigation Branch
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel:  (202) 353-9303

Attorneys for Defendant United States

- 31 -

CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word limitation of Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains 9,700 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

s/ Douglas G. Edelschick