**Slip Op. 26-62**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| MARMEN INC., MARMEN ÉNERGIE INC., and MARMEN ENERGY CO., | |
| Plaintiffs, | |
| and | |
| WIND TOWER TRADE COALITION, | |
| Consolidated Plaintiff, | **Before: Jennifer Choe-Groves, Judge** |
| v. | **Consol. Court No. 20-00169** |
| UNITED STATES, | |
| Defendant, | |
| and | |
| WIND TOWER TRADE COALITION, MARMEN INC., MARMEN ÉNERGIE INC., and MARMEN ENERGY CO., | |
| Defendant-Intervenors. | |

## OPINION AND ORDER

[Sustaining the U.S. Department of Commerce's Second Remand Redetermination.]

Dated: June 15, 2026

Jay C. Campbell, Allison J.G. Kepkay, and Cristina M. Cornejo, White & Case, LLP, of Washington, D.C., for Plaintiffs and Defendant-Intervenors Marmen Inc., Marmen Energy Co., and Marmen Énergie Inc.

Alan H. Price, Robert E. DeFrancesco, III, Maureen E. Thorson, and Laura El-Sabaawi, Wiley Rein, LLP, of Washington, D.C., for Consolidated Plaintiff and Defendant-Intervenor Wind Tower Trade Coalition.

Douglas G. Edelschick, Senior Trial Counsel, Commercial Litigation Branch, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With him on the brief were Brett A. Shumate, Assistant Attorney General, Patricia M. McCarthy, Director, and Claudia Burke, Deputy Director. Of counsel on the brief were Paul H. Thornton, III, Attorney, Jesus N. Saenz, Attorney, and Ruslan N. Klafehn, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Choe-Groves, Judge:  This action concerns the final determination published by the U.S. Department of Commerce ("Commerce") in the antidumping duty investigation on utility scale wind towers from Canada.  See Utility Scale Wind Towers from Canada ("Final Determination"), 85 Fed. Reg. 40,239 (Dep't of Commerce July 6, 2020) (final determination of sales at less than fair value and final negative determination of critical circumstances; 2018–2019), ECF No. 18-4; see also Issues and Decision Mem. for the Final Affirmative Determination in the

Consol. Court No. 20-00169                                    Page 3

Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from Canada (June 29, 2020) ("Final IDM"), ECF No. 18-5.

Before the Court is Commerce's Second Remand Redetermination, filed pursuant to the Court's Remand Order following the Court of Appeals for the Federal Circuit's ("CAFC") Opinion in Marmen Inc. v. United States ("Marmen III"), 134 F.4th 1334 (Fed. Cir. 2025). See Order (June 17, 2025), ECF No. 95; Final Results of Redetermination Pursuant to Court Remand ("Second Remand Redetermination") ECF No. 101-1, SRPR 9[1]; see also Final Results of Redetermination Pursuant to Court Remand ("Remand Redetermination"), ECF No. 62-1.

For the following reasons, the Court sustains the Second Remand Redetermination.

## BACKGROUND

The Court presumes familiarity with the underlying facts and procedural history of this case and recites the facts relevant to the Court's review of the Second Remand Redetermination. See Marmen Inc. v. United States ("Marmen I"), 45 CIT __, 545 F. Supp. 3d 1305 (2021); Marmen Inc. v. United States

---

[1] Citations to the administrative record reflect public record ("PR"), remand public record ("PRR"), and second remand public record ("SRPR") document numbers filed in this case, ECF Nos. 46, 75, 110.

("Marmen II"), 47 CIT __, 627 F. Supp. 3d 1312 (2023); Marmen III.  In August

2019, Commerce initiated an antidumping duty investigation into wind towers

from Canada for the period covering July 1, 2018, through June 30, 2019.  Utility

Scale Wind Towers from Canada, 84 Fed. Reg. 37,992, 37,992–93 (Dep't of

Commerce Aug. 5, 2019) (initiation of less-than-fair-value investigations).  In the

Final Determination, Commerce assigned a weighted-average dumping margin of

4.94% to Marmen.  Final Determination, 85 Fed. Reg. at 40,239.  Commerce

determined the all-others weighted average dumping margin of 4.94% based on

Marmen's dumping margin.  Id.

In the Final Determination, Commerce rejected a portion of the

supplemental cost reconciliation information submitted by Marmen as untimely,

unsolicited new information.  Final IDM at 7–9.  Commerce applied a differential

pricing analysis using the Cohen's $d$ test and determined that there was a pattern of

export prices that differed significantly.  Id. at 10–11.  As a result, Commerce

calculated Marmen's weighted-average dumping margin by using the alternative

average-to-transaction ("A-to-T") method, rather than the default average-to-

average ("A-to-A") method.  Id.

In Marmen I, the Court remanded for Commerce to explain its use of the

Cohen's $d$ test in light of Stupp Corp. v. United States ("Stupp"), 5 F.4th 1341

(Fed. Cir. 2021), and for Commerce to further explain or reconsider Marmen's

supplemental cost reconciliation information.  45 CIT at __, 545 F. Supp. 3d at 1317–21.

On remand, Commerce accepted the previously rejected information from Marmen.  Remand Redetermination at 4–11.  Commerce examined the additional cost reconciliation information and did not adjust Marmen's cost of manufacturing or cost of production.  Id.  Commerce determined that the assumptions of normality and roughly equal variances at issue in Stupp were not relevant to Commerce's application of the Cohen's $d$ test in its differential pricing analysis on remand.  Id. at 12–50.

In Marmen II, the Court sustained Commerce's Remand Redetermination, concluding that Commerce did not abuse its discretion by rejecting Marmen's proposed corrective information and upholding Commerce's use of the Cohen's $d$ test in its differential pricing analysis.  47 CIT at __, 627 F. Supp. 3d at 1320.

In Marmen III, the CAFC vacated and remanded for Commerce to fashion a differential pricing analysis that did not rely on the Cohen's $d$ test and to accept Marmen's price reconciliation information.  Marmen III, 134 F.4th at 1341–43, 1348.  In the Second Remand Redetermination, Commerce accepted Marmen's price reconciliation information and reformulated its differential pricing analysis to consist of three steps: (1) a new "price difference test" in place of the prior

Consol. Court No. 20-00169                                                    Page 6

Cohen's *d* test; (2) the "ratio test;" and (3) the "meaningful difference test."

Second Remand Redetermination.

## JURISDICTION

The Court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28

U.S.C. § 1581(c), which grant the Court authority to review actions contesting the

final determination in an antidumping duty investigation.  The Court shall hold

unlawful any determination found to be unsupported by substantial evidence on the

record or otherwise not in accordance with the law.  19 U.S.C. § 1516a(b)(1)(B)(i).

The Court also reviews determinations made on remand for compliance with the

Court's remand order.  Ad Hoc Shrimp Trade Action Comm. v. United States ("Ad

Hoc Shrimp"), 38 CIT __, __, 992 F. Supp. 2d 1285, 1290 (2014), aff'd, 802 F.3d

1339 (Fed. Cir. 2015).

## DISCUSSION

I.      **Commerce Reasonably Considered Marmen's Additional Cost
        Reconciliation Information**

As noted above, the CAFC held in Marmen III that Commerce's

determination to reject a reconciling line item related to Marmen's exchange rate

data was unsupported by substantial evidence.  134 F.4th at 1343.  The CAFC

explained that Commerce's double-counting argument was unpersuasive because

the statements from Marmen's auditors were "primarily made prior to the

discovery of the omitted exchange-rate conversion." Id. (citations omitted).  The

CAFC rejected Commerce's argument that Marmen's data was unreliable and

stated that "[t]he records that Marmen relied on were intended to show that the

2018 sales were recorded in USD and should be converted to CAD[,]" and any

other interpretation of the data "amounts to a question of the veracity of Marmen's

representations—not its reliability." Id.

As part of Marmen's estimated weighted-average dumping margin in the

Second Remand Redetermination, Commerce included the reconciling line item in

Marmen's calculation of its cost of production to reflect the cost reconciliation

difference related to these exchange rate differences, consistent with the CAFC's

Opinion in Marmen III.  Second Remand Redetermination at 6–7.  Accordingly,

the Court concludes that Commerce's determination to include the reconciling line

item in Marmen's dumping margin calculation complied with the CAFC's Opinion

in Marmen III and is in accordance with law.  Ad Hoc Shrimp, 38 CIT at __, 992

F. Supp. 2d at 1290.

II.       **Commerce Reasonably Conducted Its Differential Pricing Analysis**

To comply with the CAFC's Opinion in Marmen III, Commerce

discontinued the use of the Cohen's $d$ test and replaced it with a new "price

difference test" for evaluating whether price differences are significant among

purchasers, regions, or time periods, which is the first step of Commerce's

differential pricing analysis.  Second Remand Redetermination at 7–8 (citation

omitted).

Commerce adopted the "price difference test" as step one of its differential

pricing analysis in the Second Remand Redetermination as follows:

> The differential pricing analysis used here examines whether there
> exists a pattern of prices for comparable merchandise that differ
> significantly among purchasers, regions, or time periods.  The analysis
> evaluates all U.S. sales by purchaser, region, and time period to
> determine whether a pattern of prices that differ significantly exists.  If
> such a pattern is found, then the differential pricing analysis evaluates
> whether such differences can be taken into account when using the A-
> to-A method to calculate the weighted-average dumping margin.  The
> analysis incorporates default group definitions for purchasers, regions,
> time periods, and comparable merchandise.  Purchasers are based on
> the reported consolidated customer codes.  Regions are defined using
> the reported destination code (i.e., ZIP code) and are grouped into
> regions based upon standard definitions published by the U.S. Census
> Bureau.  Time periods are defined by the quarter within the [period of
> investigation] based upon the reported date of sale.  For purposes of
> analyzing sales transactions by purchaser, region, and time period,
> comparable merchandise is defined using the product control number
> (CONNUM) and all characteristics of the U.S. sales, other than
> purchaser, region, and time period, that Commerce uses in making
> comparisons between [export price] or [constructed export price] and
> [normal value] for the individual dumping margins.
>
> In the first stage of the differential pricing analysis used here, the "price
> difference test" is applied to determine whether prices differ
> significantly.  For comparable merchandise, the price difference test
> examines whether the weighted-average net price to a given purchaser,
> region, or time period is within [2%] of the weighted average net price
> to all other purchasers, regions, or time periods.  If the weighted-
> average net price to the given purchaser, region, or time period falls
> outside of the plus or minus [2%] band around the weighted average
> net price to all other purchasers, regions, or time periods, then the prices

to that given purchaser, region, or time period are found to differ significantly and those sales to the given purchaser, region, or time period pass the price difference test.

Next, the "ratio test" assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test. The ratio test calculates the ratio of the total value of sales that pass the price difference test to the total value of sales by the respondent in the United States during the [period of investigation]. If [33%] or less of the total value of sales passes the price difference test, then the results of the price difference and ratio tests do not support consideration of the A-to-T method. If more than [33%] of the total value of U.S. sales passes the price difference test, then Commerce will find that a pattern of prices existed during the [period of investigation]. Consequently, Commerce will examine whether there is a meaningful difference in the weighted-average dumping margins calculated using the standard A-to-A method and using the alternative A-to-T method.

If both tests in the first stage (i.e., the price difference test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that the A-to-T method could be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the A-to-A method can account for such differences. In considering this question, Commerce examines whether using the A-to-T method yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-to-A method. If the difference between the two calculations is meaningful, then this demonstrates that the A-to-A method cannot account for differences in the respondent's pricing behavior in the U.S. market, such as those observed in this analysis, and, therefore, use of the A-to-T method may be appropriate. A difference in the weighted-average dumping margins is considered meaningful if: (1) there is a [25%] relative change in the weighted-average dumping margins between the A-to-A method and the A-to-T method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-to-A method and the A-to-T method move across the *de minimis* threshold.

Second Remand Redetermination at 9–11.

Commerce determined that 38.18% of the value of U.S. sales passed the "price difference test." Second Remand Redetermination at 12. Commerce stated that this "confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods." Id. (citing Less-than-Fair-Value Investigation of Utility Scale Wind Towers from Canada: Remand Calculation Memorandum for Marmen Energy Co. (Dep't of Commerce Nov. 21, 2025) ("Marmen Second Remand Calculation"), ECF No. 110, SRPR 2). In the Second Remand Redetermination, Commerce determined that the A-to-A method could not account for such differences "because the weighted-average dumping margin crosses the *de minimis* threshold when calculated using the A-to-A method and when calculated using the A-to-T method." Id. Accordingly, Commerce applied the A-to-T method to calculate the weighted-average dumping margin for Marmen. Id.

Marmen advances two arguments that Commerce unlawfully used only the A-to-T price comparison method, rather than the A-to-A comparison method, when calculating Marmen's dumping margin. Pls.' Cmts. Opp'n Final Results Redeterm. Pursuant Court Remand ("Pls.' Br.") at 2, 5–12, ECF No. 105. First, Marmen contends that Commerce's 2% "price difference test" is: (1) "inconsistent with the best reading of the statutory requirements for using the A-to-T method under the standard of review articulated in [Loper Bright Enters. v. Raimondo

Consol. Court No. 20-00169                                         Page 11

("Loper Bright"), 603 U.S. 369 (2024)]; and (2) fails to satisfy [Congress'] intent

for a case-by-case differential pricing analysis . . . thereby producing arbitrary

results." Id. at 2 (citation omitted).  Second, Marmen avers that Commerce's

decision to modify step two of its differential pricing analysis by applying the ratio

test and discontinuing the mixed method was not in accordance with law because:

(1) Commerce's methodological change was outside the bounds of the CAFC's

Opinion in Marmen III; (2) Commerce's methodological change was

impermissible on remand; and (3) Commerce erred by failing to provide an

adequate explanation for its "ratio test." Id. at 3, 12–19.

Defendant argues that the Court should sustain the Second Remand

Redetermination because it is in accordance with law, supported by substantial

evidence, and complies with the CAFC's Opinion in Marmen III.  Def.'s Cmts.

Supp. Remand Redeterm. ("Def.'s Br."), ECF No. 108.  Defendant avers that

Loper Bright does not disturb the standard for reviewing Commerce's differential

pricing analysis and argues that Congress intended to delegate authority to

Commerce.  Id. at 10–14.  Defendant contends that Marmen's argument regarding

the 2% "price difference test" is unsupported and avers that the 2% threshold in the

"price difference test" is consistent with Congress' intent to require a case-by-case

analysis of price differences.  Id. at 14–20.  As to Marmen's second argument,

Defendant avers that the discontinuance of the mixed method is supported by

substantial evidence and otherwise in accordance with law.  Id. at 20–31.

The relevant standard for reviewing Commerce's selection of statistical tests

and numerical cutoffs is reasonableness.  See Stupp, 5 F.4th at 1353 ("Our

precedents make clear that the relevant standard for reviewing Commerce's

selection of statistical tests and numerical cutoffs is reasonableness, not substantial

evidence.") (citing Mid Continent Steel & Wire, Inc. v. United States, 940 F.3d

662, 667 (Fed. Cir. 2019) ("In carrying out its statutorily assigned tasks,

Commerce has discretion to make reasonable choices within statutory

constraints."); Apex Frozen Foods Priv. Ltd. v. United States ("Apex Frozen

Foods"), 862 F.3d 1337, 1346 (Fed. Cir. 2017) (holding Commerce's "meaningful

difference" test to be "reasonable")).  Further, the CAFC applied a

"reasonableness" standard in evaluating whether it was "unreasonable for

Commerce to use [the] Cohen's $d$ test as part of its differential pricing analysis[.]"

Marmen III, 134 F.4th at 1345.  Accordingly, the Court reviews Commerce's

Second Remand Redetermination and its "price difference test" under the

reasonableness standard.

Commerce shall determine whether subject merchandise is being sold at less

than fair value:

(i) by comparing the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise, or

(ii) by comparing the normal values of individual transactions to the export prices (or constructed export prices) of individual transactions for comparable merchandise.

19 U.S.C. § 1677f-1(d)(1)(A).  Section 1677f-1(d)(1)(B) provides an exception,

when Commerce:

may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if—

(i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and

(ii) the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii).

Id. at § 1677f-1(d)(1)(B).

Congress implemented subsection (d) to address the concern that the A-to-A method for calculating dumping margins "could conceal 'targeted dumping.'" Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, vol. 1 at 842–83 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4177–78 ("SAA").  Under subsection (d), Commerce is allowed to calculate dumping margins using the A-to-T method in situations when the A-to-A method

Consol. Court No. 20-00169                                              Page 14

"cannot account for a pattern of prices that differ significantly among purchasers,

regions, or time periods, i.e., where targeted dumping may be occurring[,]" but

only after Commerce first "establish[es] and provide[s] an explanation why it

cannot account for such differences through the use of [the A-to-A method]."  Id.

at 4178 (emphasis omitted).  The SAA provides that "Commerce will proceed on a

case-by-case basis, because small differences may be significant for one industry

or one type of product, but not for another."  Id.  "The rationale behind that

statutory exception is that targeted dumping is more likely to be occurring when

export prices fit a pricing model that differs significantly among different periods

of time, different purchasers, or different regions of the United States."  Stupp, 5

F.4th at 1345 (citing Apex Frozen Foods, 862 F.3d at 1347).

In the Second Remand Redetermination, Commerce discontinued its

application of the Cohen's $d$ test and instead applied a new "price difference test"

as the first step in Commerce's differential pricing analysis following Marmen III.

See Second Remand Determination at 10.  Under the "price difference test," if:

> the weighted-average net price to the given purchaser, region, or time
> period falls outside of the plus or minus [2%] band around the
> weighted-average net price to all other purchasers, regions, or time
> periods, then the prices to that given purchaser, region, or time period
> are found to differ significantly and those sales to the given purchaser,
> region, or time period pass the price difference test.

Consol. Court No. 20-00169                                          Page 15

Id. Commerce explained that it chose the 2% threshold because it is the same threshold used in the arm's length test conducted pursuant to 19 C.F.R. § 351.403(c), when "Commerce evaluates whether sale prices made by a respondent to an affiliated party in the comparison market are within the ordinary course of trade and, therefore, usable in Commerce's [normal value] calculation. Id. at 14–15; see 19 C.F.R. § 351.403(c). In evaluating arm's length transactions, the Second Remand Redetermination explained that Commerce will find that sale prices to an affiliated customer in the comparison market are not at arm's length and fall outside the ordinary course of trade "if the average, product specific, comparison market prices to an affiliated customer are not within a range of [98%] to [102%] of the average, product-specific, comparison market prices to unaffiliated customers[.]" Id. at 15. Commerce reasoned that "the [2%] threshold as used in the arm's-length test and the [2%] threshold as used in the price difference test both seek to determine whether a respondent's pricing behavior . . . could affect Commerce's calculation of a respondent's weighted-average dumping margin." Id. As support, Commerce cited to Large Diameter Welded Pipe from the Republic of Turkey, 84 Fed. Reg. 6,382 (Dep't of Commerce Feb. 27, 2019) (Final Determination of Sales at Less-Than-Fair-Value), when Commerce determined that "average prices to an affiliated customer that differ by at least [2%], and therefore fail the arm's-length test, 'differ significantly'

from home market prices." Id.  As further support for the 2% threshold in the "price difference test," Commerce explained that pursuant to 19 U.S.C. §§ 1673b(b)(3) and 1673d(a)(4), the *de minimis* threshold for an estimated weighted-average dumping margin is 2% and has been synonymously referred to by Commerce as a "significant" amount of dumping.  Id. at 15–16; see 19 U.S.C. §§ 1673b(b)(3), 1673d(a)(4).

Plaintiffs argue that Commerce's "price difference test" fails to establish that prices "differ significantly" as required by 19 U.S.C. § 1677f-1(d)(1)(B).  Pls.' Br. at 8.  Plaintiffs contend that Commerce's reliance on Garg Tube Export LLP v. United States, 48 CIT __, 740 F. Supp. 3d 1355 (2024) in the Second Remand Redetermination is misplaced, alleging that the statutory interpretation analysis was overruled by the CAFC's Opinion in the Marmen III.  Id. at 9.

The CAFC has affirmed Commerce's use of the *de minimis* threshold in another part of the differential pricing test, the "meaningful difference test."  See Apex Frozen Foods, 862 F.3d at 1346 ("[W]e agree that the difference in the actual antidumping rates that would be assessed—below *de minimis* when calculated with the [A-to-A] methodology; above *de minimis* when calculated using an alternative methodology—indeed informs the question of whether the [A-to-A] methodology can adequately account for a pattern of significant price differences 'because [A-to-A] masked the dumping that was occurring as revealed by the [A-to-T]

calculated margin.'") (quoting Apex Frozen Foods Priv. Ltd. v. United States, 40

CIT __, __, 144 F. Supp. 3d 1308, 1333 n.24 (2016)).

Based upon the explanation offered by Commerce in the Second Remand

Redetermination and the CAFC's Opinion in Marmen III, the Court concludes that

Commerce's adoption of the 2% threshold in the first stage of its differential

pricing analysis in the new "price difference test" is reasonable and complies with

Marmen III.  Because Commerce adequately explained how its methodology was

reasonable, the Court holds that Commerce's application of the "price difference

test" to determine whether there is a pattern of prices for comparable merchandise

that differ significantly among purchasers, regions, or time periods, applied as a

component of its differential pricing analysis, is in accordance with law.

In the Second Remand Redetermination, Commerce "discontinued the use of

the 'mixed method' in administrative proceedings" and applied the "ratio test" as

step two of its differential pricing analysis.  Second Remand Redetermination at 8,

10–11 (citation omitted).  The "ratio test" "assesses the extent of the significant

price differences for all U.S. sales as measured by the price difference test" by

calculating the ratio of the total value of sales that pass the "price difference test"

to the total value of sales by the respondent in the U.S. during the period of

investigation.  Id. at 10.  If "[33%] or less of the total value of sales passes the

price difference test, then the results of the price difference and ratio tests do not

Consol. Court No. 20-00169                                                    Page 18

support consideration of the A-to-T method." Id. However, "[i]f more than [33%]

of the total value of U.S. sales passes the price difference test, then Commerce will

find that a pattern of prices existed during the [period of investigation]." Id. at 10–

11. Commerce will then "examine whether there is a meaningful difference in the

weighted-average dumping margins calculated using the standard A-to-A method

and using the alternative A-to-T method." Id. at 11.

Plaintiffs argue that Commerce unlawfully lowered the threshold for

applying the A-to-T comparison method in the "ratio test" from 66% to 33%. Pls.'

Br. at 12. Plaintiffs contend that Commerce's modification and abandonment of

the "mixed method" is unlawful because: (1) the policy change exceeded the scope

of Marmen III because of the CAFC's concern about overuse of the A-to-T

methodology; (2) the change is the type of modification that has been held

impermissible on remand; and (3) Commerce independently erred by failing to

provide an adequate explanation for its modification of the "ratio test." Id.

In Marmen III, the CAFC concluded that, on remand:

Commerce may re-perform a differential pricing analysis, and that
analysis may not rely on [the] Cohen's $d$ test for data sets like those
here. This conclusion, of course, does not preclude Commerce from
fashioning and justifying a statistical analysis that uses some of the
ideas underlying Cohen's analysis of group differences as long as the
resulting analysis is itself justified as sound for gauging differences in
the data sets at issue.

134 F.4th at 1348.  In the Second Remand Redetermination, Commerce explained

that the "mixed method" was "not statutorily required, and to align more closely

with the statute, Commerce has discontinued the mixed method as a matter of

administrative practice for all of its administrative proceedings."  Second Remand

Redetermination at 22–23.  Specifically, Commerce stated that "[w]hile the statute

permits Commerce's previous policy that adopted a hybrid version of the two

available comparison methodologies," Section 1677f-1(d)(1)(B) "permits

Commerce to use the A-to-T method when certain conditions . . . are satisfied."  Id.

at 22.

　　　　Section 1677f-1(d)(1)(B) provides that Commerce may apply the A-to-T

method, rather than the A-to-A method, if there is a pattern of export prices that

differ significantly among purchasers, regions, or periods of time, so long as

Commerce "explains why such differences cannot be taken into account using a

method described in paragraph (1)(A)(i) or (ii)."  19 U.S.C. § 1677f-1(d)(1)(B).

The exception in Section 1677f-1(d) refers to determining margins through the A-

to-A methodology or the A-to-T methodology and makes no reference to a "mixed

method" when Commerce applies both.  See id. § 1677f-1(d).  This absence of

statutory language referring to a mixed method supports Commerce's

determination to discontinue the use of its "mixed method."

Additionally, the SAA refers to the use of one methodology over the other but makes no reference to the simultaneous application of the A-to-A method and the A-to-T method.  See SAA at 842–843, 1994 U.S.C.C.A.N. at 4178.[2]  Plaintiffs argue that Commerce impermissibly "reopen[ed] a settled issue (the ratio test) on remand[]" because the CAFC has held previously that "'Commerce's selection of the 33% and 66% cutoffs is a reasonable choice'" as it provided a middle ground between 33% and 66% in which the A-to-T method is only partially applied.  Pls.' Br. at 14 (quoting Stupp, 5 F.4th at 1355) (citing Zhaoqing Tifo New Fibre Co. v. United States, 41 CIT __, __, 256 F. Supp. 3d 1314, 1334 (2017)).  However, Commerce's departure from the "mixed method" and application of the "ratio test" was a direct result of the CAFC's Opinion in Marmen III, when Commerce was directed to "re-perform a differential pricing analysis" and was not precluded from "fashioning and justifying a statistical analysis that uses some of the ideas underlying Cohen's analysis of group differences as long as the resulting analysis is itself justified as sound for gauging differences in the data sets at issue." Marmen III at 1348.

---

[2] "New section 777A(d)(1)(B) provides for a comparison of average normal values to individual export prices or constructed export prices in situations where an [A-to-A] or [T-to-T] methodology cannot account for a pattern of prices that differ significantly among purchasers, regions, or time periods, i.e., where targeted dumping may be occurring."  SAA at 843, 1994 U.S.C.C.A.N. at 4178.

Consol. Court No. 20-00169                                                    Page 21

Relying on the statutory language and the legislative history, the Court concludes that Commerce permissibly revised its differential pricing analysis to discontinue use of the "mixed method" and to apply the "ratio test" in accordance with Marmen III.  The Court observes that the CAFC has previously upheld the "ratio test" as a reasonable method for Commerce to implement the statutory requirement to determine whether there is a pattern of export prices that differ significantly among purchasers, regions, or periods of time.  Stupp, 5 F.4th at 1355.  The Court concludes that Commerce provided a reasonable explanation for abandoning the "mixed method" and applying the "ratio test," and that Commerce complied with the CAFC's Opinion in Marmen III.  Ad Hoc Shrimp, 38 CIT at __, 992 F. Supp. 2d at 1290.  Because Commerce adequately explained how its methodology was reasonable, the Court holds that Commerce's application of the "ratio test" to determine the extent of the significant price differences of all U.S. sales as measured by the "price difference test" applied as a component of its differential pricing analysis is in accordance with law.

In the "meaningful difference test," which is the third step of Commerce's differential pricing analysis, if both the "price difference test" and the "ratio test" demonstrate the existence of a pattern of prices that differ significantly "such that the A-to-T method could be considered, Commerce "examines whether using only the A-to-A method can account for such differences." Second Remand

Redetermination at 11.  Commerce accomplished the "meaningful difference test"

by examining whether "the A-to-T method yields a meaningful difference in the

weighted-average dumping margin as compared to that resulting from the use of

the A-to-A method."  Id.  A difference in the weighted-average dumping margins

is considered "meaningful" if: "(1) there is a [25%] relative change in the weighted

average dumping margins between the A-to-A method and the A-to-T method

where both rates are above the *de minimis* threshold; or (2) the resulting weighted-

average dumping margins between the A-to-A method and the A-to-T method

move across the *de minimis* threshold."  Id.

In the Second Remand Redetermination, Commerce applied the A-to-T

method to calculate Marmen's weighted-dumping margin.  Id. at 12.  Applying its

"price difference test," Commerce determined that 38.18% of the value of U.S.

sales passed, confirming the existence of a pattern of prices that differ significantly

among purchasers, regions, or time periods.  Id. (citing Marmen Second Remand

Calculation).  As to the "ratio test" application, Commerce determined that the A-

to-A method could not account for such differences because "the weighted-average

dumping margin crosses the *de minimis* threshold when calculated using the A-to-

A method and when calculated using the A-to-T method."  Id.  Commerce applied

the "meaningful difference test" and calculated the weighted-average dumping

margins using both the A-to-A method and the A-to-T method, with the A-to-A

method resulting in a 1.22% weighted-average dumping margin, and the A-to-T

method resulting in a 2.93% weighted-average dumping margin.  Marmen Second

Remand Calculation at 3.

In summary, Commerce conducted the differential pricing analysis here in

three steps: the new "price difference test," the "ratio test," and the "meaningful

difference test."  The CAFC has held previously that Commerce's "ratio test"

"reasonably implements the statutory requirement that Commerce determine

whether there is a 'pattern of export prices' 'differ[ing] significantly among

purchasers, regions, or periods of time' before selecting the [A-to-T]."  Stupp, 5

F.4th at 1355 (alteration in original) (quoting 19 U.S.C. § 1677f-1(d)(1)(B)(i)).

The CAFC reasoned that the "ratio test" is a "conventional method for quantifying

comparisons across discrete groups: counting the number of divergent sales prices,

as identified by an effect-size test, and calculating the population percentage of

those divergent sales prices."  Id. at 1354.  The CAFC further held that

Commerce's selection of the 33% and the 66% cutoffs in the "ratio test" is

reasonable.  Id. at 1354–55.  The CAFC has also held that the "meaningful

difference test," step three of the differential pricing analysis, is reasonable.  Id. at

1356 (citing Apex Frozen Foods, 862 F.3d at 1348–49); see also Toyo Kohan Co.,

Ltd. v. United States, 50 CIT __, Slip Op. 26-54 (May 22, 2026) (sustaining

Commerce's differential pricing analysis using the new "price difference test"

instead of the Cohen's *d* test after Marmen III).

With respect to the new "price difference test" that replaced the Cohen's *d*

test and is the first step in Commerce's differential pricing analysis, Commerce

explained that the "price difference test" is intended to determine whether prices

differ significantly among purchasers, regions, or time periods.  Second Remand

Redetermination at 10, 14–17.  Commerce stated that if average prices to an

affiliated customer differ by at least 2% from market prices, then Commerce

considers that 2% threshold to be a significant difference.  Id. at 15.  As noted

above, the CAFC in Stupp held that Commerce's selection of statistical tests and

numerical cutoffs must be reasonable.  Stupp, 5 F.4th at 1353.

In Commerce's new "price difference test," Commerce determined that a 2%

difference in pricing would be considered significant.  Because Commerce applied

the new "price difference test" on a case-by-case basis and determined that 38.18%

of the value of U.S. sales passed the "price difference test," Commerce reasonably

determined that prices differed significantly.  Second Remand Redetermination at

9.  Accordingly, the Court concludes that Marmen's arguments that the "price

difference test" is inconsistent with the best reading of the statutory requirements

for using the A-to-T method and fails to satisfy Congress' intent for a case-by-case

differential pricing analysis thereby producing arbitrary results, are not persuasive.

Consol. Court No. 20-00169                                          Page 25

Moreover, Marmen's argument that the "ratio test" and change in methodology by discontinuing the "mixed method" as an alternative comparison methodology was not in accordance with law is not persuasive.  The CAFC stated in <u>Marmen III</u> that Commerce could revisit its differential pricing analysis, which is what Commerce did on second remand in this case.  <u>Marmen III</u>, 134 F.4th at 1348 ("Commerce may re-perform a differential pricing analysis[.]").  Commerce's determination to alter its "mixed method" within its differential pricing analysis was reasonable when refashioning a new analytical framework to implement 19 U.S.C. § 1677f-1(d)(1)(B).

The Court concludes that Commerce's determination is reasonable and sustains the differential pricing analysis.

## CONCLUSION

For the foregoing reasons, Commerce's <u>Second Remand Redetermination</u> is sustained.  Judgment will be entered accordingly.

/s/  Jennifer Choe-Groves

Jennifer Choe-Groves, Judge

Dated:   June 15, 2026
         New York, New York